## Docket No. 23-4031

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

OLYMPUS SPA, MYOON WOON LEE, SUN LEE,
JANE DOE, patron and JANE DOES, employees 1-3,

*Plaintiffs-Appellants,*

v.

ANDRETA ARMSTRONG, Executive Director of the
Washington State Human Rights Commission and MADISON IMIOLA,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the Western District of Washington,*
*No. 2:22-cv-00340-BJR · Honorable Barbara Jacobs Rothstein*

## APPELLANTS' OPENING BRIEF

KEVIN T. SNIDER, ESQ.
MATTHEW MCREYNOLDS, ESQ.
PACIFIC JUSTICE INSTITUTE
9851 Horn Road, Suite 115
Sacramento, California 95827
(916) 857-6900 Telephone
(916) 857-6902 Facsimile
ksnider@pji.org
mattmcreynolds@pji.org

*Attorneys for Appellants,*
*Olympus Spa, Myoon Woon Lee,*
*Sun Lee, Jane Doe and Jane Does*

 COUNSEL PRESS INC. · (213) 680-2300          PRINTED ON RECYCLED PAPER 

## CORPORATE DISCLOSURE STATEMEMT

Pursuant to Fed. R. App. Proc. 26.1(a), Appellant, Olympus Spa, affirms

that it has no parent corporation and that it does not issue stock.

/s/ Kevin T. Snider
Kevin T. Snider

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................... iv

STATEMENT OF JURISDICTION............................................... 1

ISSUES PRESENTED FOR APPEAL........................................... 1

STATUTORY AUTHORITIES ...................................................... 2

STATEMENT OF THE CASE......................................................... 2

STATEMENT OF THE FACTS .................................................... 3

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 8

ARGUMENT ............................................................................ 11

    I. STANDARD OF REVIEW IS *DE NOVO* ................................. 11

    II. CITIZENS HAVE CONSTITUTIONAL RIGHTS WHILE ENGAGED IN
       COMMERCIAL ENTERPRISE ................................................ 11

    III. THE SPA WAS BOTH CENSORED BY THE STATE FOR POSTING THE
        STATEMENT THAT "BIOLOGICAL WOMEN ARE WELCOME," AND
        COMPELLED TO EMBRACE A CONTRADICTORY MESSAGE ................. 14

        A. The district court correctly held that the Spa's assertion of
           constitutional injury from self-censorship more than sufficed
           for Article III standing.................................................. 14

        B. The State's mandated censorship of the Spa's website is content
           and viewpoint discrimination, is presumptively unconstitutional,
           and should have been subjected to strict scrutiny ........................ 15

        C. The State's requirement that the Spa change its message and
           embrace contrary ideology and expression should further be
           viewed as unconstitutional compelled speech.............................. 16

D. The district court's reliance on overturned and inapposite decisions to deem the curtailment of the Spa's speech merely "incidental" is unsupportable ....................................... 17

E. The intermediate-level *O'Brien* test for symbolic speech is a poor fit, but the Spa can overcome even that hurdle.................... 20

IV. THE SPA'S RIGHTS TO THE FREE EXERCISE OF RELIGION WAS SUBSTANTIALLY BURDENED BY THE APPLICATION OF THE PUBLIC ACCOMMODATION LAWS...................................................... 25

V. THE SPA'S FREEDOM OF ASSOCIATION WAS VIOLATED BY THE APPLICATION OF THE PUBLIC ACCOMMODATION LAW........................ 32

A. The State's coercion to force males into the intimate spaces of females interferes with the Spa's right to enjoy intimate association ................................................................. 33

B. Application of the public accommodation laws changes the Spa's message and serves to interfere with the Spa's enjoyment of expressive association ............................................... 38

CONCLUSION ............................................................. 41

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Ellinas*,
    6 F.4th 1160 (10th Cir. 2021) ...................................................... 17, 18, 23

*303 Creative LLC v. Elenis*,
    143 S.Ct. 2298 (2023) ........................................................... 12, 15, 16, 20

*Arlene's Flowers, Inc. v. Washington*,
    138 S.Ct. 2671 (2018) ............................................................................ 39

*Barnes v. Glen Theater*,
    501 U.S. 560 (1991) .......................................................................... 20, 24

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) ............................................................... 32, 33, 34, 39

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000) ............................................................................... 16

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ............................................................................... 13

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ......................................................................... 31, 32

*Daniel v. Paul*,
    395 U.S. 298 (1969) ............................................................................... 34

*Employment Div., Dep't of Hum. Res. of Or. v. Smith*,
    494 U.S. 872 (1990) ................................................................. 9, 29, 30, 41

*Fair Hous. Council v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2011) ............................................. 33, 34, 35, 35

*Fulton v. Philadelphia*,
    141 S.Ct. 1868 (2021) ...................................................................... 28, 30

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949).......................................................... 17, 19

*Green v. Miss USA, LLC*,
   52 F.4th 773 (9th Cir. 2022) ...........................................*passim*

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
   565 U.S. 171 (2012)................................................................ 30

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995)......................................................... 16, 23

*Lawrence v. Texas*,
   539 U.S. 558 (2003)................................................................ 37

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
   138 S.Ct. 1719 (2018)......................................... 13, 23, 31, 39

*Minnesota v. Olson*,
   495 U.S. 91 (1990).................................................................. 36

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S.Ct. 2361 (2018) .....................................................*passim*

*Our Lady of Guadalupe School v. Morrissey-Berru*,
   140 S.Ct. 2049 (2020)............................................................ 30

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)................................................................ 15

*Riley v. Fed'n of Blind of N.C., Inc.*,
   487 U.S. 781 (1988)................................................................ 16

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)......................................... 10, 33, 34, 38

*Sullivan v. Little Hunting Park, Inc.*,
   396 U.S. 229 (1969)................................................................ 34

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014).................................................................. 14

*United States v. O'Brien,*
    391 U.S. 367 (1968).................................................................. 20

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976).................................................................. 13

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)............................................................. 17, 18

*West Va. Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)........................................................ 16, 25, 35

*Wilson v. Lynch,*
    835 F.3d 1083 (9th Cir. 2016) .................................................. 11

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)............................................................. 28, 29

## CONSTITUTIONAL PROVISIONS

Wash. Const., art. I, § 11.............................................................. 8

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1331 ........................................................................ 1

29 U.S.C.S. § 621 ..................................................................... 30

42 U.S.C. § 1983 ........................................................................ 1

42 U.S.C. § 12101 .................................................................... 30

Fed. R. Civ. P. 12(b)(1)............................................................. 2

Fed. R. Civ. P. 12(b)(6)............................................................ 1, 2, 11

Fed. R. Civ. P. 25(d) ................................................................. 2

**STATE STATUTES AND REGULATIONS**

Colo. Rev. Stat. § 24-34-401 .................................................. 30

Colo. Rev. Stat. § 24-34-601 .................................................. 12

N.J. Stat. § 10:5-4.................................................................. 30

Or. Rev. Stat. Ann. § 659A.403 ............................................. 37

Philadelphia, Pa. Code § 9-1102 ............................................ 30

Wash. Rev. Code § 49.60 (WLAD)........................................ 6, 7

Wash. Rev. Code § 49.60.040(2)............................................ 32

Wash. Rev. Code § 49.60.040(26).......................................... 20

Wash. Rev. Code § 49.60.040(27).................................... 5, 12, 20

Wash. Rev. Code § 49.60.30(1).............................................. 27

Wash. Rev. Code § 49.60.30(1)(b) ......................................... **27**

## STATEMENT OF JURISDICTION

The U.S. District Court for the Western District of Washington had original jurisdiction over this case under 28 U.S.C. § 1331 in that the Complaint alleged violations of the U.S. Constitution actionable under 42 U.S.C. § 1983.

The judgment and order appealed from are final under Fed. R. Civ. P. 12(b)(6) and 28 U.S.C. § 1291 in that the district court granted the Defendants' motion to dismiss with prejudice and without leave to amend. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR APPEAL

**Issue I:** A business, operating as a nude women's spa, published on its website a policy that its facility "welcomes biological women." Does a state actor's directive that the policy be removed or the spa be referred for prosecution constitute a content-based restriction on speech?

**Issue II:** Owners of a women's spa hold religious convictions that men and women should not be present together while unclothed unless married to one another. By not allowing males access to the facilities, the spa violates Washington's public accommodation laws. Can a claim be stated under the First Amendment based on the substantial burden imposed on the free exercise of religion?

1

**Issue III:** Does a traditional Korean women's spa owned by Christians enjoy associational rights allowing it to prevent biological males from using its facility?

## STATUTORY AUTHORITIES

All constitutional provisions, statutes, and court rules cited herein appear in the Addendum to this Brief.

## STATEMENT OF THE CASE

On or about March 22, 2022, Plaintiffs filed a verified complaint against the Executive Director of Washington's Human Rights Commission, Sharon Ortiz. 3-ER-413. The State subsequently moved for dismissal under Rule 12(b)(1) and (6) alleging that Plaintiffs lacked standing and that the claims did not meet the requirements of law. 3-ER-383–476. The Court found standing for the harms or threat of harm from the Commission and denied the 12(b)(1). The Court sustained the Defendant's 12(b)(6) motion but granted Plaintiffs leave to file an amended complaint. 3-ER-267–306. The Plaintiffs did so file on July 6, 2023, adding the Commission's investigator, Madison Imiola, as a defendant and two more claims, one for due process and the other under the Washington Constitution. 2-ER-122–192.[1] The Defendants once again moved to dismiss. 2-ER-101–120. The district

---

[1] A new Executive Director, Andreta Armstrong, replaced Sharon Ortiz pursuant to Fed. R. Civ. P. 25(d).

court dismissed the Amended Complaint with prejudice on November 13, 2023. 1-ER-3–15. Judgment was entered on November 15, 2023. 1-ER-2. Plaintiffs timely filed a notice of appeal on December 6, 2023. 3-ER-479–81.

## STATEMENT OF THE FACTS

For many generations traditional Korean spas have operated and catered to women only. There are but two such spas in the entire State of Washington operated by a family-owned business for more than twenty years. 2-ER-163. These facilities are called Olympus Spa.[2]

The Spa provides Korean body scrubs referred to as *seshin*, massages, and a place to relax in a steamed quality room which is a combination of a bath house and sauna called a *jjimjilbang*. *Seshin* is an age-old body scrub technique requiring lengthy soaking while fully nude, in a warm pool to soften skin in order to allow and enhance total skin exfoliation. *Id*. The massages are given in the open while nude amongst approximately five tables with viche showers. 3-ER-362. A female receiving a Korean body scrub service or massage at the Spa must do so unclothed. This is required of the patron. 2-ER-163. Women specifically seek the boutique services of the Spa. Among the patrons are girls as young as thirteen years old who come with their mothers. 2-ER-225. The employees who provide body scrubs and

---

[2] The plaintiffs will be referred to jointly as "Spa." When appropriate, separate references to the owners, employee and patron plaintiffs will be so indicated.

massages are all females and are called *ddemiri*. It is the Spa's business purpose to

provide traditional Korean kiln saunas and exfoliation therapy experiences. 2-ER-

163. The president of the Spa explains the following:

> We are a Korean Spa that is also based on Korean traditional values. Therefore, anyone who enters our spa understands that we operate our spa in Korean style. Preserving culture is important to us as our culture continues to be reduced and marginalized. We are the only Korean spa in the state and if we close our doors our culture is forever lost. Everyone has been ethical, respectful, and appreciated our "Korean Traditional Spa." Korean traditional Spa means it provides female spa separately at their comforts. Also, the Korean body scrub has been always served by the same gender over hundreds of years. A service provider never serves a Korean body scrub to an opposite-sex customer. Our ethnicity and creed is being discriminated against.

2-ER-225. Entrance into the Spa by a patron is not casual. Before accessing the

Spa where the whirlpools, saunas, and services are located, the Spa requires the

patron to sign in and wait in an ante-room. After that, the patron goes into a private

changing room. Then a patron enters the main area where the hallways lead to the

restaurant and sweat rooms. Finally, the patron can access the whirlpools, saunas,

and other services. Entrants are vetted at each entry point to ensure they are

female.[3]

---

[3] In order to provide needed clarity, the Amended Complaint and Appellants' brief provides definitions as follows:
*Male*: a person whose genitals are external (Unless a modifier indicates otherwise, all references to "man" or its cognates refers to a *male*).
*Female:* a person whose genitals are internal (Unless a modifier indicates otherwise, all references to "woman" or its cognates refers to a *female*).

The Spa tethers its business model to Korean tradition and the Christian faith of the owners:

> According to our religion, man and woman are created differently. Our spa is designed specifically for women and our mission is to restore and rejuvenate women's physical health as well as spiritual health. Some customers think of our spa as a healing place for victims of sexual assault, especially by men. Some of our spa employees choose to work here because they felt safe. Our cultural heritage and our beliefs are an integral part of who we are. By adopting policies that violate both of these our heritage and beliefs will be lost. Women are in a vulnerable position when they are unclothed and/or having treatment while unclothed and we seek to ensure that they feel their privacy and rights are respected. This is a biblical principle from 1 Peter 3:7, 1 Timothy 3:1-7, 1 Timothy 5:2, Phillipians 4:3 [*sic*], Genesis 1:27, Proverbs 31:17, Phillipians 2:3 [*sic*] and more.

2-ER-224. There have been incidents involving pre-operative transgender individuals who presented male in the nude. These individuals were asked to leave the Spa, and no complaint to the Washington's Human Rights Commission ensued. 2-ER-223. This has been an amicable and respectful manner in which to deal with actual confrontations where the competing interest of multiple protected classes of persons intersect.

---

*Gender expression or identity*: having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth. Wash. Rev. Code § 49.60.040(27).
*Transgender woman*: a person who is biologically male but identifies as a woman.
*Transgender man*: a person who is biologically female but identifies as a man. 2-ER-123–24.

An individual ("complainant") who self-describes as a transgender woman, is at all relevant times a biological male who has not undergone sex reassignment surgery, but nonetheless identifies as a woman. The complainant alleged that the "[o]wner denied me services and stated that transgender women without surgery are not welcome because it could make other customers and staff uncomfortable." 2-ER-155.

On November 24, 2020, the Commission served its Notice of Complaint of Discrimination. 2-ER-157–58. Then on March 25, 2021, the Spa responded to the Commission denying that it's women-only rule violates Wash. Rev. Code § 49.60. The Spa stated that the nudity requirement is consistent with administrative and county codes and protects minors while allowing vaginally presenting transgender women to gain access because they can be reasonably accommodated. 2-ER-163–65. In addition, the Spa published on its website "OLYMPUS Spa Entry Policy." The language reads in full, "Biological women are welcome. It is the policy of Olympus Spa not to discriminate on the basis of race, color, national origin, sex, age or disability in its programs or activities, as required by applicable laws and regulations." 2-ER-166.

Despite no proof that the complainant ever set foot in either of the Spa's locations, in a letter dated April 14, 2021, the Commission deemed the Spa as having violated the Washington Law Against Discrimination in a place of public

accommodation for two reasons: (1) Female Language on its website, and (2) Female Only Policy. 2-ER-168–69.

The Commission investigator wrote, "The WSHRC has already identified that Olympus Spa's 'biological women' entry policy is not compliant with the Washington Law Against Discrimination (WLAD), RCW § 49.60, which prohibits discrimination on the basis of gender identity in places of public accommodation." The investigator then gave an ultimatum to enter into a "Pre-Finding Settlement" or the investigator will "proceed accordingly by preparing the case for referral to the Attorney General's Office for prosecution." *Id*.

After review of the Commission's draft settlement agreement, the Spa inserted language to reserve it's right to bring a legal challenge as to the constitutionality of the signed agreement, the operative statutes and implementing regulations, and related policies of the Commission. The representative of the Commission sent a final draft to the Spa which included the reservation of right to bring a legal challenge. 2-ER-183–92.

The Spa, its owner, the president, an employee, and a patron filed suit in federal court as an exercise of that right bargained for by the parties, as well as to remedy the ongoing harm. 3-ER-413–76.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

A women's Korean spa provides traditional health treatments to female patrons. Situated in a private setting, nude women and girls as young as thirteen receive body scrubs, exfoliation, and massages. A man without bottom surgery who nonetheless identifies as a woman filed a complaint with Washington's Human Rights Commission due to the spa's refusal to grant him access to its services. Based on the Washington Law Against Discrimination, the Commission sided with the complainant, deeming the intimate spaces of unclothed female patrons as places of public accommodation, thus requiring female employees to work on the bodies of nude males. Not content with the inherent interference with the associational rights and religious exercise of women who hold traditional sensibilities, the Commission prohibited the spa from publishing on its own website its message that "biological women are welcome" at the spa.

By interpreting antidiscrimination laws so that males have visual and physical access to naked women and girls, the Commission extends public accommodation laws to the outer reaches of an absurd and unconstitutional frontier. As such, the district court's decision supporting the Commission should be reversed on the three First Amendment claims for the reasons set forth below.[4]

---

[4] The Plaintiffs are no longer pursuing Fourteenth Amendment claims for due process or the religious freedom claim under Article I, § 11 of the Washington Constitution.

*Freedom of Speech*—Use of an antidiscrimination law as a means to censor a message regarding biological women due to its inconsistency with government orthodoxy is a content-based restriction on speech. As a content-based restriction on speech, application of the law in this manner is subject to strict scrutiny review. *See*, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

*Free Exercise of Religion*—Requiring this business to grant a male visual and physical access to nude women and girls substantially burdens the exercise of the religious rights of the spa, its employees, and patrons who hold traditional religious sensibilities relative to the mixing of the sexes while in the nude. Though the antidiscrimination statutes and regulations are arguably neutral and of general applicability, the U.S. Supreme Court has issued post *Employment Div. v. Smith*, 494 U.S. 872 (1990), decisions in which application of neutral and generally applicable laws were subordinate to the religious liberties of persons and entities. Within the context of the violation of the religious liberties of the owners, female employees, and patrons, the application of state law which requires giving biological males access to the intimate spaces of nude women and girls inside the spa cannot be effectuated while maintaining fidelity to the competing right to the free exercise of religion.

9

*Freedom of Association*—The spa's purpose is to restore, rejuvenate, and bring spiritual health and renewal exclusively to females by providing services created in accordance with Korean traditions specifically for women and girls. Application of the Washington antidiscrimination law within a uniquely female environment, and within a specific cultural context, intrudes into women's choices to enter into and maintain intimate human relationships. The constitutional right of unclothed females to not associate with naked males where there is close physical and visual contact supersedes the desires of preoperative transgender women to enter those same intimate spaces on the basis of a public accommodation law. Beyond this, requiring the admittance of a biological male changes the message of the spa, namely, that males and females are different. *Roberts v. U.S. Jaycees,* 468 U.S. 609 (1984).

*Strict Scrutiny*—The Amended Complaint, inclusive of exhibits, alleges facts which when deemed as true sufficiently state a violation of the First Amendment rights described above. As a result, strict scrutiny applies to the actions of the State. The district court instead erred by use of rational basis review. For purposes of this appeal the Plaintiffs do not contest that the elimination of discrimination against transgender women *may* qualify as a compelling government interest. But even assuming a compelling government interest, the State must show that its statutory scheme and regulations are narrowly tailored. Though the State bears that

10

burden, the Plaintiffs offer that the State of Washington cannot meet the narrow tailoring requirement due to numerous statutory exemptions that it has carved out. These include bona fide clubs, a place of accommodation that "by its nature [is] distinctly private," fraternal organizations, and educational facilities. Because of these carve outs, the application of the antidiscrimination laws fails to meet the standards of narrow tailoring by use of the least restrictive means. The State could have provided the same statutory exemptions to the public accommodation law for these religious objectors who wish to exclude nude males in the intimate spaces of women and girls.

## ARGUMENT

### I. STANDARD OF REVIEW IS *DE NOVO*.

A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed *de novo*. *Wilson v. Lynch*, 835 F.3d 1083, 1090 (9th Cir. 2016). Likewise, constitutional claims are reviewed *de novo*. *Id*.

### II. CITIZENS HAVE CONSTITUTIONAL RIGHTS WHILE ENGAGED IN COMMERCIAL ENTERPRISE.

A threshold issue for all of the 1983 claims is whether for-profit entities enjoy First Amendment rights. The State weaves the thread of public accommodation laws into the fabric of its legal position asserting that voluntary entry into commercial activity serves as a waiver of First Amendment rights. 3-ER-314, 405–06. As a factual matter, the State has the chronology out of order. The

11

Spa's entrance into its commercial enterprise preceded the addition of *gender identity* to the public accommodation law by four years. RCW § 49.60.040(27). 3-ER-378.

Moving beyond the facts, the notion that persons seeking to make a living sign away their bundle of expressive rights when the government issues a business license (*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018)) cannot be reconciled with the language of the First Amendment which reads, "Congress shall make no law . . . prohibiting the free exercise [of religion] thereof; or abridging the freedom of speech, or the press; or of the right of the people peaceably to assemble." The reach of the State's position contemplates no limiting principle. Can the State expand waiver of constitutional rights for a professional license? How about issuance of a permit such as zoning?

It is the Spa's contention that a business does not shed its constitutional rights when it unlocks the doors of the store. The Supreme Court has rejected multiple attempts by federal, state, and local governments at disgorging constitutional rights of businesses or corporations. Just last term the high court rejected attempts by Colorado to limit the speech rights of a for-profit web-designer through its public accommodation laws.[5] *303 Creative LLC v. Elenis*, 143 S.Ct. 2298 (2023). The Supreme Court has made clear that persons engaged in

---

[5] Colo. Rev. Stat. § 24-34-601.

commercial enterprise have constitutional rights. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014). Of importance, the high court relied on Free Exercise of Religion caselaw to support its determination, though in the context of the Religious Freedom Restoration Act. A baker running a for-profit bakery enjoys free exercise rights. *See*, *e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719 (2018). Likewise, this Court recently stated in a case involving associational rights, "Nor . . . does it matter that the Pageant is a for-profit entity that engages in commerce." *Green v. Miss USA, LLC*, 52 F.4th 773, 788 (9th Cir. 2022). Surely "speech does not lose its First Amendment protection because money is spent." *Id.* (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976)).

Finally, by way of analogy, the business entity occupying real property to sell goods or services does not have to submit to warrantless searches by a sheriff's deputy. If the Fourth Amendment requirement of a warrant does not disappear due to the exchange of money between a business and customer, there is no principled reason why any of the other constitutional liberties of speech, religion, or association should vanish when the sign hanging on the door is flipped from *closed* to *open*.

Having established that business entities do not lose their constitutional liberties when they enter into commercial endeavors with the public, this Brief turns to a discussion of those liberties.

III. **THE SPA WAS BOTH CENSORED BY THE STATE FOR POSTING THE STATEMENT THAT "BIOLOGICAL WOMEN ARE WELCOME," AND COMPELLED TO EMBRACE A CONTRADICTORY MESSAGE.**

A. **The district court correctly held that the Spa's assertion of constitutional injury from self-censorship more than sufficed for Article III standing.**

Before reaching the substance of the free speech claim, the district court considered at some length and rejected the State's argument that the Spa lacked Article III standing because it agreed to self-censorship of its website in order to avoid prosecution. 3-ER-282. The district court responded similarly to another version of this argument on the merits, to the effect that the Spa's constitutional injury was self-inflicted. 3-ER-286–87. The district court's holdings in these respects hardly could have been otherwise: the Spa was required to excise the material modifier "biological" from its invitation to women, under threat of prosecution. Indeed, the Supreme Court has established a low threshold for asserting a First Amendment injury that the Spa more than clears here. *Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014).

For comparison, in *303 Creative* the plaintiff filed suit, worrying about enforcement of Colorado's public accommodations statute to her online web

14

design business, in which she declined to create content for same-sex weddings. Her worries, albeit without prior complaints or enforcement, coupled with Colorado's unwillingness to disavow possible future enforcement against her, were deemed sufficient to establish standing. *303 Creative*, 143 S.Ct. at 2308-2310. Here, Washington's enforcement of its public accommodation statute to censor and coerce the Spa's online speech is not just a fear—it is a fait d'accompli. It should therefore be beyond dispute that the Spa's speech was and is being curtailed by the State.

> **B. The State's mandated censorship of the Spa's website is content and viewpoint discrimination, is presumptively unconstitutional, and should have been subjected to strict scrutiny.**

There should be little doubt that censorship of a business's description of itself and its services, on its own website, constitutes "pure speech" under the First Amendment. *303 Creative*, 143 S.Ct. at 1213. Such content- and viewpoint-based censorship is presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Restrictions may be justified only if the government proves they are narrowly tailored to serve compelling state interests. *NIFLA,* 138 S.Ct. at 2371. This is a "stringent standard." *Id.*

While the State is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either

15

purpose may strike the government. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 643 (2000).

### C.  The State's requirement that the Spa change its message and embrace contrary ideology and expression should further be viewed as unconstitutional compelled speech.

Like censorship, compelled speech is the equally anathema other side of the same content- and viewpoint-based coin. "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. [Citations omitted.] All that offends the First Amendment just the same." *303 Creative*, 143 S.Ct. at 2312. *Accord, NIFLA,* 138 S.Ct. at 2371.

The State's mandate constitutes forbidden compelled speech in at least three distinct ways. First, it controlled the way that the Spa began its conversation with and about women. *Riley v. Fed'n of Blind of N.C., Inc*., 487 U.S. 781, 795 (1988). Second, it required the Spa to embrace the State's orthodoxy as to how women can be described, *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Third, it compelled the Spa to accept and embrace the gender expression of activists such as complainant. *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995). The Supreme Court has rejected attempts to create new categories of less-protected speech, or to subject

16

content-based restrictions to less-stringent review than strict scrutiny. *NIFLA*, 138

S.Ct. at 2372. In order to do so, the Court requires a long history of such speech

being unprotected. *Id.* (rejecting lower level of scrutiny for professional speech).

Within that framework, the district court did not explain how referring to

biological women could possibly have been unprotected speech. Nevertheless, this

particular phrase was targeted, excised, and replaced at the State's behest on threat

of prosecution. The failure to apply strict scrutiny to such unabashed censorship

and compelled speech was reversible error.

### D. The district court's reliance on overturned and inapposite decisions to deem the curtailment of the Spa's speech merely "incidental" is unsupportable.

Rejecting the searching inquiry requisite to censorship and compelled speech,

the district court leaned heavily on overturned and off-the-mark decisions to steer

toward a more deferential review of the government's mandate.

To this end, the district court determined that restrictions on the Spa's

speech were only "incidental." 3-ER-299–300. To get there, the Court relied on the

overturned decision of the Tenth Circuit in *303 Creative LLC v. Ellinas*, 6 F.4th

1160 (10th Cir. 2021). It also invoked *Ward v. Rock Against Racism*, 491 U.S. 781

(1989), and hearkened back to *Giboney v. Empire Storage & Ice Co.*, 336 U.S.

490, 502 (1949). These decisions, though, cannot bear the weight placed on them

by the court below.

17

The first leg of this three-legged stool, the Tenth Circuit decision in *303 Creative LLC*, collapses under its own weight. The Supreme Court in *303 Creative* rejected the incidental speech theory advanced by the State of Colorado. Parting company with the Tenth Circuit's assessment of Ms. Smith's websites as pure speech, "[i]nstead, Colorado says, this case involves only the sale of an ordinary commercial product and any burden on Ms. Smith's speech is purely incidental." *Id.* at 2316. The Court, having already noted the many expressive aspects of the websites was having none of it and further rejected Colorado's attempt to make much of the commercial nature of the speech. *Id.* at 2316-2317. The majority separately rebutted the dissent's claim that the burden on speech was only incidental. *Id.* at 2319-2320.

Even though the Tenth Circuit's decision in *303 Creative* had been reversed by the time of its second dispositive decision, the district court perplexingly chose not to reexamine its reliance on the overturned reasoning. This was error.

In short, the notion that censorship and compelled speech of a business's website on an ideological issue is merely "incidental" is not a winning argument for Washington.

Nor is the content-neutral, time/place/manner framework of *Ward v. Rock Against Racism* a comfortable fit here. There, the Supreme Court clarified that governments may regulate incidental effects of concerts—such as volume—taking

18

place on public property and reverberating off the apartment buildings bordering Central Park. That the government professed no interest in controlling the message of the concert—only its volume—could hardly be more different than the present situation where the State has required the Spa to remove specific descriptive wording from its website that the government deems offensive to its sensibilities. Nor does the district court's reference to one of the Supreme Court's earlier conduct versus speech cases, *Giboney*, support the conclusion. There, the Court explained that crimes committed via speech, such as conspiracy, are not for that reason shielded from prosecution. This logic, while true enough for incitement to violence such as the union violence at issue there, has been cabined by the Court in situations more like the present. *NIFLA* put *Giboney* in context and distinguished it—along with other professional disclosure, malpractice, and misconduct cases— from government speech mandates that cannot be fairly described as factual and non-controversial. *NIFLA*, 138 S.Ct. at 2372-2373. It is one thing, the Court explained, to require lawyers to disclose their fees or doctors to disclose the risks of treatment; it is quite another to require speech, especially on controversial issues such as abortion or gender identity, disconnected from such disclosures. *Id.* at 2373-2374.

Ironically, the State's mandate here had the opposite effect of disclosures—it limited the Spa's ability to explain what was meant by its female-focused services.

19

Nor was it helpful or effective to ratchet up the rhetoric and diminish the value of the Spa's speech with derogatory comparisons to other, widely condemned forms of discrimination. The district court's attempted analogy to the censorship of the Spa's website speech as akin to removal of a repugnant "White Applicants Only" sign, 3-ER-299, echoes the dissent in *303 Creative*. The majority of the Court pointedly rejected the comparison as "pure fiction." *303 Creative*, 143 S.Ct. at 2319. This Court should do likewise.

In the distinct yet corollary context of nudity-for-hire, the position that such expression is merely conduct and not speech is also a minority view. *See, e.g., Barnes v. Glen Theater*, 501 U.S. 560, 580-581 (1991) (Scalia, J., Concurring in judgment) (expressing lone view that nude dancing was conduct and not speech). Re-labeling the Spa's speech as conduct is even less persuasive in the present context.

### E.  The intermediate-level *O'Brien* test for symbolic speech is a poor fit, but the Spa can overcome even that hurdle.

Instead of applying strict scrutiny, the district court opted for intermediate scrutiny under *United States v. O'Brien,* 391 U.S. 367, 377 (1968), for symbolic speech. The *O'Brien* test, which originated from a prosecution for publicly burning a draft card as a war protest, might be appropriate if the complainant were suing and arguing that undressing alongside the other female patrons was a symbolic act. But the Spa's online speech was unequivocally censored by the State, and the

20

Spa was compelled to embrace the preferred gender expression and identity of the complainant. There was less symbolism here than straightforward suppression and coercion. For many of the reasons set forth in the foregoing subsections, even intermediate scrutiny cannot justify what Washington has done and is doing to the Spa. Rather than repeating those arguments, they will be incorporated by reference and a few additional reasons will be identified here why intermediate scrutiny cannot save the State's expressive restrictions.

First, *NIFLA* held that compelled speech of the type at issue here cannot pass muster even if it is subjected to intermediate rather than strict scrutiny. *NIFLA*, 138 S.Ct. at 2375. Among other reasons, the restrictions there and the restrictions here are "wildly underinclusive." *Id.* Consider, for instance, that the supposedly discriminatory description of "biological women" is not otherwise banned in public discourse, and indeed has been utilized by this Court in discussing similar issues. *Miss USA*. The Supreme Court is "deeply skeptical" of laws that distinguish among different speakers, allowing speech by some but not others. *NIFLA*, 138 S.Ct. at 2378. The problem is compounded when the government is allowed to utter exactly what the targeted speaker may not, as is happening here.

If anything, the Spa excludes far fewer persons than other entities whose First Amendment rights this Court has upheld. In *Miss USA*, a would-be contestant

21

was rejected by the Miss USA pageant which restricted entrants to "natural born women." *Id.* at 777-778. Miss USA was far more discriminatory than the Spa, rejecting women based not only on biology but also age (29 is too old to compete), marital status (no married women allowed), motherhood (moms excluded), and of course appearance (those suffering from obesity and disfiguring medical conditions need not apply). Olympus Spa is even more welcoming to persons identifying as transgender than the pageant, permitting those who present post-operatively as female while excluding those who continue to present as male. Miss USA rejected a transgender-identifying contestant who, unlike the complainant against the Spa, had undergone surgery to remove male genitalia. This, in spite of the fact that contestants do not appear in the nude, and if found to have been photographed in the nude are excluded. Should this Court now affirm the decision below, businesses will be incentivized to exclude more—not less—in order to be protected.

Second, and relatedly, the State cannot identify a narrowly drawn, substantial government interest in censoring and compelling the Spa's speech. At a very high level, eradicating discrimination seems like an unassailable interest. But precision, not generalities, must be the touchstone in regulating speech. *NIFLA*, 138 S.Ct. at 2376. And just such generalities of eradicating discrimination through

22

sweeping public accommodations statutes have been rejected in *Hurley, Dale, Masterpiece Cakeshop,* and now *303 Creative.*

With precision as the guiding light, one must ask uncomfortable questions about the State's interests here.

- Why is it permissible for the Spa to identify at all as a spa for women, thereby excluding nearly half the population?

- If the phrase "biological women" is verboten, may the Spa drop gendered language entirely and instead lawfully announce that it welcomes "people with vaginas"? If not, how would such a stance constitute gender identity discrimination, or any other type of prohibited discrimination?

- Why may the Spa exclude people with penises who identify as male, but not exclude people with penises who happen to consider themselves women, non-binary, or something else? Why does an individual's self-expression override the Spa's expression?

- What possible interest does or could the State of Washington possess to force non-consenting adults with penises and vaginas to congregate in the nude?

Decades of asserted and accepted state interests advance nearly the opposite premise—that nudity in public places and establishments can be restricted to further a substantial government interest in protecting order and even morality.

23

*Barnes v. Glen Theater*, 501 U.S. 560, 569 (1991) (plurality). Even Justices who have favored fewer restrictions on public nudity have emphasized the importance of doing so between consenting adults, not where minors or non-consenting adults are present. *Barnes*, 501 U.S. at 591 (dissent of White, Marshall, Blackmun, and Stevens, JJ.) (distinguishing between public decency statutes whose purpose is "to protect others from offense," and establishments where consenting adults pay to view nudity).

To the Spa's knowledge, Washington has never before advanced anything close to an interest in requiring a naked person with a penis to access interior spaces with unwilling women and teenage girls who would reasonably feel vulnerable in the presence of a naked male-presenting stranger, whatever the intent may be—leering at their bare breasts, buttocks, and pubic hair. Not so long ago, the State of Washington regarded the showing of one's penis to unsuspecting strangers as criminal exhibitionism, not expression so protected as to trump the rights of unwilling viewers. At what point Washington's purported state interests transmogrified, it is impossible to say.

Without minimizing the importance of public accommodations laws, the Supreme Court has drawn the line where they are applied to censor or coerce speech. *303 Creative LLC*, at 2314-2315.

24

At the heart of this dispute lies the state government's insistence that the Spa conform to its prescribed orthodoxy on gender, gender identity, and gender expression. This, no official high or petty may do without transgressing the First Amendment. *Barnette*, 319 U.S. at 642.

## IV.  THE SPA'S RIGHTS TO THE FREE EXERCISE OF RELIGION WAS SUBSTANTIALLY BURDENED BY THE APPLICATION OF THE PUBLIC ACCOMMODATION LAWS.

The First Amendment not only guarantees the right to believe what one wants but also to put faith into practice by the exercise of religion. Persons who identify as traditional Christians hold to the view that there are but two biological sexes. Related to that it comes as no shock that the business owners of Olympus Spa embrace traditional religious views on moral issues finding as problematic the mixing of nude persons of the opposite sex who are not married to one another. The Spa's reasons stem from its tethering of modesty between the sexes to traditional Christian teaching on sexual conduct. This runs head long into the State's weaponization of public accommodation laws wherein here the State insists on the mixing of nude males and females as a condition for staying in business. This is not hyperbole. The State's investigator writes the following:

> Olympus Spa's 'biological women' policy focuses on the genitals of patrons rather than allowing transgender women to access your facilities based on their gender identity, as required by WAC 162-32-

060.[6]Additionally, any dress and grooming standards Olympus Spa cites are clearly applied to unequally to patrons of the spa, as cisgender women are allowed[7] to be fully nude in the spa while transgender women who have not had surgery are prohibited from even entering the spa.

3-ER-453. These conditions for running the business particularly wound the conscience when unclothed teenage girls—some as young as thirteen years old coming in with their mothers (2-ER-225)—find themselves thrust into an

---

[6] WAC 162-32-060 **Gender-segregated facilities.** (1) Facility use. All covered entities shall allow individuals the use of gender-segregated facilities, such as restrooms, locker rooms, dressing rooms, and homeless or emergency shelters, that are consistent with that individual's gender expression or gender identity. In such facilities where undressing in the presence of others occurs, covered entities shall allow access to and use of a facility consistent with that individua's gender expression or gender identity.
(2) Cannot require use inconsistent with gender expression or gender identity. A covered entity shall not request or require an individual to use a gender-segregated facility that is inconsistent with that individual's gender expression or gender identity, or request or require an individual to use a separate or gender-neutral facility. (a) If another person expresses concern or discomfort about a person who uses a facility that is consistent with the person's gender expression or gender identity, the person expressing discomfort should be directed to a separate or gender-neutral facility, if available. (b) Any action taken against a person who is using a restroom or other gender-segregated facility, such as removing a person, should be taken due to that person's actions or behavior while in the facility, and must be unrelated to gender expression or gender identity. The same standards of conduct and behavior must be consistently applied to all facility users, regardless of gender expression or gender identity.
(3) Provision of options encouraged. Whenever feasible, covered entities are encouraged to provide options for privacy, such as single-use gender-neutral bathrooms or private changing areas, that are available to any individual desiring privacy.
[7] The investigator's use of the word *allowed* is incorrect. *Seshin* treatments **require** the patron to be fully nude. 3-ER-447.

environment with nude adult males. Naturally women who also share the views of the owners of the Spa gravitate towards such a business as either an employee or patron.

The State protests that this law does not prohibit the free exercise of religion but simply compels compliance with what amounts to an all-comers policy for businesses. In other words, businesses must serve all persons. The statute provides that a person has "[t]he right to be free from discrimination because of . . . sex[8] [or] . . . sexual orientation.[9]" RCW § 49.60.30(1). This includes "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." RCW § 49.60.30(1)(b). The State views the public accommodation law as neutral and of general applicability. That is arguably true on its face, but not as actually applied here.

The investigator from the Human Rights Commission was well aware that the Spa's services were based on traditional Korean beliefs and that this included the spiritual health of women. 3-ER-447. In this case, the official used the neutral

---

[8] "Sex" means gender. RCW § 49.60.40(26).

[9] "Sexual orientation" means heterosexuality, homosexuality, bisexuality, and gender expression or identity. As used in this definition, "gender expression or identity" means having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth. RCW 49.60.40(27).

27

and generally applicable public accommodation law as a means to launder its coercive actions which substantially burden the free exercise of the Spa's religion. By so doing, the Human Rights investigator chose to elevate the rights of public access of a transgender woman over the expressed constitutional rights of these Korean Christians.

Though the application of the law may not require the Spa to renounce its faith in words, nonetheless the Spa must censor its message on its website and renounce its faith by its deeds. Christians deem affirmative acts performed in a manner contrary to the rules of one's faith as sin and hypocrisy.

The application of the State's discrimination law by the Commission against the Spa substantially burdens the Spa's rights to the free exercise of religion. A regulation neutral on its face may, as applied, offend the constitutional requirement of government neutrality if it unduly burdens the free exercise of religion. *Fulton v. Philadelphia*, 141 S.Ct. 1868, 1890 (2021) (J. Alito concur) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 220 (1972)). As applied here, the Spa cannot maintain business operations and practice its faith and maintain compliance with Washington's public accommodation laws.

To choose between its business and its faith constitutes a substantial burden. Because the Spa does not operate in a manner that disturbs the public peace or good order (*Fulton*, 141 S.Ct. at 1890, 1901-03 (J. Alito concurring) (citing the

Northwest Ordinance of 1787)), the State cannot show how it's interest would be adversely affected by granting an exemption to the Spa. *Yoder,* 406 U.S. at 220.

The application of the State's public accommodation laws places the Spa in an untenable position. If the Spa allows preoperative males to use the facilities, then it will deny its faith and spiral into bankruptcy due to female patrons refusing to share the facilities with naked men. 2-ER-123. Losing a business that has been in the family for more than twenty years, and by extension their livelihood, is a burden on the practice of their faith. On the other hand, failure to comply with the State's public accommodation law can lead to prosecution (3-ER-457), lawsuits, and fines causing ruinous financial losses that also cannot be sustained. 2-ER-123.

Instead of acknowledging these consequences, the State and the district court take an absolutist view of *Emp. Div., Dep't of Hum. Res. of Or. v. Smith* with the refrain that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Smith*, 494 U.S. 872, 877 (1990). 3-ER-294; 3-ER-346. That is not a universal holding of the Supreme Court. The Court has found that the Free Exercise of Religion Clause has trumped neutral or generally applicable laws in several of its post-*Smith* decisions.

29

The neutral and generally applicable Americans with Disabilities Act of 1990[10] could not be applied in an employment dispute due to First Amendment implications triggered by the ministerial exception. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012). There the EEOC specifically argued what the State and district court maintains in this case. Namely, that the holding in *Smith* governs the case because the ADA provision at issue comprised "a valid and neutral law of general applicability." *Id*. at 190. Likewise, though neutral and generally applicable, the high court found that the Age Discrimination in Employment Act[11] and the ADA must give way to the religion clauses. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049 (2020). New Jersey did no better in its attempts to limit the associational rights of the Boy Scouts via its Law Against Discrimination.[12] *Dale*. To no avail, the City of Philadelphia made similar arguments against Catholic Charities pursuant to the City's Fair Practices Ordinance. *Fulton*, 141 S. Ct. at 1880.[13] The Colorado Anti-Discrimination Act,[14] though also neutral and generally applicable, had to bend to the Free Exercise Clause in the context of a small business owner who did not want

---

[10] 42 U.S.C. § 12101, *et seq*.
[11] 29 U.S.C.S. § 621.
[12] N.J. Stat. § 10:5-4.
[13] Pa. Ordinance § 9-1102.
[14] Colo. Rev. Stat. § 24-34-401.

to bake a cake as part of the festivities associated with a same-sex wedding. *Masterpiece Cakeshop*.

These cases demonstrate that there is room for courts to find that neutral and generally applicable laws must, at times, yield to the conscience concerns of individuals, businesses, and nonprofit organizations due to the constitutional guarantee of the free exercise of religion. In the particular facts of this case, the Court should find sufficient grounds to vindicate the Spa's religious exercise in a manner that trumps Washington's public accommodation laws.

On the determination that the public accommodation laws as applied to the Spa burdens religious exercise as in the above line of cases, this Court should review this case under strict scrutiny instead of rational basis. That standard of review means that a government policy can survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) (internal quotation marks omitted).

Assuming for the purposes of this case on appeal that combating discrimination in places of public accommodation, public resort, assemblage, or amusement *may* be a compelling government interest, the inquiry does not end. The government carries the obligation to demonstrate a compelling governmental

31

interest that must be narrowly tailored and utilizes the least restrictive means to advance that interest. *Lukumi*, 508 U.S. at 531-32.

In this case, a lack of narrow tailoring can be demonstrated by the statutory carve outs to public accommodation. These include bona fide clubs, a place of accommodation that "by its nature [is] distinctly private," fraternal organizations, and educational facilities. RCW § 49.60.040(2). There is no reason that this same carve out could not be made for religious objectors in the narrow context of the intimate spaces of women and girls. Finally, it should be noted that the burden is not on the citizen to prove that narrow tailoring is not used.

## V. THE SPA'S FREEDOM OF ASSOCIATION WAS VIOLATED BY THE APPLICATION OF THE PUBLIC ACCOMMODATION LAWS.

The Constitution guards the right to associate without government interference. Though often overlapping, this liberty interest encompasses two forms: (1) the choice to enter into and maintain certain intimate or private relationships, and (2) the choice to associate with groups for the purpose of engaging in expressive activities including the exercise of religion, free speech, assembly, and petition. *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987). Intimate association comes as a fundamental element of personal liberty. Thus, interference by the State in the ability to create and sustain intimate human relationships threatens the core of individual freedom which stands as central to our constitutional scheme. Then there is expressive association which

32

indispensably preserves the other individual First Amendment liberties as a natural outworking of that Amendment's structure. *Roberts*, 468 U.S. at 618-19 (1984). *Miss USA*, 52 F.4th at 803 (J. Vandyke, concur).

### A. The State's coercion to force males into the intimate spaces of females interferes with the Spa's right to enjoy intimate association.

There are certain obvious relationships that the First Amendment protects such as marriage, family, child rearing, cohabitating with relatives, and educating children. *Rotary Int'l*, 481 U.S. at 545. But "the right isn't restricted exclusively to family." *Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1220 (9th Cir. 2011). These relationships include things such as deep attachments and commitments, special community of thoughts and experiences, and also distinctively personal aspects of one's life. *Roberts*, 468 U.S. at 619-20. Erecting a protective bulwark from "unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 619. In view of the realization that individuals draw much of their emotional enrichment from close ties with others, the courts have declined to mark the precise boundaries of these types of constitutionally protected relationships. *Rotary Int'l*, 481 U.S. at 481.

To determine whether a particular relationship falls within an intimate association, courts look to "size, purpose, selectivity, and whether others are

excluded from critical aspects of the relationship." *Roommate.com, LLC*, 666 F.3d

at 1221 (citing *Rotary Int'l*, 481 U.S. at 481).

Starting with *size*, the Spa operates as a local business out of just two locations.

Compare the Spa with the regional and national enterprise of the Jaycees which

was massive in size (7,400 chapters) and membership (295,000). *Roberts*, 468 U.S.

at 614, 621. The Spa's *purpose* is to bring health, healing, and renewal as a service

to females. In comparison, the Jaycees had nonmembers of both genders whom

regularly participated in a substantial portion of the activities central to the

operations of the members to associate with each other. In stark contrast, this

business has two local spas with exclusively female staff, a bona-fide nudity

requirement, and exclusively vaginally presenting clients. This contrasts with other

entities in which there is "no plan or purpose of exclusiveness." *Roberts*, 468 U.S.

at 621 (quoting *Sullivan v. Little Hunting Park, Inc*., 396 U.S. 229, 236 (1969)

(same)); *Daniel v. Paul*, 395 U.S. 298, 302 (1969) (same). As to *selectivity*, the Spa

allows only females, willing to undergo certain traditional Korean services

designed *exclusively* for women, while in a state of nature.

In light of these four factors for consideration (i.e., size, purpose, selectivity,

and exclusivity) the opinion in *Roommate.com* is instructive. A panel of this Court

found the right of intimate association protected a citizen's discretion in choosing a

roommate, and in so doing, exclude persons of the opposite sex. There were several reasons for this that line up with this case.

First, this Court observed that "roommates often share bathrooms and common areas." Not surprisingly, "a girl may not want to walk around in her towel in front of a boy." *Roommate.com*, 666 F.3d at 1221. It is difficult to image a worse—if not more dangerous—application of a public accommodation law than to force females to share spaces with males while both are undressed or walking around with just a towel. This would be unwise and an unsafe environment for adult women, and utterly foolish for girls as young as thirteen. Those are the conditions that the Commission seeks to force the Spa into creating at its facility. 3-ER-453. The potential liability to the Spa would be significant because the prospect of sexual harassment and assault would be reasonably foreseeable if not assumed.

The notion that women or girls should just get over themselves and suppress their traditional or religiously informed sensibilities about mixed nudity is not something the State is constitutionally empowered to impose on them. *Barnette*, 319 U.S. at 642. The record shows that on the occasions when a male has been able to evade the Spa's entry protocols, the women present experienced humiliation, rage, and trauma. 2-ER- 272. The State's insistence that through a raw exercise of its police powers, it can force unwilling naked females into the company of naked

35

males merely because the males assert they are women lacks common sense and cannot pass First Amendment review.

What is more, it would not stretch credulity that a man or teenaged boy observing a woman or girl in a state of full or partial undress would consider her attractive and the source of sexual arousal. This Court recognized as much. In determining that a female may object to being required to share spaces with males in intimate settings in the context of a roommate, this Court found that a woman or girl might worry about unwanted sexual advances. *Roommate.com*, 666 F.3d at 1221. If such is true relative to a roommate, it also applies to a traditional Korean women's spa where clothing is not an option.

A third factor concerns physical vulnerability. It is self-evident that there is a heightened level of vulnerability associated with sleep when one cannot monitor their own safety or security of their belongings. *Id*. (citing *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)). So too one faces a strong sense of vulnerability when naked, lying face down on a table. Indeed, the distinctive emotional aura of vulnerability would be acute for a female when there are naked males who may be in close proximity. This is not speculation. The Spa's president explains, "Some customers think of our spa as a healing place for victims of sexual assault, especially by men. Some of our spa employees choose to work here because they felt safe." 2-ER-151.

36

If, as this Court found, a roommate relationship "easily qualifies" for associational protection, so too must the relationship within the culturally unique context of the Korean female spa. In that "[l]iberty protects the person from unwarranted government intrusions . . . [in] private places," *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), there is no reason to believe that a nude spa is any less private than sharing a house or apartment.

Beyond that, the application of Washington's public accommodation law suffers from the same shortcoming as Oregon's law recently reviewed by this Court. Like the Oregon Public Accommodations Act,[15] the Washington Law Against Discrimination in this case covers numerous other protected categories including *sex*. The State's position and the district court's holding "would apply with equal force" to the Spa's policy to "exclude a male who identifies as a man." *Miss USA*, 52 F.4th at 788. If the law applies to a male who identifies as a man, there is no reason that it should not apply to a preoperative male who identifies as a woman. For that reason this Court found Oregon's public accommodation law as needing to yield to the associational rights of a woman's beauty pageant organization. Washington's public accommodation law should likewise give way to the associational rights pressed here by the Spa.

---

[15] Or. Rev. Stat. Ann. § 659A.403.

37

**B. Application of the public accommodation laws changes the Spa's message and serves to interfere with the Spa's enjoyment of expressive association.**

The Spa was established as a place where women could seek and enjoy a place of healing and treatment within the context of the Korean tradition. 2-ER-152. The courts have long understood as implicit in the right to engage in First Amendment activities the corresponding liberty to associate with others in pursuit of "a wide variety of . . . social . . . educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. Such a right sits as "especially important in preserving . . . cultural diversity." *Id*. Yet when public accommodation laws run into conflict with First Amendment rights, it is the public accommodation law which must give. *Dale*.

Though not defined with precision by the courts, this form of expressive association includes certain kinds of personal bonds crucial in the culture and traditions of the nation by "transmitting shared ideals and beliefs." *Roberts*, 468 U.S. at 619-20. The Spa fits within that cultural transmission by providing to interested females a place to experience an ancient Korean tradition with like-minded women. The Spa is "designed specifically for women and our mission is to restore and rejuvenate women's physical health as well as spiritual health." 2-ER-151. This is a form of expressive association protected by the First Amendment. The forced inclusion of transgender individuals would necessarily alter the purpose

38

and relationship of women to come together to engage in services offered by the Spa. *Miss USA*, 52 F.4th at 783.

Unlike the provision of services which are short in duration and in which the "commercial enterprise" is not required to partake in the activity, the services offered by the Spa are very interactive and hands on as well as lengthy. In contrast, a person who is baking a cake or arranging flowers can do so without being forced to attend a ceremony or actively partake in the messaging, event, or activity of the customer. *Masterpiece Cakeshop*; *Arlene's Flowers, Inc. v. Washington*, 138 S.Ct. 2671 (2018). Not so in the case of the Spa. The employees must actively work on the bodies of the patrons and Jane Doe [Employee 1] would be forced to work on a man even though her sincerely held religious convictions require her not to see or touch a naked male body of someone with whom she is not married. As the president of the corporation explained, "[T]he Korean body scrub has been always served by the same gender over hundreds of years. A service provider never serves a Korean body scrub to an opposite-sex customer." 2-ER-152. The Spa does not seek to sell an ordinary commercial good but sells a specialized service that is only offered by them and reflects their particular traditions, beliefs, and voice. The logical extension of the State's coercion in this case is that the owners and employees will be forced to not only accept but also express a reciprocating message that a male is a woman.

39

Although the Spa's services are not pure speech or press, like delivering a lecture or printing a newspaper, it is a form of expressive conduct, nonetheless. Just as a "narrow, succinctly articulable message is not a condition" for First Amendment protection, *Miss USA*, 52 F.4th at 785, so too the liberty to enjoy expressive association does not require precision in terms of the transmission of culture and beliefs. Here the Spa's message encompasses the Korean and religious tradition that there is a difference between biological males and females; that includes the notion that women should be allowed to enjoy the physical and highly intimate procedures in privacy and safety. This of necessity requires being outside of the visual and physical presence of males.

Contrast this to Rotary Club activities that are not done in an "atmosphere of privacy," but rather "seek to keep their windows and doors open to the whole world." *Rotary Int'l*, 481 U.S. at 547. Not the Spa. It most decidedly requires the strongest measures of privacy and keeps its windows and doors shut to the community. The Spa's activities are further distinguished from the Jaycees. The inclusion of women required "no change in the Jaycee's creed of promoting the interests of young men." *Roberts*, 468 U.S. at 627. But the forced inclusion of males stands in direct conflict with the Spa's Christian values and the Korean culture related to women's spa treatments. Unlike the Jaycees which invites women to share the "group's views and philosophy and to participate in much of

40

its training and community activities," *id*., the Spa has never invited males into its orbit.

## CONCLUSION

The Commission's lack of toleration for an opinion inconsistent with State orthodoxy represents an egregious content-based restriction on the Spa's freedom of speech. The message is simple. Biological women are welcome at the Spa. Failure to change that message triggers referral to the Attorney General for prosecution. Beyond that, application of the public accommodation laws, requiring the mixing of nude males and females, imposes such an onerous burden on the free exercise of religion that review under neutral and generally applicable laws should be substituted for the reasoning in the post-*Smith* free exercise line of cases. Finally, the application of the Washington laws to the Spa significantly interferes with the intimate association that women and girls understandably seek to enjoy in private settings. Moreover, forcing the insertion of biological males into the Spa's environment changes the cultural and religious message of the business.

Taken together as true, the allegations in the Amended Complaint with its declaration and exhibits state sufficient facts to establish violations of these three liberties guaranteed by the First Amendment. Thus, the Spa requests reversal of the lower court's decision to dismiss the case.

41

Dated: March 27, 2024

/s/ Kevin T. Snider
Kevin T. Snider, Esq.
Matthew McReynolds, Esq.
PACIFIC JUSTICE INSTITUTE
9851 Horn Road, Suite 115
Sacramento, California 95827
(916) 857-6900 Telephone
(916) 857-6902 Facsimile
ksnider@pji.org
mattmcreynolds@pji.org

*Attorneys for Appellants,*
*Olympus Spa, Myoon Woon Lee,*
*Sun Lee, Jane Doe and Jane Does*

## **STATEMENT OF RELATED CASES**

The undersigned attorney states the following:

Counsel is unaware of any related cases currently pending in this Court.

/s/ Kevin T. Snider
Kevin T. Snider

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4031

I am the attorney or self-represented party.

**This brief contains** | 9,657 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( ● ) complies with the word limit of Cir. R. 32-1.

( ○ ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ○ ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ○ ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ○ ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ○ ) complies with the length limit designated by court order dated [            ].

( ○ ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Kevin T. Snider | **Date** | March 27, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 29, 2024

/s/ Kevin T. Snider
Kevin T. Snider