No. 23-4031

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

OLYMPUS SPA, JANE DOE EMPLOYEE, JANE DOE PATRON 1,

Plaintiffs-Appellants,

v.

ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission, MADISON IMIOLA, in her official and individual capacities as Civil Rights Investigator for the Washington State Human Rights Commission,

Defendants-Appellees.

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
No. 2:22-cv-00340-BJR
The Honorable Barbara J. Rothstein
United States District Judge

---

## APPELLEES' ANSWERING BRIEF

---

ROBERT W. FERGUSON
Attorney General

NEAL LUNA, WSBA No. 34085
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 287-4189
neal.luna@atg.wa.gov

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   JURISDICTIONAL STATEMENT ...................................................4

III.  STATUTORY AUTHORITIES ...........................................................4

IV.   COUNTERSTATEMENT OF THE ISSUES ....................................4

V.    STATEMENT OF THE CASE ...........................................................5

    A.  The WLAD's Public Accommodations Provision.......................5

    B.  HRC Enforces the WLAD, Following a Defined, Civil
        Procedure...................................................................................7

    C.  The Spa's Business in the State.................................................8

    D.  Procedural History...................................................................10

VI.   STANDARD OF REVIEW ...............................................................18

VII.  SUMMARY OF ARGUMENT .........................................................19

VIII. ARGUMENT .....................................................................................22

    A.  The Spa's Free Speech Claim Fails as a Matter of Law
        Because the WLAD Is a Content-Neutral Law that
        Satisfies Intermediate Scrutiny.................................................22

        1.  The First Amendment protects speech, not
            discriminatory conduct........................................................22

        2.  The WLAD is content-neutral because on its face,
            and as applied to the Spa, it regulates the Spa's
            discriminatory conduct and at most incidentally
            burdens the Spa's speech .....................................................26

3.   The WLAD does not infringe on the Spa's Free
     Speech right under rational basis review or
     intermediate scrutiny...........................................30

4.   The WLAD does not regulate the Spa's speech
     because the Spa's services are not inherently
     expressive............................................................32

B.  The Spa's Free Exercise Claim Fails as a Matter of
    Law Because the WLAD Prohibits Gender Identity
    Discrimination for Any Reason and Thereby Advances
    a Legitimate State Interest.........................................35

   1.   The record does not support the Spa's litigation
        position that its "biological women only" policy
        is rooted in religion............................................36

   2.   The WLAD is a neutral law because it prohibits
        gender identity discrimination in places of public
        accommodation, regardless of the reason...........................37

   3.   The WLAD is a generally applicable law that does
        not burden the Spa's religion because it gives
        HRC no discretion to grant an exemption to its
        requirements, and it does not favor secular conduct
        over similar religious conduct..............................41

C.  The Spa's Free Association Claim Fails as a Matter of
    Law Because the Relationships Between and Among the
    Spa, Its Employees, and Its Customers Are Not the
    Intimate or Expressive Associations that the First
    Amendment Protects ................................................45

   1.   The WLAD does not violate the Spa's right to
        intimate association because the Spa's employees
        and customers are mostly strangers and thus lack
        the intimate relationship that the First Amendment
        protects ................................................46

2. The WLAD does not violate the Spa's right to expressive association because the Spa employees and customers don't express anything ................................. 50

D. The WLAD Satisfies Strict Scrutiny Because There Is No Less Restrictive Way to Ensure Equal Access to Goods and Services .................................................... 52

IX. CONCLUSION ................................................................... 54

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ................................................................... 27, 28, 33, 53

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................... 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 18

*Board of Directors of Rotary Intern. v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) .................................................................. passim

*Bostock v. Clayton Cnty., Georgia*,
    590 U.S. 644 (2020) ......................................................................... 50

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000) .................................................................. 44, 51

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .................................................................. passim

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989) ............................................................... 46, 47, 52

*Dean v. United States*,
    556 U.S. 568 (2009) ......................................................................... 42

*Doe v. Horne*,
    683 F. Supp. 3d 950 (D. Ariz. 2023) .................................................. 9

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
    494 U.S. 872 (1990) ......................................................................... 37

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
    880 F.3d 450 (9th Cir. 2018) ........................................................... 30

iv

*Fair Hous. Council v. Roommate.com, LLC*,
 666 F.3d 1216 (9th Cir. 2012) ................................................................. 47, 49

*Fulton v. City of Philadelphia*,
 593 U.S. 522 (2021) ................................................... 38, 41, 45, 52

*Giboney v. Empire Storage & Ice Co.*,
 336 U.S. 490 (1949) ...................................................................... 24

*Green v. Miss United States of Am., LLC*,
 52 F.4th 773 (9th Cir. 2022) ........................................................ 33

*Heart of Atlanta Motel, Inc. v. United States*,
 379 U.S. 241 (1964) ...................................................... 23, 31, 44

*Hecox v. Little*,
 479 F. Supp. 3d 930 (D. Idaho 2020) ................................... 9, 12, 14

*Hecox v. Little*,
 No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023) ......................... 9

*Hecox v. Little*,
 79 F.4th 1009 (9th Cir. 2023) ...................................................... 10

*Hishon v. King & Spalding*,
 467 U.S. 69 (1984) ...................................................................... 47

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
 565 U.S. 171 (2012) .................................................................... 44

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Bos.*,
 515 U.S. 557 (1995) ........................................................ 26, 27, 28, 33

*Kadel v. Folwell*,
 100 F.4th 122 (4th Cir. 2024) ..................................................... 1, 12

*Katzenbach v. McClung*,
 379 U.S. 294 (1964) .................................................................... 53

*Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rts. Comm'n,*
    584 U.S. 617 (2018) ........................................................... 38, 41, 45

*McGinity v. Proctor & Gamble Co.,*
    69 F.4th 1093 (9th Cir. 2023) ..................................................... 18, 19

*New York State Club Ass'n, Inc. v. City of New York,*
    487 U.S. 1 (1988) ............................................................... 31, 48

*Newman v. Piggie Park Enterprises, Inc.,*
    390 U.S. 400 (1968) ................................................................ 53

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020) ................................................................ 44

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) ..................................................... 50

*Police Dep't of Chicago v. Mosley,*
    408 U.S. 92 (1972) .................................................................. 22

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ............................................................ 23, 24

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................ 23

*Reynolds v. United States,*
    98 U.S. 145 (1878) .................................................................. 42

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ......................................................... passim

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) .......................................................... passim

*Schroer v. Billington,*
    424 F. Supp. 2d 203 (D.D.C. 2006) ............................................. 10

*Spence v. Washington*,
    418 U.S. 405 (1974) ................................................................. 33

*Stanton Rd. Assocs. v. Lohrey Enters.*,
    984 F.2d 1015 (9th Cir. 1993) .............................................. 42

*State v. Arlene's Flowers, Inc.*,
    441 P.3d 1203 (Wash. 2019) .......................................... 31, 34

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .............................................. 38

*Texas v. Johnson*,
    491 U.S. 397 (1989) .......................................................... 32, 33

*Thomas v. Review Bd. of Indiana Employ. Sec. Div.*,
    450 U.S. 707 (1981) ............................................................. 36

*Tingley v. Ferguson*,
    144 S. Ct. 33 (2023) ............................................................ 25

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022)........................................ 25, 53

*Ulane v. E. Airlines, Inc.*,
    742 F.2d 1081 (7th Cir. 1984)............................................... 9

*United States v. Albertini*,
    472 U.S. 675 (1985) ............................................................. 31

*United States v. O'Brien*,
    391 U.S. 367 (1968) ............................................... 16, 25, 26

*W. Min. Council v. Watt*,
    643 F.2d 618 (9th Cir. 1981)............................................... 19

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ............................................................. 24

## Constitutional Provisions

U.S. CONST. amend. I ................................................................ 37

WA CONST. art. I §§ 3–29 ........................................................ 5

WA CONST. art. VI § 1 ............................................................. 5

WA CONST. art. XXXI § 1 ........................................................ 5

## Statutes

28 U.S.C. § 1291 ..................................................................... 4

28 U.S.C. § 1331 ..................................................................... 4

28 U.S.C. § 1343 ..................................................................... 4

Wash. Rev. Code § 34.05.514(1) ............................................. 7

Wash. Rev. Code § 34.05.518(1) ............................................. 7

Wash. Rev. Code § 34.05.526 ................................................. 7

Wash. Rev. Code § 49.60.010 ...................................... 5, 45, 53

Wash. Rev. Code § 49.60.030(1) ............................................. 6

Wash. Rev. Code § 49.60.030(1)(b) .......................... 6, 26, 31

Wash. Rev. Code § 49.60.040(14) ........................................... 6

Wash. Rev. Code § 49.60.040(2) .............................. 6, 42, 43

Wash. Rev. Code § 49.60.040(27) ........................................... 6

Wash. Rev. Code § 49.60.120 ............................................... 41

Wash. Rev. Code § 49.60.215 .................................. 6, 26, 31

Wash. Rev. Code § 49.60.230(1)........................................................... 7

Wash. Rev. Code § 49.60.240 ............................................................ 41

Wash. Rev. Code § 49.60.240(2)–(3) ................................................. 7

Wash. Rev. Code § 49.60.250 ............................................................. 7

Wash. Rev. Code § 49.60.250(5)......................................................... 7

Wash. Rev. Code § 49.60.310 ............................................................. 7

<u>Regulations</u>

Wash. Admin. Code § 162-32-060(1)–(2)......................................... 31

## I.    INTRODUCTION

The Washington Law Against Discrimination (WLAD) has prohibited discrimination in places of public accommodation since 1957. Since 2006, the WLAD has barred gender identity discrimination by businesses that serve the public. But in this case, a Korean day spa operating in Washington State, its owner, an officer, three unnamed employees, and an unnamed customer (together, the Spa, unless specifically stated otherwise), seek a judicially created exemption from the WLAD's public accommodations provision. The Spa, which caters exclusively to women, refuses to serve pre-operative transgender women because, according to the Spa, they are not "biological" women and spa-goers are nude in certain areas of the Spa.[1] In furtherance of its discrimination, the Spa maintained a "biological women only" entry policy on its website.

In response to a complaint regarding enforcement of that policy, the Washington State Human Rights Commission (HRC) investigated the Spa's practices and reached an agreement with the Spa that required the non-discriminatory admission of all women, regardless of gender identity. After

---

[1] "[A]pproximately 1.4 million people in the United States . . . identify as transgender. This means that their gender identity—that is, their deeply felt, inherent sense of their gender—is not aligned with their sex assigned at birth." *Kadel v. Folwell*, 100 F.4th 122, 135–36 (4th Cir. 2024). Additionally, while the Spa represents that its "biological women only" entry policy applies to pre-operative transgender women, its policy presumably also would apply to non-operative transgender women who do not intend to undergo that form of gender-affirming care. HRC's use of the term "pre-operative" transgender women in this brief includes non-operative transgender women.

reaching this voluntary resolution, the Spa then sued HRC, claiming that it has a right under the First Amendment to discriminate against customers based on gender identity. It does not, and the district court rightly dismissed the Spa's three claims.

First, the Spa asserts that it has a Free Speech right to express its belief that transgender women are men, not women, by refusing to serve them. But, the Spa's services are not inherently expressive, unlike a parade, custom website, or beauty pageant. And the Free Speech Clause does not protect discriminatory conduct, nor does it shield words that initiate, evidence, or carry out such conduct. At most, HRC's enforcement of the WLAD only incidentally burdened the Spa's speech. The WLAD does not violate the Spa's Free Speech right because it furthers an important or substantial governmental interest—protecting the public's civil rights—that is unrelated to suppressing protected speech, and the WLAD unquestionably increases the effectiveness of the government's efforts to achieve its interest.

Second, the Spa claims that HRC's enforcement of the WLAD infringes its right to Free Exercise of religion. But there are no allegations (or evidence in the record accompanying the Complaints) indicating the WLAD targets the Spa's religion, either overtly or subtly. There is likewise no support for the Spa's claim that the WLAD gives HRC discretion to exempt the Spa from the law's non-discrimination mandate, or that the WLAD treats the Spa's religious-based request for an exemption any differently than it would treat a secularly based

request. The Spa's Amended Complaint instead shows that HRC could not have known of the Spa's alleged religious belief—that pre-operative transgender women are men—when it enforced the WLAD against the Spa because the Spa did not raise its religious belief until it sued HRC. Because the WLAD as applied to the Spa is a neutral law of general applicability, and is rationally related to the State's legitimate purpose to ensure non-discriminatory access to goods and services, the WLAD does not violate the Spa's Free Exercise right.

Third, the Spa claims a right not to associate with pre-operative transgender women, under both the intimate association and expressive association prong of the First Amendment. But, the relationships between and among the Spa, its employees, and its customers are not the sort of intimate or expressive associations protected by the Free Association Clause. The Spa and its employees provide a service to all women willing to pay with one exception: pre-operative transgender women. The fact that customers are unclothed in the same area does not transform a business transaction between strangers into a selective, exclusive, deeply personal relationship akin to family members or roommates. Nor is the Spa an expressive association. Customers come to the Spa to use its amenities and receive standardized spa services, and is unlike the Boy Scouts' communication of values in the Scout Oath, the Jaycees' advocacy for political and social causes, or Miss USA's organization of a beauty pageant to convey its idea of the ideal woman. Because the WLAD does not implicate any intimate or expressive association of the Spa, and it is

3

rationally related to a legitimate State interest, the law does not violate the Spa's Free Association right.

Finally, even if the WLAD as applied to the Spa regulates the content of the Spa's speech, substantially burdens the Spa's religious belief, or interferes with the Spa's right to intimate or expressive association, it satisfies strict scrutiny. There can be no question that protecting Washingtonians from harmful discrimination in the marketplace is a compelling State interest. By ensuring equal access to goods and services, the WLAD furthers the State's interest. And it does so in the least restrictive way: by prohibiting the very discriminatory conduct that causes the harm.

The district court dismissed the Spa's First Amendment claims. This Court should affirm.

## II.   JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## III.   STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## IV.   COUNTERSTATEMENT OF THE ISSUES

1.     Was the district court correct in dismissing the Spa's Free Speech claim because the WLAD's public accommodations provision regulates the Spa's discriminatory conduct, only incidentally burdens the Spa's discriminatory speech, and satisfies intermediate scrutiny?

4

2.      Was the district court correct in dismissing the Spa's Free Exercise claim because the WLAD's public accommodations provision is a neutral law of general applicability that is rationally related to the legitimate governmental purpose of protecting the public from discrimination in the marketplace, and in fulfilling the provisions of the State Constitution concerning civil rights?

3.      Was the district court correct in dismissing the Spa's Free Association claim because the relationships between the Spa, its employees, and its customers are not the intimate or expressive associations that the First Amendment protects?

## V.      STATEMENT OF THE CASE

### A.      The WLAD's Public Accommodations Provision

Enacted in 1949, the WLAD "is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights." Wash. Rev. Code § 49.60.010; *see, e.g.*, WA CONST. art. I §§ 3–29; *id*. art. VI § 1; *id*. art. XXXI § 1. As relevant here, the WLAD recognizes "[t]he right to be free from discrimination because of . . . sexual orientation," which includes gender expression or identity.[2]

---

[2] "Gender expression or identity" is defined as "having . . . a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth." Wash. Rev. Code § 49.60.040(27).

5

Wash. Rev. Code §§ 49.60.030(1), .040(27). This right includes "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement[.]"[3] *Id*. § 49.60.030(1)(b); *see also id*. § 49.60.215 (declaring discrimination based on gender expression or identity in places of public accommodation an "unfair practice"). A "'place of public . . . accommodation' includes . . . any place . . . kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment . . . or for the benefit, use, or accommodation of those seeking health, recreation, or rest, or for the . . . rendering of personal services[.]" *Id*. § 49.60.040(2). Two types of places are not "places of public accommodation" for purposes of the WLAD: a facility, such as a bona fide club or fraternal organization, "which is by its nature distinctly private . . . though where public use is permitted that use shall be covered by this chapter"; and "any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution." *Id*.

---

[3] "'Full enjoyment of' includes the right to purchase any service . . . offered or sold on, or by, any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular . . . sexual orientation . . . to be treated as not welcome, accepted, desired, or solicited." *Id.* § 49.60.040(14).

6

B.     **HRC Enforces the WLAD, Following a Defined, Civil Procedure**

The Washington Legislature created HRC, a State agency, and endowed it with jurisdiction to enforce the WLAD. Wash. Rev. Code § 49.60.010. The WLAD provides an array of civil remedies to eliminate and remedy discrimination. *See id.* §§ 49.60.250(5), .310.

Over the years, HRC has issued regulations that govern its enforcement procedures, which are located in the Washington Administrative Code, Title 162. Generally, any person who believes they have been unfairly discriminated against in an activity covered by the WLAD may file a complaint with HRC. Wash. Rev. Code § 49.60.230(1). HRC investigates the complaint, and if it finds reasonable cause to believe that the respondent entity violated the WLAD, HRC may attempt to resolve the matter with the respondent before making any findings of fact or finding of discrimination. *Id.* § 49.60.240(2)–(3). If HRC and the respondent are unable to agree to a pre-finding settlement, then HRC makes findings of fact and a reasonable cause finding of discrimination. *Id*. In a public accommodations case like this one, the matter would then proceed to an administrative hearing before an administrative law judge. *Id.* § 49.60.250. A party may seek review of the administrative law judge's final decision in Washington State courts, up to and including the Washington State Supreme Court, under Washington's Administrative Procedure Act. *Id.* §§ 34.05.514(1), .518(1), .526.

7

### C.     The Spa's Business in the State

Because this comes to the Court on the appeal of a Rule 12(b)(6) dismissal, HRC takes the Spa's factual allegations as true for purposes of this appeal. Accordingly, Olympus Spa is a business that has operated in Washington State for more than twenty years. 2-ER-125 ¶ 11.[4] There are two locations, one in Tacoma and the other in Lynnwood, just north of Seattle. *Id.* The Spa "is specifically designed for females [aged 13 and above]," and its "business purpose to provide traditional Korean kiln saunas and exfoliation therapy experiences." *Id*. at 127 ¶¶ 20–21, 163. The Spa calls itself a "Korean Traditional Spa," explaining that "it provides female spa separately at their comforts," and "the Korean body scrub has been always served by the same gender over hundreds of years." *Id*. at 152. All Olympus Spa employees who provide body scrubs and work onsite are female. *Id*. at 127 ¶ 21.

The Spa's services are rooted in the Korean tradition, "which requires its users to be naked while undergoing certain services." *Id*. at 124 ¶ 3. The Spa states that customers "are required to be fully naked" when using the bath area and "for all procedures called 'Seshin' according to Korean tradition." *Id*. at 127 ¶¶ 20–21. The Spa is consistent in representing that its nudity

---

[4] The Spa's alleged facts are contained in its Complaint and Amended Complaint and the identical declarations filed with each complaint. Since the Spa is appealing the district court's dismissal of its Amended Complaint, the citations to the record are to the Amended Complaint or its related declaration.

requirement is rooted in the Korean spa tradition, rather than in its religion. *Id*. at 124 ¶ 3, 127 ¶ 21, 129 ¶ 28, 132 ¶ 39.

Appellant Myoon Woon Lee owns Olympus Spa; Appellant Sun Lee is the Spa's president; Appellants Jane Doe Employees 1, 2, and 3 are unidentified Spa employees who provide spa services to customers who are either naked or partially naked; and Plaintiff Jane Doe Patron 1 is an unidentified customer who frequents the Spa and uses its services while naked or partially naked. 3-ER-415 ¶¶ 4–9. While not identified by name, the Complaint asserts that each Appellant/Plaintiff "is a Christian who believes that males and females should not be together in a state of full or partial undress if not married to each other." 3-ER-417–18 ¶¶ 17, 19–22. Consequently, the three unidentified Olympus Spa employees will not provide services to "naked men (males)." *Id.* ¶¶ 19–21.

As to legal terms, and as it did in the district court, the Spa defines "male" as "a person whose genitals are external;" and "female" as "a person whose genitals are internal." Opening Br. at 4 n.3; 2-ER-123–24 ¶¶ 2.a., 2.b. 3-ER-414 ¶¶ 2.a., 2.b. The Spa cites no source for its definitions of "male" and "female." But federal courts, including in this circuit, recognize that "male" and "female" are defined by more factors than genitals—such as chromosomes, hormones, and other physiological processes. *See Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1083 n.6 (7th Cir. 1984); *Doe v. Horne*, 683 F. Supp. 3d 950, 957 (D. Ariz. 2023); *Hecox v. Little*, 479 F. Supp. 3d 930, 945 (D. Idaho 2020), *aff'd,* No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023), and *aff'd,*

79 F.4th 1009 (9th Cir. 2023) (opinion withdrawn); *Schroer v. Billington*, 424 F. Supp. 2d 203, 213 n.5 (D.D.C. 2006). Because one's sex is determined by factors other than one's genitals, a person whose genitals are external can be female. *Schroer*, 424 F. Supp. 2d at 213 n.5. HRC recognizes that the Spa may be using "male" and "female" as shorthand to refer to someone with external and internal genitals, respectively, regardless of that someone's actual sex or gender.

The Spa also provides the same, unsourced definitions of "transgender woman"—"a person who is biologically male but identifies as a woman"—and "transgender man"—"a person who is biologically female but identifies as a man"—that it used in its Complaints. Opening Br. at 4 n. 3; 2-ER-124 ¶¶ 2.d., 2.e.; 3-ER-415 ¶¶ 2.d., 2.e.

**D.    Procedural History**

In 2020, an adult, pre-operative transgender woman[5] submitted a complaint to HRC regarding the Spa. 3-ER-439. The complainant alleged that the Spa's owner "denied me services and stated that transgender women without surgery are not welcome because it could make other customers and staff uncomfortable." *Id*. The complainant believed that the Spa discriminated against her because of her "sexual orientation." *Id*.

---

[5] The parties' briefs do not name the transgender woman who filed the HRC complaint. Media coverage of this case resulted in threats of violence being directed at her. HRC does not wish to further perpetuate the risk of such harm to her, and appreciates that the Spa did not name her in its Opening Brief.

HRC subsequently sent the Spa a Notice of Complaint of Discrimination, providing the complaint and requesting that the Spa respond in writing. *Id*. at 420 ¶¶ 26–27, 444. In its written response, the Spa explained that

> Our attendance rules limit guests to females only, including post-operative transsexuals (MTF). We firmly believe it is essential for the safety, legal protection and well-being of our customers and employees that we maintain adherence to this adaptation of a females-only rule.

*Id*. at 447, 420–21 ¶ 28. The Spa emphasized that allowing pre-operative transgender women into the Spa could subject the Spa to "criminal liability" under state or county indecent exposure or lewd conduct laws. *Id*. at 420–21 ¶ 28, 448–49. The Spa repeated that "[o]ur assertion is that there are historical, cultural, and practical and legal reasons to allow Olympus Spa to continue to offer our services in a 'biological female' only environment, with an exception for post-operative MTF transsexuals." *Id*. at 449, 420 ¶ 28. The Spa gave no religious reason for its policy. *Id.* The Spa concluded that "[w]hile we remain willing to consider a review of our current biological females only policy, we are unwilling to remake the 'jjimjilbang' haven we have worked so hard over many years to build and preserve, simply for the sake of promoting gender neutrality." *Id*. at 449. The Spa enclosed a copy of its entry policy posted on its website, which stated: "Biological women are welcome." *Id*. at 450. The Spa asserts it has enforced this policy to prospective customers on prior occasions. *Id*. at 418–19 ¶¶ 23–24; Opening Br. at 5.

11

After reviewing the Spa's response, HRC found that "the evidence in this investigation supports that [the Spa's] 'biological women' policy is not compliant with the [WLAD], which prohibits discrimination on the basis of gender identity in places of public accommodation." 3-ER-452. HRC further explained that the Spa's policy unlawfully "denies services to transgender women who have not had surgery specifically because their physical appearance is not 'consistent' with the traditional understanding of biological women." *Id*. HRC continued:

> Olympus Spa's 'biological women' policy focuses on the genitals of patrons rather than allowing transgender women to access your facilities based on their gender identity as required by [Wash. Admin. Code §] 162-32-060. Additionally, any dress and grooming standards Olympus Spa cites are clearly applied unequally to patrons of the spa, as cisgender women are allowed to be fully nude in the spa while transgender women who have not had surgery are prohibited from even entering the spa. This practice is clearly discriminatory and violates the WLAD.

*Id*. at 422 ¶ 29, 453.[6]

Consistent with its regulations, HRC offered the Spa the opportunity to enter into a pre-finding settlement agreement to resolve the matter. *Id*. at 423 ¶ 32, 452. Under the pre-finding settlement agreement, HRC would end its investigation, and Olympus Spa would—without admitting any violation of state law—update its policies and procedures to avoid discriminating on the

---

[6] "The term 'cisgender' refers to a person who identifies with the sex that person was determined to have at birth." *Kadel*, 100 F.4th at 36; *Hecox*, 479 F. Supp. at 945 (citing *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018)).

basis of gender identity. *Id*. at 452. The benefits of this option for both parties included prompt compliance with the law, avoiding the costs of non-compliance and litigation, and reducing the likelihood of future complaints. *Id*.

The Spa chose to enter into a pre-finding settlement agreement and resolve the complaint. *Id*. at 424 ¶ 33, 459. HRC proposed that the settlement would memorialize that the Spa already had removed its "biological women" entry policy from its website prior to signing the settlement agreement, that HRC would provide the Spa with training materials and review the Spa's policies to ensure compliance with the WLAD. *Id*. at 424 ¶ 34, 461. The final, executed agreement contained those terms and included the following provision proposed by the Spa:

> This agreement does not preclude [the Spa] . . . from exercising [its] constitutional rights to . . . bring[] a legal challenge as to the constitutionality of any term or provision in this agreement, or the operative statutes, including but not limited to [the WLAD], implementing regulations and related policies of [HRC].

*Id*. at 424–25 ¶ 35, 473–75. The pre-finding settlement agreement became effective on October 7, 2021. *Id*. at 472.

Months later, the Spa sued HRC and its Executive Director in federal district court, alleging that HRC's enforcement of the WLAD's public accommodations provision against the Spa violated the Spa's First Amendment rights to Free Exercise of religion, Free Speech, and Free Association. *Id*. at 413–30. The Spa asserted prospective and retrospective claims. The Spa asserted that forcing it to serve pre-operative transgender women would violate

13

its religious beliefs that "man and woman are created differently," and that it has a duty to protect women and children by providing "a safe, private, and respectful environment for women." *Id*. at 425–26 ¶¶ 37–40, 435–36. The Spa alleged further that forcing the Spa to remove its "biological women are welcome" entry policy from its website, and "adopt[] new language on its website reflecting a non-discriminatory policy that comports with [the WLAD]" violated its First Amendment right to express its view about "biological" women.[7] *Id*. at 426 ¶ 43, 461. Finally, the Spa alleged that forcing it to serve pre-operative transgender women would compel "females in a state of nature to remain in the presence of naked males" in violation of the Spa's right to Free Association.[8] *Id*. at 426–27 ¶¶ 45–47. The Spa requested a declaratory judgment

---

[7] To be precise, the pre-finding settlement agreement required the Spa to "[i]mplement and/or revise existing company policies as necessary to ensure their compliance with the [WLAD]." 3-ER-473. In implementing that agreement, the Spa itself decided to post its new non-discriminatory policy on its website. *Id*. HRC did not require that step. *Id*.

[8] The Spa and Amicus Women's Declaration International-USA (WDI) misgender transgender women throughout their briefs, repeatedly calling them "male" or "men."[8] *See, e.g.*, Opening Br. at 4, 9, 10, 16, 17, 18, 19, 33, 37, 41, 43, 44, 45, 47, 48, 49; WDI Amicus Br. at 9, 10, 14, 15, 18, 19, 21, 22, 25, 29, 30, 31, 32, 33. The Spa did this in their briefing before the district court, as well, and HRC called the district court's attention to this practice in its Motion to Dismiss. 2-ER-105 n.4. "[C]ourts have denounced such misgendering as degrading, mean, and potentially mentally devastating to transgender individuals." *Hecox*, 479 F. Supp. 3d at 957 (citing *T.B., Jr. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 577 (4th Cir. 2018)) (characterizing as harassment and "pure meanness" a student's use of male gender pronouns to refer to a transgender female teacher). The *Hecox* district court expressly rejected counsel's argument that the misgendering was "necessary" for accuracy in "differentiat[ing] between 'immutable' categories of sex versus 'experiential' categories of gender identity." *Hecox*, 479 F. Supp. 3d at 957. "Such 'accuracy[]'

that the WLAD's public accommodations provision violated its First Amendment rights, a permanent injunction from having the WLAD's public accommodations provisions enforced against it, nominal damages, attorneys' fees and costs, and all other appropriate relief. *Id*. at 427–28.

HRC moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because the Spa lacked standing and its claims failed as a matter of law; specifically, the Eleventh Amendment barred the Spa's claim for nominal damages, and the U.S. Supreme Court precedent rejected the legal arguments the Spa made to support its First Amendment claims for declaratory and injunctive relief. *Id*. at 383–412. Judge Rothstein concluded that the Spa had standing, but agreed with HRC that the Spa's factual allegations, accepted as true, failed to state a cognizable claim for relief and dismissed the Spa's complaint without prejudice. *Id*. at 267, 293. More specifically, the district court concluded that the WLAD does not violate the Spa's First Amendment right to freely exercise its religion because it is a neutral law of general applicability that is rationally related to the legitimate, governmental purpose of eliminating discrimination against protected classes. *Id*. at 295.

In dismissing the Spa's Free Speech claim, the district court found that the WLAD "bars Olympus Spa from denying services to customers based on sexual

---

. . . is not compromised by simply referring to . . . transgender females as 'transgender women,' or by adopting . . . preferred gender pronouns." *Id*. Similarly here, the Spa may challenge the WLAD in a way that respects transgender women.

orientation and, in this regard, it incidentally burdens Olympus Spa's speech by prohibiting advertisement of discriminatory entrance policies (e.g., one that permits only 'biological women')." *Id.* at 299. The court analogized to established Supreme Court precedent holding that laws that "prohibit employers from discriminating in hiring on the basis of race," would also "require an employer to take down a sign reading 'White Applicants Only.'" *Id*. at 299 (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (*FAIR*)). The court determined intermediate scrutiny applied, and that the WLAD met all three elements under *United States v. O'Brien*, 391 U.S. 367, 377 (1968): first, it furthers an important or substantial governmental interest, namely protecting the public's civil rights; second, this State interest is unrelated to suppressing protected speech; and third, the WLAD increases the effectiveness of the government's efforts to achieve its interest. 3-ER-300.

Finally, the district court dismissed the Spa's Free Association claim because "[t]he relationship between Olympus Spa and its customers clearly falls 'outside of the category of relationships worthy of this kind of constitutional protection.'" *Id.* at 303 (citation omitted). "[S]pa-goers 'are not members of any organized association; they are customers of the same business establishment. Most are strangers to one another, and the [spa] admits all [biological females] who are willing to pay[.]'" *Id*. (citation omitted). The district court was sensitive to "the privacy concerns at play when employees are performing exfoliating massages on nude patrons." *Id.* at 304. However, it explained that nudity and the

16

Spa's "biological women only" entry policy did not transform the relationships between random strangers into the type of intimate association that the First Amendment protects. *Id*. The district court gave the Spa leave to amend its complaint. *Id*. at 304–06.

The Spa thereafter filed an Amended Complaint, removing Appellants Myoon Woon Lee, Sun Lee, and two unnamed employees as Plaintiffs, and adding HRC investigator Madison Imiola in her official and personal capacities as a Defendant. 2-ER-122–48. It asserted the same three First Amendment claims that the district court previously dismissed and added two new claims not on appeal here. *Id*. at 138–46. The Amended Complaint contained limited additional factual allegations about the Spa. For example, the Spa alleged that it was founded to preserve Korean traditions and that its purpose is to "bring health, peace, safety, and welfare to women who can freely associate in a safe space." *Id*. at 125 ¶¶ 12–13. It also alleged that the Spa's customer base had expanded "from predominately Korean/Asian female customers to female customers of all ethnicities, backgrounds, and races." *Id*. at 126 ¶ 14.

The Amended Complaint also added allegations about the HRC complainant's personal, educational, and activism background. *Id*. at 130 ¶¶ 32–33. Plaintiffs further alleged that the HRC complainant stated in press interviews that she never visited Olympus Spa, but rather had called ahead of visiting to inquire whether she would be admitted. *Id*. at 131 ¶ 35. Finally, the Amended Complaint contains personal health details about the

17

complainant, such as an allegation that she had bottom surgery after she made the complaint to HRC, but before HRC began investigating. *Id*. at 131–32 ¶¶ 35–36.

HRC moved to dismiss the Amended Complaint under Rule 12(b)(6). *Id*. at 101–18. The district court dismissed the Spa's Amended Complaint, this time with prejudice. 1-ER-3–15. Judge Rothstein found "no new grounds for the Court to change its original opinion" regarding the Spa's First Amendment claims. *Id*. at 9. The district court dismissed the Spa's other claims, too, finding that neither the facts nor law supported them, or that the Spa failed to respond to HRC's arguments. *Id*. at 10–15.

Judgment was entered on November 15, 2023. *Id*. at 2. Appellants appeal, challenging only the district court's dismissal of the Spa's First Amendment claims. Opening Br. at 1–2.

## VI.    STANDARD OF REVIEW

The district court's grant of a Rule 12(b)(6) motion to dismiss is reviewed *de novo*, accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party. *McGinity v. Proctor & Gamble Co.*, 69 F.4th 1093, 1096 (9th Cir. 2023). However, "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The Court need not "assume the truth of legal conclusions merely because they are cast in the form of factual

18

allegations." *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). The task of determining whether a complaint states a plausible claim for relief is "context-specific," and requires "the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "If support exists in the record, a dismissal may be affirmed on any proper ground." *McGinty*, 69 F.4th at 1096.

## VII.   SUMMARY OF ARGUMENT

This case concerns a conflict between the State's compelling interest in enforcing the WLAD to eliminate gender identity discrimination in places of public accommodation and the Spa's asserted rights to Free Speech, Free Exercise of religion, and Free Association. The district court correctly found that under well-established Supreme Court precedent, the WLAD is a neutral law of general applicability, and the Spa has no First Amendment right to discriminate based on gender identity.

The Spa's Free Speech claim fails as a matter of law. The WLAD does not target speech; it expressly prohibits gender identity discrimination—which is non-expressive conduct, not speech—in places of public accommodation like the Spa. The First Amendment does not protect discriminatory conduct. And while the Free Speech Clause prohibits the State from regulating the Spa's speech, the Spa is not speaking when it provides its services, including access to a steam room and exfoliations. In other words, the Spa's services are not inherently expressive—and unlike a parade, a website, a beauty pageant, or a

19

burning flag, all of which convey some message to an observer without further explanation. By contrast, when the Spa provides or withholds its services, an observer is unlikely to know that the Spa is communicating anything at all about its view of "biological" women. Similarly, an observer would not know, just by noticing military recruiters conducting interviews off-campus, that a school had exiled those recruiters in protest of a military policy. In both circumstances, more words would be needed for the observer to know that something was being communicated by the discriminatory conduct. The WLAD thus regulates the Spa's discriminatory conduct, not the content of its speech. As such, it only incidentally burdens the Spa's discriminatory "biological women only" entry policy in a way that is no greater than is essential to advance the State's important—even compelling—interest in eliminating discrimination. This Court should affirm the district court's dismissal of the Spa's Free Speech claim.

The Spa's Free Exercise claim also fails as a matter of law for two reasons. First, the Spa's allegations show that the Spa did not disclose or rely on its religious beliefs at any time before the Spa and HRC entered into the pre-finding settlement agreement. HRC's enforcement of the WLAD had nothing to do with the Spa's religious beliefs because HRC simply did not know about them. Second, even if HRC had known about the Spa's religious beliefs, the WLAD does not violate the Spa's Free Exercise right because the statute is a neutral law of general applicability that is rationally related to a legitimate State interest. The WLAD is neutral and generally applicable because it has no mechanism of

20

discretionary exemptions from the WLAD's requirements, and the law treats equally religious and secular reasons for gender identity discrimination: both are prohibited. This Court should affirm the district court's dismissal of the Spa's Free Exercise claim.

The WLAD does not violate the Spa's freedom of intimate or expressive association as a matter of law. The relationship between and among the Spa, its employees, and its customers is not an intimate association that the First Amendment protects. It is a business relationship between people who are largely strangers to each other, who spend a few hours in each other's presence in a public place and then go their separate ways. They are not in a familial relationship; they are not roommates who share a home and have near unfettered access to each other's lives and belongings. Nudity does not transform strangers into intimate partners whose relationship the First Amendment protects.

Nor is the Spa an expressive association; it is unlike the Boy Scouts, who imparts its values to young people, or the Jaycees, who engage in political and community activities. Spa employees and customers come to the Spa to provide or receive spa treatments, not to participate in any activity protected by the First Amendment, namely speech, religious exercise, or petitioning the government. The hands-on nature of the Spa's services does not transform those procedures into expressive services. Even the Spa admits its services are not "pure speech." Opening Br. at 48. Just as serving Muslim women does not mean the Spa is expressing its agreement with Muslim teachings, serving transgender women

does not compel the Spa to communicate that the Spa believes transgender women are women. This Court should affirm the district court's dismissal of the Spa's Free Association claim.

Finally, even if the WLAD infringed the Spa's First Amendment rights, which it does not, it is still constitutional because it passes strict scrutiny as applied to the Spa. First, it is black letter law that a state has a compelling interest in eradicating discrimination against protected classes. The WLAD promotes that interest by requiring that places of public accommodation, unless distinctly private or a specified religious or sectarian facility, provide equal access to all, regardless of gender identity. There is no less restrictive means to end gender identity discrimination in places of public accommodation than this provision common to state and local anti-discrimination law. The least restrictive means to end discrimination is to prohibit it. This Court should affirm the district court's dismissal of the Spa's case.

## VIII. ARGUMENT

### A.    The Spa's Free Speech Claim Fails as a Matter of Law Because the WLAD Is a Content-Neutral Law that Satisfies Intermediate Scrutiny

#### 1.    The First Amendment protects speech, not discriminatory conduct

The First Amendment prohibits the State "from telling people what they must say[,]" or what they cannot say. *FAIR*, 547 U.S. at 61; *see Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (under the Free Speech Clause, the government "has no power to restrict expression because of

22

its message, its ideas, its subject matter, or its content"). Laws that regulate speech because of its content are content-based "and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

But, the Free Speech Clause does not provide a license for businesses to discriminate against protected classes. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984).

> As we have explained, acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—*wholly apart from the point of view such conduct may transmit.* Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection.

*Id*. (emphasis added); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964) ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty."). A law that proscribes discriminatory conduct that may flow from a speaker's words, without regulating the content of the speaker's message, "is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."

23

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

A law against treason is an example of such a neutral law because on its face, it targets unlawful conduct, namely telling national secrets to an enemy, and only incidentally circumscribes speech. *R.A.V.*, 505 U.S. at 389. The treason law regulates the "'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the speech.'" *Id.* (citations omitted).

Minnesota's public accommodation law, at issue in *Jaycees*, is another example of a content neutral law aimed expressly at assuring equal access to publicly available goods and services. *Jaycees*, 468 U.S. at 624. The law did not target speech, discriminate based on viewpoint, or permit authorities to enforce the statute in ways that did. *Id.* at 623. By requiring the Jaycees, dedicated to developing young men's civic organizations, to admit women, who may have a different view or agenda than the male members of the Jaycees, the Minnesota public accommodations law at most only incidentally abridged the Jaycees protected speech. *Id.* at 628.

As a third example, a federal law requiring access to college campuses and students for military recruiters on par with other job recruiters did not

24

regulate speech by requiring the schools to send the same emails and post the same notices for military recruiters that they would for other job recruiters. *FAIR*, 547 U.S. at 55, 61–65. That law did not focus "on the *content* of a school's recruiting policy[,]" but rather looked "to the *result* achieved by the policy." *Id*. at 57 (emphases in original). In fact, the law "[did] not dictate the content of the speech at all, which [was] only 'compelled' if, and to the extent, the school provide[d] such speech for other recruiters." *Id.* at 62. As such, the regulated speech was "plainly incidental to [the law's] regulation of conduct[.]" *Id*.

Laws that regulate non-expressive conduct are distinct from restrictions on protected expression; they do not implicate the First Amendment and are reviewed for rationality, even if they have an incidental burden on speech. *See, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1078 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023) (applying rational basis review to statute prohibiting conversion therapy for minors as practiced by licensed health professionals, which may have incidental effect on speech). A facially neutral regulation that regulates conduct containing elements of both speech and non-speech receives intermediate scrutiny. *See O'Brien*, 391 U.S. at 377–82 (law prohibiting mutilating draft cards, conduct that may communicate a message of protest or express nothing at all, was constitutional under intermediate scrutiny). Such a law does not violate the First Amendment "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged

First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id*.

To summarize, strict scrutiny applies to a law that is enforced to compel a speaker to express an idea that they do not want to express, or to prohibit a speaker from expressing an idea that they want to express. Intermediate scrutiny applies to a neutral law that regulates a secondary effect of speech—or conduct containing speech and non-speech elements—that is harmful apart from any idea that the speech or conduct may express. Rational basis applies to a neutral law that regulates non-expressive conduct, including any speech that initiates, evidences, or carries out such conduct.

### 2.   The WLAD is content-neutral because on its face, and as applied to the Spa, it regulates the Spa's discriminatory conduct and at most incidentally burdens the Spa's speech

On its face, the WLAD's public accommodations provisions bar discriminatory conduct. Wash. Rev. Code §§ 49.60.030(1)(b), .215. They are aimed at ensuring that state businesses open to the public do not discriminate based on a protected class—including gender identity—and provide equal access to their goods and services. 3-ER-299. But the Supreme Court looks beyond the face of the law to determine whether it is content-neutral as applied to the speaker. *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Bos.*, 515 U.S. 557, 578–79 (1995) (state public accommodations law did not regulate speech on its face, but by requiring parade organizers to allow openly gay, lesbian, and bisexual persons to march as a group to express pride in their Irish

26

heritage would violate the organizers' right to choose the content of their message); *303 Creative LLC v. Elenis*, 600 U.S. 570, 580–81, 588–89 (2023) (state public accommodations law did not target speech on its face, but by forcing a graphic designer to create a website to celebrate a gay couple's wedding, it would compel her to speak a message of support for the wedding against her will). The issue is whether the law is aimed more at a secondary effect of the speaker's message, like discrimination against a protected class, or whether the focus of the law is on what the speaker is saying.

The public accommodation laws in *Hurley* and *303 Creative* were applied primarily to compel speech or censor ideas and not to curtail discriminatory conduct. In *Hurley*, parade organizers would allow openly gay, lesbian, and bisexual individuals to march in the parade, but not as a unit. *Hurley*, 515 U.S. at 572. The state believed this conduct discriminated based on sexual orientation in violation of its public accommodations law. *Id*. The Supreme Court disagreed, reasoning that the state was applying the law in a "peculiar way": not to "address any dispute about the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade[,] but "to the admission of [a gay, lesbian, and bisexual group] as its own parade unit carrying its own banner." *Id*. Since parades are "the inherent expressiveness of marching to make a point[,]" and "[s]ince every participating unit affects the message conveyed by the private organizers, the state courts' application of the [public accommodations] statute produced an order essentially requiring petitioners to

27

alter the expressive content of their parade." *Id*. at 573. The Court held that "this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id*.

Similarly, the state public accommodations provision in *303 Creative* violated a website designer's Free Speech right by compelling her to use her words and custom, one-of-a-kind artwork to express a view with which she did not agree, namely that marriage should be reserved to unions between one man and one woman. *303 Creative*, 600 U.S. at 579–80, 589. As in *Hurley*, the enforcement of the law focused less on preventing sexual orientation discrimination and more on compelling the website designer's speech, since the website designer had not, and would not, create *for anyone*—not just gay couples—custom websites that express views in conflict with her own. *Id*. at 580, 588 (emphasis added). The website designer "intend[ed] to 've[t]' each prospective project to determine whether it is one she is willing to endorse." *Id*. at 588. For the Court, the "'very purpose' in seeking to apply [the] law to [the website designer]" was "the coercive '[e]liminati[on] of dissenting 'ideas' about marriage[.]'" *Id*. at 588.

*Hurley* and *303 Creative* have no application here. Whereas the *Hurley* parade organizers and the *303 Creative* website designer discriminated *based on the message* the parade or websites would convey, the Spa discriminates *based on the customer* seeking the Spa's standardized menu of services. As the district

28

court found, "the [spa] admits all [biological females] who are willing to pay[.]"
3-ER-303 (brackets in original). Only transgender women are excluded. This is
clear-cut gender identity discrimination, not content regulation prohibited by the
First Amendment.

Despite the clear speech-conduct distinction, the Spa asserts nonetheless
that its "description of itself and its services, on its own website, constitutes 'pure
speech' under the First Amendment." Opening Br. at 15. But, again, the WLAD
constitutionally may prohibit the Spa's gender identity discrimination, including
the words the Spa uses to further that discrimination. *See FAIR*, 547 U.S. at 62.
The district court correctly concluded that "[t]he compelled speech to which
Olympus Spa points [i.e., the Spa's "biological women only" entry policy] is
'plainly incidental' to the WLAD's regulation of discriminatory conduct.
3-ER-299 (citing *FAIR*, 547 U.S. at 62). This is because the Spa's entry policy
initiates, evidences, or carries out the Spa's exclusion of transgender women, the
very conduct the WLAD prohibits. *See id*. Requiring the Spa to remove its
"biological women only" entry policy in this case is the same as Congress
requiring an employer to remove a "White Applicants Only" sign: neither
removal violates the Free Speech Clause because both are removed to stop
discrimination against a protected class, a secondary effect that is distinct from
the content of the words.

The WLAD, therefore, is content-neutral on its face and as applied to the
Spa. The WLAD regulates the Spa's non-expressive, discriminatory conduct,

29

and the Court should analyze the constitutionality of the WLAD as applied to the Spa under rational basis review. But even if the Court accepted that the Spa's discriminatory conduct contained elements of speech and non-speech, intermediate scrutiny would apply. The WLAD readily satisfies either standard.

### 3. The WLAD does not infringe on the Spa's Free Speech right under rational basis review or intermediate scrutiny

The Free Speech Clause does not bar the WLAD's application to the Spa because the WLAD is rationally related to a legitimate government purpose. "Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018). The State "carries a light burden," as "[l]egislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 457 (quoting *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). The Spa bears the burden of negating "every conceivable basis which might support" the WLAD. *Id.* (citation omitted).

The district court correctly found that the WLAD meets this test. 3-ER-295–96. States have a legitimate interest, even a compelling one, in guaranteeing that people have equal access to publicly available goods and services. *See Jaycees*, 468 U.S. at 628; *Board of Directors of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). Public accommodations laws like the WLAD that assure equal access to participation in political,

30

economic, and cultural life further that substantial state interest.[9] *see, e.g.*, *Jaycees*, 468 U.S. at 628–29; *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988); *Heart of Atlanta Motel*, 379 U.S. at 261–62; *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1231 (Wash. 2019).

Even under intermediate scrutiny, the district court applied the three-part *O'Brien* test and correctly concluded that the Spa's Free Speech challenge fails as a matter of law. 3-ER-300. The first two elements have already been shown above. The State has an important interest in ensuring equal access to places of public accommodation, and the State's interest in protecting the public's civil rights is "wholly apart" from suppressing protected speech. *Jaycees*, 468 U.S. at 624, 628.

And third, the WLAD's incidental restriction on speech is no greater than is essential to the furtherance of that interest. That is, the State's interest "would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985). As the district court explained, without the WLAD, state businesses could more easily discriminate against members of a protected

---

[9] The Spa poses four "uncomfortable questions about the State's interests here." Opening Br. at 23. But these questions demonstrate the Spa's misunderstanding of the type of discrimination at the heart of this case. The WLAD requires the Spa to treat transgender women the same as cisgender women. Wash. Rev. Code §§ 49.60.030(1)(b), .215. Further, under the regulations governing the WLAD, places of public accommodation are permitted to maintain "gender-segregated facilities," like "restrooms, locker rooms, dressing rooms" and similar spaces. Wash. Admin. Code § 162-32-060(1)–(2). HRC has never contended that the Spa falls outside the terms of this regulation or that maintaining the Spa's nude areas for women is not lawful.

class. 3-ER-300. Members of the public could experience exclusion from businesses and refusals of service based on race, sex, marital status, sexual orientation, disability, and more. That there may be other ways to protect Washingtonians' civil rights to participate in the marketplace without discrimination is not the test. *Id*. What matters is that the WLAD "add[s] to the effectiveness" of safeguarding civil rights and guaranteeing equal access to places of public accommodation. *Id*. (citations omitted). The Free Speech Clause does not bar the WLAD from regulating the Spa's discriminatory conduct.

### 4.    The WLAD does not regulate the Spa's speech because the Spa's services are not inherently expressive

The Spa seeks to escape this conclusion by suggesting in conclusory fashion that while its "services are not pure speech or press, like delivering a lecture or printing a newspaper, it [*sic*] is a form of expressive conduct, nonetheless." Opening Br. at 40. But that is wrong. The First Amendment protects conduct only when it is *inherently* expressive, and standardized spa services do not qualify.

Certain expressive conduct can be protected "speech" within the meaning of the First Amendment. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word."). But conduct is protected speech only when it is "inherently expressive." *FAIR*, 547 U.S. at 66. Conduct is inherently expressive when "[a]n intent to convey a

particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curiam); *FAIR*, 547 U.S. at 64. Stated differently, the conduct itself must indicate that something is being expressed, without further explanation. *FAIR*, 547 U.S. at 66.

Flag burning is a paradigmatic example of inherently expressive conduct. *Texas,* 491 U.S. at 406. Observers would know, without further explanation, that the flag burner intended to express something by burning the flag. *Id*. Other examples of inherently expressive conduct include parade marching, custom website design, beauty pageants, plays, musicals, movies, and the Super Bowl halftime show. *See Hurley*, 515 U.S. at 568, 572–73 (holding that a parade is inherently expressive because it is made up of "marchers who are making some sort of collective point, not just to each other but to bystanders along the way"); *303 Creative*, 600 U.S. at 587–88 (holding that the designer is engaged in expressive conduct because she uses her own words and artwork to create unique websites to communicate ideas about marriage); *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 780 (9th Cir. 2022) ("As with theater, cinema, or the Super Bowl halftime show, beauty pageants combine speech with live performances such as music and dancing to express a message.").

The Spa's services are not inherently expressive conduct like those above. According to the Spa, the message its services convey is "that there is a difference between biological males and females; that includes the notion that

33

women should be allowed to enjoy the physical and highly intimate procedures in privacy and safety." Opening Br. at 40. But, the Spa never alleged the Spa's *services* express any such message or idea. Rather, the Amended Complaint alleges only that the Spa wishes to communicate to the public on its website its view "[t]hat there is a difference between males and females[.]" 2-ER-140 ¶ 61. Even if the Spa intended that its services, or even its denial of services to transgender women, communicate its view of "biological" women, an *intent* to express an idea through conduct is insufficient to infuse the Spa's services with inherent expression and transform that conduct into protected speech. *FAIR*, 547 U.S. at 65–66.

*FAIR* illustrates this point. There, law schools denying campus access to military recruiters in protest of the military's "Don't Ask, Don't Tell" policy was not inherently expressive conduct. *FAIR*, 547 U.S. at 66. An observer seeing military recruiters interviewing off campus would have no way of knowing whether the schools were even protesting anything or treating the military recruiters differently without further explanation. *Id*. Similarly, just as "providing flowers for a wedding between Muslims would not necessarily constitute an endorsement of Islam," a florists "decision to either provide or refuse to provide flowers for a wedding does not inherently express a message about that wedding." *Arlene's Flowers*, 441 P.3d at 1226 (applying the WLAD).

The same is true about the Spa's refusal to serve pre-operative transgender women. The Spa cannot credibly argue that providing spa services to a Muslim

34

woman means that the Spa endorses Islam. Similarly, providing spa services to a pre-operative transgender woman does not mean that the Spa considers her to be a "biological" woman. In both situations, speech beyond providing or withholding the spa service would be required to communicate the Spa's stance on Islam or "biological" women. Further, an observer seeing a transgender woman abruptly leave the Spa would not know whether the Spa is treating her worse because of her gender identity, because it has no available appointments, because it does not offer the type of massage she seeks, or some other reason. Indeed, the observer may not know that the customer is transgender at all. The Spa's discriminatory conduct is not inherently expressive conduct because it requires words, beyond the conduct itself, to explain.

Because the WLAD simply regulates what the Spa must *do*—i.e., provide equal access and refrain from discrimination—and not what the Spa may or may not *say* about "biological women," there is no speech regulation here. *See FAIR*, 547 U.S. at 60. This Court should affirm the district court's dismissal of the Spa's Free Speech claim.

**B.     The Spa's Free Exercise Claim Fails as a Matter of Law Because the WLAD Prohibits Gender Identity Discrimination for Any Reason and Thereby Advances a Legitimate State Interest**

The district court correctly dismissed Plaintiffs' Free Exercise claim because the Spa did not rely on its religious beliefs to justify its "biological women only" policy. Even if it had, the WLAD is a valid, neutral law of general applicability that at most incidentally burdens Plaintiffs' religious belief that

35

transgender women are men, not women. 3-ER-294–95. This Court should affirm because the WLAD has a legitimate purpose—to eliminate discrimination and protect the public welfare, health and peace. *Id*. at 295 (citing Wash. Rev. Code § 49.60.010). It promotes that purpose, in significant part, by proscribing discrimination in places of public accommodation, thereby "advanc[ing] Washington's 'legitimate interest in ensuring equal access to public accommodation.'" *Id*. Therefore, the WLAD survives rational basis review and the Spa's claim fails as a matter of law.

**1.     The record does not support the Spa's litigation position that its "biological women only" policy is rooted in religion**

As an initial matter, the Free Exercise Clause does not protect the Spa's services at all, because the Spa only alleges that they are rooted in Korean culture, not in any religious belief. 3-ER-447 ("The cultural underpinnings of the unique services offered at Olympus Spa, originated in Korean spa therapy and body massage (requiring nudity) that goes back many generations."); *Thomas v. Review Bd. of Indiana Employ. Sec. Div.*, 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise Clause[.]"). Nor does the Spa allege a religious requirement that women be nude at any time or for any procedure in the Spa. 3-ER-420 ¶ 28 ("Olympus Spa's position is that nudity is required for certain procedures called 'Seshin' according to Korean tradition."). It alleges no religious belief that any procedure in which the customer is unclothed must occur in view of others. 3-ER-416–17 ¶ 15 ("Patrons

are typically fully naked when using these sections of the spa and have visual access to other patrons."). The Spa asserts no First Amendment right to require nudity for the purpose of receiving Spa treatments, and has claimed only a cultural or practical basis for preferring nudity. 3-ER-447. Instead, during the investigation, the Spa's arguments in support of its discriminatory policy had to do with criminal liability and legal protection; safety; the well-being of customers; serving reasonable business purposes; and historical, cultural, and practical reasons—not religion. 3-ER-447–49. In short, the Spa does not allege that its religious beliefs require them to operate the Spa in the manner it does, and that is enough to affirm the district court's dismissal of the Spa's Free Exercise claim.

### 2. The WLAD is a neutral law because it prohibits gender identity discrimination in places of public accommodation, regardless of the reason

Even if the Spa had sufficiently established a religious tie to its nudity requirement, contrary to its allegations, its belief is not enough to overcome the WLAD's neutral and generally applicable scope. The Free Exercise Clause provides: "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. CONST. amend. I. The right to freely exercise one's religion, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that her religion prescribes (or proscribes)." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)

37

(internal quotation marks omitted). Thus, "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Rational basis review applies to neutral, generally applicable laws, which means that the law need only be rationally related to a legitimate governmental purpose to survive constitutional scrutiny. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1137 (9th Cir. 2009).

A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation[.]" *Lukumi*, 508 U.S. at 533. This may occur if the text of the law is aimed at a religious practice and not also similar secular practices, or if the government acted in a manner "hostile to . . . religious beliefs" by enacting or enforcing the law in a way that subtly departs from neutrality or covertly targets religious conduct. *Id*. at 533–34; *Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018). A law is not generally applicable if it either has "a mechanism for individualized exemptions" that "invite[] the government to consider the particular reasons for a person's conduct" and whether to grant the exemption, or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 523, 534 (internal quotations and citations omitted). "Neutrality and

general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. A law failing to satisfy the neutrality or generally applicable requirement must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. *Id.* at 531–32.

As the district court correctly concluded, the WLAD's public accommodations provision is a neutral law of general applicability. 3-ER-294–95; 1-ER-8–9. "The law does not discriminate on its face, and it does not by its terms favor a particular religion or the non-exercise of religion." 3-ER-294. Further, the district court found no facts, either in the Complaint or Amended Complaint, "to suggest that the legislature was motivated by a masked intent to discourage religious exercise or discriminate against [the Spa's] religion[,]" or that HRC applied the WLAD in a manner hostile to the Spa's religious beliefs. 3-ER-294–95; 1-ER-8–9.

None of the Spa's allegations or arguments demonstrated any such masked intent to discourage the Spa's exercise of its religious beliefs or that HRC acted in a manner hostile to the Spa's religion. The original HRC complainant's gender-affirming surgery did not moot HRC's investigation because the Spa had an ongoing discriminatory entry policy. And the original complainant's history of transgender activism, HRC's use of the term "cisgender," and the fact that a church and a religious university had recently and separately sued the Attorney General's Office (a separate state agency), was

not evidence of religious animus against the Spa by HRC. 1-ER-8–9. In fact, based on the record included with the Complaints, HRC could not have known about the Spa's religious beliefs because the Spa did not mention them—much less raise them in defense of its gender identity discrimination—during HRC's investigation. 3-ER-447–50, 455, 459.

The WLAD and HRC's enforcement of the statute against the Spa lack any of the indicators of bias against religion that characterized the city ordinances struck down in *Lukumi*. Those ordinances were facially neutral, but the record evidence showed that their purpose was to target a particular religion's practice of animal sacrifice. *Lukumi*, 508 U.S. at 534. For example, the ordinances defined animal "sacrifice" in a way that would prohibit only the "ritual" of one religion and not of other religions, or the killing of animals in general; the city interpreted the ordinances in a way that deemed as "unnecessary" only animal killings for religious reasons, but not for any other purposes, like hunting or euthanasia; and the ordinances prohibited the religious animal sacrifices even if they occurred in licensed, inspected, and zoned slaughterhouses. *Id*. at 536–37. The Spa does not, and cannot, argue that the WLAD prohibits gender identity discrimination only for religious, and not for secular reasons. The WLAD is nothing like the *Lukumi* ordinances that substantially burdened religion.

As to whether HRC's actions departed from the ordinary course in a way that may signal animus, the Spa's own allegations show that HRC proceeded as

40

it is directed to under its regulations: it determined, preliminarily, that there was reasonable cause to believe the Spa's "biological women only" entry policy violated the WLAD's public accommodations provision. 3-ER-452; *accord* Wash. Rev. Code §§ 49.60.120, .240. Whereas the Colorado Civil Rights Commission in *Masterpiece Cakeshop* showed animus in remarks that disparaged the business owner's religion, "cast[ing] doubt on the fairness and impartiality" of those proceedings, 584 U.S. at 635–36, plausible allegations of any such religious animus are completely absent here. HRC did not even know about the Spa's alleged religious beliefs until the Spa sued HRC in federal court. The WLAD is a neutral law.

### 3. The WLAD is a generally applicable law that does not burden the Spa's religion because it gives HRC no discretion to grant an exemption to its requirements, and it does not favor secular conduct over similar religious conduct

The WLAD also satisfies the two conditions that make it generally applicable. First, the WLAD's public accommodations provision has no system of discretionary exemptions that HRC may grant on an individual basis, depending on whether HRC agrees with reason for the exemption. *See Fulton*, 593 U.S. at 534–35 (the city's contract with foster care agencies gave the city sole discretion to grant an exception, which made the contract not generally applicable, and the city's decision not to grant an exception to a religious foster care agency for refusing to certify gay and lesbian married couples as foster parents in violation of the city's non-discrimination laws was subject to strict

41

scrutiny); *Lukumi*, 508 U.S. at 537 ("Further, because it requires an evaluation of the particular justification for the [animal] killing, this ordinance represents a system of 'individualized governmental assessment of the reasons for the relevant conduct'" (citation omitted)). There are just two explicit, nondiscretionary exclusions from the WLAD's public accommodations provision: one for distinctly private institutions, like a bona fide private club; and a second for "any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution." Wash. Rev. Code § 49.60.040(2). These are not individualized exemptions; HRC cannot consider the reason for the Spa's discriminatory conduct and whether it is worthy of an exemption from the WLAD's requirements. And, a court may not read words into the WLAD to create an exemption for the Spa. *Dean v. United States*, 556 U.S. 568, 572 (2009); *Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1020 (9th Cir. 1993). Nor should there be such an exemption because it would "make the professed doctrines of religious belief superior to the law of the land, and in effect [] permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878). The WLAD's public accommodations provision meets the first requirement for being a generally applicable law.

Second, the WLAD's public accommodations provision is generally applicable because it does not prohibit religious conduct while permitting secular conduct that similarly undermines the State's asserted interests. The ordinance

in *Lukumi*, for example, prohibited only the church from killing animals in licensed, inspected and zoned slaughterhouses. *Lukumi*, 508, U.S. at 538. The WLAD, in contrast, prohibits all spas open to the public in the state, whether religious or secular, from engaging in gender identity discrimination. *See* Wash. Rev. Code § 49.60.040(2) (no spa exception). The WLAD is generally applicable.

Even the Spa concedes that the WLAD is neutral and generally applicable, just not as applied to the Spa. Opening Br. at 27–28. The Spa claims that HRC enforced the WLAD "as a means to launder its coercive actions which substantially burden the free exercise of the Spa's religion." Opening Br. at 27–28. But again, the Spa did not raise its religious beliefs during the investigation.[10] Even if it had, the WLAD contains no exemption from its prohibition on gender- identity discrimination for spas.

The Spa further argues that HRC's application of the WLAD against the Spa substantially burdens its right to freely exercise its religion because "the Spa cannot maintain business operations and practice its faith and maintain compliance with Washington's public accommodation laws." Opening Br. at 28; 3-ER-414 ("customers have clearly communicated that they will not return [if

---

[10] The Spa appears to argue that HRC should have known about its religious beliefs because HRC "was well aware that the Spa's services were based on traditional Korean beliefs and that this included the spiritual health of women." Opening Br. at 27 (citing 3-ER-447). HRC may have been aware of the Spa's Korean heritage and focus on spiritual health, but did not become aware of its religious beliefs until the Spa filed its Complaint.

the Spa serves pre-operative transgender women], causing the business to spiral into bankruptcy"). Whether the Spa will suffer economic hardship by complying with anti-discrimination law, is, of course, a matter of pure speculation. In fact, "[e]xperience is to the contrary where discrimination is completely obliterated as to all public accommodations." *Heart of Atlanta Motel*, 379 U.S. at 260. Regardless, the Supreme Court "has specifically held that the fact that a 'member of the class which is regulated may suffer economic losses not shared by others . . . has never been a barrier' to [the constitutionality of public accommodation laws]." *Id*. (citation omitted).

Finally, the Spa misapplies the holdings of five Supreme Court decisions in arguing that the Free Exercise Clause trumps neutral or generally applicable laws. Opening Br. at 29–31. *Dale* does not apply here because it is a Free Association case, not Free Exercise. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). *Hosanna-Tabor* and *Our Lady of Guadalupe* also are unlike this case because those were employment cases involving the ministerial exception, a doctrine exclusive to employment discrimination law. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). The ministerial exception has no application to a public accommodations case like this one. And *Fulton* and *Masterpiece Cakeshop*, like here, applied the same legal analysis that the district court did in this case—that a neutral law of general applicability does not unconstitutionally burden religion when it is rationally

44

related to a legitimate governmental purpose—but, as explained above, the laws at issue in those cases were not neutral or generally applicable. *Fulton*, 593 U.S. at 534–35; *Masterpiece Cakeshop*, 584 U.S. at 635–36. The WLAD *is* a neutral law of general applicability that prohibits discrimination in the marketplace, regardless of motivation, whether it be tradition, custom, prejudice, personal distaste, ignorance, religion, or some other reason. Wash. Rev. Code § 49.60.010.

The Spa's allegations show that the WLAD is a neutral law of general applicability, and as argued above, the WLAD is rationally related to the State's purpose of preventing discrimination. This Court should affirm the district court dismissal of the Spa's Free Exercise claim.

**C.    The Spa's Free Association Claim Fails as a Matter of Law Because the Relationships Between and Among the Spa, Its Employees, and Its Customers Are Not the Intimate or Expressive Associations that the First Amendment Protects**

The Free Exercise Clause protects the "freedom of intimate association"—those types of intimate relationships, such as the choice of one's spouse—and the "freedom of expressive association"—certain personal associations "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Jaycees*, 468 U.S. at 617–18. "Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty."

45

*Id*. at 619. The First Amendment shields only associations that exemplify these purposes. *Id*.

If a law regulates an intimate or expressive association, a court applies strict scrutiny to determine whether it violates the First Amendment. *See id*. at 623. But a law that regulates relationships that are not the intimate or expressive associations that the First Amendment protects need only satisfy rational basis review. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

The Spa brought only an intimate association claim, which the district court correctly dismissed. 3-ER-427; *id*. at 302–04. On appeal, the Spa argues that enforcement of the WLAD violates both its right to freedom of intimate and expressive association. Opening Br. at 33–41. But, as the district court correctly found, "[t]he relationship between Olympus Spa and its customers clearly falls 'outside of the category of relationships worthy of this kind of constitutional protection.'" 3-ER-303 (citing *Jaycees*, 468 U.S. at 620). And Spa employees and customers do not associate to further any kind of expressive message.

### 1. The WLAD does not violate the Spa's right to intimate association because the Spa's employees and customers are mostly strangers and thus lack the intimate relationship that the First Amendment protects

The intimate relationships that have qualified for the protection include "marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives." *Rotary Club of Duarte*, 481 U.S. at 545 (internal citations omitted). But, the Court has "not attempted to mark the precise

46

boundaries of this type of constitutional protection[,]" and has "not held that constitutional protection is restricted to relationships among family members." *Id*. The Court must conduct a "careful assessment" of the relationship's characteristics to locate where it falls on a spectrum "from the most intimate to the most attenuated of personal attachments." *Jaycees*, 468 U.S. at 620; *see, e.g.*, *Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1221 (9th Cir. 2012) (finding that roommate relationship "easily qualifies" for protection because people "generally have very few roommates; they are selective in choosing roommates; and non-roommates are excluded from the critical aspects of the relationship[.]").

A court considers the following factors when determining state authority over an individual's freedom of association: "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Jaycees*, 468 U.S. at 620. Relationships that a state may not regulate without satisfying strict scrutiny "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* A large business enterprise serving the public, like a law firm, lacks these qualities and would not be protected. *Id*.; *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). Similarly, the First Amendment does not protect the associational freedom of the operator of a dance hall open to teenagers. *Stanglin,* 490 U.S. at 24.

47

The relationship between the Spa and its employees and customers is not the sort of intimate relationship protected by the First Amendment. As the district court correctly recognized, the Spa never alleged that it is a private club with an exclusive and vetted membership. Rather, the Spa's allegations show that "spa-goers 'are not members of any organized association; they are customers of the same business establishment. Most are strangers to one another, and the [spa] admits all [biological females] who are willing to pay[,]'" "with no inquiry into their backgrounds." 3-ER-303–04 (citing *Stanglin*, 490 U.S. at 24–25; *Jaycees*, 468 U.S. at 621 (internal quotations omitted)). The district court was sensitive to the Spa's argument that nudity makes a space intimate or private, but that alone did not transform the *relationship* between and among the Spa, its employees, and its customers from a business catering to strangers into an intimate, private, exclusive, and selective association protected by the Constitution. 3-ER-303–04; *see also Rotary Club of Duarte*, 481 U.S. at 547 (many of the organization's "central activities" were "carried on in the presence of strangers"). As the Supreme Court recognized,

> It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so.

*New York State Club*, 487 U.S. at 12.

The Spa cannot plausibly argue that nude strangers in the Spa, using a spa room or receiving spa treatments for a few hours for one day, share the same intimate association as roommates. Opening Br. at 34–37. Roommates "generally have very few roommates"; "are selective in choosing roommates"; share living spaces; have "unfettered access to the home"; "are fully exposed to a roommate's belongings, activities, habits, proclivities and way of life"; exclude non-roommates from critical aspects of the relationship; and "risk becoming a suspect in whatever illegal activities" a roommate engages in. *Roommate.com*, 666 F.3d at 1221. Employees and customers of the Spa, on the other hand, do not share a home at all. The fact that dozens of them may share a space for a few hours in a state of undress does not transform a business transaction into an intimate association. The First Amendment requires more selectivity and exclusivity in clientele, more evidence of close personal bonds between and among employees and customers, and more "unfettered access" to each other's personal lives. *Id*. Contrary to the Spa's argument, this Court's holding in *Roommate.com* did not turn solely on the idea that "a girl may not want to walk around in her towel in front of a boy." *Id*.

HRC does not minimize the Spa's concerns over privacy, safety, and the emotional well-being of its employees and customers. *Contra* Opening Br. at 35–36, 40. At the same time, the possibility that a person, whether a teenager or adult, "might see or be seen by someone of the opposite biological sex while either are undressing or performing bodily functions in a restroom, shower, or

49

locker room does not give rise to a constitutional violation[,]" even if it causes some to feel "'embarrassment, humiliation, anxiety, intimidation, fear, apprehension, and stress.'" *Parents for Privacy v. Barr*, 949 F.3d 1210, 1218, 1223–26 (9th Cir. 2020). Also, there are no plausible allegations (much less evidence) that including transgender women threatens the safety of cisgender women in the Spa. Put simply, the Spa cannot discriminate against transgender women just because an aspect of their appearance may not conform to the stereotypical woman. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659 (2020). The WLAD applies to the Spa as a place of public accommodation.

Because the WLAD does not implicate an intimate association protected by the Free Association Clause, the WLAD need only satisfy rational basis review. As previously shown, the WLAD easily meets that test, and this Court should affirm dismissal of the Spa's Free Association claim.

### 2. The WLAD does not violate the Spa's right to expressive association because the Spa employees and customers don't express anything

As the Supreme Court has explained, "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Jaycees*, 468 U.S. at 622. Freedom of association implies a right not to associate. *Id*. at 623. A law that forces a group to accept members it does not desire "may

impair the ability of the original members to express only those views that brought them together." *Id*. But, there are limits to the right to associate. *Id*.

The issue here is whether the Spa engages in "expressive association." *Dale*, 530 U.S. at 648. While the Spa need not be an advocacy group, it must "engage in some form of expression, whether it be public or private." *Id*. For example, the Boy Scouts was an expressive association because its mission was to impart a system of values. *Id*. at 649–50. And, the Jaycees was an expressive association because it engaged in protected activities, such as its advocacy of political and public causes. *Jaycees*, 468 U.S. at 617, 622. But, the Spa and its customers are not conveying values, supporting political or public causes, and its services are not inherently expressive, like a parade, a custom website, saluting or burning the flag, or a beauty pageant.

The Spa hardly argues otherwise. The fact that the Spa's procedures may be "very interactive and hands on as well as lengthy," Opening Br. at 39, does not transform those procedures into expressive services. Even the Spa admits its services are not "pure speech." Opening Br. at 40. Whereas forcing the Boy Scouts to have a gay scout leader would directly impact the message of values the Boy Scouts communicates, forcing the Spa to provide standardized massages to transgender women does not mean, without more explanation, that the Spa has any particular belief about transgender people.

Even if the Spa were to argue that employees and customers come to the Spa to learn about, practice, and experience a part of Korean culture, that also is

51

true of employees and customers of any ethnic place of public accommodation, including restaurants and stores. The fact that the Spa's services are rooted in Korean tradition does not alone make the Spa an expressive association protected by the Free Association Clause. The Constitution does not "recognize[] a generalized right of 'social association' that includes chance encounters." *Stanglin*, 490 U.S. at 25.

Because the Spa is not an expressive association, the WLAD may require the Spa to serve all transgender women on an equal basis, subject to rational basis analysis. As previously shown, the WLAD meets that test.

### D. The WLAD Satisfies Strict Scrutiny Because There Is No Less Restrictive Way to Ensure Equal Access to Goods and Services

Even if the WLAD's public accommodations provision infringed the Spa's First Amendment rights, which it does not, the WLAD is still constitutional because it passes strict scrutiny. That is, the law was "adopted to serve compelling state interests . . . that cannot be achieved through means significantly less restrictive of [First Amendment] freedoms." *Jaycees*, 468 U.S. at 623; *Fulton*, 593 U.S. at 538. As applied to the Spa, the WLAD satisfies strict scrutiny.

First, as argued above, it is black letter law that a state has a compelling interest in eradicating discrimination against protected classes, and the WLAD's public accommodations provision promotes that compelling State interest. *Jaycees*, 468 U.S. at 628; *Rotary Club of Duarte*, 481 U.S. at 549 ("public

accommodation laws 'plainly serv[e] compelling state interests of the highest order'" (citation omitted)). The WLAD's text and purpose support this conclusion. As the Legislature explained, discrimination against protected classes "are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." Wash. Rev. Code § 49.60.010.

Public accommodations laws, like the WLAD, "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *303 Creative*, 600 U.S. at 590 (citing *Heart of Atlanta Motel*, 379 U. S. at 250 (internal quotation marks omitted)); *see also*, *e.g.*, *Katzenbach v. McClung*, 379 U.S. 294 (1964); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) (per curiam). "These concerns are strongly implicated with respect to gender discrimination in the allocation of publicly available goods and services." *Jaycees*, 468 at 625. The WLAD honors the gender identity of Washingtonians "out of 'that respect for the individual which is the lifeblood of the law.'" *Tingley*, 47 F.4th at 1084 (citation omitted). And the WLAD advances the State's compelling interest by requiring that places of public accommodation, unless distinctly private or a specified religious or sectarian facility, provide equal access to all, regardless of gender identity. There can be no doubt that the WLAD satisfies the first element of strict scrutiny analysis.

The WLAD also meets strict scrutiny's second element. Even assuming the WLAD's public accommodations provision infringes on the Spa's First

53

Amendment rights, it does so as little as possible to further the State's interest. The law prohibits places of public accommodation from discriminating based on gender identity. There is no less restrictive means to end gender identity discrimination in places of public accommodation than to require all places of public accommodation to treat everyone equally regardless of their gender identity. The least restrictive means to end discrimination is to prohibit it. *See Jaycees*, 468 U.S. at 628–29 (by prohibiting discriminatory practices, a state's public accommodations law "'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose" (citation omitted)). The WLAD satisfies strict scrutiny as applied to the Spa.

## IX.    CONCLUSION

The Court should affirm the district court judgment dismissing the Spa's Amended Complaint.

RESPECTFULLY SUBMITTED this 29th day of May, 2024.

ROBERT W. FERGUSON
Attorney General

NEAL LUNA, WSBA No. 34085
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 287-4189
neal.luna@atg.wa.gov

54

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____23-4031_____

I am the attorney or self-represented party.

**This brief contains** _____**13,993**_____ **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
   29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
   only one)*:
       [ ] it is a joint brief submitted by separately represented parties.
       [ ] a party or parties are filing a single brief in response to multiple briefs.
       [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Signature: __*s/ Lane Richards*___        Date: _5/29/24___
*(use "s/[typed name]" to sign electronically-filed documents)*

---

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                    *Rev. 12/01/22*