No. 23-4031

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

OLYMPUS SPA, JANE DOE EMPLOYEE, JANE DOE PATRON 1,
*Plaintiffs/Appellants,*

v.

ANDRETA ARMSTRONG, in her official capacity as Executive Director of
the Washington State Human Rights Commission, MADISON IMIOLA, in her
official and individual capacities as Civil Rights Investigator for the
Washington State Human Rights Commission,
*Defendants/Appellees.*

---

*On Appeal from the United States District Court western District Of Washington
No. 2:22-cv-00340-BJR
The Honorable Barbara J. Rothstein
United States District Judge*

---

***AMICUS CURIAE* BRIEF IN SUPPORT OF APPELLEES
ARMSTRONG, ET. AL.
FOR GONZAGA LAW SCHOOL - CLINICAL LEGAL PROGRAMS
AND QLAW FOUNDATION OF WASHINGTON AFFIRMING THE
DECISION BELOW**

J. Denise Diskin, WSBA No. 41425
QLAW FOUNDATION OF
WASHINGTON
400 East Pine Street, #225
Seattle, WA 98122

Sarah N. Harmon, WSBA No. 46493
GONZAGA LAW SCHOOL –
CLINICAL LEGAL PROGRAMS
721 N. Cincinnati Street
Spokane, WA 99220

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

I.     IDENTITY AND INTERESTS OF *AMICI* ................................................1

       A.     GONZAGA LAW SCHOOL LINCOLN LGBTQ+ RIGHTS
              CLINIC ...........................................................................1

              1.     DISCLOSURES ................................................................1

       B.     QLAW FOUNDATION OF WASHINGTON ...............................2

              1.     DISCLOSURES ................................................................3

       C.     AUTHORITY TO FILE ................................................................3

II.    INTRODUCTION ..........................................................................3

       A.     TRANSGENDER PEOPLE ARE PART OF WASHINGTON
              COMMUNITIES, ENGAGE IN WELLNESS AND RELIGIOUS
              ACTIVITIES, AND ARE BUSINESS OWNERS .........................4

       B.     MEDICAL INTERVENTIONS ARE NOT PART OF EVERY
              TRANSGENDER PERSON'S EXPERIENCE AND SHOULD
              NOT BE DISPOSITIVE TO PUBLIC ACCOMMODATION
              ACCESS ...........................................................................8

III.   ARGUMENT ..........................................................................9

       A.     THE PURPOSE OF WASHINGTON'S LAW AGAINST
              DISCRIMINATION IS TO CORRECT SIGNIFICANT
              DISCRIMINATION AGAINST PROTECTED AND
              VULNERABLE CLASSES ............................................................9

       B.     COURTS HAVE CONSISTENTLY REJECTED RELIGIOUS
              APPEALS TO DISCRIMINATE .................................................. 11

i

C.    TRANSGENDER PEOPLE EXPERIENCE SIGNIFICANT RATES OF PUBLIC ACCOMMODATION DISCRIMINATION NOTWITHSTANDING PROTECTIONS.................................... 14

D.    OLYMPUS SPA RELIES ON SPECIOUS SEX STEREOTYPES TO JUSTIFY ITS DISCRIMINATION .............................................. 16

    1.    OLYMPUS SUBJECTS TRANSGENDER WOMEN TO DEHUMANIZING SCRUTINY THAT IT DOES NOT SUBJECT CISGENDER WOMEN TO ............................ 17

    2.    OLYMPUS SPA AND AMICUS CATEGORICALLY AND BASELESSLY ACCUSE TRANSGENDER WOMEN OF ASSAULT.......................................................................... 19

E.    PERMITTING SPECIAL EXEMPTIONS TO PUBLIC ACCOMMODATION LAWS BASED ON USE OR MOTIVATION WILL EVISCERATE ANTI-DISCRIMINATION LAW AND PURPOSE ................................................................... 22

IV.    CONCLUSION.......................................................................... 24

CERTIFICATE OF COMPLIANCE................................................... 25

CERTIFICATE OF SERVICE ......................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                           **Page**

*303 Creative, LLC v. Elenis,*
   600 U.S. 570 (2023) .......................................................................7

*Bob Jones University v. U.S.,*
   461 U.S. 574 (1983) ................................................................... 14

*Bostock v. Clayton County, Georgia,*
   590 U.S. 644, (2020) ............................................................ 16, 17

*Brown v. Bd. Of Ed. Of Topeka, Shawnee Cnty,., Kan.*,
   347 U.S. 483 (1954*)* .......................................................... 12, 13

*Doe v. Snyder,*
   28 F.4th 103 (9th Cir. 2022) ........................................................ 16

*Floeting v. Grp. Health Coop.,*
   192 Wn.2d 848, 855, 434 P.3d 39 (Wash. 2019)......................... 10

*Grimm v. Glouchester County School Board,*
   972 F.3d 586 (4th Cir. 2020) ....................................................... 16

*Heart of Atlanta Motel, Inc. v. United States,*
   379 U. S. 241, 250, 85 S.Ct. 348 (1964)................................ 10, 11

*Katzenbach v. McClung,*
   379 U.S. 294 (1964) ................................................................... 13

*Newman v Piggie Park Enterprises Inc.,*
   390 U.S. 400, (1968) .................................................................. 13

*Plessy v. Ferguson,*
   163 U.S. 537, (1896)................................................................... 12

*Reynolds v. United States,*
   98 U.S. 145, (1878) .................................................................... 23

*State v. Arlene's Flowers, Inc.,*
193 Wn.2d 469, (2019) ............................................................... 24

**Statutes and Regulations**

RCW 49.60.010........................................................................... 4, 10

RCW 49.60.030........................................................................... 3, 10

RCW 49.60.040............................................................................... 10

WAC 162-32-060............................................................................ 11

**Articles/Other**

2015 U.S. Transgender Survey: Washington State Report. (2017).
Washington, DC: National Center for Transgender Equality,
https://transequality.org/sites/default/files/docs/usts/USTSWAStateReport
(1017).pdf (last viewed June 3, 2024). ............................................ 15

Am. Med. Ass'n & GLMA: Health Professionals Advancing LGBTQ
Equality, Issue Brief: Transgender Individuals' Access to Public Facilities
2 (2018) ............................................................................................ 15

E. Coleman, et al., Standards of Care for the Health of Transgender and Gender
Diverse People, Version 8, 23 INT'L J. OF TRANSGENDER HEALTH, (2022),
https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. ............8

Exec. Order No. 138988, 86 FR 7023 (2021).................................... 17

Horim Yi, et al., Public Opinion of Transgender Rights in South Korea,
Williams Institute, November 2019, https://williamsinstitute.law.ucla.edu/wp-
content/uploads/Public-Opinion-Trans-South-Korea-English-Dec-2019.pdf with
Winston Luhur, et al., Public Opinion of Transgender Rights in the United States,
Williams Institute, August 2019, https://williamsinstitute.law.ucla.edu/wp-
content/uploads/Public-Opinion-Trans-US-Aug-2019.pdf ................................6

How an Inclusive Gym Brand Became a Battlefield over LGBTQ+ Rights, Wash.
Post April 28, 2024,
https://www.washingtonpost.com/technology/2024/04/28/planet-fitness-bomb-
threats-trans-lgbtq/ (last reviewed June 5, 2024).............................................. 22

Ian T. Nolan et al., Demographic and Temporal Trends in Transgender Identities
and Gender Confirming Surgery, 8 TRANSLATIONAL ANDROLOGY &
UROLOGY 184 (2019),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6626314/...............................8

In the Name of God: Structural Injustice and Religious Faith, Sager,
Lawrence, Saint Louis University Law School, Volume 60, Number 4,
(Summer 2016), ...................................................................... 12, 15

Jody L. Herman, et al., How Many Adults and Youth Identify as Transgender in
the United States, Williams Institute, October 2020,
https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-
2022.pdf. ..........................................................................................................4

Karen Fredriksen Goldsen, et al., Washington State LGBTQ+ Equity and Health
Report 2020, Goldsen Institute, November 2020
https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-
2022.pdf (last reviewed June 5, 2024)..................................................................5

Kerith J. Conron, et al., Religiosity Among LGBT Adults In the US, Williams
Institute, October 2020 at 7, https://williamsinstitute.law.ucla.edu/wp-
content/uploads/LGBT-Religiosity-Oct-2020.pdf...............................................6

Lawrence G. Sager, In the Name of God: Structural Injustice and Religious
Faith, 60 St. Louis U. L.J. 585, 588 (2016) ...................................................... 10

Locker Room Experiences Among LGBTQ+ Adults, Herrick, Shannon and
Duncan, Linday; Journal of Sport and Exercise Psychology, 2020
............................................................................................................... 20

Public Accommodation Laws and Gender Panic in Clinical Settings, Boskey, et al.,
AMA Journal of Ethics, Nov. 2018, available at https://journalofethics.ama-
assn.org/article/public-accommodation-laws-and-gender-panic-clinical-
settings/2018-11 (last reviewed June 3, 2024).................................................. 19

The World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Edition, https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf. ...................................................................................................................9

Tisa Wenger, Discriminating in the name of religion? The Washington Post (Dec. 5, 2017, 6:00am) https://www.washingtonpost.com/news/made-by-history/wp/2017/12/05/discriminating-in-the-name-of-religion-segregationists-and-slaveholders-did-it-too/ ..................................................................................... 12

Trans woman faces hate messages, death threats after identity revealed in Olympus Spa lawsuit, Fox 13 Seattle, June 14, 2023, available at https://www.fox13seattle.com/news/trans-woman-faces-hate-messages-death-threats-after-identity-revealed-in-olympus-spa-lawsuit (last reviewed June 3, 2024) ................................................................................................................. 18

Weeks after anti-trans salon posts, Traverse City grapples with legal, community implications, Michigan Advance, August 10, 2023, https://michiganadvance.com/2023/08/10/weeks-after-anti-trans-salon-posts-traverse-city-grapples-with-legal-community-implications/ (last reviewed June 3, 2024). ...................................................................................................................7

Woman Banned by Planet Fitness for Photographing Trans Member Vows to Keep Fighting, Fox 10 Phoenix March 29, 2024, https://www.fox10phoenix.com/news/woman-banned-planet-fitness-transgender (last reviewed June 5, 2024) ........................................................................... 21

I. **Identity and Interests of *Amici***

   A. **Gonzaga Law School Lincoln LGBTQ+ Rights Clinic**

The Lincoln LGBTQ+ Rights Clinic is a legal clinic created by the Center for Civil & Human Rights at Gonzaga University School of Law. The Lincoln LGBTQ+ Rights Supervising Attorney, Sarah N. Harmon, along with law students enrolled in the Clinic co-authored this brief with the QLaw Foundation.

The Lincoln LGBTQ+ Rights Clinic is a part of Gonzaga Law School's Clinical Legal Programs. This Clinic represents individuals who identify as members of the Two Spirit, Lesbian, Gay, Bisexual, Queer, Intersex, Asexual, and other ("2SLGBTQIA+") community whose rights have been violated or have experienced harm, hardship, or discrimination because of their 2SLGBTQIA+ identity. The Clinic advocates for legal advancements in equality, rights, and fair treatment for 2SLGBTQIA+ individuals. The Clinic is substantially interested in the outcome of this case as it relates to protecting and enforcing 2SLGBTQIA+ rights, rejecting discriminatory, transphobic, and unsubstantiated and unfounded arguments, and preventing a carve-out from anti-discrimination law for public accommodations and the private sector. Accordingly, the LGBTQ+ Rights Clinic supports affirmance of the District Court's dismissal.

   1. **Disclosures**

Gonzaga School of Law – Clinical Legal Programs is a non-profit subsidiary of

1

Gonzaga University School of Law, neither of which are corporations; thus, no corporate disclosure statement is required. No funding by either party or party's counsel was provided for the purposes of preparing or submitting this brief. No person, corporation, or otherwise contributed any monies, funding, or otherwise in the preparation, drafting, and submission of this amicus brief.

### B.    QLaw Foundation of Washington

QLaw Foundation of Washington ("QLaw") promotes the dignity and respect of 2SLGBTQIA+ individuals, families, and communities in Washington. QLaw executes its mission by providing legal services to 2SLGBTQIA+ communities through free legal clinics, direct representation, impact litigation, and policy advocacy. It has been serving its mission for 15 years, and has engaged in extensive litigation, appellate work, and amicus support in the Western District of Washington, the Ninth Circuit, and the United States Supreme Court, as well as Washington State courts. Serving over 350 clients every year, QLaw has extensive understanding of the issues facing 2SLGBTQIA+ communities, including public accommodation discrimination. QLaw has a substantial interest in preventing discrimination against marginalized communities, including 2SLGBTQIA+ communities, communities of color, and other communities protected by anti-discrimination laws.

### 1. Disclosures

QLaw is a non-profit organization, not a corporation; thus, no corporate disclosure statement is required. No funding by either party or party's counsel was provided for the purposes of preparing or submitting this brief. No person, corporation, or otherwise contributed any monies, funding, or otherwise for the preparation, drafting, and submission of this amicus brief except funds contributed as tax-deductible donations to QLaw's general fund and not earmarked for any specific purpose.

### C. Authority to File

The parties in this action have consented to the filing of this amicus brief in compliance with FRAP 29(a)(1).

## II. Introduction

*Amici* submit this brief in support of Appellee Andreta Armstrong, State of Washington. Transgender people are subject to discrimination in many areas of life, including in accessing public accommodation, and are legally protected from discrimination due to the myriad biases they encounter. For this reason, it is well-settled law that businesses may not prohibit transgender people from using public accommodations. RCW 49.60.030(1)(b). In arguing to the contrary, Olympus Spa, et al. ("Olympus") rely on non-existent religious exceptions and specious stereotypes which portray transgender people as categorically objectionable.

3

Rather than support Olympus' sought exemptions, its arguments serve only to provide exemplar for exactly the type of hateful and biased behavior anti-discrimination laws are designed to prevent.

### A.     Transgender people are part of Washington communities, engage in wellness and religious activities, and are business owners

An estimated 38,300 people ages 13 and up identify as transgender in Washington. Jody L. Herman, et al., *How Many Adults and Youth Identify as Transgender in the United States*, Williams Institute, October 2020 at 9, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf. Approximately 1,637,200 identify as transgender nationally, making Washington's population slightly higher than the national average of 32,744 transgender people per state.  *Id.* at 5. The largest age group of people reporting transgender identities in Washington are age 18-24, comprising 2.01% of the overall Washington population that age. *Id.* at 9.

Recognizing the specific experiences of 2SLGBTQIA+[1] communities in Washington, the Washington legislature passed anti-discrimination protections for sexual orientation and gender identity in 2006. RCW 49.60.010 ("The legislature hereby finds and declares that practices of discrimination against any of its

---

[1] "2SLGBTQIA+" refers to Two Spirit, lesbian, gay, bisexual, transgender, queer, intersex, and asexual individuals, with "+" indicating inclusion of the growing categories of self-identification for people expressing sexual and gender diversity.

inhabitants because of […] sex, [or] sexual orientation […] are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundations of a free democratic state.")

While transgender and gender diverse adults in 2SLGBTQIA+ communities in Washington experience elevated risk of health disparities, almost half reported desiring access to wellness activities and exercise classes. Karen Fredriksen Goldsen, et al., *Washington State LGBTQ+ Equity and Health Report 2020, Goldsen Institute*, November 2020 at 16, 20, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf (last reviewed June 5, 2024). But while Washington's 2SLGBTQIA+ community members want to use services like those offered by Olympus, there are few businesses catering to them. Only 11% of 2SLGBTQIA+ community members in Washington own businesses, with nearly 20% of those business owners reporting discrimination at their own place of business. *Id.*

Many 2SLGBTQIA+ people are, like the general population, also people of faith. 16% of 2SLGBTQIA+ people in Washington attend spiritual or religious activities, even when their faith community is not affirming of their 2SLGBTQIA+ identity. Nationally, about 5.3 million 2SLGBTQIA+ adults are religious, 2.23 million of whom report being highly religious. Among 18- to 34-year-old

2SLGBTQIA+ people, 40% are religious. 2SLBTQIA+ people of faith are predominantly Protestant, Roman Catholic, or another Christian religion, but more than 100,000 people nationwide are Jewish, Mormon, or Muslim. Kerith J. Conron, et al., *Religiosity Among LGBT Adults In the US*, Williams Institute, October 2020 at 7, https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Religiosity-Oct-2020.pdf.

Nor are beliefs about culture or tradition unique or uniform. Olympus holds its discriminatory policy out as reflecting Korean traditional culture. Dkt. No. 10-1, p. 12 ("We are a Korean Spa that is also based on Korean traditional values. … Preserving culture is important to us as our culture continues to be reduced and marginalized."). But Olympus' call to tradition reflects preference, not any sort of immutable cultural characteristic. Not only are transgender people present in South Korean culture, beliefs regarding transgender people in South Korean are as diverse and nuanced as those held by people in the United States. *Compare* Horim Yi, et al., Public Opinion of Transgender Rights in South Korea, Williams Institute, November 2019, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Public-Opinion-Trans-South-Korea-English-Dec-2019.pdf *with* Winston Luhur, et al., Public Opinion of Transgender Rights in the United States, Williams Institute, August 2019, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Public-Opinion-Trans-US-Aug-2019.pdf (Only 7.1% of South

Koreans strongly agree that transgender people violate the traditions of their culture, compared with 14.8% of people living in the United States).

Unfortunately, even narrow holdings that relax public accommodation standards illuminate business biases. Just days after the United States Supreme Court ruled in *303 Creative, LLC v. Elenis,* 600 U.S. 570 (2023), that a wedding website designer had a limited right to deny service to same-sex engaged couples, a Michigan hair salon owner posted on the salon's official Facebook page that, "[i]f a human identifies as anything other than a man/woman please seek services at a local pet groomer. … You are not welcome at this salon. Period." *Weeks after anti-trans salon posts, Traverse City grapples with legal, community implications*, Michigan Advance, August 10, 2023, https://michiganadvance.com/2023/08/10/weeks-after-anti-trans-salon-posts-traverse-city-grapples-with-legal-community-implications/ (last reviewed June 3, 2024).

Transgender people are a substantial part of Washington's communities. If our courts begin allowing exemptions, the exceptions will quickly become the rule, deferring to the groups with the strongest desire to discriminate with predictably ugly results.  Washington's communities will be marred by businesses urging certain undesirables to "keep out" – whether they have legal authority to do so or not - and the Washington Law Against Discrimination will be unable to serve the purpose intended by the legislature.

**B.  Medical interventions are Not Part of Every Transgender Person's Experience and Should Not be Dispositive to Public Accommodation Access**

Olympus' focus on the genital anatomy of their customers not only strips all women of their dignity, but also imposes a rigid gender standard that is not applied to cisgender, intersex, disabled, or any other category of women except transgender women. Not every transgender person obtains medical intervention to establish their gender identity, and there are many reasons a transgender person might identify strongly as a woman but not meet Olympus' narrow definition of "woman." For some, it is simply not a component of their gender identity, and altering their attire, physical presentation (e.g., haircut, shaving), name, pronouns, or activities is sufficient support for their gender identity. E. Coleman, et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 INT'L J. OF TRANSGENDER HEALTH 51, 55 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. Others may desire medical intervention, but only in the form of hormone therapy or breast augmentation. *Id.* Finally, those who desire surgical intervention may be in the process of obtaining required prerequisite care.

Nationally, only 5-10% of transgender women obtain "bottom" surgery, due primarily to cost and a lack of trained providers. Ian T. Nolan et al., Demographic

8

and Temporal Trends in Transgender Identities and Gender Confirming Surgery, 8

TRANSLATIONAL ANDROLOGY & UROLOGY 184 (2019),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6626314/. Instead, comparatively

more transgender women seek procedures feminizing other highly-gendered

aspects of their outward presentation, including hair removal, facial feminization,

and body contouring. *Id.*

But the type of gender-affirming health care obtained by transgender people

should not matter to Olympus, to this Court, or to anyone else. Transgender people

exhibit the same bodily and gender diversity as humans all over the world. The

World Professional Association for Transgender Health, Standards of Care for the

Health of Transsexual, Transgender, and Gender Nonconforming People, 7th

Edition, S15,

https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.p

df. It is Olympus, not transgender women, who challenge social norms by

demanding access to customers' genitals before allowing them entry to their

business, and deny them access based not on objectionable behavior, but solely the

appearance of the most private part of their bodies.

### III. Argument

    **A.  The Purpose of Washington's Law Against Discrimination is to Correct Significant Discrimination Against Protected and Vulnerable Classes**

The purpose of Washington's Law Against Discrimination ("WLAD") is to prevent discrimination in public accommodations. RCW 49.60.010. Antidiscrimination laws like the WLAD are a "matter of state concern," performing the critical function of ending discriminatory practices which "threaten[] not only the rights and proper privileges of [Washington] but menace[] the institutions and foundations of a free democratic state." *Id.; see also see also* Lawrence G. Sager, In the Name of God: Structural Injustice and Religious Faith, 60 St. Louis U. L.J. 585, 588 (2016). Legislatures enact laws like the WLAD to dismantle chronic patterns of discrimination which deny equal participation in, and access to, public accommodations to certain marginalized and disfavored groups of people. In Washington, transgender people have been protected from discrimination since 2006. *See* RCW 49.60.010 (West) (effective June 8, 2006, to July 21, 2007) (first addition of protections for sexual orientation).

The WLAD's public accommodation protections represent the Legislature's response to structural, historical, and systemic injustices experienced by marginalized populations. The WLAD prohibits not only denial of service but also any behavior that makes a person feel "not welcome, accepted, desired, or solicited." *See* RCW 49.60.030(1)(b); RCW 49.60.040(14). Its fundamental objective is "to vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Floeting v. Grp.*

*Health Coop.*, 192 Wn.2d 848, 855, 434 P.3d 39 (Wash. 2019), *citing Heart of Atlanta Motel, Inc. v. United States*, 379 U. S. 241, 250, 85 S.Ct. 348 (1964).

The fact that Olympus' particular business offerings are appropriate to a sex-segregated environment does not alleviate Olympus of their burden not to discriminate. Public accommodations with sex-segregated facilities must allow "access to and use" of the facility consistent with the user's gender expression or gender identity and may not ask a guest to use a separate gender-neutral facility based on their gender expression or identity. WAC 162-32-060. The private and vulnerable nature of Olympus' services are not unique in this Court's precedent. Instead, they have already been explicitly contemplated and addressed in law, and those who object "should be directed to a separate or gender-neutral facility." *Id.*

Olympus seeks to take full advantage of the profit margins of the broader public, comprised of both women who are uncomfortable with transgender peoples' bodies, as well as women who are comfortable with transgender peoples' bodies but are not aware of Olympus' policy. But Washington's public accommodation laws as applied to Olympus ensure full enjoyment by all customers, and do not sacrifice access to meet the needs of the uncomfortable few.

### B.    Courts Have Consistently Rejected Religious Appeals to Discriminate

As a result of the religious persecution preceding the founding of the United

11

States, "concerns for the equal membership of minority religious beliefs [were] laced into our Constitution." *In the Name of God: Structural Injustice and Religious* Faith, Sager, Lawrence, Saint Louis University Law School, Volume 60, Number 4, (Summer 2016), at 588. Tension between religious freedom and civil rights stretches far back in American history, with religious beliefs often cited to justify maintaining inequalities. *Id.* at 597-98.

In the 19th century, slaveholders and their sympathizers defended slavery by pointing to its presence in the Bible as evidence that it fit with "God's plan" for social order. Tisa Wenger, Discriminating in the name of religion? The Washington Post (Dec. 5, 2017, 6:00am) https://www.washingtonpost.com/news/made-by-history/wp/2017/12/05/discriminating-in-the-name-of-religion-segregationists-and-slaveholders-did-it-too/. Slaveholders also argued that biblical stories like Cain and Abel proved that God intended for people of color to be slaves, and accused abolitionists of distorting scripture to change public opinion. *Id.*

After the Civil War and the years of Reconstruction ended, white Southerners "updated" their proslavery ideologies and weaponized religion yet again to support an emerging Jim Crow regime of racial segregation. *Id.* There, Christian segregationists argued that segregation was a racial order divinely ordained. *Id.* In *Plessy v. Ferguson* in 1896, the United States Supreme Court created the "separate but equal" doctrine, codifying segregationists' biblical logic into law. *Plessy v.*

12

*Ferguson,* 163 U.S. 537, 542 (1896) <u>overruled by</u> *Brown v. Bd. Of Ed. Of Topeka, Shawnee Cnty,., Kan.*, 347 U.S. 483 (1954). They believed Black people to be cursed by God and naturally suited for manual labor, not equal employment with whites. Wegner, *supra.* Like their predecessors, segregationists accused those supporting the civil rights movement of being anti-Christian, and imposing an ideology that destroys the Christian order, the "settled" order of the nation. *Id.* These arguments parallel those being made by Olympus before this Court today.

After the Civil Rights Movement and passage of the Civil Rights Act of 1964, the Supreme Court rejected a religious right to exclude African Americans from equal services. *Katzenbach v. McClung,* 379 U.S. 294 (1964). There, the Court held that even deeply held beliefs about human relationships and the organization of society cannot give rise to any right to discriminate once a business owner chooses to enter the public marketplace. Maintaining separate facilities led to people of color being relegated to "unkempt restaurants and under most unsatisfactory and often unpleasant conditions." *Id.* at 300. Furthermore, the Court noted that racial discrimination was not merely a state or regional problem, but one of national scope, "which left unchecked may well become far-reaching in its harm[.]" *Id.* at 301 (internal citations omitted).

In *Newman v Piggie Park Enterprises Inc.,* the Court in 1968 again rejected arguments for religious freedom in public accommodations as "patently frivolous."

13

390 U.S. 400, 402, n. 5 (1968). There, the Court rejected a business owner's claimed constitutional exemption from Title II, notwithstanding his "belie[f] as a matter of religious faith that racial intermixing or any contribution thereto contravenes the will of God." *Id.* Regardless of the sincerity of the moral or religious belief, the Supreme Court reaffirmed that antidiscrimination laws are enforceable, and necessary. *Id.; see also Bob Jones University v. U.S.,* 461 U.S. 574 (1983). Accordingly, in the post-Civil Rights Era, it became settled law that commercial businesses cannot claim constitutional cover from public accommodations laws.

Olympus' arguments similarly manipulate religious freedom in pursuit of permission to discriminate against transgender women. Religious freedoms here become a weapon - no longer used as a shield from religious persecution, but as a sword to infringe upon others' rights under the guise of religion.

This Court should stand in the long line of Supreme Court precedent and reject a constitutional right to espouse religious beliefs by denying equal service to certain customers on the basis of a protected characteristic.

### C. Transgender People Experience Significant Rates of Public Accommodation Discrimination Notwithstanding Protections

Transgender people, along with members of other protected classes, experience "diminished membership in our national community within which some persons

14

are systematically disregarded and treated as less worthy by many other members of our community, [even when they are] not merely disadvantaged by our laws." *In the Name of God*, at 585. For example, in 2015, nearly ten years after the Washington Legislature added gender identity and expression to the list of characteristics protected from discrimination, 8% of transgender people surveyed in Washington reported being denied access to a restroom in the past year. 2015 U.S. Transgender Survey: Washington State Report. (2017). Washington, DC: National Center for Transgender Equality, https://transequality.org/sites/default/files/docs/usts/USTSWAStateReport(1017).pdf (last viewed June 3, 2024). 13% reported being verbally harassed while accessing a restroom, with 25% being verbally harassed using a public accommodation generally. *Id.* Policies excluding transgender individuals from facilities consistent with their gender identity have detrimental effects on the healthy, safety, and well-being of those individuals. Am. Med. Ass'n & GLMA: Health Professionals Advancing LGBTQ Equality, Issue Brief: Transgender Individuals' Access to Public Facilities 2 (2018). Exclusionary policies lead to poorer health outcomes throughout life. *Id.* And, transgender individuals face greater risk of violence when using a public facility that does not correspond with their gender identity. *Id.* Based on Washington's estimated population of transgender individuals, each of these types of discrimination were experienced by thousands of people in Washington

15

over the course of just one year.

### D.   Olympus Spa Relies on Specious Sex Stereotypes to Justify Its Discrimination

Even if Washington did not explicitly prohibit discrimination on the basis of gender identity and expression, it falls squarely within federal prohibitions of sex discrimination. In *Bostock v. Clayton County, Georgia*, the Supreme Court held that Title VII of the Civil Rights Act prohibits employers from engaging in employment discrimination based on sexual orientation or gender identity. 590 U.S. 644, 651-52 (2020). There, the court held that even though Title VII protects "sex," not sexual orientation or gender identity, employers who discriminate against 2SLGBTQIA+ individuals engage in sex discrimination because the two are "inextricably" linked. *See Id.* at 660-61. In the employment context, *Bostock* held it is unlawful for an employer to "intentionally penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. … [S]ex plays an unmistakable and impermissible role in the discharge decision." *Id.* Discrimination based on an individual's nonconformance with gender stereotypes is similarly unlawful. *Id*. at 662.

Since *Bostock*, courts across the nation have adopted its analysis widely and held discrimination against 2SLGBTQIA+ people to be unlawful.  *E.g.*, *Grimm v. Glouchester County School Board*, 972 F.3d 586 (4th Cir. 2020) (extending

16

*Bostock* to Title IX claims); *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022)

(prohibiting unequal treatment of transgender patients in federally funded health

care); *see also* Exec. Order No. 138988, 86 FR 7023 (2021) (explaining and

expanding *Bostock*'s reasoning to other federal laws). Based on *Bostock's*

reasoning, there is no legal distinction between sex discrimination, sexual

orientation discrimination, and gender identity or expression discrimination.[2]

### 1.     Olympus subjects transgender women to dehumanizing scrutiny that it does not subject cisgender women to

Olympus admits to scrutinizing customers to ascertain their gender no fewer

than three times after they enter the facility. Dkt. No. 10-1, p. 4. ("Entrants are

vetted at each point to ensure they are female."). In doing so, Olympus admits to

applying qualifying gender criteria based on a genital exam: males have external

genitalia and females have internal genitalia. *Id.* at fn. 3.

Applying these criteria, Olympus admits to having engaged in multiple

instances of discrimination against transgender women: "There have been incidents

involving pre-operative transgender individuals who presented male in the nude."

Dkt. No. 10-1, p. 4. These individuals were instructed to leave the spa. Olympus

---

[2] The Amicus Brief submitted by Women's Declaration International, USA, argues that "gender expression or identity" cannot be "elevated over" sex without violating the Equal Protection Clause. Dkt. No. 13.1, Sec. I(A). Under *Bostock's* reasoning, Amicus' argument fails - it is sex discrimination to treat a woman differently because her body looks different from that of other women by virtue of not having been assigned female at birth.

17

also applied its gender test to the initial complainant to the Human Rights Commission, describing her as "a biological male who has not undergone sex reassignment surgery, but nonetheless identifies as a woman" and identifying her by name.  Dkt. No. 10-1 at 6.; W.D. WA Case No. 2:22-cv-00340-LK, June 9, 2022, Dkt. No. 14 at 10. It was unnecessary and dehumanizing for Olympus to identify the complainant by name or to describe her genitals – Olympus' policy was clearly written on its website for every would-be patron to view, whether they would have passed Olympus' gender screening or not. Dkt. 10-1, p. 6-7. Olympus' identification of the complainant and her private anatomy had significant unwelcome consequences when she was suddenly subjected to a barrage of death threats and violent hate following the dismissal of Olympus' claims. *Trans woman faces hate messages, death threats after identity revealed in Olympus Spa lawsuit,* Fox 13 Seattle, June 14, 2023, *available at* https://www.fox13seattle.com/news/trans-woman-faces-hate-messages-death-threats-after-identity-revealed-in-olympus-spa-lawsuit (last reviewed June 3, 2024).

Olympus' policy – which does not vet individuals for adherence to Korean traditional values, religious beliefs, body type or adornment (e.g., tattoos, size, limb difference, etc.) or any other characteristic – prohibits the use of its facilities by individuals solely because of their sex, gender identity, and gender expression,

18

using examination of patrons' genitals as the sole determination of their ability to use the facilities. Olympus uses privacy as a cover for unlawful preference. If privacy was truly a concern, other customers would be vetted; yet, they are not. Olympus' written policy excluding transgender women sounds more like the business owners who engage in those "other, widely condemned forms of discrimination" than it thinks when those business owners relied on no less ugly and harmful stereotypes when refusing to serve other groups of customers. Dkt. No. 10-1 p. 20 (referring to comparisons between Olympus' policy and racial discrimination, e.g., "White Applicants Only").

### 2.    Olympus Spa and Amicus Categorically and Baselessly Accuse Transgender Women of Assault

Gender stereotypes, like those espoused by Olympus and *Amicus,* position women as inherently sexually vulnerable and men as inherently sexually threatening – and transgender woman as men pretending to be women in order to assault women. *Public Accommodation Laws and Gender Panic in Clinical Settings*, Boskey, et al., AMA Journal of Ethics, Nov. 2018, *available at* *https://journalofethics.ama-assn.org/article/public-accommodation-laws-and-gender-panic-clinical-settings/2018-11* (last reviewed June 3, 2024).  These concerns, sometimes described as "gender panic," have been used as the basis for "bathroom bills" which seek to force transgender women into men's facilities, ostensibly to "protect" cisgender women. *Id.* In fact, transgender women are at

19

demonstrably elevated risk of sexual assault relative to cisgender women: 47%
reported having been sexually assaulted during their lifetime, a rate more than
double that of cisgender women. *Id.* Transgender women are also at risk for sexual
assault in public restrooms, which can cause health problems due to bathroom
avoidance. *Id.*

For transgender women, there is no safe option: "Being a transwoman places
me in outright dangerous situations in regard to locker rooms, bathrooms - every
single time I use those facilities. ... When trying to use facilities I identify with, as
a "nonpassing" transwoman, I am then placed in more danger. In addition to being
seen or read as a sexual threat I am also viewed, among female-bodied people, as a
physical threat." *Locker Room Experiences Among LGBTQ+ Adults*, Herrick,
Shannon and Duncan, Linday; Journal of Sport and Exercise Psychology, 2020, 42,
227-239, at 235. Many transgender women report having to put their wellbeing at
risk to improve their physical health: "I get anxiety when approaching and in
locker rooms. I have to put on a brave face because I know my physical health is
just as important as any cis person who doesn't have to think about locker
rooms." *Id.* at 236.

Olympus' language toward transgender women is ugly and dehumanizing. *See*
Dkt No. 10-1, pg 24 (describing transgender women as a "naked person with a
penis," implying criminal intent to be naked around "unwilling women" to make

them feel vulnerable, and accusing transwomen of patronizing the spa for the purpose of "leering at" other patrons' "bare breasts, buttocks, and pubic hair."). *Amicus* Women's Declaration International USA is even uglier, claiming that allowing transgender women equal use of Olympus' facilities constitutes voyeurism, indecent exposure, or both. Dkt. 13.1, Sec. II. Citing to numerous salacious (and journalistically disreputable) stories, *Amicus* argues that because some individuals have allegedly engaged in obscene or harassing behavior in sex-segregated facilities, any transgender woman who seeks to use Olympus' facility must have a similar intent. *Id.*

Despite Olympus' apparent fear and concern, they fail to describe any policy or practice of vetting customers for having been accused or convicted of voyeurism, sexual assault, child sex abuse, or any other history which might suggest that Olympus' patrons or employees might be unsafe. Olympus does not even describe doing a cursory search of Washington's sex offender registry before allowing customers entry. Nor has Olympus described any situation wherein a transgender person engaged in behavior any more invasive than simply using the facility. It is in fact Olympus, not transgender patrons, who are engaging in invasive behavior.[3]

---

[3] In a similar instance, a Planet Fitness patron who photographed a transgender woman in a locker room and posted the photo on the internet claimed she was the wronged party when Planet Fitness revoked her membership. The photographer asserted that a "separate but equal" policy should be employed for transgender patrons using locker rooms because "they have created this unsafe space for

Allowing safe and equal access for transgender women in public accommodations does not minimize or compete with the issues cisgender women face. Antidiscrimination laws and efforts aim to protect all vulnerable groups.

### E. Permitting Special Exemptions to Public Accommodation Laws Based on Use or Motivation will Eviscerate Anti-Discrimination Law and Purpose

Olympus's policy creates real harm to transgender individuals, while manufacturing a false narrative of victimization to justify its request from this Court for state sanctioned sex and gender discrimination. Recognizing a First Amendment right to deny equal service to a class of customers based on religiously motivated bias would invite myriad challenges to the enforcement of public accommodation laws and thwart the legislative intent to combat, reduce, and

---

women" – when it was *she* who photographed the woman without her consent seeking to scrutinize and expose her gender, demanded that Planet Fitness examine the woman's identification, and created and shared a video and screenshots about her experience on the internet. *Woman Banned by Planet Fitness for Photographing Trans Member Vows to Keep Fighting*, Fox 10 Phoenix March 29, 2024, https://www.fox10phoenix.com/news/woman-banned-planet-fitness-transgender (last reviewed June 5, 2024)

In the ensuing weeks, more than 50 Planet Fitness locations received bomb threats, and the former CEO of the company stated "I'd want to go in there and freakin' take the guy by the neck and throw him out in the parking lot …That's the way that things would've been done a while back." Meanwhile, transgender Planet Fitness employees reported harassment and fear going to work. *How an Inclusive Gym Brand Became a Battlefield over LGBTQ+ Rights*, Wash. Post April 28, 2024, https://www.washingtonpost.com/technology/2024/04/28/planet-fitness-bomb-threats-trans-lgbtq/ (last reviewed June 5, 2024).

eliminate systemic, historic, and structural discrimination, injustices, and inequalities for protected classes.[4]

Religious freedom is a rich and vital part of our constitutional jurisprudence; and for good reason. This jurisprudence is shaped by a commitment to equal membership, not to law-defying privilege. Distaste, even impassioned and religiously motivated distaste, does not give Olympus a constitutional right to discriminate in defiance of the WLAD.

For the state, and this Court, to permit religious views of this sort to excuse the legal obligation of Olympus – and business owners everywhere – under the applicable public accommodation law, would permit religion to upend the state's commitment to the constitutional value of equal membership in the public sphere and go against nearly a century of precedent. Owners of public accommodations are entitled to their religious beliefs, but they are not entitled to act on those beliefs in derogation of their obligations under law.

If they were, it would pave a return to segregation on the basis of race, or an evolution of religiously motivated discrimination against other protected classes who may later fall into disfavor. Such broad reading of religious freedoms raises the concern that "every citizen [could] become a law unto himself." *Reynolds v.*

---

[4] In fact, permitting such discrimination on religious grounds has the effect of granting the government's imprimatur on the religious institution's beliefs, arguably a violation of the U.S. Constitution's Establishment clause.

23

*United States,* 98 U.S. 145, 167 (1878)("to permit this would be to make the professed doctrines of religious belief superior to the law of the land[.]").

Finally, Olympus's position would create an increase in *real* and long lasting harm to transgender individuals, and the 2SLGBTQIA+ community. The opposition briefing implies that no real harm comes from this refusal, no access problems exist, and these services can still be obtained elsewhere. Dk. No. 10 at pg. 4. But the Washington State Supreme Court rejected this identical argument in *State v. Arlene's Flowers, Inc.*, when a florist argued that enforcement of the WLAD was unnecessary when no access problems arise. 193 Wn.2d 469, 531-32 (2019). The Court stated,

> "We emphatically reject this argument… This case is no more about access to flowers than civil rights cases in the 1960s were about access to sandwiches. As every other court to address the question has concluded, public accommodations law do not simply guarantee access to goods or services. Instead, they serve a broader societal purpose: eradicating barriers to the equal treatment of all citizens in the commercial marketplace. Were we to carve out a patchwork of exceptions for ostensibly justified discrimination, that purpose would be fatally undermined."

*Id. (Internal citations omitted).* Nothing in our country's tradition of religious freedom should be understood as inconsistent with these rules of fair and open commercial exchange or with the ongoing efforts to secure equal membership in the public sphere for all. A deep commitment to equality, equal membership for all requires dismantling structural injustices and historic discrimination, not a web of conflicting permission allowing anyone who claims "religion" to discriminate and

exclude with impunity.

## IV.    Conclusion

This Court should emphatically reject Olympus' recycled weaponization of religious rights to permit unlawful discrimination. Transgender women are women and exist throughout out our society and communities. Under the WLAD, they are entitled to equal access to public accommodation, regardless of Olympus' religious or other beliefs. Rejecting Olympus' claims will uphold longstanding precedent, and will ensure the legislature's intent when enacting antidiscrimination public accommodations is neither diluted nor eviscerated. For these reasons, *Amici* requests this Court affirm the District Court's Order of Dismissal.

GONZAGA LAW SCHOOL –                    QLAW FOUNDATION OF
CLINICAL LEGAL PROGRAMS                 WASHINGTON


/s/ *Sarah Harmen*                      */s/ Denise Diskin*
Sarah N. Harmon, WSBA No. 46493         J. Denise Diskin, WSBA No. 41425
721 N. Cincinnati Street                400 East Pine Street, #225
Spokane, WA 99220                       Seattle, WA 98122
509-313-3728                            206-483-2725 ext. 103
harmons@gonzaga.edu                     denise@qlawfoundationorg
                                        *9th Circuit Court of Appeals*
                                        *Application Pending*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-4031

I am the attorney or self-represented party.

**This brief contains** | 5,492 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | 06/06/2024 .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Sarah N. Harmon | **Date** | 06/06/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*