No. 23-4031

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

OLYMPUS SPA, et al.

*Plaintiffs-Appellants*,

v.

ANDRETA ARMSTRONG, Executive Director of the Washington State Human
Rights Commission, et al.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Western District of
Washington, No. 2:22-cv-00340-BJR

---

## BRIEF OF *AMICUS CURIAE* LAMBDA LEGAL DEFENSE AND
## EDUCATION FUND IN SUPPORT OF DEFENDANTS-APPELLEES AND
## AFFIRMANCE

---

Peter C. Renn
Pelecanos†
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa St., Suite 1260
Los Angeles, CA 90010
(213) 382-7600
†*Mailing address only*

Counsel for *Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae*
Lambda Legal Defense and Education Fund, Inc. certifies that it is a nonprofit
organization, that it has no parent corporation, and that no corporation owns 10%
or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT .........................................................................................4

    I.    The Spa's Commercial Relationships Are Not Protected by a Right of Intimate Association. ....................................................................4

    II.    The Spa's Commercial Relationships Are Not Protected by a Right of Expressive Association..............................................................13

    III.    The WLAD Is Narrowly Tailored to Further a Compelling State Interest in Barring Discrimination Against Transgender People. .........................16

        A.    Eliminating Sex-Based Discrimination—Including Against Transgender People—Is a Compelling State Interest. ..................16

        B.    The Government Has a Particularly Strong Interest in Prohibiting Discrimination in the Commercial Marketplace............................20

        C.    Washington's Prohibition on Discrimination Against Transgender People Serves a Compelling Interest of the Highest Order. ..........23

        D.    The WLAD Is Narrowly Tailored to Achieving Its Objective. ......26

CONCLUSION ....................................................................................29

CERTIFICATE OF COMPLIANCE ........................................................30

CERTIFICATE OF SERVICE ................................................................31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ...................................................................17

*A.C. v. Metropolitan Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023)......................................................10

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
  481 U.S. 537 (1987) .......................................................... 4, 8, 17

*Bell v. Maryland*,
  378 U.S. 226 (1964) ............................................................. 9, 21

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ...................................................................18

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ...................................................................15

*Cervelli v. Aloha Bed & Breakfast*,
  415 P.3d 919 (Haw. Ct. App. 2018)........................................ 6, 7, 21

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989) .....................................................................6

*Comm'n on Hum. Rts. and Opportunities v. Edge Fitness, LLC*,
  268 A.3d 630 (Conn. 2022)........................................................26

*Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018).......................................................11

*EEOC v. Fremont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986).....................................................22

*EEOC v. Pac. Press Publ'g Ass'n*,
    676 F.2d 1272 (9th Cir. 1982)........................................................ 19, 28

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018)......................................................19

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
    880 F.3d 450 (9th Cir. 2018)........................................................ 5, 11

*Fair Housing Council v. Roommate.com*,
    666 F.3d 1216 (9th Cir. 2012)......................................................9

*G.G. v. Gloucester County Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016)......................................................12
    972 F.3d 586 (4th Cir. 2020)......................................................12

*Gifford v. McCarthy*,
    23 N.Y.S.3d 422 (2016) ......................................................21

*Green v. Miss United States of America*,
    52 F.4th 773 (9th Cir. 2022)......................................................22

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ........................................................ 12, 18, 21

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ......................................................21

*IDK, Inc. v. Cnty. of Clark*,
    836 F.2d 1185 (9th Cir. 1988).................................................. *passim*

*In re Grand Jury Subpoena*,
    875 F.3d 1179 (9th Cir. 2017)......................................................15

*Kalantar v. Lufthansa German Airlines*,
    402 F. Supp. 2d 130 (D.D.C. 2005) ......................................................28

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019)......................................................19

*Knox v. Serv. Emps. Int'l Union*,
 567 U.S. 298 (2012) ...................................................................15

*Latta v. Otter*,
 771 F.3d 456 (9th Cir. 2014).........................................................21

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
 138 S. Ct. 1719 (2018) .................................................................17

*N. Coast Women's Care Med. Grp., Inc. v. Superior Court*,
 189 P.3d 959 (Cal. 2008) ..............................................................21

*N.Y. State Club Ass'n, Inc. v. City of New York*,
 487 U.S. 1 (1988) .............................................................. 17, 28, 29

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of, Psych.*, 228 F.3d 1043 (9th Cir. 2000) ........................................ 4, 7, 9

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
 585 U.S. 755 (2018) .......................................................................4

*Newman v. Piggie Park Enters., Inc.*,
 256 F. Supp. 941 (D.S.C. 1966).....................................................22

*Norwood v. Harrison*,
 413 U.S. 455 (1973) ............................................................... 14, 22

*Palmore v. Sidoti*,
 466 U.S. 429 (1984) .....................................................................12

*Parents for Priv. v. Barr*,
 949 F.3d 1210 (9th Cir. 2020)...................................... 11, 13, 19, 20

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*,
 229 F.3d 435 (3d Cir. 2000)............................................................6

*Pickup v. Brown*,
 728 F.3d 1042 (9th Cir. 2013).....................................................4, 7

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ..........................................................................22

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ..................................................................... *passim*

*Romer v. Evans*,
    517 U.S. 620 (1996) ..........................................................................21

*Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ............................................................................14

*Ry. Mail Ass'n v. Corsi*,
    326 U.S. 88 (1945) ............................................................................22

*Scardina v. Masterpiece Cakeshop, Inc.*,
    528 P.3d 926 (Colo. Ct. App. 2023) .................................................19

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000)............................................................18

*State v. Arlene's Flowers, Inc.*,
    441 P.3d 1203 (Wash. 2019)......................................... 13, 21, 26, 27

*Sundberg v. Shelton Sch. Dist. No. 309*,
    No. 3:23-CV-05717-DGE, 2024 WL 1860242 (W.D. Wash. Apr. 29, 2024).....26

*Taking Offense v. State*,
    281 Cal. Rptr. 3d 298 (Cal. Ct. App. 2021) .....................................19

*U.S. Citizens Ass'n v. Sebelius*,
    705 F.3d 588 (6th Cir. 2013)..............................................................6

*U.S. v. Bell*,
    414 F.3d 474 (3d Cir. 2005)..............................................................15

*Wine & Spirits Retailers Inc. v. Rhode Island*,
    418 F.3d 36 (1st Cir. 2005) ...............................................................14

## Statutes

42 U.S.C. § 2000a(b) ..................................................................28

42 U.S.C. § 2000e-1 ...................................................................28

42 U.S.C. § 2000e(b) ..................................................................28

Wash. Admin. Code 162-32-060 ...................................................8

Wash Rev. Code § 49.60.030(1) ..................................................23

Wash Rev. Code § 49.60.040(27) .................................................23

## Other Authorities

Miriam Cherry, *Exercising the Right to Public Accommodations: the Debate Over Single-Sex Health Clubs*, 52 Me. L. Rev. 97, 119 n.135 & 120 (2000) ...................8

Alyssa Downing, *Too Many Barriers: Being Trans and Homeless in Seattle*, The Mockingbird Society, https://mockingbirdsociety.org/component/content/article/401-too-many-barriers-being-trans-and-homeless-in-seattle ..................................25

David Ham, *Transgender Woman Says She Wasn't Given Access to Own Bank Account*, KIRO 7 (June 3, 2015), https://www.kiro7.com/news/transgender-woman-says-she-was-refused-service-ban/43265834/ ...........................................25

Jody L. Herman, *Gendered Restrooms and Minority Stress: the Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19(1) J. of Public Mgmt. and Soc. Policy 65 (2013) ........................................................................13

Jody L. Herman, Taylor N.T. Brown & Ann P. Haas, *Suicide Thoughts and Attempts Among Transgender Adults Findings from the 2015 U.S. Transgender Survey*, The Williams Institute (Sep. 2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf ........................................................................23

Movement Advancement Project, *LGBT Policy Spotlight: Public Accommodations Nondiscrimination Laws* (2018), https://www.lgbtmap.org/file/Spotlight-Public-Accommodations-FINAL.pdf.................................................................................24

Sara Reisner, et al., *Discrimination and Health in Massachusetts: A Statewide Survey of Transgender and Gender Nonconforming Adults,* Fenway Health (2014), https://fenwayhealth.org/wp-content/uploads/The-Fenway-Institute-MTPC-Project-VOICE-Report-July-2014.pdf.................................................................24

Amanda Sullender, *'Unaware' and 'Willfully Ignorant': Transgender Patients Struggle For Respect In Healthcare***,** The Spokesman-Review (Jan 15, 2024), https://www.spokesman.com/stories/2024/jan/15/unaware-and-willfully-ignorant-transgender-patient/.................................................................................25

## INTEREST OF *AMICUS CURIAE*[1]

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") is the nation's oldest and largest legal organization committed to achieving full recognition of the civil rights of lesbian, gay, bisexual, and transgender people (LGBT) and everyone living with HIV through impact litigation, education, and policy advocacy.  As both party counsel and *amicus curiae*, Lambda Legal has litigated the constitutionality of civil rights protections barring discrimination against LGBT people, including defenses based on intimate and expressive association like those raised by Plaintiffs here, which constitute the focus on this brief.  Lambda Legal also regularly receives reports from community members in Washington and across the country of discrimination based on their gender identity or sexual orientation in places of public accommodation and other contexts.  The outcome of this appeal implicates the constitutionality of civil rights protections relied upon by the communities that Lambda Legal serves.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Civil rights protections embody the collective promise of equal participation in public life, one of the most compelling interests that a government can achieve

---

[1] All parties consented to the filing of this brief.  No party's counsel authored this brief in whole or in part.  No party, party's counsel, or any person or entity other than *amicus*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

1

for its people.  These protections cover a wide array of settings where discrimination can inflict its damage—but regulation of activity by commercial businesses falls within the dead-center core of the government's constitutional authority.  When prohibiting discrimination by commercial enterprises that profit from solicitation of the general public, the government interest at stake is at its zenith, and the interest of the business is at its nadir.

The State of Washington lawfully exercised its authority to protect transgender people from the harms of discrimination, and the First Amendment's freedom of association does not insulate the ordinary commercial activities of the spa here from compliance with the Washington Law Against Discrimination (WLAD).

First, the freedom of intimate association does not extend to the commercial relationships between the spa staff and spa-goers or between spa-goers.  The spa's relationships do not share salient characteristics with the types of relationships protected by intimate association, such as those between family members.  The large size, commercial purpose, non-selectivity, and short duration of any relationships with spa-goers place them outside the ambit of protection.  They are no more entitled to protection than the other commercial relationships that circuit precedent has found to fall outside the scope of a right to intimate association, including those between a therapist and a client, and an escort and a client.

Second, the freedom of expressive association also does not provide any defense to application of the WLAD here.  The spa's expressive association claim fails for the same reasons that the district court rejected the spa's speech claim.  Reframing a speech claim as an expressive association claim adds nothing.  The spa also cannot plausibly contend that spa-goers who patronize the business seeking spa treatments are, in reality, seeking to send some message about transgender women to some unidentified audience.

Third, while application of the WLAD does not trigger heightened scrutiny, it would nevertheless satisfy such scrutiny.  Barring discrimination based on sex in public accommodations is a quintessential compelling state interest, and the rampant discrimination, harassment, and even violence faced by transgender people powerfully illustrates why.  Such discrimination not only deprives transgender people of equal access to goods and services in the commercial marketplace but also inflicts the unforgettable humiliation of being rejected as unworthy in places otherwise open for business to the general public—followed by the often unshakeable fear of more to come.  Today, it may be a spa; tomorrow, it may be a grocery store, school, or shelter.  The WLAD is also narrowly tailored to achieving its objective.  The government's compelling interest in eliminating discrimination against transgender people in the commercial marketplace justifies application of the WLAD under any level of scrutiny.

3

## ARGUMENT

### I.    The Spa's Commercial Relationships Are Not Protected by a Right of Intimate Association.

There are "certain kinds of personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-19 (1984).  The right of intimate association protects relationships that "involve deep attachments and commitments to the necessarily few other individuals with whom one shares … a special community of thoughts, experiences, and beliefs." *Id.* at 619-20; *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).  The U.S. Supreme Court identified relationships among family members as one relevant guidepost because they "suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection." *Roberts*, 468 U.S. at 619.

The relationships among the spa, its employees, and its customers are not on remotely equal constitutional footing with these protected relationships.  Rather, they more closely resemble the commercial and professional relationships that this Court has previously held fall outside the scope of a right to intimate association.  That includes the relationship between a therapist and a client.  *See Pickup v. Brown*, 728 F.3d 1042, 1058 (9th Cir. 2013), *overruled on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018); *Nat'l Ass'n for*

4

*the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000). It also includes the relationship between an escort and a client. *See IDK, Inc. v. Cnty. of Clark*, 836 F.2d 1185, 1193 (9th Cir. 1988); *see also Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 456 (9th Cir. 2018). If these commercial relationships—which may involve the sharing of physical intimacy or the confession of secrets and one's most intimate thoughts— are not protected by a right of intimate association, it is difficult to see how garden-variety interactions with spa-goers can possibly be protected.

In determining whether a particular relationship is protected by the right to intimate association, courts examine factors such as "the group's size, its congeniality, its duration, the purposes for which it was formed, and the selectivity in choosing participants." *IDK*, 836 F.2d at 1193. Consideration of these factors confirms that the relationship between the spa and its customers, or between fellow customers, is not one of constitutional dimension.

***Size.*** Far from the "necessarily few" relationships protected by a right of intimate association, *Roberts*, 468 U.S. at 620, the spa necessarily deals in volume by its very nature. It has generated a sufficient volume of business to remain in operation for more than 20 years and to warrant opening a second location. 2-ER-125. Its customer base has also expanded over time, from predominantly Asian customers to customers "of all ethnicities, backgrounds, and races." 2-ER-126. At

5

any given time, any number of customers may be utilizing the many different areas of the spa. 2-ER-127.

Courts have rejected intimate association claims asserted by groups of an even smaller size and structure. *See, e.g.*, *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (fraternity chapter with 20 to 80 members, placing it "within the same size range as the local Rotary Clubs that the [Supreme] Court held did not engage in intimate association in *Duarte*"); *Cervelli v. Aloha Bed & Breakfast*, 415 P.3d 919, 933 (Haw. Ct. App. 2018) (bed-and-breakfast served 100 to 200 customers annually out of three bedrooms in owner's home). Businesses that rely on customer volume, such as dance halls and health insurance companies, similarly fall outside the ambit of intimate association protection. *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) ("relationships with large business enterprises like health insurance companies do not qualify as intimate associations warranting constitutional protection").

Notably, the relevant analysis examines the size of the overall enterprise— not any individual transaction within it. For example, this Court recognized that while "an escort and client are the smallest possible association … an escort may be involved with a large number of clients." *IDK*, 836 F.3d at 1193. The relationship between a doctor or therapist and a patient is similar. *U.S. Citizens*

6

*Ass'n*, 705 F.3d at 598; *Pickup*, 728 F.3d at 1057-58; *Nat'l Ass'n for the Advancement of Psychoanalysis*, 228 F.3d at 1050.  And the same is true for a bed-and-breakfast that serves only a handful of customers at once.  *Cervelli*, 415 P.3d at 933.  Thus, that only a limited number of customers may receive a body scrub at a particular time, for instance, does not reduce the size of the business enterprise.

*Purpose.*  The spa's relationship with its customers owes its existence to a commercial purpose, and the commercial aspect of that relationship is the only one that the public accommodations law regulates here.  A customer may patronize the spa in order to sweat in a sauna, to sit in a whirlpool, or to exfoliate.  The purpose is not, for any person, to become "deeply attached and committed to each other." *IDK*, 836 F.2d at 1193; *cf. Roberts*, 468 U.S. at 619-20 (holding that family relationships are protected associations because of their deep attachments).  The same is true for any pleasantries that customers may exchange with one another. Indeed, the spa could provide the exact same paid facilities and services even if only one customer was patronizing the spa at a particular moment.  Tellingly, the spa has not identified a single authority of this Court, or the Supreme Court, finding a right of intimate association in a commercial context akin to the one here.

*Selectivity.*  With the exception of its "biological women only" policy, the spa accepts virtually all paying customers.  2-ER-126 (alleging that the customer base spans all backgrounds); *cf. Roberts*, 468 U.S. at 621 ("new members are …

admitted with no inquiry into their backgrounds").  Customers thus do not necessarily share a special community of "thoughts, beliefs, and experiences." *IDK*, 836 F.2d at 1193.  Even taking the spa's admission policy at face value, a business that admits half of the population so long as they can pay the requisite fee cannot plausibly allege that it is selective in a meaningful sense.[2]  2-ER-126.

Although the spa maintains that it is "selective" in terms of the sex of its customers, it is no more "selective" than the Jaycees in *Roberts*, which excluded all women and anyone outside the ages of 18-35 from full membership.  468 U.S. at 613.  It is also no more "selective" than the Rotary Clubs in *Rotary Club of Duarte*, which not only excluded women in various respects but did not even make club membership open to the general public.  481 U.S. at 547.  The U.S. Supreme Court nevertheless rejected a right to intimate association asserted by these clubs.

**Duration**.  The spa provides services that only last for a few hours, in

---

[2] The spa's policy of refusing to serve men also likely violates the WLAD.  The spa could lawfully choose to maintain a women's side and men's side, just like any other place of public accommodation that provides sex-separated restrooms or facilities, provided that it refrains from discriminating against customers based on their gender identity with respect to those facilities.  Wash. Admin. Code 162-32-060.  But there is no exception in the WLAD for the spa's refusal to serve men *at all*.  More than half of all state public accommodation laws similarly prohibit, for instance, single-sex health clubs.  *See* Miriam Cherry, *Exercising the Right to Public Accommodations: the Debate Over Single-Sex Health Clubs*, 52 Me. L. Rev. 97, 119 n.135 & 120 (2000) (noting that, in some places, such "clubs still operate, perhaps hoping that if they keep a low profile they will escape suit").

contrast to the longer standing relationships that courts have typically recognized as protected by the right of intimate association. A relationship that "lasts for a short period and only as long as the client is willing to pay the fee" is not generally a protected intimate association. *IDK*, 836 F.2d at 1193 ("we do not believe that a day … is sufficient time to develop deep attachments"); *Nat'l Ass'n for the Advancement of Psychoanalysis*, 228 F.3d at 1050; *Bell v. Maryland*, 378 U.S. 226, 314-15 (1964) (Goldberg, J., concurring) (noting that the relationship between a restaurateur or innkeeper and a customer is "evanescent"). Any fleeting interactions among the spa's customers or with its staff do not give rise to a right of intimate association.

Taken together, these various factors—size, purpose, selectivity, and duration—explain why the spa's reliance on *Fair Housing Council v. Roommate.com*, 666 F.3d 1216, 1221 (9th Cir. 2012), is misplaced. That case relied on the constitutional avoidance doctrine to construe the Fair Housing Act as not reaching roommate relationships and thus avoid deciding any constitutional issue. The relationship between the spa's customers, however, is materially different from that between roommates. People do not generally cycle through hundreds of roommates on a weekly basis, as a business relying on customer volume could expect. People do not generally have roommates for a handful of hours, the time that customers would spend at the spa. And people do not

9

generally take in roommates without ever having spoken a word with one another, as would be true for most spa-goers. The spa's contention that "there is no reason to believe that a nude spa is any less private than sharing a house or apartment" defies credulity. Opening Br. 37.

***Other Factors.*** The spa also argues that non-customers are excluded from critical aspects of the relationship. The same is true, however, of the relationship between a therapist or escort and a client. And those relationships entail far greater seclusion from others than that here: spa-goers are voluntarily patronizing a facility open to the general public that involves sharing communal spaces with strangers who may not be fully clothed at all times. Any individual with particular personal modesty concerns may not be well-served by choosing to visit the spa,[3] or to work in a role requiring body scrubs.[4] Washington does not "force" anyone to use a public spa. Opening Br. 35. That is a choice people make for themselves.

The presence of nudity is also not sufficient to create a right of intimate association in a commercial relationship under existing precedent. *See IDK*, 836

---

[3] The same is true for a customer who does not wish to see bodies different from their own. A person who objects to seeing a woman with a double mastectomy from breast cancer, or an intersex person with a difference of sexual development, *see A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024), can refrain from visiting the spa.

[4] A business can, however, provide accommodations to individual employees provided that doing so does not run afoul of any nondiscrimination obligations.

F.2d at 1193; *Erotic Serv. Provider Legal Educ. & Rsch. Project*, 880 F.3d at 456.

In addition, this Court has held that there is no constitutional right to privacy to

exclude transgender people from facilities matching their gender identity based on

objections to seeing or being seen by them.  *See Parents for Priv. v. Barr*, 949 F.3d

1210, 1217 (9th Cir. 2020) (upholding school policy providing transgender

students with equal access to restrooms, locker rooms, and showers consistent with

their gender identity), *cert. denied*, 141 S. Ct. 894 (2020).  Whether framed in

terms of privacy or intimate association, this Court's precedent has rejected the

gravamen of the spa's claim.

The spa is free, however, to adopt any privacy-enhancing measures it

desires, provided they remain nondiscriminatory.  For example, if the spa wishes

to hang up curtains between spa-goers who are receiving a massage or body scrub,

it can do so.  *Cf. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524 (3d Cir.

2018) (rejecting privacy claims by cisgender students objecting to sharing school

facilities with transgender students and noting the availability of showers with

privacy curtains).  Similarly, if the spa wishes to adopt a policy that customers

must wear bathing suits in the pool, or use towels in the sauna, it is free to do that

as well.  That the spa's environment might look different as a result does not

change the point, as there is no constitutional right to operate a nude spa, much

less on the spa's chosen discriminatory terms.  Nor does any economic impact of

compliance with nondiscrimination laws, including lost revenue due to the preferences of other customers, support a valid constitutional defense. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964).

The spa's argument premised on assumptions about sexual attraction also miss the mark. Opening Br. 36. To the extent that the argument assumes that transgender women seek access to facilities "for the purpose of arousal or gratifying [] sexual desire," WDI Amicus Br. 14, that is a vile and dangerous stereotype that the law cannot give effect. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). And it is unclear how an objection to being seen by a transgender woman based on presumed sexual attraction would be resolved by the spa's policy, which permits access if the transgender woman has undergone genital surgery. Relatedly, an objecting customer or employee also could not lawfully demand the exclusion of a lesbian, gay, or bisexual customer based on their presumed sexual attraction to other customers. *Cf. G.G. v. Gloucester County Sch. Bd.*, 822 F.3d 709, 723 n.11 (4th Cir. 2016) (rejecting argument based on presumed "sexual responses"), *vacated on other grounds and remanded*, 580 U.S. 1168 (2017), *aff'd*, 972 F.3d 586 (4th Cir. 2020).

Of course, the spa remains fully empowered to protect the safety of all customers and staff by maintaining and enforcing anti-harassment policies against any person, regardless of their gender identity or sexual orientation, in the event of

12

any misconduct.  Indeed, it is often transgender people who face the risk of victimization in sex-separated facilities.[5]  *See* Jody L. Herman, *Gendered Restrooms and Minority Stress: the Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19(1) J. of Public Mgmt. and Soc. Policy 65 (2013).

In sum, consideration of the various factors relevant to determining whether a right of intimate association exists confirms that no such right attaches to commercial relationships with spa-goers.

## II.    The Spa's Commercial Relationships Are Not Protected by a Right of Expressive Association.

The spa's invocation of a right to expressive association also fails.  "[T]he Supreme Court has never held that a commercial enterprise, open to the general public, is an 'expressive association' for purposes of First Amendment protections."  *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1236 (Wash. 2019).

First, the spa's expressive association claim fails at the outset for the same reasons that the district court rejected its speech claim.  That is because "activity that is otherwise regulable when undertaken by a single individual or entity" does

---

[5] As demonstrated by the spa's limited interactions with transgender women across twenty years of operation, transgender people often avoid contexts and actions that they perceive may jeopardize their safety or that may exacerbate gender dysphoria. *See Parents for Priv*, 949 F.3d at 1217.

not become constitutionally protected simply because a group is involved.  *Wine &*
*Spirits Retailers Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005).  And, with
potential exceptions inapplicable here such as those involving pure expression like
a parade, a commercial business has no general speech right to "send a message"
by discriminating against customers in violation of civil rights protections.

A few examples illustrate the point.  A fitness instructor has no greater
speech right to discriminate when soliciting the general public to purchase group
lessons, rather than one-on-one training sessions, even though the former
necessarily involves multiple individuals.  Likewise, if a store named "Betsy's
Dresses – No Transgender Women!" claimed a constitutional right to discriminate,
it would similarly lose—even if every customer agreed that they were banding
together to send a message of exclusion.  Repackaging discrimination as freedom
of association cannot create constitutional protection that does not exist.  *Cf.*
*Norwood v. Harrison*, 413 U.S. 455, 469-70 (1973) (recognizing that
discrimination can always be "characterized as a form of exercising freedom of
association").

Second, the right of expressive association does not protect the right of
individuals to come together for any reason; rather, it protects the "right to
associate for the purpose of speaking."  *Rumsfeld v. F. for Acad. and Institutional*
*Rts., Inc.*, 547 U.S. 47, 68 (2006).  Most recently, the Supreme Court has

characterized the right as protecting "the ability of like-minded individuals to associate for the purpose of expressing commonly held views."  *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 309 (2012); *see, e.g.*, *In re Grand Jury Subpoena*, 875 F.3d 1179, 1184 (9th Cir. 2017) (rejecting expressive association defense of website that allowed users to post information about employers, whether positive or negative, because users did not "associate[] to advance shared views").  This Court has also recognized a distinction between associations that are primarily commercial versus those that are primarily expressive.  *IDK*, 836 F.3d at 1195; *accord U.S. v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005).

The factual context here belies any notion that spa-goers or staff come together in order to engage in any expression relating to transgender women, nor can the spa identify the audience for such expression.[6]  As noted, customers may patronize the spa to use its whirlpools, saunas, and on-site restaurant; but there is no plausible allegation that the purpose of their association is to send a message about transgender women (much less about those who have not received particular medical care).  The absence of any such expression precludes the spa's expressive association claim.

---

[6] This case is also unlike *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 652 (2000), where the association sought to create shared views by inculcating its "official position" on homosexuality among youth members.

15

### III. The WLAD Is Narrowly Tailored to Further a Compelling State Interest in Barring Discrimination Against Transgender People.

Although application of the WLAD to the spa's business activities does not trigger heightened scrutiny, it would survive such scrutiny in any event. The compelling nature of the state interest at issue in protecting transgender people from the harms of discrimination is reinforced by multiple considerations. First, courts have long recognized that there is a compelling interest in prohibiting discrimination based on sex, which necessarily includes discrimination against transgender people. Second, the state interest in ensuring nondiscrimination within the commercial marketplace is particularly consequential given the role of businesses in everyday life. Third, the particular landscape of harms addressed here—discrimination based on gender identity in Washington's public accommodations—illustrates why the state has an interest of the highest order. Finally, the WLAD is narrowly tailored to achieving that interest.

#### A. Eliminating Sex-Based Discrimination—Including Against Transgender People—Is a Compelling State Interest.

Across a trio of cases beginning with *Roberts*, the U.S. Supreme Court has repeatedly affirmed that states act pursuant to a compelling interest when they prohibit discrimination based on sex in public accommodations. *See Roberts*, 468 U.S. at 624 (recognizing that a state's "commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services …

16

plainly serves compelling state interests of the highest order"); *Rotary Club of Duarte*, 481 U.S. at 549; *see also N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1 (1988). While recognizing that the freedom of association can encompass a freedom not to associate, the Supreme Court nonetheless held that various clubs seeking to exclude women could not maintain their discriminatory practices, even where there was "some slight infringement" on associational rights. *Rotary Club of Duarte*, 481 U.S. at 549. And the Supreme Court has recently emphasized that it "do[es] not question the vital role that public accommodations laws play in realizing the civil rights of all Americans," as "governments in this country have a 'compelling interest' in eliminating discrimination in places of public accommodation." *303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023).

The *Roberts* trio of cases confirmed the breadth of the government's interest in prohibiting discrimination based on sex in public accommodations. That includes ensuring equal access to "purely tangible goods and services" as well as the removal of "barriers to economic advancement and political and social integration." *Roberts*, 468 U.S. at 625-26; *Rotary Club of Duarte*, 481 U.S. at 549. But the government's interest extends further. It also encompasses a compelling interest in preventing the "deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Roberts*, 468 U.S. at 625 (quotes omitted); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.

17

Ct. 1719, 1729 (2018) (recognizing "serious stigma" inflicted by unlawful discrimination). "Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public." *Heart of Atlanta Motel*, 379 U.S. at 292 (Goldberg, J., concurring; quotes omitted).

The Supreme Court confirmed in *Bostock* that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). Because the government has a compelling interest in striking at the entire spectrum of sex-based discrimination, it has no less of a compelling interest where that discrimination manifests in the targeting of transgender people. As a class, transgender have also faced "stereotypical notions" and barriers to inclusion "that have historically plagued certain disadvantaged groups." *Roberts*, 467 U.S. at 625-26. For example, one pernicious stereotypical notion—that transgender women pose a threat to others in sex-separated facilities—is evident here. Even before *Bostock*, this Court's precedent recognized that discrimination against transgender people is inescapably based on sex. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000). And in light of the pervasive discrimination and persecution that transgender people have historically suffered—and continue to face—this Court held that classifications based on

18

transgender status demand heightened scrutiny. *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019).

Courts to have addressed the issue agree that the government interest in prohibiting sex discrimination is no less compelling when transgender people are on the receiving end of such discrimination. *See, e.g.*, *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 (6th Cir. 2018) (recognizing the government's "compelling interest in combating discrimination in the workforce" in addressing termination of transgender woman), *aff'd sub nom. Bostock*, 140 S. Ct. 1731; *Scardina v. Masterpiece Cakeshop, Inc.*, 528 P.3d 926, 942 (Colo. Ct. App. 2023) (recognizing compelling interest in eliminating discrimination from public accommodations where bakery refused to serve transgender customer); *Taking Offense v. State*, 281 Cal. Rptr. 3d 298, 317 (Cal. Ct. App. 2021) (applying *Bostock* to confirm the government's compelling interest in barring discrimination against transgender people); *see also Parents for Priv.*, 949 F.3d at 1238 n.21 (recognizing that nothing in *Hurley* precludes a compelling interest in protecting transgender people from "the stigmatizing injury of discrimination" when denied access to facilities matching their gender identity or publicly available goods and services). Just as protections from sex discrimination do not carve out transgender people from their scope, neither is there a carve-out from the government's compelling interest in eliminating sex discrimination in all its forms. *See EEOC v.*

19

*Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) (holding that the government has a compelling interest in eliminating "all forms of discrimination").

Indeed, this Court has upheld the constitutionality of government action protecting transgender people from discrimination in access to sex-separated facilities. In *Parents for Privacy*, this Court rejected a constitutional challenge to an inclusive school policy in Oregon that allowed transgender students to use restrooms, locker rooms, and showers matching their gender identity. 949 F.3d at 1238 (recognizing authority that the government has a compelling interest in similar contexts). Given long-standing precedent upholding prohibitions against sex-based discrimination, prohibiting discrimination against transgender people serves an interest that is at least as compelling.

### B.    The Government Has a Particularly Strong Interest in Prohibiting Discrimination in the Commercial Marketplace.

The government's interest in prohibiting discrimination by commercial businesses is particularly compelling given the enormous role that they play in everyday life. As *Roberts* noted long ago, "the changing nature of the American economy" strengthened the government's interest in regulating even "various forms of public, quasi-commercial conduct." 468 U.S. at 625-26. There is thus no question that ensuring full and equal access to the commercial marketplace—the backdrop for "an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society"—falls within the heartland of the

government's constitutional authority. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

The law has consistently recognized the *quid pro quo* relationship between a business and the general public. In exchange for profiting from the general public, a business subjects itself to regulation protecting the public from harm. "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Bell*, 378 U.S. at 314-15 (Goldberg, J., concurring).

Courts have thus had no difficulty in confirming, in the related context of sexual orientation, that prohibiting discrimination by a range of commercial businesses serves a compelling state interest. *See, e.g.*, *Arlene's Flowers*, 441 P.3d at 1235 (flower shop), *cert. denied*, 141 S. Ct. 2884 (2021); *Cervelli*, 415 P.3d at 935 (bed-and-breakfast), *cert. denied*, 139 S. Ct. 1319 (2019); *Gifford v. McCarthy*, 23 N.Y.S.3d 422 (2016) (facility rental); *N. Coast Women's Care Med. Grp., Inc. v. Superior Court*, 189 P.3d 959, 968 (Cal. 2008) (medical group); *see also Latta v. Otter*, 771 F.3d 456, 475 (9th Cir. 2014) ("enforcement of anti-discrimination laws … 'serv[e] compelling state interests of the highest order'").

These authorities stand on a bedrock of precedent rejecting constitutional challenges to civil rights protections similar to the one mounted by the spa here. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting law firm's expressive association defense to sex discrimination); *Heart of Atlanta Motel*, 379

21

U.S. at 250 (upholding federal public accommodations law against constitutional challenge); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 384 (1973) (rejecting expression defenses in holding newspaper could be restrained from carrying job advertisements that displayed illegal sex preferences); *Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941 (D.S.C. 1966) (rejecting restaurant's asserted constitutional right to discriminate based on race).  And the government also has a compelling interest in prohibiting discrimination outside the commercial context as well.  *See, e.g.*, *Norwood*, 413 U.S. at 463 (private school); *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 94 (1945) (labor union); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1368 (9th Cir. 1986) (religious school's discriminatory employment policy).

Nothing in *Green v. Miss United States of America*, 52 F.4th 773 (9th Cir. 2022), diminishes the compelling nature of the government interest in prohibiting discrimination in the commercial context presented here.  *Green* concerned a beauty pageant that the Court held constituted "purely expressive" activity, and it therefore evaluated the asserted "antidiscrimination interests in the special context of First Amendment expressive activity." *Id.* at 780 (quotes omitted), 792.  The Court found no compelling interest sufficient to justify a restriction on pure expression because the plaintiff could participate in other pageants or engage in expression in other ways. *Id.* at 792.  By contrast, in the commercial context, the

22

fact that a customer who is turned away from a restaurant or hotel can go elsewhere to find another place to eat or sleep has never lightened the weight of the state's interest in addressing discrimination and the toll it takes.[7]  Indeed, Plaintiffs here "do not contest that the elimination of discrimination against transgender women *may* qualify as a compelling government interest."  Opening Br. 10.

### C.     Washington's Prohibition on Discrimination Against Transgender People Serves a Compelling Interest of the Highest Order.

As relevant here, the WLAD advances the State of Washington's compelling interest in prohibiting discrimination based on gender identity in public accommodations.  Wash Rev. Code §§ 49.60.030(1), 49.60.040(27).

The WLAD responds to a well-documented harm.  Social science has confirmed pervasive and widespread discrimination against transgender people in public accommodations.  In recent studies of transgender people, nearly one-third of respondents "reported being denied equal treatment or service, verbally harassed, or physically assaulted in a place of public accommodation in the past year," and twenty percent of respondents avoided public accommodations altogether to avoid mistreatment.  Jody L. Herman, Taylor N.T. Brown & Ann P. Haas, *Suicide Thoughts and Attempts Among Transgender Adults Findings from*

---

[7] And here, the spa alleges that it offers a unique service, as "the only Korean spa in the state."  2-ER-225.

*the 2015 U.S. Transgender Survey*, The Williams Institute, 25 (Sep. 2019),

https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf.  The consequences of that discrimination can be devastating.

Among transgender respondents, "having negative experiences in places of public

accommodation in the past year, or avoiding these places all together, [was]

associated with a higher prevalence of suicide thoughts and attempts." *Id.*

Discrimination has harmful snowball effects.  A 2014 survey of transgender

people in Massachusetts found that a staggering sixty-five percent of respondents

reported at least one experience of discrimination in a public accommodation

within the last year, and that such experiences were associated with postponing

needed medical care when sick or injured.  Sara Reisner, et al., *Discrimination and*

*Health in Massachusetts: A Statewide Survey of Transgender and Gender*

*Nonconforming Adults*, Fenway Health, 15-19 (2014), https://fenwayhealth.org/

wp-content/uploads/The-Fenway-Institute-MTPC-Project-VOICE-Report-July-2014.pdf.  Similarly, another study found widespread avoidance of public

accommodations by transgender people due to discrimination, with 34 percent who

had experienced discrimination in the past year avoiding public spaces like stores

and restaurants.  Movement Advancement Project, *LGBT Policy Spotlight: Public*

*Accommodations Nondiscrimination Laws*, 2-4 (2018), https://www.lgbtmap.org/

file/Spotlight-Public-Accommodations-FINAL.pdf.

The discrimination in public accommodations encountered by transgender Washingtonians confirms the critical importance of the WLAD's protections. For example, one transgender person recounted their inability to find generalized medical care in Spokane because healthcare providers were "uncomfortable" with their gender identity. Amanda Sullender, *'Unaware' and 'Willfully Ignorant': Transgender Patients Struggle For Respect In Healthcare*, The Spokesman-Review (Jan 15, 2024), https://www.spokesman.com/stories/2024/jan/15/unaware-and-willfully-ignorant-transgender-patient/. Another transgender person in Seattle experiencing homelessness encountered hostility in locating shelters and programs, including one that refused to provide access for the night without disclosure of the person's "real name." Alyssa Downing, *Too Many Barriers: Being Trans and Homeless in Seattle*, The Mockingbird Society, https://mockingbirdsociety.org/component/content/article/401-too-many-barriers-being-trans-and-homeless-in-seattle. A transgender woman in Seattle was denied access to her bank account balance because the bank employee refused to believe she was the owner of the account, even after she answered her bank security questions correctly. David Ham, *Transgender Woman Says She Wasn't Given Access to Own Bank Account*, KIRO 7 (June 3, 2015), https://www.kiro7.com/news/transgender-woman-says-she-was-refused-service-ban/43265834/. One high school student in Washington was repeatedly harassed by peers based on sexual orientation and gender identity,

25

reaching a breaking point in which the student was stabbed six times with a knife, causing nearly fatal injuries. *Sundberg v. Shelton Sch. Dist. No. 309*, No. 3:23-CV-05717-DGE, 2024 WL 1860242, *2 (W.D. Wash. Apr. 29, 2024). Medical care, emergency shelters, banking, and education are basic services that all people should be able to fully access without discrimination, and the WLAD secures that right.

Moreover, as the district court acknowledged, Washington's own courts have held that the state's interest in barring discrimination in public accommodations is compelling. *See Arlene's Flowers*, 441 P.3d at 1235 (recognizing that the WLAD serves a compelling interest, not only in guaranteeing access to goods and services but also eradicating barriers to equal treatment in the marketplace). That applies with equal force to the WLAD's prohibition of discrimination based on gender identity.

### D.    The WLAD Is Narrowly Tailored to Achieving Its Objective.

Finally, the WLAD is narrowly tailored to achieve its compelling interest in eliminating discrimination in the commercial marketplace. The law represents "the least restrictive means of achieving its ends" and it "responds precisely to the substantive problem which legitimately concerns the State." *Roberts*, 468 U.S. at 626, 629 (quotes omitted); *see also Comm'n on Hum. Rts. and Opportunities v. Edge Fitness, LLC*, 268 A.3d 630, 641 (Conn. 2022) (rejecting gyms' argument for

26

exemption from public accommodations law and recognizing that "limiting …

transgender people access to spaces on the basis of … 'moral comfort' of

customers defeats the purpose of our state's antidiscrimination legislation").

It is also no answer to tell transgender women to "go elsewhere" to find

another business willing to serve them.  That would neither remedy their dignitary

injuries nor provide them with full and "equal access to publicly available goods

and services." *Roberts*, 468 U.S at 624.  In holding that the WLAD survived strict

scrutiny under the state constitution, the Washington Supreme Court

"emphatically" rejected the argument of a floristry business, which refused to serve

a same-sex couple, that it caused no real harm "since other florists were willing to

serve [them]." *Arlene's Flowers*, 441 P.3d at 1235.  It explained that the WLAD

"serve[d] a broader societal purpose: eradicating barriers to the equal treatment of

all citizens in the commercial marketplace." *Id.*  And if it were "to carve out a

patchwork of exceptions for ostensibly justified discrimination, that purpose would

be fatally undermined." *Id.*  That justification would be particularly fraught here,

where the spa alleges that it is "the only Korean spa in the state," 2-ER-225, and

"sells a specialized service that is only offered by them," Opening Br. 39.

Plaintiffs' contention that the WLAD is under-inclusive merely because it

contains limited exceptions for particular places—such as educational institutions

operated by religious institutions and bona fide clubs that are distinctly private by

27

their nature—fails as a matter of law. *See N.Y. State Club Ass'n*, 487 U.S. at 4 &

14 n.5 (upholding public accommodation law as constitutional, notwithstanding

exemptions for public educational facilities). The government is not required to

treat different situations identically. And none of these exceptions involve a

commercial enterprise open to the public nor lessen the state's compelling interest

in maintaining a nondiscriminatory commercial marketplace.

Moreover, the government may advance a compelling state interest in

nondiscrimination without prohibiting every act of discrimination in every

conceivable situation. For example, the fact that Congress chose not to prohibit

discrimination by employers with 15 or fewer employees in Title VII, and

exempted other employers from its coverage, 42 U.S.C. § 2000e(b),[8] does not

mean that the federal government has forfeited a compelling state interest in

antidiscrimination. *Pac. Press Publ'g Ass'n*, 676 F.2d at 1280. Similarly, Title

II's prohibition on discrimination in public accommodations does not reach buses

or airplanes, as well as any number of other settings not specifically enumerated.

*See Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 139 (D.D.C.

2005); 42 U.S.C. § 2000a(b). But there is no question that laws barring

---

[8] Title VII also contains an exemption allowing a religious corporation,
association, educational institution, or society to discriminate on the basis of
religion. 42 U.S.C. § 2000e-1.

discrimination in public accommodations advance a compelling state interest.  *See*

*Roberts*, 468 U.S. at 624; *N.Y. State Club Ass'n*, 487 U.S. at 4 & 14 n.5.

## CONCLUSION

There is no constitutional right based on freedom of association for the spa

to discriminate against transgender women.  Furthermore, the WLAD lawfully

exercises one of the government's most critical powers—the vindication of civil

rights—in a context falling squarely within the government's purview—the

commercial sphere.  For the foregoing reasons, this Court should affirm the

judgment of the district court.


Dated:  June 5, 2024                    Respectfully submitted,

                                        /s/ Peter C. Renn
                                        Peter C. Renn
                                        Pelecanos[†]
                                        LAMBDA LEGAL DEFENSE AND
                                        EDUCATION FUND, INC.
                                        800 S. Figueroa St., Suite 1260
                                        Los Angeles, CA 90010
                                        (213) 382-7600
                                        [†]*Mailing address only*

                                        Counsel for *Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4031

I am the attorney or self-represented party.

**This brief contains** | 6,638 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [      ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Peter C. Renn | **Date** | 6/05/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                              *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system on June 5, 2024, and that service will be accomplished by the ACMS system.

s/ Peter C. Renn
Peter C. Renn