## Docket No. 23-4031

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

OLYMPUS SPA, MYOON WOON LEE, SUN LEE,
JANE DOE, patron and JANE DOES, employees 1-3,

*Plaintiffs-Appellants,*

v.

ANDRETA ARMSTRONG, Executive Director of the
Washington State Human Rights Commission and MADISON IMIOLA,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the Western District of Washington,
No. 2:22-cv-00340-BJR · Honorable Barbara Jacobs Rothstein*

## APPELLANTS' REPLY BRIEF

KEVIN T. SNIDER, ESQ.
MATTHEW MCREYNOLDS, ESQ.
TRACY TRIBBETT, ESQ.
PACIFIC JUSTICE INSTITUTE
9851 Horn Road, Suite 115
Sacramento, California 95827
(916) 857-6900 Telephone
(916) 857-6902 Facsimile
ksnider@pji.org
mattmcreynolds@pji.org
ttribbett@pji.org

*Attorneys for Appellants,
Olympus Spa, Myoon Woon Lee,
Sun Lee, Jane Doe and Jane Does*



COUNSEL PRESS INC. · (213) 680-2300      PRINTED ON RECYCLED PAPER



# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................2

    I.    FREE SPEECH ....................................................................2

        A.    The free speech claim stands as separate from the two claims challenging the public accommodation.................3

        B.    Content-neutrality in WLAD has no relevance to the free speech claim because the Commission does not rely on any specific provision, but instead simply proclaims the speech illegal ...........................6

        C.    The Commission's position that removal of the language stood as the most effective means of achieving the State's interest fails for lack of an underlying statute covering speech...........................7

        D.    The white racist analogy to conservative Christians with traditional sensibilities on modesty between the sexes is reprehensible rhetoric ...........................8

    II.    FREE EXERCISE OF RELIGION ................................................9

        A.    The WLAD carve-out for private clubs fails general applicability.................................................................9

        B.    The Commission has made only minimal attempts to address the substantial burden on the Spa's religious exercise....................................................12

        C.    The State was on notice of the religious component of the Spa's owner and its operations ......................13

    III.    ASSOCIATION ....................................................................14

        A.    Intimate Association .................................................14

i

1.    Strangers ......................................................................15

2.    Duration ......................................................................16

3.    Size..............................................................................16

4.    Special Community of Thoughts and Interests .............17

5.    Distinctly Personal Aspects of One's Life ....................18

B.    Expressive Association .............................................................22

IV.    COMPELLING INTEREST .............................................................25

CONCLUSION....................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................28

CERTIFICATE OF SERVICE ..............................................................29

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*,
 600 U.S. 570 (2023)............................................................ 3, 5, 7, 8, 12

*Barnes v. Glen Theater*,
 501 U.S. 560 (1991)....................................................................... 19, 20

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
 481 U.S. 537 (1987)....................................................................... 14, 25

*Bostock v. Clayton Cnty., Georgia*,
 590 U.S. 644 (2020).............................................................................. 22

*Boy Scouts of Am. v. Dale*,
 530 U.S. 640 (2000)........................................................ 12, 18, 22, 23, 24

*City of Dallas v. Stanglin*,
 490 U.S. 19 (1989)......................................................................... 15, 16

*Employment Div., Dep't of Hum. Res. of Or. v. Smith*,
 494 U.S. 872 (1990)......................................................................... 9, 12

*Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*,
 880 F.3d 450 (9th Cir. 2018) .............................................................. 16

*Fulton v. Philadelphia*,
 593 U.S. 522 (2021)................................................................................ 9

*Heart of Atlanta Motel v. United States*,
 379 U.S. 241 (1964)......................................................................... 12, 13

*Hishon v. King & Spalding*,
 467 U.S. 69 (1984)................................................................................ 16

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp.*
 *of Boston, Inc.*,
 515 U.S. 557 (1995)..................................................................... 6, 7, 8, 12

*Le Roy v. Sidley,*
    1 Sid. 168, 82 Eng. Rep. 1036 (K. B. 1664) ............................................ 19

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    584 U.S. 617 (2018) ........................................................................ 12, 27

*N.Y. State Club Ass'n v. City of N.Y.,*
    487 U.S. 1 (1988) .................................................................................. 25

*Parents for Privacy v. BARR,*
    949 F.3d 1210 (9th Cir. 2020) ........................................................ 20, 21

*Parks Sch. of Bus. v. Symington,*
    51 F.3d 1480 (9th Cir. 1995) ................................................................ 16

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................................ 4

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ................................................... 14, 17, 18, 24, 27

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ............................................................................ 2, 3

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................ 5, 6, 8

*State v. Arlene's Flowers, Inc.,*
    193 Wash. 2d 469 (2019) ...................................................................... 10

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ............................................................................ 9, 10

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................................ 2

*Thomas v. Review Bd. of Indiana Employ. Sec. Div.,*
    450 U.S. 707 (1981) .............................................................................. 13

iv

*Untied States v. Albertini*,
    472 U.S. 675 (1985)................................................................... 7

*United States v. O'Brien*,
    391 U.S. 367 (1968)..........................................................2, 4, 5, 7

*Western Radio Servs. Co. v. Qwest Corp.*,
    678 F.3d 970 (9th Cir. 2012) ................................................ 11

## CONSTITUTIONAL PROVISIONS

U.S. Const., amend. I ...........................................................*passim*

U.S. Const., art. I, § 8, cl. 3................................................ 13

## FEDERAL STATUTES AND RULES

20 U.S.C.A. §§ 1681–1688 (Title IX) ........................................... 21

42 U.S.C.A. § 2000e-2(a)(1)) (Title VII) ..................................... 22

10 U.S.C.A. § 983 (Solomon Amendment)................................. 5, 6

Fed. R. Civ. P. 12(b)(6).................................................... 11, 13, 15

## STATE STATUTES AND REGULATIONS

Wash. Rev. Code § 49.60 (WLAD).......................................*passim*

Wash. Rev. Code § 49.60.040(2)................................................. 9

Wash. Rev. Code § 9A.44.115.................................................. 19

Wash. Rev. Code § 9A.88.01.................................................... 19

**COUNTY AND MUNICIPAL ORDINANCES**

Lynwood Municipal Code § 10.04.740 ........................................................ 19

Snohomish County Code § 10.04.025 ........................................................ 19

Snohomish County Code § 10.04.035 ........................................................ 19

**OTHER AUTHORITIES**

David J. Hacker. "A Census-Based Count of the Civil War Dead."
    *Civil War History*, vol. 57 no. 4, 2011 .................................................... 26

## INTRODUCTION

Olympus Spa[1] seeks a narrow ruling. Namely, the State cannot apply a public accommodation law in a way that intrudes on the constitutional rights of nonconsenting unclothed women and girls while using their intimate spaces.[2] In contrast, the gravamen of the Washington Human Rights Commission's[3] position is that the elimination of discrimination requires that males[4] have equal access to the intimate spaces of females in places of public accommodation. The lower court agrees. The Spa challenges the application of the Washington Law Against Discrimination,[5] arguing that, in a collision between a state's public accommodation law and First Amendment restrictions on the government, constitutional liberties are of greater force.

A sober reckoning of the consequences of a ruling that public accommodation laws hold precedence over First Amendment interests should be considered. Reading the WLAD without the First Amendment's moderating

---

[1] The plaintiffs will be referred to jointly as "Spa." When appropriate, separate references to the owners, employee, and patron plaintiffs will be so indicated.

[2] It should be noted here that the opening premise of the Spa's Brief is that citizens have constitutional rights while engaging in commercial enterprise. AOB at 11-14. Because neither the Commission nor its three supporting *amici* challenge that premise, the Spa's position on this issue should be deemed conceded.

[3] Unless designated otherwise, the Defendants-Appellees are jointly referred to as "Commission."

[4] The use of the terms *male* and *female* are defined in the Amended Complaint and used consistently with those definitions herein. 2-ER-123–124.

[5] Herein "WLAD" or "public accommodation law."

constraints on government requires equal access to places of public accommodation for all males in all places, regardless of whether they identify as transgender women. As in this case, such a reading has absurd results. One of the *amici*—in support of the State—explains, "There is no exception in the WLAD for the [S]pa's refusal to serve men *at all*." LAMBDA Brief at 8, n. 2 (emphasis in original). The logical extension of this is the elimination of sex as a "coherent category in law." Women's Declaration International USA Brief at 8. This case represents the dangers of the elimination of sex by an unfettered government. Giving males equal access in all places at all times will result in nonconsensual visual access to the nude bodies of women and girls.

## ARGUMENT

### I.    FREE SPEECH

In the arguments put forth by the parties regarding the Spa's free speech claim, the parties agree that a content or viewpoint restriction is presumed unconstitutional. Spa Brief at 15; Appellees' Answering Brief ("HRC") at 22-23. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). To come within the scope of the First Amendment, speech must be inherently expressive. *See*, *Texas v. Johnson*, 491 U.S. 397, 406 (1989); *United States v. O'Brien*, 391 U.S. 367 (1968). Moreover, it is long settled that censorship based on "viewpoint" is an egregious form of content discrimination. *Rosenberger v. Rector & Visitors of the Univ. of*

2

*Va.*, 515 U.S. 819, 829 (1995). Here the speech in question reads, "Biological women are welcome." 2-ER-166. The Spa's use of the term *biological women* was the viewpoint that triggered the Commission's actions. The Commission thus leveraged its power to fine and refer the matter for prosecution (2-ER-173) in order to compel the Spa to remove the term *biological women* from the website.

The line of demarcation between the parties begins with whether the message on the Spa's website constitutes speech or conduct. The Commission portrays the Spa's statement as conduct. HRC Brief at 22-29. The Spa disagrees. A communication on a website is pure speech, *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023), and the constitutional analysis does not change for "those who seek profit." *Id*. at 600. As discussed in the next section, it is error to fuse what happens inside the Spa with the Spa's message.

### A.    The free speech claim stands as separate from the two claims challenging the public accommodation law.

Through use of a sleight of hand, the Commission justifies its prohibition on expression by recasting the speech as conduct. The Commission initially errs by conflating the Spa's challenge to the public accommodation law regarding restrictions on the operations of the business with the required removal of the *biological women* language on the website. On the one hand, the Spa challenges the application of the all-comers requirement of the public accommodation law in the Amended Complaint's Association and Free Exercise of Religion claims.

3

Separate from those two causes of action is the Free Speech claim, i.e., the message that the Spa communicates regarding biological women on its website.[6]

Aside from what actually occurs inside the Spa, the Commission seeks to suppress a particular *message* that it disapproves. Distinct from that message is what happens inside the Spa which involves the *customer*; that activity comprises the conduct. In contrast, the language posted on the website is the *message*.

The Commission's investigator made clear that the Spa's message itself violated the WLAD writing that change of the "language on its website" was the first term of a three-point settlement. 3-ER-461. Notably, even now the Commission has never conceded that it will tolerate the dissemination of the Spa's speech regarding *biological women* on any platform or at any venue. The government's disagreement with the idea, and as a consequence its speech prohibition, requires review under a strict scrutiny standard. *Reed v. Gilbert*, 576 U.S. 155, 164 (2015). Even under intermediate review, the government interest must be "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377.

---

[6] This Court could potentially determine that the State interference with the message on the Spa's website is unconstitutional while at the same time rule that the application of the public accommodation law does not infringe on the First Amendment rights to association and the free exercise of religion.

The Commission's censorship is not an incidental intrusion into expression. "There is nothing incidental about an infringement on speech when a public accommodation law is applied 'peculiar[ly]' to compel expressive activity." *303 Creative LLC*, 600 U.S. at 600, n. 6. Moreover, as explained above, the language on the website and what occurs inside the Spa are not the same course of conduct. Hence, the censorship is not "incidental." *O'Brien*, 391 U.S. at 376.

The Commission leans heavily on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) (herein *FAIR*), citing it eleven times in its brief. Close examination of *FAIR* supports the Spa, not the Commission. *FAIR* involved a federal statute (Solomon Amendment)[7] conditioning federal dollars for educational institutions on giving military recruiters equal access to campuses as they do all other private employer recruiters. The law did not regulate school speech but rather conduct, i.e., the military recruiting on campuses. For example, the U.S. Supreme Court noted that schools "could put signs on the bulletin board next to the door, they could engage in speech, they could help organize student protests." *FAIR*, 547 U.S. at 60.

Washington's public accommodation law deals with the conduct within the four walls of a business in relation to customers. Similarly, the Solomon Act concerned the conduct on a school campus in relation to military recruiters. This is

---

[7] 10 U.S.C.A. § 983.

5

where the application of the State's public accommodation law parts company with
the Solomon Act. Even if WLAD requires that the Spa provide access to males, the
Commission's application of the public accommodation law denies the Spa the
chance to explicitly communicate a contrary message. In contrast, a school could
post on a bulletin board a message disagreeing with a federal government policy
relative to the military. "[N]othing in the Solomon Amendment restricts what the
law schools may say about the military's policies." *FAIR*, 547 U.S. at 65. But here,
the Commission will not grant that same latitude of expression to the Spa on its
website. No meaningful difference exists between posting a message on a bulletin
board and a website. Because the Commission has *prohibited* the Spa's
opportunity for speech, by coercing the Spa into changing the message on its
website, the Commission's conduct is presumptively unconstitutional.

    **B.**    **Content-neutrality in WLAD has no relevance to the free speech claim because the Commission does not rely on any specific provision, but instead simply proclaims the speech illegal.**

The Commission's argument about the content-neutrality of the WLAD
misses the mark. Government authority to prohibit speech appears nowhere on the
face of the WLAD. Instead, the investigator wrote what amounts to an edict that
the *biological women* language on the website is verboten. Similarly in *Hurley*,
"the . . . application of the [public accommodations] statute produced an order
essentially requiring" the parade organizers to "alter the expressive content" of

their speech. *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 572-573 (1995). That is what is happening here. The constitutional problem is not the face of the text of the WLAD, neutral or not, but the application of the WLAD to the Spa's website. The "very purpose in seeking to apply" the WLAD to the Spa's website was "the coercive elimination of dissenting ideas" about the phenomenon of biological women. *303 Creative*, 600 U.S. at 588.

### C.     The Commission's position that removal of the language stood as the most effective means of achieving the State's interest fails for lack of an underlying statute covering speech.

The Commission asserts that there would be no less effective way to achieve the government's interest. HRC Brief at 16 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)); *see also*, *Untied States v. Albertini*, 472 U.S. 675, 689 (1985). Despite this generalized statement, the Commission points to nothing in WLAD or its regulations giving it authority to require the Spa to alter the content of its message on the website. The record shows that the investigator simply wrote to the Spa's president (2-ER-150), quoted the website, and stated that the "'biological women' policy is not compliant with . . . WLAD, RCW 49.60, which prohibits discrimination on the basis of gender identity in places of public accommodation." 2-ER-168. In point of fact, the statute cited by the investigator merely provides the purpose of the public accommodation law and says nothing about speech. Without explicit statutory authority, the investigator's conduct was simply the exercise of

7

raw power by threatening referral to prosecution if the Spa maintained its message. Absent statutory authority to restrict speech, the "most effective means" argument to censor a particular message is far off point.

### D.    The white racist analogy to conservative Christians with traditional sensibilities on modesty between the sexes is reprehensible rhetoric.

The Commission cites *FAIR* in which the Court opined that Congress can prohibit employers from discriminating on the basis of race which required an employer to take down a sign reading, "White Applicants Only." HRC Brief at 16, 29 (citing *FAIR* at 62). The Commission parrots the dissenting argument in *303 Creative* that the majority of the Court properly dismissed as "pure fiction." *303 Creative*, 600 U.S. at 598. The Commission's position also fails for two other reasons. First, the Commission makes an outrageous attempt to compare these Korean Christians who hold conservative sensibilities on nudity to white supremacists. Second, the Spa's statement did not actually read "Males Only"; it read, "Biological women are welcome." To force the Spa to rewrite and post "biological men and women are welcome" or like language would "alter the expressive content" of the Spa's website. *FAIR* at 63 (citing *Hurley* at 572-573).[8]

---

[8] The modified language on the Spa's website currently reads in the FAQ: "Who is allowed to come to the spa?" Answer: "Women ages 13 and up are welcome at our spa."[8] *See*, Olympus Spa, "About Us" at: https://olympusspa.com/lynnwood/faqs-lynnwood/.

## II.    FREE EXERCISE OF RELIGION

### A.    The WLAD carve-out for private clubs fails general applicability.

The Commission and *amici*, American Civil Liberties Union/Americans United for Separation of Church and State, assert that the WLAD is neutral and generally applicable. HRC Brief at 37-45; ACLU Brief at 3-12. The public accommodations law appears to be neutral on its face. But it is not generally applicable.

A law is not generally applicable if it invites the government to consider the particular reasons for conduct by providing a "mechanism for granting individualized exemptions." *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). Secondly, "a law is also not generally applicable if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534; *see also, Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The latter proves problematic for the Commission here.

Here the WLAD fails general applicability by providing a carve out for private clubs. The same conduct and restrictions that occur in the Spa could take place in a private club. Wash. Rev. Code § 49.60.040(2). "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted interest that justifies the regulation at issue." *Id*.

9

The Spa's rationale for its female-only policy centers on both its Korean traditions and its Christian beliefs about the separation of the sexes while in a state of undress. The cultural and Christian beliefs of the Spa's owners on this issue are identical. However, Washington's carve-out for private clubs can be based entirely on secular reasons; this undermines the State's stated interest in its public accommodation law. The interest in the WLAD is to end discrimination. But the forbearance for private clubs cannot be reconciled with its intolerance of the Spa's rules based on exercise of religion when it would allow the same conduct in a private club. The exception for private clubs does not "serve a broader societal purpose of eradicating barriers to the equal treatment of all citizens." *State v. Arlene's Flowers*, *Inc.*, 193 Wash. 2d 469, 531 (2019). In view of this, the highest level of judicial review is required. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

Washington has only expressed in the most generalized and superficial manner that it holds a compelling interest in the elimination of discrimination. But as to specifics, the State did not articulate why that interest should extend to

10

transgender women.[9] Further, the State failed to explicate what specific interest it holds in giving males access to the intimate spaces of nonconsenting naked females, including teenage girls. If there is a history of discriminating against men in having such access, there are health, safety, and moral reasons for this exclusion by entities traditionally categorized as places of public accommodation.

Hypothetically, if Washington has a compelling interest in forcing entities to provide access to activities and facilities involving the intimate spaces of females in a state of full or partial undress, the obligation remains to do so in a narrowly tailored manner. The carve-out for private clubs not only shows that the WLAD is not generally applicable but also demonstrates that it fails the test for narrow tailoring. Whatever the State does relative to private clubs to vindicate its antidiscrimination interests, it can do the same for religious adherents holding to convictions that prevent males from having access to the intimate spaces of females.

The Commission and its *amici* are dismissive of the Supreme Court's unwillingness to strictly adhere to the framework surrounding neutral and

---

[9] To fill in this gap, *amici* cite to statistics, studies, and polling data. Gonzaga Law School Lincoln LGBTQ+ Rights Clinic and QLaw Foundation of Washington Brief, *passim*, LAMBDA Brief at 23-26. This is improper in that *de novo* review of a complaint dismissed under Rule 12(b)(6) is confined to the allegations along with the complaint's exhibits. *Western Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 975-976 (9th Cir. 2012).

generally applicable laws under *Employment Div. v. Smith*. HRC Brief at 44; ACLU Brief at 13-14. They argue that this Court doesn't have to look there because those cases deal with the ministerial exception in the employment context. But the Supreme Court has not constrained itself to the ministerial exception when finding that the free exercise of religion at times trumps neutral laws of general applicability. As pointed out in the Spa's Opening Brief, parties overcame neutral and generally applicable regulations in a variety of First Amendment cases. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018); *Boys Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000); *Hurley, id.*; *303 Creative*, *id*. In sum, the Spa cites these cases to demonstrate that a determination that a law is neutral and generally applicable does not end the inquiry in a case involving First Amendment claims.

**B.    The Commission has made only minimal attempts to address the substantial burden on the Spa's religious exercise.**

In choosing between its faith relative to modesty between the sexes and potential prosecution, the Spa chooses its faith; this constitutes a substantial burden. Moreover, denying its faith by following the law will cause a loss of the business, which is also a substantial burden. The Commission cites to *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964), to counter the inevitable economic hardship to the Spa, including potential bankruptcy. The Commission

says this is pure speculation. But the Amended Complaint states otherwise (2-ER-122, 129–130), and its allegations control for purposes of Rule 12(b)(6) review.

Moving beyond the allegations in the Amended Complaint to the *Heart of Atlanta* relied on by the Commission, the Supreme Court examined the legal theory that economic loss was a Fifth Amendment taking. That is far afield from the claims in this case. The constitutional authority for passage of the Civil Rights Act of 1964 was based on the Commerce Clause. *Heart of Atlanta*, 379 U.S. 241, 260 (1964). Congress found that regulating lodging while traveling fell within the enumerated powers of Article I, § 8, Cl. 3. Here, the Commission conflates the federal regulation of interstate commerce with an exercise of Washington's police powers when it enacted the WLAD. In sum, the holding in the *Heart of Atlanta*, in which the Supreme Court determined that economic hardship fails as an affirmative defense, lies distant from the constitutional claims and defenses in this case.

### C.    The State was on notice of the religious component of the Spa's owner and its operations.

Rooted in their religious convictions, the Spa owners hold beliefs that, unless men and women are married to each other, they should not have visual and physical proximity to each other while nude. 1-ER-5. *Thomas v. Review Bd. of Indiana Employ. Sec. Div.*, 450 U.S. 707, 714 (1981). The Commission asserts that the investigator did not know of the Spa's religious beliefs. HRC Brief at 35. In its

brief, the Commission does not actually pursue this as a defense and provides no legal authority for whether this is relevant. Whatever the case may be, the Commission's position is not factually correct. In a letter to the investigator, the Spa's president wrote, "My name is Sun Lee. I am the president of our . . . family-owned women's Korean traditional health spa . . . . The business was started by my parents. We are interested in women's physical health *and equally interested in spiritual health*." 2-ER-236 (emphasis added). Further, the State's position has always been that the faith of the business is no defense to the WLAD. *Id*. Thus, notice makes no difference for legal analysis.

## III.   ASSOCIATION

### A.    Intimate Association

Courts have declined to mark the precise boundaries of the right to association under the First Amendment. *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). Though there are indicia of association (e.g., size, duration, purpose, shared community of thoughts, and personal aspects of one's life), no single characteristic is dispositive. Rather, there must be "a careful assessment" of where a relationship's "objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984).

### 1.    Strangers

The Commission attacks the Spa's associational intimacy claim primarily on the notion that those using the Spa are strangers to each other. Likewise, the district court asserted that the Spa "provides services to countless (female) strangers on a daily basis." 3-ER-303. The Commission and one of the *amici* make the same claim. HRC Brief at 46; LAMBDA Brief at 10. This claim turns a blind eye to the actual allegations in the Amended Complaint. Consider these allegations:

> Jane Doe Patron 1 seeks to form and preserve a highly personal relationship via women's health spa treatments with Olympus Spa administered through its employees . . . On average, between the years of 2018-2022 the rate of return customers is 75% of the total customer base. This consistency is due to the highly personal, professional, and intimate association this spa has cultivated.

2-ER-141. These allegations cannot be fairly described as "chance encounters" afforded no constitutional protection. HRC Brief at 52 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)).

The Commission invites this Court to engage in the same speculations as the district court about interactions and relations of the patrons who go to the Spa. This invitation should be declined. The lower court committed reversible error by substituting its own assumptions outside of the four corners of the Amended Complaint. In reviewing a district court's decision granting a motion under Rule 12(b)(6), the facts alleged in a complaint are assumed true and read in the light

15

most favorable to the nonmoving party. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

### 2.    Duration

Closely related to the unsupported assumption by the district court and the Commission that patrons and employees are strangers, the Commission asserts that patrons use the Spa for only a few hours a day. HRC Brief at 49; *see also*, LAMBDA Brief at 18. Absent from the Commission's assertion is a reference to the record. Beyond that, duration is not dispositive. A religious worship service, a political meeting, or a beauty pageant show are also of short duration, yet each enjoys associational rights. The Spa is not like a trip to the grocery store to purchase a loaf of bread or a "quickie" with an escort. *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 458-459 (9th Cir. 2018). Patrons using the Spa would be akin to a Boy Scouts or political or religious meeting in terms of time spent together at any one encounter.

### 3.    Size

Nothing in the FAC suggests that the Spa is a "large business enterprise." HRC Brief at 47 (citing *Hishon v. King & Spalding*, 467 U.S. 69 (1984)). Confined to the allegations in the FAC, the Spa cannot be compared to the large commercial enterprise of a dance hall for teenagers with up to 1,000 customers per night. *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989). Nor is the Spa remotely close to the

16

two Jaycees chapters which had 400 or more members each. *Roberts*, 468 U.S. at 621.[10] Indeed, even the district court conceded that the Spa "may not constitute a *large* enterprise." 3-ER-303 (emphasis in original). If anything, the size component of the Spa moves the needle towards the right to association and undermines the district court's assumption about persons in the Spa being mere strangers.

### 4.    Special Community of Thoughts and Interests

Because women and teenage girls choose a venue and experience in which they are naked and at the hands of persons who will be physically handling them for lengthy periods of time, that objective characteristic of the relationship should skew sharply towards intimacy and the right of association. Not only must patrons be female, but also they must want the experience of ancient Korean treatments for females, performed by females. Patrons must also share traditional or religious sensibilities that prohibit them from being in a state of undress around persons of the opposite sex for whom they are not married.[11] This precludes biological males of any kind, whether transgender women or not.[12] Such exclusivity stands in sharp

---

[10] The reimagining of the operations of the Spa by an *amicus* is not helpful. LAMBDA Brief at 5-6, 9. The Spa bears no resemblance to a grocery store or other commercial enterprise dealing in volume.

[11] Jane Doe Patron 1 is a Christian who believes that men and women should not be viewing each other's naked bodies unless married to each other. She chooses to associate with like-minded females at Olympus Spa. 2-ER-129; 3-ER-418.

[12] Certain *amici* put forward the notion that the transgender community has become more accepted. Gonzaga/QLaw Brief at 6-7. "The fact than an idea may be embraced and advocated by increasing numbers of people is all the more reason to

17

contrast to Jaycees where "numerous nonmembers of both genders regularly participate[d] in a substantial portion of activities . . . ." *Roberts*, 468 U.S. at 621. Therefore, the First Amendment renders protection to the collective effort of preserving the "shared goals" of "cultural diversity." *Id*. at 622.

### 5.    Distinctly Personal Aspects of One's Life

The notion that the patrons and employees come together as mere strangers belies the emotional enrichment underscored in the Amended Complaint. The allegations describe the physical and spiritual healing of women, some of whom have been the victims of sexual assault. 3-ER-435. To apply the public accommodation laws in this environment causes unwarranted state interference with the personal affiliations that these women seek.

It is beyond cavil that one's naked body is a distinctly personal aspect of one's life. While unclothed, most individuals greatly limit the persons that they allow into their personal space. The Commission's insistence that males have access to the Spa intrudes upon the women's independent ability to define their own identity, which is central to any concept of liberty. *Roberts*, 468 U.S. at 620.

The Commission is dismissive of the allegations that a naked male intrudes on the intimate spaces of a naked female without her consent. As the Amended

---

protect the First Amendment rights of those who wish to voice a different view." *Boys Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000).

Complaint alleges, the patrons do not wish to share that distinctly personal aspect of their lives with males to whom they are not married. Both the Commission and its *amici* undertake no meaningful reflection on the fact that girls as young as thirteen years old—in a state of full or partial undress—would be in immediate physical proximity to naked adult males.

As communicated by the Spa's president to the Commission investigator (2-ER-163–165), stated in the Amended Complaint (2-ER-126 at ¶ 18), and discussed at length in an amicus curiae brief,[13] State statutes validate the concerns of the Spa and underscore the common sense view that nudity is a distinctly personal aspect of one's life.[14] These statutes address voyeurism (Wash. Rev. Code § 9A.44.115(2)(a)), indecent exposure (Wash. Rev. Code § 9a.88.010(1)), lewd conduct (Snohomish County Code § 10.04.025), facilitating lewd conduct (Snohomish County Code §10.04.035), and public indecency (Lynwood Municipal Code § 10.04.740). These laws reflect the general understanding that nudity can be legally confined to certain environments, and those disregarding the conditions set by the law face criminal liability.

---

[13]Amicus Curiae Brief of Women's Declaration International USA in Support of Neither Party at pp. 12-19.

[14] At common law public nudity was considered an act *malum in se. Barnes v. Glen Theatre*, 501 U.S. 560, 568 (1991) (citing *Le Roy v. Sidley*, 1 Sid. 168, 82 Eng. Rep. 1036 (K. B. 1664)).

Granted those laws do not prove that nudity constitutes an associational interest per se. Yet taken together in the societal context, such laws provide an understanding of selectivity and exclusivity for purposes of gauging the level of a liberty concern in association. Stated otherwise, these laws provide indicia of the contours of association within social and cultural expectations. "Public indecency statutes . . . reflect moral disapproval of people appearing in the nude *among strangers in public places.*" *Barnes v. Glen Theatre*, 501 U.S. 560, 568 (1991) (emphasis added). When determining whether the right of private association is implicated, a business' interest in the preservation of the health, safety, and privacy of patrons should be part of the consideration when there is a challenge to a public accommodations law.

To counter this, the Commission and its *amici* argue for the dignity interests of transgender women. HRC Brief at 53; Gonzaga/QLaw Brief at 10; LAMBDA Brief at 17, 27. But they are sadly tone deaf to the dignity violations of nonconsenting, unclothed women and teenage girls seen by males in close physical proximity to them.

The Commission would narrowly frame the world such that the public accommodation law occupies the entire universe. For that reason, in the face of these state and local laws, the Commission declines to meaningfully engage in analyzing their relevance. Instead, the Commission relies on *Parents for Privacy v.*

20

*BARR*, 949 F.3d 1210 (9th Cir. 2020). HRC Brief at 50. That case is far off base. *Parents for Privacy* narrowly involved the interpretation of Title IX and claims for privacy—not a claim for association. This Court did not rule that females should get past their personal, religious, and cultural sensitivities when males want to join them in a state of undress. The state and local laws described above militate for the proposition that they do not have to do that. A woman's or girl's naked body is a distinctly personal aspect of their existence for which they may choose to associate with likeminded females—to the exclusion of males—for a physical and spiritual healing experience within the context of ancient Korean tradition. The allegations of the Amended Complaint explain as follows:

> The ritualistic nature of jjimjilbang is expressly for women and furthers the goals of the association . . . . The shared set of beliefs, ideas, and values amongst such expressive association is what drives the business, and restoration of health to patrons comes from the peace afforded them at Olympus Spa.

2-ER-142. When a group of women and girls come together and engage in culturally based traditions requiring a state of undress—and which explicitly exclude males—such gatherings should tip the judicial scales of review toward a protected associational interest.

Finally, the Commission asserts that "the Spa cannot discriminate against transgender women just because an aspect of their appearance may not conform to the stereotypical woman." HRC Brief at 50. This "aspect" is the male sex organ. It

21

is not a "stereotype." And it is this "aspect" which makes naked women and girls feel vulnerable to sexual assault by males.[15] In support of its unorthodox argument, the Commission cites to *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659 (2020). The *Bostock* Court grappled with the definition of *sex* in interpreting a federal statute.[16] The case was not brought as a liberty of association claim under the First Amendment nor was the law in question a state public accommodation law.

### B.    Expressive Association[17]

The Commission argues that the Spa does not "convey[ ] values, support[ ] political or public causes, and its services are not inherently expressive . . . . ." HRC Brief at 51. This is a strained reading of the Amended Complaint.

First, to come within the ambit of First Amendment expressive association, "a group must engage in some form of expression, whether it be public or private." *Dale*, 530 U.S. at 649. That being true, it is not necessary that the group associate for the "purpose" of disseminating a certain message as a condition for First Amendment protection. *Id*. at 500. "An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." *Id*.

---

[15] Women's Declaration Int'l. USA Brief at 13, n. 9.
[16] Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2(a)(1)).
[17] The Commission claims that the Spa only brought an intimate association claim. Not true. See the Third Cause of Action of the Amended Complaint, ¶¶ 71-73, 75-77, 85 (2-ER-142–143).

The Spa's president explained in a declaration attached to the Amended Complaint, "We are a Korean Spa that is also based on Korean traditional values." 2-ER-152. The Spa's president further wrote, "Our cultural heritage and our beliefs are an integral part of who we are. By adopting policies that violate both of these our heritage and beliefs will be lost."[18] 2-ER-152. He then explained that "[t]raditional Korean spas do not treat men for ddemiri and sheshin." *Id*. Compare this to the Boy Scouts. The Supreme Court looked at the Scout Oath to discern its mission and goals. *Dale*, 530 U.S. at 649. Likewise, in this case one can view the Spa's website to determine the business' mission, which the president of the Spa quoted and paraphrased in explaining the Spa's position to the Commission investigator. 2-ER-236. It reads in part:

> This spa is a family owned business dedicated from a husband to his wife as a gift of honoring women.
> Olympus Spa believes that one's true beauty can only be achieved when one feels healthy. In other words, our spa's focus on restoring and rejuvenating one's health comes first before achieving anything else.

---

[18] LAMBDA suggests, "The spa could lawfully choose to maintain a women's side and men's side, just like any other place of public accommodation that provides sex-separated restrooms or facilities, provided that it refrains from discriminating against customers based on their gender identity with respect to those facilities." LAMBDA Brief at n. 2. The accommodations suggested by LAMBDA would change the Spa into something other than Korean. This strikes at the heart of the right to association.

23

> Not only are we interested in women's physical health but we are equally interested in spiritual health. There is an old Korean saying, "All of one's physical illnesses come from one's mind.[19]

The Spa's expression is that it provides physical and spiritual healing through its ancient Korean treatments only to females. Inclusion of a male in the facilities impairs that activity and corresponding message. "If the Boy Scouts wishes Scout leaders to avoid questions of sexuality and teach only by example, this fact does not negate the sincerity of its belief." *Dale*, 530 U.S. at 655. Likewise, if the Spa takes an official position with respect to naked males being in the presence of unclothed females as it did on its website, that stands as sufficient under the holding in *Dale*.

Compare that with the facts in *Roberts*. If the Jaycees accepted women as full members it would not have caused any "serious burden" on the Jaycees' freedom of expressive association. *Roberts*, 468 U.S. at 626. This is because the Jaycees allowed women to attend various meetings, participate in selected projects, and engage in social functions. "Indeed, numerous nonmembers of both genders regularly participate in a substantial portion of activities central to the decision of many members to associate with one another, including many of the organization's various community programs, awards ceremonies, and recruitment meetings." *Id.*

---

[19] For the full statement, *see*, Olympus Spa, "About Us" at: https://olympusspa.com/lynnwood/about-us/.

at 621. Similarly, the Rotary Club permits women to attend meetings, give speeches, and receive awards. *Rotary*, 481 U.S. at 541. In the starkest of contrasts, the Spa does not allow males to even step foot on the property, much less include them in any activities. To do otherwise would significantly alter the fundamental interests of the Spa. *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 15-16 (1988).

Allowing male patrons into the intimate spaces of nude females would pose a serious burden on the ideas that the Spa expresses about the distinction of the sexes. Beyond that, opening up the services to males would further have the same type of direct impact on the message that the Spa wishes to convey as would the Boy Scouts having a gay scout leader.

## IV.    COMPELLING INTEREST

As an affirmative defense against the Spa's First Amendment claims, the Commission states that it has a compelling state interest to eliminate discrimination. But the state has neither a compelling nor even a legitimate interest in ensuring that males have equal access to the intimate spaces of nude women. It is not just the facility and health treatments that males seek to enjoy; males will obtain visual access to naked female patrons. Unclothed women undergoing health treatments are not "publicly available goods and services" that males are entitled to when women do not consent. HRC Brief at 30.

25

The generalized aspiration of ending discrimination may be substantial on a high level, but not when viewing it with both feet on the ground as specifically applied to women in their intimate spaces. Moving from the general interest to the specific application, the State's interest does not even measure up to the rational basis threshold. The intrusion on the intimate spaces of unclothed women and teenage girls by males produces special harms and should receive no constitutional protection or succor from state public accommodation laws.

In support of its claim of a compelling state interest, the Commission and each of its *amici* make the despicable comparison of Christians to white supremacists. HRC Brief at 16, 29; Gonzaga/QLaw Brief at 29; ACLU Brief at 18. This vile assertion is made in order to argue that there is an equally compelling state interest in the protection of gender identity as there is in race.

They are mistaken. The issue of race is historically and legally set apart from other protected classes. Race-based slavery existed in the British North American colonies during the 17th and 18th centuries and then for almost ninety years into the Republic. Slavery ended after the Civil War that cost the lives of an estimated 750,000 soldiers and sailors.[20] From that conflict, the Civil War amendments were enshrined in the nation's constitution. These historical and legal conditions make

---

[20] The figure may actually be as high as 850,000 dead. See, Hacker, J. David. "A Census-Based Count of the Civil War Dead." *Civil War History*, vol. 57 no. 4, 2011, p. 307-348.

the ending of race-based discrimination in public accommodation laws compelling. In contrast, gender identity as a suspect classification fails to rise to the same threshold as race under the law.

Finally, the Attorney General's court filings that correlate Christians with white racists comes dangerously close to supplying the statements of animus that may be lacking in the record. *Masterpiece Cakeshop*, 584 U.S. at 636. What is more, each of the Commission's *amici* make this same toxic comparison between these Christian plaintiffs and racists, including slaveholders. HRC Brief at 16, 23, 29; ACLU Brief at 16-19; LAMBDA Brief at 22; Gonzaga/QLaw Brief at 11-14, 19.

## CONCLUSION

The Commission seeks to wield its power through the public accommodations law to remove all buffers between the individual and the power of the State. *Roberts*, 468 U.S. at 619-620. This it cannot do and maintain fidelity to its obligations under the Constitution. For that reason, the district court's decision should be reversed.

Dated: August 12, 2024

/s/ Kevin T. Snider
Kevin T. Snider
Matthew B. McReynolds
Tracy Tribbett

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-4031

I am the attorney or self-represented party.

**This brief contains 6,549 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Kevin T. Snider                    **Date** August 12, 2024

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 12, 2024

/s/ Kevin T. Snider
Kevin T. Snider

29