**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| OLYMPUS SPA; MYOON WOON LEE; SUN LEE; JANE DOE, patron; JANE DOES, employees 1-3, | No. 23-4031 |
| | D.C. No. 2:22-cv-00340-BJR |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| ANDRETA ARMSTRONG, Executive Director of the Washington State Human Rights Commission; MADISON IMIOLA, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted November 18, 2024
Seattle, Washington

Filed May 29, 2025

Before: M. Margaret McKeown, Ronald M. Gould, and
Kenneth K. Lee, Circuit Judges.

2          OLYMPUS SPA V. ARMSTRONG

Opinion by Judge McKeown;
Dissent by Judge Lee

**SUMMARY**[*]

**First Amendment**

The panel affirmed the district court's dismissal of a complaint brought by two Korean spas (collectively "the Spa") alleging First Amendment violations when Washington's Human Rights Commission ("HRC") initiated an enforcement action pursuant to the Washington Law Against Discrimination ("WLAD") against the Spa for its policy of granting entry to only biological women and excluding, in addition to men, preoperative transgender women who have not yet received gender confirmation surgery affecting their genitalia.

The HRC alleged that the entrance policy violated WLAD, which prohibits public facilities from discrimination on the basis of sexual orientation, defined as including gender expression or identity. The Spa did not challenge this definition or the language of the statute nor did it argue that the statute was vague or that the Spa's conduct did not fit within the statute's definition of discrimination on the basis of gender expression or identity. Rather, the Spa alleged that WLAD, as enforced

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

against the Spa's entrance policy, violated its First
Amendment rights.

The panel affirmed the district court's dismissal of the
case with prejudice under Fed. R. Civ. P. 12(b)(6). The
panel held that the Spa's conduct discriminates based on
gender identity; therefore, under state law, it discriminates
based on sexual orientation and falls within WLAD's
ambit. The panel next held that the HRC's action under
WLAD did not impermissibly burden the Spa's First
Amendment rights to free speech, free exercise of religion,
or free association.

Addressing the First Amendment free speech claim,
which alleged that the HRC required the Spa to adopt new
language in its published admissions policy affirming equal
access to customers without regard to sexual orientation or
gender identity, the panel, applying intermediate scrutiny,
held that WLAD imposed an incidental restriction on speech
no greater than was essential to eliminate discriminatory
conduct. WLAD, therefore, did not impermissibly burden
the Spa's free speech.

The panel next rejected the Spa's claim under the Free
Exercise Clause, which alleged that WLAD required the Spa
to renounce its Christian faith by permitting the mixing of
nude persons of the opposite sex who are not married to one
another. The panel held that rational basis review applied
because the Spa's religious expression was only incidentally
burdened and that WLAD was both neutral and generally
applicable. Applying rational basis review, the panel held
that pursuant to this court's precedent, eliminating
discrimination on the basis of sex and transgender status is a
legitimate government purpose, and public accommodations

laws like WLAD have been deemed rationally related to the
elimination of discrimination.

Finally, the panel rejected the Spa's First Amendment
free association claim, which alleged that the HRC's
enforcement of WLAD interferes with intimate and
expressive association between women at the Spa. First, the
Spa, as a business enterprise serving the general public,
where payment of the entrance fee is the price of admission,
is not an intimate association, which is distinguished by
attributes such as relative smallness, high degree of
selectivity, and seclusion. The Spa is also not an expressive
association because the Spa and its patrons, in giving or
receiving a Korean massage, do not engage in expressive
activity sufficient to bring the activity within the protection
of the First Amendment.

Dissenting, Judge Lee wrote that while WLAD forbids
discrimination based on (among other things) sex and sexual
orientation, its text and structure make clear that it does not
cover transgender status, which is different from sexual
orientation.

The Spa's entry policy does not discriminate against
patrons based on their sexual orientation and thus does not
run afoul of WLAD.

## COUNSEL

Kevin T. Snider (argued), Tracy Tribbett, and Matthew McReynolds, Pacific Justice Institute, Sacramento, California, for Plaintiffs-Appellants.

Neal H. Luna (argued) and David Ward, Assistant Attorneys General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Seattle, Washington; for Defendants-Appellees.

Kara Dansky, Women's Declaration International USA, Washington, D.C., for Amicus Curiae Women's Declaration International USA.

Susannah P. Lake, Roderick & Solange MacArthur Justice Center, St. Louis, Missouri; Aditi Fruitwala, American Civil Liberties Union Foundation, Washington, D.C.; Bradley Girard and Jenny Samuels, Americans United for Separation of Church and State, Washington, D.C.; for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Washington, and Americans United for Separation of Church and State.

Sarah N. Harmon, Gonzaga University School of Law, Clinical Legal Programs, Spokane, Washington; J. Denise Diskin, QLaw Foundation of Washington, Seattle, Washington; for Amici Curiae Gonzaga Law School - Clinical Legal Programs and QLaw Foundation of Washington.

Peter C. Renn, Lambda Legal Defense and Education Fund Inc., Los Angeles, California, for Amicus Curiae Lambda Legal Defense and Education Fund.

6　　　　　　　　OLYMPUS SPA V. ARMSTRONG

**OPINION**

McKEOWN, Circuit Judge:

This appeal stems from the application of the Washington Law Against Discrimination ("WLAD") in connection with the entrance policy of two Korean spas (collectively "Olympus Spa" or "the Spa"). Washington's Human Rights Commission ("HRC") initiated an enforcement action against the Spa based on the Spa's policy of granting entry to only "[b]iological women" and excluding, in addition to men, preoperative transgender women who have not yet received gender confirmation surgery affecting their genitalia. The HRC alleged that the entrance policy violated WLAD, a state public accommodations law that prohibits public facilities from discrimination on the basis of sexual orientation. Under Washington law, "sexual orientation" is defined to include "heterosexuality, homosexuality, bisexuality, and gender expression or identity." Wash. Rev. Code §§ 49.60.030(1)(b), 49.60.040(27).

Notably, the Spa did not challenge this definition or the language of the statute. The Spa did not argue that the statute was vague or that the Spa's conduct did not fit within the statute's definition of discrimination on the basis of gender expression or identity. Nor did the Spa challenge the implementing regulations or the HRC's related policies, either in this lawsuit or during the HRC's enforcement action against it.

Although the enforcement action is grounded in state law, the Spa sued state officials (the Executive Director and Civil Rights Investigator for the HRC) on First Amendment grounds, claiming that WLAD, as enforced against the Spa's

entrance policy, violates its rights to the freedom of speech, religion, and association. Because the enforcement action did not violate the Spa's First Amendment rights, we affirm the district court's dismissal of the Spa's complaint.

The dissent endeavors to make this case about anything but the Spa's First Amendment claims, instead offering a political screed against the HRC's enforcement of the statute, which relies on an unargued—and unfounded—interpretation of WLAD's plain language. But this case has nothing to with President Trump or discrimination against Asian Americans. The Spa simply did not challenge the statute itself, and it is not our role to rewrite the statute.

We are not unmindful of the concerns and beliefs raised by the Spa. Indeed, the Spa may have other avenues to challenge the enforcement action. But whatever recourse it may have, that relief cannot come from the First Amendment.

## Background

In 2020, the HRC, the agency tasked with enforcing WLAD, received a complaint from a transgender woman. The complaint alleged that Olympus Spa "denied [her] services and stated that transgender women without surgery are not welcome because it could make other customers and staff uncomfortable." Specifically, the Spa excluded preoperative transgender women who have not yet received gender confirmation surgery affecting their genitalia.

Acting on this complaint, the HRC served a Notice of Complaint of Discrimination to the Spa, noting that the complainant alleged she experienced discrimination based on her sexual orientation. The Spa, in response to the HRC's notice, denied that its "biological women"-only policy

8          OLYMPUS SPA V. ARMSTRONG

violated WLAD and suggested that because the Spa requires nudity for certain procedures and in certain areas, "it is essential for the safety, legal protection and well-being of our customers and employees that we maintain adherence to this adaptation of a females-only rule." The Spa also added an "OLYMPUS Spa Entry Policy" segment to its website. The policy states, "Biological women are welcome. It is the policy of Olympus Spa not to discriminate on the basis of race, color, national origin, sex, age or disability in its programs or activities, as required by applicable laws and regulations."

Following the Spa's response, the HRC informed the Spa that its entrance policy continued to violate WLAD by denying transgender women access to the Spa's facilities based on their gender identity. Although the Spa contended that its entrance policy was based only on genitalia, the HRC explained that the policy "denie[d] services to transgender women who have not had surgery specifically because their physical appearance is not 'consistent' with the traditional understanding of biological women." The letter also offered the Spa an opportunity to enter into a pre-finding settlement agreement, allowing the Spa to modify its policies and practices to comply with WLAD. During the investigation of the complaint, and before execution of the settlement, the Spa had already "adopted new language on its website reflecting a non-discriminatory policy" that "affirms equal access, services and treatment for all customers . . . without regard to protected class, such as sexual orientation or gender identity."

The parties signed a pre-finding settlement agreement on October 28, 2021. The agreement required the Spa to comply with WLAD. It also required that the Spa remove the "biological women" entrance policy language on its website.

Finally, the agreement reserved the Spa's right to bring a constitutional challenge against the agreement, the operative statutes, implementing regulations, and related HRC policies. This lawsuit followed.

Following an amended complaint, the district court dismissed the case with prejudice under Rule 12(b)(6). The Spa's free speech claim failed because the alleged "compelled speech"—the alterations to the Spa's written entrance policy—was incidental to the Spa's conduct. For the Spa's free exercise claim, the district court held that WLAD was a neutral, generally applicable law and survived rational basis review. Finally, the district court determined that the relationship between the Spa and its customers was not an intimate association giving rise to First Amendment freedom of association protection.

Recent years have seen a spate of challenges arising from enforcement actions under state public accommodations laws that burden constitutional rights. Courts have repeatedly recognized that where public accommodations laws impermissibly burden constitutional rights, public accommodations laws must give way. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (enforcement action under public accommodations law unconstitutionally interfered with website designer's free expression); *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) (enforcement action under public accommodations law was not neutral with respect to religion); *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) (city policies were not generally applicable with respect to religion); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (application of public accommodations law interfered with expressive association); *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773 (9th Cir. 2022) (application of

public accommodations law would interfere with beauty pageant's free speech).

But this is not such a case. Because the HRC's action under WLAD does not impermissibly burden the Spa's First Amendment rights to free speech, free exercise, or free association, we affirm the district court's dismissal of the Spa's complaint.

## Analysis

### I. Statutory Text

WLAD is a wide-reaching law that prohibits discrimination in a variety of areas, including employment, real estate, public accommodations, credit, and insurance. The public accommodations section covers discrimination in the "right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." Wash. Rev. Code § 49.60.030(1)(b). WLAD proscribes discrimination based not only on race but also categories including "age, sex, sexual orientation, and disability." *Ockletree v. Franciscan Health Sys.*, 317 P.3d 1009, 1012 (Wash. 2014).

> WLAD recognizes:
>
> (1) The right to be free from discrimination because of race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is

> recognized as and declared to be a civil right.
> This right shall include, but not be limited to:
>> (b) The right to the full enjoyment of
>> any of the accommodations,
>> advantages, facilities, or privileges of
>> any place of public resort,
>> accommodation, assemblage, or
>> amusement.

Wash. Rev. Code § 49.60.030(1)(b). In 2006, WLAD was amended to proscribe discrimination based on "sexual orientation," defined to mean:

> heterosexuality, homosexuality, bisexuality,
> and gender expression or identity. As used in
> this definition, "gender expression or
> identity" means having or being perceived as
> having a gender identity, self-image,
> appearance, behavior, or expression, whether
> or not that gender identity, self-image,
> appearance, behavior, or expression is
> different from that traditionally associated
> with the sex assigned to that person at birth.

*Id.* § 49.60.040(29); 2006 Wash. Sess. Laws 12–25. The HRC is tasked with enforcing WLAD. Wash. Rev. Code §§ 49.60.040(3), 49.60.120. WLAD's governing regulations permit the maintenance of certain "gender-segregated facilities," such as "restrooms, locker rooms, dressing rooms," and similar spaces, so long as the facility does not remove or otherwise take action against a person for reasons "[]related to their gender expression or gender identity." Wash. Admin. Code § 162-32-060(1)–(2).

12          OLYMPUS SPA V. ARMSTRONG

The Spa does not dispute that WLAD's proscription of discrimination on the basis of sexual orientation applies to its conduct here. Nor could it. Whether WLAD proscribes the Spa's conduct here is a question of state law, and the answer is clear. WLAD prohibits discrimination based on sexual orientation, which expressly includes "gender expression or identity," including having a particular "gender identity, self-image, appearance, behavior, or expression." Wash. Rev. Code § 49.60.040(29). The Washington legislature chose to adopt this formulation of the statute almost 20 years ago. The Spa's entrance policy denies entry to preoperative transgender women whose "gender identity" or "appearance," as defined in WLAD, differ from the physical traits associated with postoperative or cisgender women. The statutory language is undoubtedly expansive, and its definition of sexual orientation is bespoke. But it is also unambiguous, and it applies to the Spa's entrance policy. *See Washington v. Armendariz*, 156 P.3d 201, 203 (Wash. 2007) ("If the plain language of the statute is unambiguous, then this court's inquiry is at an end.").

The dissent, skipping over plain meaning, claims WLAD does not apply to the Spa's conduct and urges us to read the phrase "gender expression or identity" in context. That invented context ignores the plain reading of the statute. Despite the Washington legislature's passage and framing of the statute in which "gender expression or identity" is part of the definition of "sexual orientation," the dissent would limit WLAD's prohibition on gender-identity discrimination only to instances "where gender identity serves as a proxy for sexual orientation." That is, the dissent cabins the definition of an individual's orientation to mean only heterosexual, homosexual, or bisexual. *Contra* Wash. Rev. Code § 49.060.040(29).

Notably, the Spa did not make this argument. Its challenge was under the First Amendment, not under the statute. The dissent reaches well beyond the pleadings and the briefings to conjure an argument that is not, in fact, before the court. And tellingly, the dissent never engages with the Spa's First Amendment claims.

The dissent's reading ignores the plain language of the statute: Sexual orientation includes "heterosexuality, homosexuality, bisexuality, *and gender expression or identity*." *Id.* (emphasis added). Washington chose an expansive definition of sexual orientation, and it is not our province to rewrite the statute.

The dissent points to Title VII, "common sense," the canon of *noscitur a sociis*, and provisions in the HRC's regulations to justify departing from our straightforward construction of WLAD's text. All are unavailing. The dissent's invocation of Title VII's proscription on discrimination based on national origin to support its reading is far afield and simply has no application to the Spa's case. In *Raad*, we noted that accents could be "inextricably intertwined" with national origin, and therefore discrimination based on accents could be tantamount to discrimination based on national origin. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1195 (9th Cir. 2003), *opinion amended on denial of reh'g*, 2003 WL 21027351 (9th Cir. May 8, 2003). Here, in contrast, gender identity is not "inextricably intertwined" with sexual orientation or a proxy for sexual orientation. WLAD defines gender identity as one form of sexual orientation. The Spa's conduct discriminates based on gender identity; therefore, under state law, it discriminates based on sexual orientation and falls within WLAD's ambit. The same would have been

14          OLYMPUS SPA V. ARMSTRONG

true had the Spa singled out heterosexual, homosexual, or bisexual individuals instead.

The dissent cites no authority for the proposition that common sense alone can justify departure from a statute's plain text. Nor could it. The "decision to . . . rewrite the statute falls within the legislative, not the judicial, prerogative." *Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002).

The canon of *noscitur a sociis*, even if it applied in the absence of textual ambiguity, does not favor the dissent's preferred interpretation. That canon requires us to read each item in the list in "refer[ence] to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." *Meresse v. Stelma*, 999 P.2d 1267, 1273 n.10 (Wash. App. 2000) (internal quotations and citations omitted). But the dissent's reading would diminish gender identity's role, compared to heterosexuality, homosexuality, and bisexuality, in constituting a revised definition of sexual orientation.

Finally, the dissent's notion that the WLAD should conform to the HRC's regulations has it exactly backwards. The unambiguous statute is the statute and it, not the regulations, controls.

## II. Free Speech

Because the HRC's enforcement actions fall within the express scope of WLAD, we turn to the Spa's First Amendment claims. The Spa contends that the HRC's required changes to the Spa's published admissions policy violate its right to free speech. Specifically, the HRC required the Spa to adopt new language "affirm[ing] equal access, service, and treatment for all customers 'without regard to . . . sexual orientation or gender identity.'"

It has been long recognized that the government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). However, not all state actions burdening speech are automatically subject to strict scrutiny under the First Amendment. Indeed, the First Amendment does not protect "an apparently limitless variety of conduct . . . whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Notably, "government regulations that have 'only an incidental effect on protected speech'" are instead subject to intermediate scrutiny as articulated in *O'Brien*. *Green*, 52 F.4th at 790 (quoting *Dale*, 530 U.S. at 659).

In particular, compelled changes in conduct—which might incidentally compel changes in speech—are not reviewed as content-based speech restrictions. Rather, "our cases have held that the government may sometimes 'requir[e] the dissemination of purely factual and uncontroversial information,' particularly in the context of 'commercial advertising.'" *303 Creative*, 600 U.S. at 596 (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995)). And disseminating purely factual information, even if it "includes elements of speech," is a "far cry from . . . compelled speech." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* (*FAIR*), 547 U.S. 47, 61–62 (2006) (requiring emails and notices with the time and location of recruitment meetings). For instance, a law that "prohibit[s] employers from discriminating in hiring on the basis of race . . . will require an employer to take down a sign reading 'White Applicants Only,'" but that requirement "hardly means that the law

should be analyzed as one regulating the employer's speech rather than conduct." *Id.* at 62.

Here, "[a]ny First Amendment interest which might be served" by permitting the Spa to advertise its entrance policy "is altogether absent when the [practice] itself is illegal and the restriction . . . is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973). As in *Pittsburgh Press*, because the Spa's *practice* of denying admission to preoperative transgender women is unlawful under WLAD, limitations on the entrance policy advertising that practice do not trigger First Amendment scrutiny.

Although the Spa's alterations to its admissions practices necessitated alterations to its written policy, the HRC merely required the Spa to change its published entrance policy so that it accurately described those new, WLAD-compliant practices. The mandated alterations were "plainly incidental to the [challenged law's] regulation of conduct, and 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

The HRC's objection to the entrance policy was not based on "disagreement with the message it conveys" but rather with the practice it described—a practice that was unlawful under WLAD. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The HRC did not require the Spa to modify any language from its website expressing, or

withholding, its religious, social, or political viewpoints.[1]
Nor—contrary to the Spa's representations in its opening
brief on appeal—did it "require" or "compel" the Spa to
adopt any particular views.

Consequently, the appropriate standard of review is at
most intermediate, not strict, scrutiny. *See Green*, 52 F.4th
at 790. Under *O'Brien*, a government regulation will survive
intermediate scrutiny if: (1) it "furthers an important or
substantial governmental interest;" (2) "the governmental
interest is unrelated to the suppression of free expression;"
and (3) "the incidental restriction on alleged First
Amendment freedoms is no greater than is essential to the
furtherance of that interest." *United States v. Albertini*,
472 U.S. 675, 687–88 (1985) (quoting *O'Brien*, 391 U.S. at
377). For the first *O'Brien* factor, WLAD furthers an
"important or substantial government interest"—in fact, the
government's interest in protecting against "acts of invidious
discrimination in the distribution of publicly available goods
[and] services" has been described as "compelling." *See,
e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). In
an as-applied challenge under intermediate scrutiny, the state
needs to further establish a "reasonable fit" between its
substantial interests and the action at issue. *Pena v. Lindley*,

---

[1] The Spa alleged that the HRC "required that Olympus Spa remove
language from its website that has a viewpoint that 'biological women'
are females and distinct from males." But the Spa has not pointed to any
specific statements that were on the website before the enforcement
action and removed during its pendency, beyond the statement that
"[b]iological women are welcome" to enter the Spa. As alleged, the
HRC's action went no further than requiring that the Spa's entrance
policy comply with WLAD and that the Spa's website accurately convey
that policy. The action did not otherwise infringe on the Spa's freedom
to publish its views on the nature of gender.

898 F.3d 969, 982 (9th Cir. 2018). Upon receiving a complaint regarding the Spa's discriminatory conduct, the HRC determined that there was "reasonable cause for believing" that the Spa was engaged in an "unfair practice" in violation of WLAD, as it is statutorily authorized to do. Wash. Code. Rev. § 49.60.240. The Spa has not disputed that it discriminated against would-be patrons based on gender-related appearance. The HRC's action easily clears the bar of "reasonable fit."

As to *O'Brien*'s second factor, neither party suggests that the eradication of such discriminatory action is related to the suppression of free expression. The Spa does not directly address *O'Brien*'s third factor—that the restriction be "no greater than essential"—and instead argues that Washington State's restrictions are underinclusive. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 774 (2018). But, whether assessed under *O'Brien* or *Becerra*, the restrictions pass muster: they are "sufficiently drawn to achieve," *id.* at 773, and are "no greater than . . . essential" to further, *O'Brien*, 391 U.S. at 377, the state's anti-discrimination interests in this context. The Spa's arguments to the contrary are unavailing. The Spa points out that WLAD does not otherwise ban discriminatory descriptions of biological women in public discourse, and that the Spa excludes fewer categories of persons than the Miss USA pageant in *Green*. Neither argument holds water. WLAD does not police public discourse generally because it regulates conduct, not speech. And *Green* is inapposite. Unlike the entrance policy, which is, at most, only incidentally expressive, the beauty pageant in *Green* was deemed purely expressive activity akin to the parade in *Hurley*. *Green*, 52 F.4th at 780. The court in *Green* considered a different statute, applied to categorically

different activity, under a different level of scrutiny, and thus does not bear on the over- or under-inclusiveness of the restriction in this case.

We conclude that WLAD imposes an "incidental restriction . . . no greater than is essential" to eliminate discriminatory conduct. *Albertini*, 472 U.S. at 687–88. WLAD prohibits the precise discriminatory practices that "legitimately concern[]" the State and "abridges no more speech . . . than is necessary to accomplish that purpose." *Jaycees*, 468 U.S. at 629 (citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)). The Washington law does not impermissibly burden the Spa's free speech.

## III. Free Exercise

We next turn to the Spa's claim that WLAD violates its right to free exercise by requiring the Spa "to renounce its [Christian] faith by its deeds" by permitting "the mixing of nude persons of the opposite sex who are not married to one another."

The First Amendment's Free Exercise Clause guarantees "the right to believe and profess whatever religious doctrine one desires," and proscribes "governmental regulation of religious *beliefs* as such." *Emp. Div. Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis in original) (internal citations omitted). The government may not "compel affirmation of religious belief [or] punish the expression of religious doctrines." *Id.* (internal citations omitted). The Spa is hard pressed to identify how WLAD regulates its beliefs.

We recognize that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free

Exercise Clause so long as they are neutral and generally applicable," and will instead be subject to rational basis review. *Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 878–82).

We first conclude that the Spa's religious expression is only incidentally burdened. Though we recognize that the Spa's desire to perform acts that contravene WLAD's mandate is motivated in part by religious belief, the HRC's action under WLAD does not prohibit the Spa from expressing its religious beliefs.

WLAD is both neutral and generally applicable. The statute is neutral because its object, text, legislative history, and real-world operation are neutral with respect to religious exercise. *Tingley v. Ferguson*, 47 F.4th 1055, 1085–87 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023). Nothing in the statute "prohibits religious conduct while permitting secular conduct." *Id.* at 1088 (citation omitted); *see also Fulton*, 593 U.S. at 534–35 (same); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542–43 (1993).

Not surprisingly, the Spa does not identify anything in the circumstances of WLAD's historical background, precipitating events, or legislative history that would undermine WLAD's facial neutrality. *See Lukumi*, 508 U.S. at 540. The law's stated purpose, which is to prevent discrimination and enable individuals to seek recourse for discriminatory treatment, makes no mention of religion or religious activities. Wash. Rev. Code § 49.60.010. Nor is there any suggestion that Washington undertakes enforcement actions "in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533.

This case stands in contrast to *Masterpiece Cakeshop*, where the Court held that evidence of "clear and impermissible hostility toward the sincere religious beliefs" indicated that the law was not neutral. *Masterpiece Cakeshop*, 584 U.S. at 634. The record here does not support a similar conclusion. On appeal, the Spa identifies no evidence of "clear and impermissible hostility." In the first amended complaint, the Spa claimed that the investigator's use of the term "cisgender women" was "pejorative for *female*" and evidence of animus. The Spa also claims that "WLAD is being used in an inquisitional manner, not neutrally" because the HRC never investigated whether the complainant had genuinely attempted to visit the Spa. Neither of these allegations establish a record of hostility towards the Spa's exercise of religion. In fact, the HRC never identified or referred to the Spa's religion throughout the enforcement actions.

WLAD is also generally applicable. WLAD offers no "formal mechanism for granting" individualized exceptions, and its nondiscrimination provisions apply to religious and secular conduct alike. *See Tingley*, 47 F.4th at 1088 (citing *Fulton*, 593 U.S. at 537). The statute does not "refer[] to a religious practice," and the practices it proscribes possess "a secular meaning discern[i]ble from the language or context." *Lukumi*, 508 U.S. at 533. WLAD is not underinclusive because it imposes the same requirements on religious and non-religious organizations alike, and its broad scope is commensurate with the anti-discrimination interests that the statute advances. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1236 (9th Cir. 2020).

The Spa contends, for the first time in its reply, that WLAD is not generally applicable because it carves out private clubs. We are not required to address this argument,

as it was waived after the opportunity to raise it in the district court and in the Spa's opening brief. But even absent waiver, the carveout for private clubs is not a "mechanism for individualized exemptions" that "invites the government to consider the particular reasons for a person's conduct." *Fulton*, 593 U.S. at 523 (cleaned up); *see also Tingley*, 47 F.4th at 1088. WLAD's carveouts apply to categories of businesses rather than individuals or individual businesses. These exclusions are mandatory, not discretionary, and require no consideration of the "particular reasons" for a business's conduct. This mandatory language stands in contrast to *Fulton*, where the challenged foster care contract provision included "a formal system of entirely discretionary exceptions" which the Commissioner could grant "in his/her sole discretion." 593 U.S. at 535–36.

Because WLAD, even in a charitable reading, imposes only incidental burdens on religious expression and is neutral and generally applicable, WLAD's application to the Spa is subject to rational basis review and will be upheld "if it is rationally related to a legitimate government purpose." *Parents for Privacy*, 949 F.3d at 1238; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1137 (9th Cir. 2009). Rational basis review is "highly deferential" to the government. *United States v. Hancock*, 231 F.3d 557, 566 (9th Cir. 2000), *cert. denied*, *Hancock v. United States*, 121 S. Ct. 1641 (2001).

Our precedent squarely forecloses the Spa's claim that WLAD, as applied, fails rational basis review. As we held in *Parents for Privacy*, "eliminating discrimination on the basis of sex and transgender status" is a legitimate government purpose, and public accommodations laws like WLAD have been deemed "rationally related" to the elimination of discrimination. 949 F.3d at 1238; *see also Heart of Atlanta*

*Motel, Inc. v. United States*, 379 U.S. 241, 261–62 (1964) (public accommodations law rationally related to elimination of discrimination based on race). The HRC has met its burden to "establish[] on the record a rational basis" for its action under WLAD. *Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991), amended (May 8, 1992). And the Spa has not shown that the HRC's action is "arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 431, 446 (1985). We conclude that the enforcement action did not contravene the free exercise clause.

The Spa falls back on several cases which, it contends, show that even neutral and generally applicable laws can fail rational basis review. But those cases are unhelpful, as none involve the application of rational basis review to neutral and generally applicable laws challenged on the relevant grounds. The *Dale* case addresses the freedom of association, not expression. And both *Fulton* and *Masterpiece Cakeshop* involved laws that the Court held were either not neutral or not generally applicable and therefore cannot be invoked to guide our application of the rational basis test.

Finally, contrary to the Spa's arguments, the ministerial exception at issue in *Hosanna-Tabor* and *Our Lady of Guadalupe* has no applicability here. Courts have recognized a narrow exception, "grounded in the First Amendment, that precludes application of [antidiscrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *see Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 757 (2020) (extending the exception to teachers at private religious schools, or other employees of religious institutions who act as "teachers of religion"). But

the Spa is not a religious institution, the complainant is not a minister or religious instructor, and the proprietor-customer relationship is not an employment relationship.

## IV. Free Association

We turn to the Spa's final First Amendment claim: that the HRC's enforcement of WLAD interferes with both the intimate and expressive association between women at the Spa.

The Constitution protects the freedom of association as "a fundamental element of personal liberty" and "an indispensable means of preserving other individual liberties." *Jaycees*, 468 U.S. at 618. That right protects both "intimate association," that is, the "choices to enter into and maintain certain intimate human relationships," and "expressive association," which is "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 617–18. These are fundamental and important rights but none of them are implicated here.

To begin, the Spa is not an intimate association. The bottom line is that payment of the entrance fee is the price of admission. And any woman, except a transgender woman who has not yet received gender confirmation surgery affecting her genitalia, who can pay the fee can be admitted. Intimate associations are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. Business enterprises serving the general public typically lack these qualities. *Id*.; *see also Hishon v. King & Spalding*,

467 U.S. 69, 78 (1984) (law firm); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (dance hall open to teenagers).

The Spa's customers and employees do not share "deep attachments and commitments." *Jaycees*, 468 U.S. at 620. Although the Spa might not be a "*large* business enterprise," it is nevertheless a business, open to all women except preoperative transgender women. *Id.* (emphasis added). Other than its exclusion of preoperative transgender women, the Spa exhibits no selectivity, let alone a "high degree of selectivity," in admission. *Id.* Patrons "are not members of any organized association; they are patrons of the same business establishment." *Stanglin*, 490 U.S. at 24. Like the dance hall in *Stanglin*, the Spa admits "all [women] who are willing to pay." *Id.* at 25.

The Spa offers no facts suggesting it is an intimate association. Although, as the Spa notes, in contrast with nonprofit membership corporation Jaycees' sizable national membership, the Spa is a local business with two locations, the Spa's comparatively smaller size and local presence does not convert it to an intimate association, particularly compared to intimate family, romantic, or roommate relationships that ordinarily constitute intimate associations. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 12 (1988) (noting that protection for private associations has previously been denied for associations with "as few as 20 members").

The Spa further argues that its entrance policy is selective because only women "willing to undergo certain traditional Korean services" while nude will visit the Spa. But this argument conflates self-selection, based on a customer's individual preference, with the "high degree of selectivity" required by *Jaycees*.

Finally, the Spa notes that women might feel physically vulnerable while at the Spa. Without a doubt, nude spas raise unique privacy concerns absent in most other public spaces, but nudity alone does not transform a public place of business into an intimate association. The Spa analogizes the relationship between spa patrons to the intimate roommate relationship, pointing to language in *Roommate.com* observing that "a girl may not want to walk around in her towel in front of a boy." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1221 (9th Cir. 2012). Although "modesty or security concerns," which could drive the selection of one's roommate, may also influence a patron's decision to visit the Spa, the similarities stop there. *Id.* The roommate relationship is "selective" and "implicates significant privacy and safety considerations" because the choice of roommate necessarily "intrudes into the home." *Id*. In contrast, patrons purchase commercial services at the Spa without regard to the identities of other patrons and do not themselves control admission to the Spa. Because "much of the activity central to the formation and maintenance of [the Spa] involves the participation of strangers," *Jaycees*, 468 U.S. at 621, *Roommate.com* is inapposite. And to the extent the Spa seeks to invoke the privacy rights of its patrons, it has not made such a claim under the First Amendment or otherwise.

The Spa is also not an expressive association because the Spa and its patrons do not engage in expressive activity. The freedom of association includes "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at 647 (quoting *Jaycees*, 468 U.S. at 622). State actions burden the freedom of expressive association

through intruding "into the internal structure or affairs of an association" by "[f]orcing a group to accept certain members," which "may impair the ability of the group to express those views, and only those views, that it intends to express." *Id.* at 648 (quoting *Jaycees*, 468 U.S. at 623). While expressive association does not protect only "advocacy groups," "a group must engage in some form of expression, whether it be public or private." *Id.*

The Spa's effort to transform the act of visiting a spa into the sharing of "ideals and beliefs" within an expressive association would stretch the freedom of association beyond all existing bounds. The Spa alleges its "mission is to restore and rejuvenate women's physical health as well as spiritual health," and that its services are more expressive than traditional commercial activities because the services "are very interactive and hands on as well as lengthy." That broad description would turn virtually every commercial gym or massage establishment into an expressive association.

These facts do not establish the Spa as an expressive association. Like the dance hall in *Stanglin*, patrons of the spa "are not members of any organized association" to begin with; "they are patrons of the same business establishment." *Stanglin*, 490 U.S. at 24. And the act of giving or receiving a Korean massage hardly contains even a "kernel of expression," let alone a quantity "sufficient to bring the activity within the protection of the First Amendment." *Id.* at 25.

In contrast, in *Dale*, the Court concluded that the Boy Scouts engaged in expressive activity because it is "an association that seeks to transmit . . . a system of values." 520 U.S. at 650. The Court placed special emphasis on the Boy Scouts' mission statement, which offered a "positive

moral code for living," and noted that the Boy Scouts "instill[ed] these values" "both expressly and by example." *Dale*, 530 U.S. at 649–50. Although the Spa does provide a mission statement—"to restore and rejuvenate women's physical health as well as spiritual health"—this statement bears at best a tenuous relationship to moral, political, or social beliefs. Significantly, the Boy Scouts offered consistent instruction and engagement with a stable membership, in "activities like camping, archery, and fishing" designed to "inculcate [youth members] with the Boy Scouts' values." *Id.* at 649–50. In contrast, the Spa's commercial services are not similarly designed to "transmit . . . a system of values." *Id.* at 650. Rather, they offer a service for which patrons pay. Consequently, unlike the Boy Scouts, in the absence of a cognizable association, the Spa cannot prevail on its First Amendment freedom of association claim.

## Conclusion

The HRC's enforcement action against Olympus Spa was a straightforward application of Washington's statutory scheme—WLAD—which prohibits discrimination on the basis of gender expression or identity in places of public accommodation. As applied, the statute does not abridge the Spa's rights to free speech, free exercise, or free association. We affirm the district court's dismissal of the complaint.

**AFFIRMED.**

LEE, Circuit Judge, dissenting:

Korean spas are not like spas at the Four Seasons or Ritz Carlton with their soothing ambient music and lavender aroma in private lounges. Steeped in centuries-old tradition, Korean spas require their patrons to be fully naked, as they sit in communal saunas and undergo deep-tissue scrubbing of their entire bodies in an open area filled with other unclothed patrons. Given this intimate environment, Korean spas separate patrons as well as employees by their sex.

The State of Washington, however, threatened prosecution against Olympus Spa, a female-only Korean spa, because it denied entry to a pre-operative transgender female—*i.e.*, a biological male who identifies as female but has not undergone sex-reassignment surgery. Now, under edict from the state, women—and even girls as young as 13 years old—must be nude alongside patrons with exposed male genitalia as they receive treatment. And female spa employees must provide full-body massages to naked pre-operative transgender women with intact male sexual organs.

This is not what Washington state law requires. While the Washington Law Against Discrimination (WLAD) forbids discrimination based on (among other things) sex and sexual orientation, its text and structure make clear that it does not cover transgender status. Washington has perversely distorted a law that was enacted to safeguard women's rights to strip women of protections. The women and girls of Washington state deserve better.

Olympus Spa—an immigrant-founded business run by a Korean family—also deserves better. The Spa's owners pleaded with the Washington Human Rights Commission that they wanted to provide privacy to women and girls,

some of whom had complained years ago about seeing a naked person with male genitalia there. They also begged the government not to force them to violate their Christian belief in modesty between men and women. Those pleas fell on deaf ears. One would think that the Washington Human Rights Commission would be sympathetic to the Spa's owners—members of a racial minority group who want to share their cultural heritage and provide a safe space for women and girls. Instead, it threatened prosecution for defying the state's contorted reading of its anti-discrimination law.

I respectfully dissent.

## BACKGROUND

### A. Olympus Spa provides traditional Korean spa services rooted in hundreds of years of tradition.

Korean spas provide services incorporating hundreds of years of Korean cultural tradition going back to the Choson dynasty (1392–1910). Traditional Korean spa therapy focuses on rejuvenating the body and mind through treatments, massages, and full-body scrubs in communal bathhouses and steam rooms called *jjimjilbang*.

Korean spas are uniquely intimate environments: Patrons must be nude in the communal bathhouse and sauna areas, and unlike other spas, patrons are not given robes or towels for covering up. Patrons must also remain fully nude to receive traditional Korean spa services like *seshin*, a traditional Korean body scrub of the entire body. After soaking in a warm pool, customers are scrubbed head-to-toe to promote holistic health and to exfoliate the skin. *Seshin* is performed by *ddemiri*, individuals who are trained in the Korean art of body scrub using traditional techniques.

*Ddemiri* intimately touch patrons for prolonged periods as they scrub them all over their bodies. And all of this occurs in a large communal area, where all the patrons must be naked. Given the intimate nature, Korean spas not surprisingly separate male and female customers.

Olympus Spa is one such Korean spa in the state of Washington. For two decades, this family-owned business has provided Korean spa treatments to people from all walks of life: Non-Koreans have flocked to Olympus Spa to learn and experience this Korean cultural tradition—an ode to America's melting pot culture. The president of the Spa, Sun Lee, is a first-generation Korean American. Lee's parents opened the Spa after fleeing Korea to the United States in the hopes of a better life and greater religious freedom as Christians. The family hoped to preserve Korean tradition and culture—and to share their heritage with the larger community.

Today, Olympus Spa provides an intimate space for females to enjoy the benefits of Korean spa treatments. Women of all ages, including girls as young as 13 years old, visit the Spa for traditional services like *seshin* and to enjoy the steam rooms.

The Spa limits entry to biological women and post-operative transgender women (*i.e.*, people who were born biological males but underwent sex-reassignment operations). The Spa will treat biological women and post-operative transgender women of any sexual orientation, race, religion, or any other protected status. To put it plainly, Olympus Spa—a female-only spa—provides services to anyone without male genitalia.

As Sun Lee explained, the Spa's entry policy creates an intimate, safe, and private *jjimjilbang* for women to receive

traditional Korean spa services. Because Korean tradition mandates sex-segregated facilities, the Spa considers this policy necessary to remain true to its cultural heritage. And given that the Spa provides services to girls as young as thirteen, Sun Lee believes the Spa has a responsibility to safeguard the privacy of those minors.

The entry policy also reflects the owners' religious beliefs. Describing themselves as "traditional theologically conservative Korean Christians," they consider modesty between males and females as a central tenet. They also believe that it would violate their faith to compel their female employees to give full-body massages to individuals with exposed male genitalia.

The Spa has maintained its entry policy for over twenty years without complaint. But when one person complained about the policy in early 2020, the government pounced.

**B. The state finds that Olympus Spa's entry policy violates WLAD.**

In late 2020, Olympus Spa received a notice from the Washington State Human Rights Commission explaining that someone had filed a complaint against the Spa for violating Section 49.60 of WLAD. A pre-operative transgender woman claimed to have been denied entry into Olympus Spa in January 2020.

The Washington State Human Rights Commission warned Olympus Spa that it was investigating a discrimination claim and demanded a response in writing. Sun Lee wrote a letter, explaining that Korean *jjimjilbangs* require nudity and that, as a female-only spa, it aims to ensure the safety and privacy of its customers. Sun Lee also

explained that the Spa allows post-operative transgender women to enjoy its services.

A Civil Rights Investigator from the Washington Human Rights Commission wrote back, accusing Olympus Spa of violating Washington's anti-discrimination law because "cisgender women are allowed to be fully nude in the spa while transgender women who have not had surgery are prohibited from even entering the spa." The Civil Rights Investigator then pressured Olympus Spa to settle within ten days—or else she would prepare the case "for referral to the Attorney General's Office for prosecution."

Sun Lee responded, stating the Spa has no record of the complainant ever visiting the Spa. Sun Lee asked the Commission for more information so that the Spa may "ensur[e] that no person, especially [the complainant], feels discriminated against," and emphasized that the Spa has "had many guests who identify differently over the years and have never had an issue."

The Commission's Civil Rights Investigator refused to provide any further information, declaring that the "time to ensure that [the complainant] does not feel discriminated against has passed." She expressed little interest in discovering whether the complainant ever visited the Spa. She again threatened prosecution, warning that if the Spa did not acquiesce, then she would "proceed accordingly by preparing the case for referral to the Attorney General's Office for prosecution."

Given the state's unyielding position and threat of prosecution, Sun Lee said that the Spa would like to settle the matter, even though "we have told you that we have never had [the complainant] on the premises, nor denied entry." The Spa's owners agreed to change their entry policy

and undergo training in exchange for not being prosecuted.
The settlement agreement preserved the Spa's right to
challenge the constitutionality of WLAD as applied here,
and Olympus Spa ultimately sued. The Spa fears that it will
have to close its doors if it must permanently change its entry
policy. Its employees and customers have made it clear that
they will not return if naked individuals with male genitalia
use the female-only spa.

## C. Olympus Spa challenges the state's enforcement of WLAD in court.

Olympus Spa sued the state. Among other claims, the
Spa alleged that the state's enforcement of WLAD violates
its rights under the First Amendment—the right to free
exercise, free speech, and free association. The district court
granted the state's motion to dismiss, determining that the
state's enforcement of WLAD against Olympus Spa's entry
policy did not violate the First Amendment. This appeal
followed.

## DISCUSSION

## A. Washington's anti-discrimination statute does not cover transgender status.

Washington state contends that Olympus Spa's entry
policy violates WLAD's prohibition against discrimination
based on "gender expression or identity."

But that is not what WLAD says.[1] WLAD states that
Washington's citizens have the "right to be free from

---

[1] The majority opinion states that the dissent is "conjur[ing a statutory
interpretation] argument that is not, in fact, before the court." Maj. Op.
13. But the Supreme Court has held that courts can address a threshold

OLYMPUS SPA V. ARMSTRONG                    35

discrimination because of race, creed, color, national origin,
citizenship or immigration status, sex, honorably discharged
veteran or military status, sexual orientation, or the presence
of any sensory, mental, or physical disability or the use of a
trained dog guide or service animal by a person with a
disability." WASH. REV. CODE § 49.60.030(1). Nowhere in
that statutory provision does it mention "gender expression
or identity" as a protected class.

The state plucks the term "gender expression or identity"
out of context from the statutory definition of "sexual
orientation" and claims that it is a standalone status protected
under the law. *See* WASH. REV. CODE § 49.60.040(29). But
as explained below, gender identity is protected only if it
serves as a proxy for sexual orientation. Simply put,
transgender status is different from sexual orientation—and
WLAD protects only the latter, not the former.

The state's contorted reading of WLAD violates basic
canons of statutory construction. "Context matters." *Wright
v. Jeckle*, 144 P.3d 301, 304 (Wash. 2006) (citation omitted).
It is a "fundamental canon of statutory construction" that
courts must construe the words of a statute "in their context

---

statutory interpretation question because "to determine whether a statute
is constitutional fairly includes the question of what that statute says."
*Rumsfeld v. Forum for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 56
(2006) (rejecting the government's argument that the statutory "question
is not before the Court because it was neither included in the questions
presented nor raised by FAIR."). Indeed, by addressing the statutory
question, we can avoid thorny constitutional issues. *See Jean v. Nelson*,
472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional
questions, federal courts must consider nonconstitutional grounds for
decision.") (citation omitted). And because I believe that WLAD does
not apply here, I would not consider the Spa's constitutional challenges
to WLAD.

and with a view to their place in the overall statutory scheme." *West Virginia v. Env't Prot. Agency,* 597 U.S. 697, 721 (2022) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). This well-known principle— known as the "whole-text canon"—"calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167 (2012). We must follow this mandate to read statutory provisions in context. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (reversing this court's interpretation of a statutory provision for failing to read it in the "context of the statute as a whole"); *see also Nissen v. Pierce Cnty.*, 357 P.3d 45, 52 (Wash. 2015) ("We cannot interpret statutory terms oblivious to the context in which they are used.").

We thus must read "gender expression or identity" in context as part of the definition of "sexual orientation." In 2006, the Washington legislature added "sexual orientation" to WLAD as a protected class. S.H.B. No. 2661, 59th Leg., Reg. Sess. (Wash. 2006). From then on, Washington forbade discrimination on the basis of "race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or . . . disability." WASH. REV. CODE § 49.60.030(1). The legislature, however, did not include "gender expression or identity" as an independently protected class. The legislature also chose not to include "gender expression or identity" within the definition of "sex." "Sex" remained defined as "gender." *Id.* § 49.60.040(28). Rather, the legislature included "gender expression or identity" only in the definition of "sexual orientation." *Id.* § 49.60.040(29).

So why include "gender expression or identity" in the definition of "sexual orientation"?  It guards against discrimination where gender identity serves as a proxy for sexual orientation.  For instance, suppose a transgender woman (*i.e.*, a biological male who identifies as a female) is in a relationship with a biological male. An employer who harbors anti-gay views fires the transgender woman but claims that he did not discriminate based on sexual orientation because the transgender woman is in a relationship with a man. By including "gender expression and identity" in the definition of sexual orientation, the law tells businesses that such gamesmanship will not fly. It, however, does not create a separate and standalone protected class for gender identity or transgender status.

We simply cannot take words out of a definition to expand the statutory scope of anti-discrimination law. Consider the following example.  Title VII of the Civil Rights Act prohibits employers from discriminating based on "national origin," 42 U.S.C. § 2000e-2(a)(1), and courts have interpreted discrimination based on "national origin" to include discrimination based on a person's accent. *See, e.g.*, *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1192–95 (9th Cir. 2003).  For instance, an employer may have discriminated on the basis of national origin if he refuses to hire someone because she has a Lebanese accent. *See id.* at 1195.  In other words, an accent can serve as a proxy for national origin.  But Title VII does not prohibit discrimination based on an accent independent of national origin.  So it would likely not cover a national origin discrimination claim by an American-born Lebanese woman based on her Midwest twang because that accent has nothing to do with her national origin.  Similarly here, WLAD does not protect individuals from discrimination based on gender

identity when it does not implicate sexual orientation. And this case has nothing to do with sexual orientation.

The majority opinion ignores this statutory structure and context, and instead claims that the "plain meaning" of the statute bars discrimination based on "gender expression or identity" simply because those words appear somewhere in the text. Maj. Op. at 12. Instead of considering what "gender identity" means within the bounds of sexual orientation, the majority opinion does the opposite and concludes that the state adopted an "expansive" definition that treats gender identity as "one form of sexual orientation." Maj. Op. 13.

But such a reading defies common sense, statutory rules of construction, and the state's own reading of the statute. First, common sense: Someone's gender identity is different from his or her sexual orientation. A transgender woman has transgender status regardless of whether she is attracted to men or women. And the facts here further underscore that gender identity is not a form of sexual orientation: The Spa admits lesbians and bisexuals, and only bars entry to people with male genitalia to protect the privacy of women and girls.

Our rules of statutory construction also undermine the majority opinion's reading. The Associated-Words Canon—*noscitur a sociis*—states that a series of words "associated in a context suggest[] that the words have something in common" and thus "bear on one another's meaning." Scalia & Garner, *supra* at 195. Here, sexual orientation is defined as "heterosexuality, homosexuality, bisexuality, and gender expression or identity." WASH. REV. CODE § 49.60.040(29). Thus, we should read "gender expression or identity" in context of the other three terms—

*i.e.*, the statute bars discrimination based on gender identity when it is a proxy for sexual orientation, not as a standalone category divorced from sexual orientation.

Finally, the Washington Human Rights Commission itself treats "gender identity" as a standalone status, not as a form of sexual orientation. For example, one of its regulations states that "[h]arassment based on an individual's sexual orientation or gender expression or gender identity is prohibited." WASH. ADMIN. CODE § 162-32-040(1). If the Commission agreed with the majority's reading, there would be no need to reference gender identity separately because it would already be included in the definition of sexual orientation.[2]

In sum, "statutory provisions should not be read in isolation, and the meaning of a statutory provision must be consistent with the structure of the statute of which it is a part." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 731 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015). And in our case, that means "gender identity" cannot be exported out of its place in the statutory structure to establish a new standalone protected class.

## B. Olympus Spa does not discriminate on the basis of sexual orientation.

WLAD prevents businesses from discriminating based on, among other things, sexual orientation. But there is no whiff of discrimination based on sexual orientation by

---

[2] The Washington Human Rights Commission, of course, does not have authority to issue regulations that conflict with the authorizing statute. *See Washington Water Power Co. v. Washington State Hum. Rights Comm'n*, 586 P.2d 1149, 1152 (Wash. 1978).

Olympus Spa. The Spa allows lesbians, heterosexuals, and
bisexuals. And it allows post-operative transgender women
to visit the Spa regardless of their sexual orientation. The
Spa's entry policy focuses not on sexual orientation but on
whether an individual has male genitalia.

Neither the state nor the complainant has alleged that the
Spa's policy discriminates against patrons based on their
sexual orientation. Rather, the state took issue only with
Olympus Spa excluding pre-operative transgender women
from a women's spa. In short, Olympus Spa's entry policy
does not discriminate based on sexual orientation and thus
does not run afoul of WLAD.

## C. The Supreme Court's decision in *Bostock v. Clayton County* does not bear on this case.

Some may be thinking about the elephant in the room—
what about the Supreme Court's decision in *Bostock v.
Clayton County*? 590 U.S. 644, 683 (2020). Relying on a
literalist textual reading of the statute, the Court held that
discrimination on the basis of sexual orientation or
transgender status must logically be discrimination based on
"sex" under Title VII. *See id.*

But *Bostock* has no relevance here. Unlike WLAD, Title
VII does not define "sex." *Bostock*, 590 U.S. at 655. Nor
does it include "sexual orientation" or "gender expression or
identity" anywhere in its text. *Id.* at 670. Because Congress
did not include any definitions, the Court interpreted sex
discrimination broadly to include transgender status based
on a logical syllogism that the undefined term "sex" must
implicate sexual orientation and gender identity. *Id.* at 680.

Here, on the other hand, we are not left in the dark on
how to interpret the term "sex" or to guess if the statute

covers sexual orientation or gender identity. The state legislature has already given us the answers. WLAD explicitly prohibits discrimination based on "sexual orientation" and defines "sex" and "sexual orientation" differently. WASH. REV. CODE §§ 49.60.030(1), 49.60.040(28)–(29). WLAD also expressly includes "gender expression or identity" under the definition of "sexual orientation" (but not under "sex"), confirming that "gender identity" is distinct from "sex." *Bostock*'s reasoning thus has no application to WLAD's intricate statutory structure and express definitions. Not to mention that to read "sex" under WLAD to include sexual orientation or gender identity would render the 2006 amendment adding "sexual orientation" entirely superfluous. *See Whatcom Cnty. v. City of Bellingham*, 909 P.2d 1303, 1308 (Wash. 1996) ("Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.") (citation omitted).

It is no surprise that the Court in *Bostock* emphasized that its decision did not extend to any state anti-discrimination laws. 590 U.S. at 681 ("The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination . . . [b]ut none of these other laws are before us[,] . . . and we do not prejudge any such question today.").

\* \* \* \*

Washington is not just legally wrong in misconstruing its anti-discrimination law. It is also wrong in how it overzealously pursued its case against the interests of protected class members—the women and girls of the state, and the Korean owners of Olympus Spa, an immigrant-founded small business.

In 1973, the state amended WLAD to include "sex" as a forbidden basis for discriminatory treatment. H.B. No. 404, 43rd Leg., Reg. Sess. (Wash. 1973). Over the years, the Washington Supreme Court construed the statute broadly to protect women and girls. *See, e.g.*, *MacLean v. First Northwest Indus.*, 635 P.2d 683, 684–86 (Wash. 1981) (holding that "ladies' night" with half-price tickets for women at an NBA game was a lawful way to increase attendance of female fans). Our court, too, has recognized that our laws provide privacy for females: For example, we noted that in shared "bathrooms and common areas, a girl may not want to walk around in her towel in front of a boy." *Fair Hous. Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216, 1221 (9th Cir. 2012).

But Washington has now rolled back the clock in protecting women and girls by bizarrely citing the very law that safeguarded their rights for decades. Now, women and girls as young as 13 years old must lay naked alongside individuals with exposed male genitalia as they receive treatment at Korean spas. And for the female employees at the Spa, they must provide full-body deep-tissue massage to naked persons with intact male sexual organs—or else lose their livelihood.

The state also unjustly hounded Olympus Spa's Korean owners. The Washington Human Rights Commission threatened them with prosecution on questionable legal grounds. As the owners explained, they wanted to share their ethnic heritage to the larger community, but they also felt obligated to ensure privacy for their female patrons and employees. That did not matter to the Commission. Nor did the Commission care about the owners' fear of losing clients and ultimately their small business that they had worked so hard to build.

The Washington Human Rights Commission threatened prosecution against a protected class—racial minority members who want to share their cultural traditions—to favor a group that is not even a protected class under the statute. To be clear, transgender persons, like all people, deserve to be treated with respect and dignity. But showing respect does not mean the government can distort the law and impose its will on the people the law was intended to protect.

Ultimately, this case is not just about the fate of a family-owned business. It is about power—which groups have it and which do not. And Asian Americans in Washington have historically lacked political clout. Washington barred Chinese people from voting as soon as it became a territory in 1853.[3] Other restrictions (such as preventing them from testifying against whites) followed.[4] Even in the post-civil rights era, the University of Washington has faced repeated allegations of discrimination against Asian Americans.[5]

---

[3] *See* Matthew W. Klingle, Ctr. for the Study of the Pac. Nw., Univ. of Washington Dep't of Hist., *A History Bursting with Telling: Asian Americans in Washington State* 5, https://content.lib.washington.edu/curriculumpackets/A_History_Bursti ng_With_ Telling.pdf (last visited May 7, 2025).

[4] *See id.*

[5] *See, e.g.*, Hannah Fry, *Rejected by 16 colleges, hired by Google. Now he's suing some of the schools for anti-Asian discrimination*, L.A. Times, Apr. 4, 2025 (detailing how Stanley Zhong—who "had a 4.42 grade-point average, a nearly perfect SAT score, had bested adults in competitive coding competitions and started his own electronic signing service all while still in high school"—was rejected by, among others, University of Washington); Heath Foster and Ruth Schubert, *Two UW law school applicants, two paths: one got in, one didn't*, Seattle Post-Intelligencer, Oct. 15, 1998 (noting disparity in LSAT scores).

And the Washington Human Rights Commission's bullheaded investigation of Olympus Spa makes plain who has political power (and who does not) today.[6]

Make no mistake about it: the Washington Human Rights Commission has wielded its power to advance its own political agenda. The homepage of its website includes statements about national politics that have little to do with the Commission's duties under state law: It declares that "President Trump is misleading the American people on diversity, equity, and inclusion and accessibility initiatives."[7] The agency then links to a press release from a group of politicians attacking "President Trump's executive orders" as "unnecessary and disingenuous" and condemning him for "baseless and offensive claims."[8] All

---

[6] Not only did the state contort its reading of the statute, it flipped-flopped and took inconsistent positions in pursuing its case against the Spa's owners. While the state thought Olympus Spa's entry policy was serious enough to merit potential prosecution, it then argued to the district court that the Spa lacked standing because it faced no credible threat of state prosecution. In an about-face, the state argued that the Spa faces no credible threat of enforcement because it is unlikely that a pre-operative transgender woman will visit the Spa in the future. The state emphasized that there had been "only one instance of a transgender woman, who has not had gender-affirming surgery, who [ ] attempted to access the spa's services in over 20 years of the spa's existence." The state even oddly invoked Olympus Spa's contention that the complainant never visited the Spa to show that enforcement is unlikely. Intellectual consistency was no bar for the state in its campaign against the Spa.

[7] Washington State Human Rights Commission Home Page, https://www.hum. wa.gov/ (last visited on May 7, 2025).

[8] *Joint statement from 13 state attorneys general: President Trump is misleading the American people on diversity, equity, and inclusion and accessibility initiatives*, Washington State Attorney General (Jan. 31,

this political palaver—from an agency tasked with impartially investigating and neutrally enforcing the state's anti-discrimination laws on behalf of all Washington citizens. It is no wonder then that the Washington Human Rights Commission exerted the full force of state power to bully members of a politically weak minority group.

I respectfully dissent.

---

2025), https://www.atg.wa.gov/news/news-releases/joint-statement-13-state-attorneys-general-president-trump-misleading-american          (last visited on May 7, 2025).