**FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

MAR 12 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| OLYMPUS SPA; et al., | No. 23-4031 |
| Plaintiffs - Appellants, | D.C. No. 2:22-cv-00340-BJR Western District of Washington, Seattle |
| v. | |
| ANDRETA ARMSTRONG, Executive Director of the Washington State Human Rights Commission and MADISON IMIOLA, | ORDER AND AMENDED OPINION |
| Defendants - Appellees. | |

Before: McKEOWN, GOULD, and LEE, Circuit Judges.
Opinion by Judge McKEOWN
Dissent by Judge LEE
Statement Respecting the Denial of Rehearing En Banc by Judge MCKEOWN
Additional Statement Respecting the Denial of Rehearing En Banc by Judge MCKEOWN
Statement Respecting the Denial of Rehearing En Banc by Judge OWENS
Dissent from Denial of Rehearing En Banc by Judge VANDYKE
Dissent from Denial of Rehearing En Banc by Judge TUNG
Dissent from Denial of Rehearing En Banc by Judge COLLINS

The opinion filed May 29, 2025, and reported at 138 F.4th 1204 is hereby

amended. The dissent is unchanged. The amended opinion will be filed

concurrently with this order.

Judge McKeown and Judge Gould voted to deny appellants' petition for

panel rehearing. Judge Lee voted to grant the petition for panel rehearing. Judge

Gould and Judge Lee vote to deny the petition for rehearing en banc, and Judge McKeown so recommended.

The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

Accordingly, the petitions for panel rehearing and rehearing en banc, Dkt. No. 56, are **DENIED**.

23-4031

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| OLYMPUS SPA; MYOON WOON LEE; SUN LEE; JANE DOE, patron; JANE DOES, employees 1-3, | No. 23-4031 |
| | D.C. No. |
| Plaintiffs - Appellants, | 2:22-cv-00340-BJR |
| v. | AMENDED OPINION |
| ANDRETA ARMSTRONG, Executive Director of the Washington State Human Rights Commission; MADISON IMIOLA, | |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted November 18, 2024
Seattle, Washington

Before: M. Margaret McKeown, Ronald M. Gould, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge McKeown
Dissent by Judge Lee

McKEOWN, Circuit Judge:

This appeal stems from the application of the Washington Law Against

Discrimination ("WLAD") in connection with the entrance policy of two Korean

spas (collectively "Olympus Spa" or "the Spa"). Washington's Human Rights Commission ("HRC") initiated an enforcement action against the Spa based on the Spa's policy of granting entry to only "[b]iological women" and excluding, in addition to men, preoperative transgender women who have not yet received gender confirmation surgery affecting their genitalia. The HRC alleged that the entrance policy violated WLAD, a state public accommodations law that prohibits public facilities from discrimination on the basis of sexual orientation. Under Washington law, "sexual orientation" is defined to include "heterosexuality, homosexuality, bisexuality, and gender expression or identity." Wash. Rev. Code §§ 49.60.030(1)(b), 49.60.040(27).

Notably, the Spa did not challenge this definition or the language of the statute. The Spa did not argue that the statute was vague or that the Spa's conduct did not fit within the statute's definition of discrimination on the basis of gender expression or identity. Nor did the Spa challenge the implementing regulations or the HRC's related policies, either in this lawsuit or during the HRC's enforcement action against it.

Although the enforcement action is grounded in state law, the Spa sued state officials (the Executive Director and Civil Rights Investigator for the HRC) on First Amendment grounds, claiming that WLAD, as enforced against the Spa's entrance policy, violates its rights to the freedom of speech, religion, and

association. Because the enforcement action did not violate the Spa's First Amendment rights, we affirm the district court's dismissal of the Spa's complaint.

The dissent endeavors to make this case about anything but the Spa's First Amendment claims, instead offering a political screed against the HRC's enforcement of the statute, which relies on an unargued—and unfounded— interpretation of WLAD's plain language. But this case has nothing to with President Trump or discrimination against Asian Americans. The Spa simply did not challenge the statute itself, and it is not our role to rewrite the statute.

We are not unmindful of the concerns and beliefs raised by the Spa. Indeed, the Spa may have other avenues to challenge the enforcement action. But whatever recourse it may have, that relief cannot come from the First Amendment.

## Background

In 2020, the HRC, the agency tasked with enforcing WLAD, received a complaint from a transgender woman. The complaint alleged that Olympus Spa "denied [her] services and stated that transgender women without surgery are not welcome because it could make other customers and staff uncomfortable." Specifically, the Spa excluded preoperative transgender women who have not yet received gender confirmation surgery affecting their genitalia.

Acting on this complaint, the HRC served a Notice of Complaint of Discrimination to the Spa, noting that the complainant alleged she experienced

discrimination based on her sexual orientation. The Spa, in response to the HRC's notice, denied that its "biological women"-only policy violated WLAD and suggested that because the Spa requires nudity for certain procedures and in certain areas, "it is essential for the safety, legal protection and well-being of our customers and employees that we maintain adherence to this adaptation of a females-only rule." The Spa also added an "OLYMPUS Spa Entry Policy" segment to its website. The policy states, "Biological women are welcome. It is the policy of Olympus Spa not to discriminate on the basis of race, color, national origin, sex, age or disability in its programs or activities, as required by applicable laws and regulations."

Following the Spa's response, the HRC informed the Spa that its entrance policy continued to violate WLAD by denying transgender women access to the Spa's facilities based on their gender identity. Although the Spa contended that its entrance policy was based only on genitalia, the HRC explained that the policy "denie[d] services to transgender women who have not had surgery specifically because their physical appearance is not 'consistent' with the traditional understanding of biological women." The letter also offered the Spa an opportunity to enter into a pre-finding settlement agreement, allowing the Spa to modify its policies and practices to comply with WLAD. During the investigation of the complaint, and before execution of the settlement, the Spa had already "adopted

new language on its website reflecting a non-discriminatory policy" that "affirms equal access, services and treatment for all customers . . . without regard to protected class, such as sexual orientation or gender identity."

The parties signed a pre-finding settlement agreement on October 28, 2021. The agreement required the Spa to comply with WLAD. It also required that the Spa remove the "biological women" entrance policy language on its website. Finally, the agreement reserved the Spa's right to bring a constitutional challenge against the agreement, the operative statutes, implementing regulations, and related HRC policies. This lawsuit followed.

Following an amended complaint, the district court dismissed the case with prejudice under Rule 12(b)(6). The Spa's free speech claim failed because the alleged "compelled speech"—the alterations to the Spa's written entrance policy— was incidental to the Spa's conduct. For the Spa's free exercise claim, the district court held that WLAD was a neutral, generally applicable law and survived rational basis review. Finally, the district court determined that the relationship between the Spa and its customers was not an intimate association giving rise to First Amendment freedom of association protection.

Recent years have seen a spate of challenges arising from enforcement actions under state public accommodations laws that burden constitutional rights. Courts have repeatedly recognized that where public accommodations laws

impermissibly burden constitutional rights, public accommodations laws must give way. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (enforcement action under public accommodations law unconstitutionally interfered with website designer's free expression); *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) (enforcement action under public accommodations law was not neutral with respect to religion); *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) (city policies were not generally applicable with respect to religion); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (application of public accommodations law interfered with expressive association); *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773 (9th Cir. 2022) (application of public accommodations law would interfere with beauty pageant's free speech).

But this is not such a case. Because the HRC's action under WLAD does not impermissibly burden the Spa's First Amendment rights to free speech, free exercise, or free association, we affirm the district court's dismissal of the Spa's complaint.

## Analysis

### I. Statutory Text

WLAD is a wide-reaching law that prohibits discrimination in a variety of areas, including employment, real estate, public accommodations, credit, and insurance. The public accommodations section covers discrimination in the "right

to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." Wash. Rev. Code § 49.60.030(1)(b). WLAD proscribes discrimination based not only on race but also categories including "age, sex, sexual orientation, and disability." *Ockletree v. Franciscan Health Sys.*, 317 P.3d 1009, 1012 (Wash. 2014).

WLAD recognizes:

(1) The right to be free from discrimination because of race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:

> (b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement.

Wash. Rev. Code. § 49.60.030(1)(b). In 2006, WLAD was amended to proscribe discrimination based on "sexual orientation," defined to mean:

heterosexuality, homosexuality, bisexuality, and gender expression or identity. As used in this definition, "gender expression or identity" means having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth.

*Id.* § 49.60.040(29); 2006 Wash. Sess. Laws 12–25. The HRC is tasked with enforcing WLAD. Wash. Rev. Code §§ 49.60.040(3), 49.60.120. WLAD's governing regulations permit the maintenance of certain "gender-segregated facilities," such as "restrooms, locker rooms, dressing rooms," and similar spaces, so long as the facility does not remove or otherwise take action against a person for reasons "[]related to their gender expression or gender identity." Wash. Admin. Code § 162-32-060(1)–(2).

The Spa does not dispute that WLAD's proscription of discrimination on the basis of sexual orientation applies to its conduct here. Nor could it. Whether WLAD proscribes the Spa's conduct here is a question of state law, and the answer is clear. WLAD prohibits discrimination based on sexual orientation, which expressly includes "gender expression or identity," including having a particular "gender identity, self-image, appearance, behavior, or expression." Wash. Rev. Code § 49.60.040(29). The Washington legislature chose to adopt this formulation of the statute almost 20 years ago. The Spa's entrance policy denies entry to preoperative transgender women whose "gender identity" or "appearance," as defined in WLAD, differ from the physical traits associated with postoperative or cisgender women. The statutory language is undoubtedly expansive, and its definition of sexual orientation is bespoke. But it is also unambiguous, and it applies to the Spa's entrance policy. *See Washington v. Armendariz*, 156 P.3d 201,

203 (Wash. 2007) ("If the plain language of the statute is unambiguous, then this court's inquiry is at an end.").

The dissent, skipping over plain meaning, claims WLAD does not apply to the Spa's conduct and urges us to read the phrase "gender expression or identity" in context. That invented context ignores the plain reading of the statute. Despite the Washington legislature's passage and framing of the statute in which "gender expression or identity" is part of the definition of "sexual orientation," the dissent would limit WLAD's prohibition on gender-identity discrimination only to instances "where gender identity serves as a proxy for sexual orientation." That is, the dissent cabins the definition of an individual's orientation to mean only heterosexual, homosexual, or bisexual. *Contra* Wash. Rev. Code § 49.060.040(29).

Notably, the Spa did not make this argument. Its challenge was under the First Amendment, not under the statute. The dissent reaches well beyond the pleadings and the briefings to conjure an argument that is not, in fact, before the court. And tellingly, the dissent never engages with the Spa's First Amendment claims.

The dissent's reading ignores the plain language of the statute: Sexual orientation includes "heterosexuality, homosexuality, bisexuality, *and gender expression or identity*." *Id.* (emphasis added). Washington chose an expansive definition of sexual orientation, and it is not our province to rewrite the statute.

The dissent points to Title VII, "common sense," the canon of *noscitur a sociis*, and provisions in the HRC's regulations to justify departing from our straightforward construction of WLAD's text. All are unavailing. The dissent's invocation of Title VII's proscription on discrimination based on national origin to support its reading is far afield and simply has no application to the Spa's case. In *Raad*, we noted that accents could be "inextricably intertwined" with national origin, and therefore discrimination based on accents could be tantamount to discrimination based on national origin. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1195 (9th Cir. 2003), *opinion amended on denial of reh'g*, 2003 WL 21027351 (9th Cir. May 8, 2003). Here, in contrast, gender identity is not "inextricably intertwined" with sexual orientation or a proxy for sexual orientation. WLAD defines gender identity as one form of sexual orientation. The Spa's conduct discriminates based on gender identity; therefore, under state law, it discriminates based on sexual orientation and falls within WLAD's ambit. The same would have been true had the Spa singled out heterosexual, homosexual, or bisexual individuals instead.

The dissent cites no authority for the proposition that common sense alone can justify departure from a statute's plain text. Nor could it. The "decision to . . . rewrite the statute falls within the legislative, not the judicial, prerogative." *Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002).

The canon of *noscitur a sociis*, even if it applied in the absence of textual ambiguity, does not favor the dissent's preferred interpretation. That canon requires us to read each item in the list in "refer[ence] to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." *Meresse v. Stelma*, 999 P.2d 1267, 1273 n.10 (Wash. App. 2000) (internal quotations and citations omitted). But the dissent's reading would diminish gender identity's role, compared to heterosexuality, homosexuality, and bisexuality, in constituting a revised definition of sexual orientation.

Finally, the dissent's notion that the WLAD should conform to the HRC's regulations has it exactly backwards. The unambiguous statute is the statute and it, not the regulations, controls.

## II. Free Speech

Because the HRC's enforcement actions fall within the express scope of WLAD, we turn to the Spa's First Amendment claims. The Spa contends that the HRC's required changes to the Spa's published admissions policy violate its right to free speech. Specifically, the HRC required the Spa to adopt new language "affirm[ing] equal access, service, and treatment for all customers 'without regard to . . . sexual orientation or gender identity.'"

It has been long recognized that the government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content."

11                                                                    23-4031

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). However, not all state actions burdening speech are automatically subject to strict scrutiny under the First Amendment. Indeed, the First Amendment does not protect "an apparently limitless variety of conduct . . . whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Notably, "government regulations that have 'only an incidental effect on protected speech'" are instead subject to intermediate scrutiny as articulated in *O'Brien*. *Green*, 52 F.4th at 790 (quoting *Dale*, 530 U.S. at 659).

In particular, compelled changes in conduct—which might incidentally compel changes in speech—are not reviewed as content-based speech restrictions. Rather, "our cases have held that the government may sometimes 'requir[e] the dissemination of purely factual and uncontroversial information,' particularly in the context of 'commercial advertising.'" *303 Creative*, 600 U.S. at 596 (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995)). And disseminating purely factual information, even if it "includes elements of speech," is a "far cry from . . . compelled speech." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* (*FAIR*), 547 U.S. 47, 61–62 (2006) (requiring emails and notices with the time and location of recruitment meetings). For instance, a law that "prohibit[s] employers from discriminating in hiring on the basis of race . . . will require an employer to take down a sign reading 'White

Applicants Only,'" but that requirement "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Id.* at 62.

Here, "[a]ny First Amendment interest which might be served" by permitting the Spa to advertise its entrance policy "is altogether absent when the [practice] itself is illegal and the restriction . . . is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973). As in *Pittsburgh Press*, because the Spa's *practice* of denying admission to preoperative transgender women is unlawful under WLAD, limitations on the entrance policy advertising that practice do not trigger First Amendment scrutiny.

Although the Spa's alterations to its admissions practices necessitated alterations to its written policy, the HRC merely required the Spa to change its published entrance policy so that it accurately described those new, WLAD-compliant practices. The mandated alterations were "plainly incidental to the [challenged law's] regulation of conduct, and 'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

The HRC's objection to the entrance policy was not based on "disagreement with the message it conveys" but rather with the practice it described—a practice that was unlawful under WLAD. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The HRC did not require the Spa to modify any language from its website expressing, or withholding, its religious, social, or political viewpoints.[1] Nor—contrary to the Spa's representations in its opening brief on appeal—did it "require" or "compel" the Spa to adopt any particular views.

Consequently, the appropriate standard of review is at most intermediate, not strict, scrutiny. *See Green*, 52 F.4th at 790. Under *O'Brien*, a government regulation will survive intermediate scrutiny if: (1) it "furthers an important or substantial governmental interest;" (2) "the governmental interest is unrelated to the suppression of free expression;" and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. Albertini*, 472 U.S. 675, 687–88 (1985) (quoting *O'Brien*, 391 U.S. at 377). For the first *O'Brien* factor, WLAD furthers an

---

[1] The Spa alleged that the HRC "required that Olympus Spa remove language from its website that has a viewpoint that 'biological women' are females and distinct from males." But the Spa has not pointed to any specific statements that were on the website before the enforcement action and removed during its pendency, beyond the statement that "[b]iological women are welcome" to enter the Spa. As alleged, the HRC's action went no further than requiring that the Spa's entrance policy comply with WLAD and that the Spa's website accurately convey that policy. The action did not otherwise infringe on the Spa's freedom to publish its views on the nature of gender.

"important or substantial government interest"—in fact, the government's interest in protecting against "acts of invidious discrimination in the distribution of publicly available goods [and] services" has been described as "compelling." *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). In an as-applied challenge under intermediate scrutiny, the state needs to further establish a "reasonable fit" between its substantial interests and the action at issue. *Pena v. Lindley*, 898 F.3d 969, 982 (9th Cir. 2018). Upon receiving a complaint regarding the Spa's discriminatory conduct, the HRC determined that there was "reasonable cause for believing" that the Spa was engaged in an "unfair practice" in violation of WLAD, as it is statutorily authorized to do. Wash. Code. Rev. § 49.60.240. The Spa has not disputed that it discriminated against would-be patrons based on gender-related appearance. The HRC's action easily clears the bar of "reasonable fit."

As to *O'Brien*'s second factor, neither party suggests that the eradication of such discriminatory action is related to the suppression of free expression. The Spa does not directly address *O'Brien*'s third factor—that the restriction be "no greater than essential"—and instead argues that Washington State's restrictions are underinclusive. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 774 (2018). But, whether assessed under *O'Brien* or *Becerra*, the restrictions pass muster: they are "sufficiently drawn to achieve," *id.* at 773, and are "no greater than . . . essential" to further, *O'Brien*, 391 U.S. at 377, the state's anti-

discrimination interests in this context. The Spa's arguments to the contrary are unavailing. The Spa points out that WLAD does not otherwise ban discriminatory descriptions of biological women in public discourse, and that the Spa excludes fewer categories of persons than the Miss USA pageant in *Green*. Neither argument holds water. WLAD does not police public discourse generally because it regulates conduct, not speech. And *Green* is inapposite. Unlike the entrance policy, which is, at most, only incidentally expressive, the beauty pageant in *Green* was deemed purely expressive activity akin to the parade in *Hurley*. *Green*, 52 F.4th at 780. The court in *Green* considered a different statute, applied to categorically different activity, under a different level of scrutiny, and thus does not bear on the over- or under-inclusiveness of the restriction in this case.

We conclude that WLAD imposes an "incidental restriction . . . no greater than is essential" to eliminate discriminatory conduct. *Albertini*, 472 U.S. at 687–88. WLAD prohibits the precise discriminatory practices that "legitimately concern[]" the State and "abridges no more speech . . . than is necessary to accomplish that purpose." *Jaycees*, 468 U.S. at 629 (citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)). The Washington law does not impermissibly burden the Spa's free speech.

### III.    Free Exercise

We next turn to the Spa's claim that WLAD violates its right to free exercise by requiring the Spa "to renounce its [Christian] faith by its deeds" by permitting "the mixing of nude persons of the opposite sex who are not married to one another."

The First Amendment's Free Exercise Clause guarantees "the right to believe and profess whatever religious doctrine one desires," and proscribes "governmental regulation of religious *beliefs* as such." *Emp. Div. Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis in original) (internal citations omitted). The government may not "compel affirmation of religious belief [or] punish the expression of religious doctrines." *Id.* (internal citations omitted). The Spa is hard pressed to identify how WLAD regulates its beliefs.

We recognize that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable," and will instead be subject to rational basis review. *Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 878–82).

We first conclude that the Spa's religious expression is only incidentally burdened. Though we recognize that the Spa's desire to perform acts that contravene WLAD's mandate is motivated in part by religious belief, the HRC's action under WLAD does not prohibit the Spa from expressing its religious beliefs.

17

WLAD is both neutral and generally applicable. The statute is neutral because its object, text, legislative history, and real-world operation are neutral with respect to religious exercise. *Tingley v. Ferguson*, 47 F.4th 1055, 1085–87 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023). Nothing in the statute "prohibits religious conduct while permitting secular conduct." *Id.* at 1088 (citation omitted); *see also Fulton*, 593 U.S. at 534–35 (same); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542–43 (1993).

Not surprisingly, the Spa does not identify anything in the circumstances of WLAD's historical background, precipitating events, or legislative history that would undermine WLAD's facial neutrality. *See Lukumi*, 508 U.S. at 540. The law's stated purpose, which is to prevent discrimination and enable individuals to seek recourse for discriminatory treatment, makes no mention of religion or religious activities. Wash. Rev. Code § 49.60.010. Nor is there any suggestion that Washington undertakes enforcement actions "in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533.

This case stands in contrast to *Masterpiece Cakeshop*, where the Court held that evidence of "clear and impermissible hostility toward the sincere religious beliefs" indicated that the law was not neutral. *Masterpiece Cakeshop*, 584 U.S. at 634. The record here does not support a similar conclusion. On appeal, the Spa

identifies no evidence of "clear and impermissible hostility." In the first amended complaint, the Spa claimed that the investigator's use of the term "cisgender women" was "pejorative for *female*" and evidence of animus. The Spa also claims that "WLAD is being used in an inquisitional manner, not neutrally" because the HRC never investigated whether the complainant had genuinely attempted to visit the Spa. Neither of these allegations establish a record of hostility towards the Spa's exercise of religion. In fact, the HRC never identified or referred to the Spa's religion throughout the enforcement actions.

WLAD is also generally applicable. WLAD offers no "formal mechanism for granting" individualized exceptions, and its nondiscrimination provisions apply to religious and secular conduct alike. *See Tingley*, 47 F.4th at 1088 (citing *Fulton*, 593 U.S. at 537). The statute does not "refer[] to a religious practice," and the practices it proscribes possess "a secular meaning discern[i]ble from the language or context." *Lukumi*, 508 U.S. at 533. WLAD is not underinclusive because it imposes the same requirements on religious and non-religious organizations alike, and its broad scope is commensurate with the anti-discrimination interests that the statute advances. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1236 (9th Cir. 2020).

The Spa contends, for the first time in its reply, that WLAD is not generally applicable because it carves out private clubs. We are not required to address this

argument, as it was waived after the opportunity to raise it in the district court and in the Spa's opening brief. But even absent waiver, the carveout for private clubs is not a "mechanism for individualized exemptions" that "invites the government to consider the particular reasons for a person's conduct." *Fulton*, 593 U.S. at 523 (cleaned up); *see also Tingley*, 47 F.4th at 1088. WLAD's carveouts apply to categories of businesses rather than individuals or individual businesses. These exclusions are mandatory, not discretionary, and require no consideration of the "particular reasons" for a business's conduct. This mandatory language stands in contrast to *Fulton*, where the challenged foster care contract provision included "a formal system of entirely discretionary exceptions" which the Commissioner could grant "in his/her sole discretion." 593 U.S. at 535–36.

Notably, the Washington law also makes no distinction between secular and non-secular activities, as in *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). WLAD's bar on discrimination in places of public accommodation and its exemption for private clubs apply equally to secular and non-secular aggregations. So even assuming the Spa is a religious institution, this is not a situation where a "comparable secular activity [is treated] more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

Because WLAD, even in a charitable reading, imposes only incidental burdens on religious expression and is neutral and generally applicable, WLAD's

application to the Spa is subject to rational basis review and will be upheld "if it is rationally related to a legitimate government purpose." *Parents for Privacy*, 949 F.3d at 1238; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1137 (9th Cir. 2009). Rational basis review is "highly deferential" to the government. *United States v. Hancock*, 231 F.3d 557, 566 (9th Cir. 2000), *cert. denied*, *Hancock v. United States*, 121 S. Ct. 1641 (2001).

Our precedent squarely forecloses the Spa's claim that WLAD, as applied, fails rational basis review. As we held in *Parents for Privacy*, "eliminating discrimination on the basis of sex and transgender status" is a legitimate government purpose, and public accommodations laws like WLAD have been deemed "rationally related" to the elimination of discrimination. 949 F.3d at 1238; *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261–62 (1964) (public accommodations law rationally related to elimination of discrimination based on race). The HRC has met its burden to "establish[] on the record a rational basis" for its action under WLAD. *Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991), amended (May 8, 1992). And the Spa has not shown that the HRC's action is "arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 431, 446 (1985). We conclude that the enforcement action did not contravene the free exercise clause.

The Spa falls back on several cases which, it contends, show that even neutral and generally applicable laws can fail rational basis review. But those cases are unhelpful, as none involve the application of rational basis review to neutral and generally applicable laws challenged on the relevant grounds. The *Dale* case addresses the freedom of association, not expression. And both *Fulton* and *Masterpiece Cakeshop* involved laws that the Court held were either not neutral or not generally applicable and therefore cannot be invoked to guide our application of the rational basis test.

Finally, contrary to the Spa's arguments, the ministerial exception at issue in *Hosanna-Tabor* and *Our Lady of Guadalupe* has no applicability here. Courts have recognized a narrow exception, "grounded in the First Amendment, that precludes application of [antidiscrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *see Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 757 (2020) (extending the exception to teachers at private religious schools, or other employees of religious institutions who act as "teachers of religion"). But the Spa is not a religious institution, the complainant is not a minister or religious instructor, and the proprietor-customer relationship is not an employment relationship.

## IV.    Free Association

We turn to the Spa's final First Amendment claim: that the HRC's enforcement of WLAD interferes with both the intimate and expressive association between women at the Spa.

The Constitution protects the freedom of association as "a fundamental element of personal liberty" and "an indispensable means of preserving other individual liberties." *Jaycees*, 468 U.S. at 618. That right protects both "intimate association," that is, the "choices to enter into and maintain certain intimate human relationships," and "expressive association," which is "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 617–18. These are fundamental and important rights but none of them are implicated here.

To begin, the Spa is not an intimate association. The bottom line is that payment of the entrance fee is the price of admission. And any woman, except a transgender woman who has not yet received gender confirmation surgery affecting her genitalia, who can pay the fee can be admitted. Intimate associations are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. Business enterprises serving the general public typically lack these qualities. *Id.*; *see also Hishon v.*

23                                                          23-4031

*King & Spalding*, 467 U.S. 69, 78 (1984) (law firm); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (dance hall open to teenagers).

The Spa's customers and employees do not share "deep attachments and commitments." *Jaycees*, 468 U.S. at 620. Although the Spa might not be a "*large business enterprise*," it is nevertheless a business, open to all women except preoperative transgender women. *Id.* (emphasis added). Other than its exclusion of preoperative transgender women, the Spa exhibits no selectivity, let alone a "high degree of selectivity," in admission. *Id.* Patrons "are not members of any organized association; they are patrons of the same business establishment." *Stanglin*, 490 U.S. at 24. Like the dance hall in *Stanglin*, the Spa admits "all [women] who are willing to pay." *Id.* at 25.

The Spa offers no facts suggesting it is an intimate association. Although, as the Spa notes, in contrast with nonprofit membership corporation Jaycees' sizable national membership, the Spa is a local business with two locations, the Spa's comparatively smaller size and local presence does not convert it to an intimate association, particularly compared to intimate family, romantic, or roommate relationships that ordinarily constitute intimate associations. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 12 (1988) (noting that protection for private associations has previously been denied for associations with "as few as 20 members").

The Spa further argues that its entrance policy is selective because only women "willing to undergo certain traditional Korean services" while nude will visit the Spa. But this argument conflates self-selection, based on a customer's individual preference, with the "high degree of selectivity" required by *Jaycees*.

Finally, the Spa notes that women might feel physically vulnerable while at the Spa. Without a doubt, nude spas raise unique privacy concerns absent in most other public spaces, but nudity alone does not transform a public place of business into an intimate association. The Spa analogizes the relationship between spa patrons to the intimate roommate relationship, pointing to language in *Roommate.com* observing that "a girl may not want to walk around in her towel in front of a boy." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1221 (9th Cir. 2012). Although "modesty or security concerns," which could drive the selection of one's roommate, may also influence a patron's decision to visit the Spa, the similarities stop there. *Id.* The roommate relationship is "selective" and "implicates significant privacy and safety considerations" because the choice of roommate necessarily "intrudes into the home." *Id*. In contrast, patrons purchase commercial services at the Spa without regard to the identities of other patrons and do not themselves control admission to the Spa. Because "much of the activity central to the formation and maintenance of [the Spa] involves the participation of strangers," *Jaycees*, 468 U.S. at 621,

*Roommate.com* is inapposite. And to the extent the Spa seeks to invoke the privacy rights of its patrons, it has not made such a claim under the First Amendment or otherwise.

The Spa is also not an expressive association because the Spa and its patrons do not engage in expressive activity. The freedom of association includes "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at 647 (quoting *Jaycees*, 468 U.S. at 622). State actions burden the freedom of expressive association through intruding "into the internal structure or affairs of an association" by "[f]orcing a group to accept certain members," which "may impair the ability of the group to express those views, and only those views, that it intends to express." *Id.* at 648 (quoting *Jaycees*, 468 U.S. at 623). While expressive association does not protect only "advocacy groups," "a group must engage in some form of expression, whether it be public or private." *Id.*

The Spa's effort to transform the act of visiting a spa into the sharing of "ideals and beliefs" within an expressive association would stretch the freedom of association beyond all existing bounds. The Spa alleges its "mission is to restore and rejuvenate women's physical health as well as spiritual health," and that its services are more expressive than traditional commercial activities because the services "are very interactive and hands on as well as lengthy." That broad

description would turn virtually every commercial gym or massage establishment into an expressive association.

These facts do not establish the Spa as an expressive association. Like the dance hall in *Stanglin*, patrons of the spa "are not members of any organized association" to begin with; "they are patrons of the same business establishment." *Stanglin*, 490 U.S. at 24. And the act of giving or receiving a Korean massage hardly contains even a "kernel of expression," let alone a quantity "sufficient to bring the activity within the protection of the First Amendment." *Id.* at 25.

In contrast, in *Dale*, the Court concluded that the Boy Scouts engaged in expressive activity because it is "an association that seeks to transmit . . . a system of values." 520 U.S. at 650. The Court placed special emphasis on the Boy Scouts' mission statement, which offered a "positive moral code for living," and noted that the Boy Scouts "instill[ed] these values" "both expressly and by example." *Dale*, 530 U.S. at 649–50. Although the Spa does provide a mission statement—"to restore and rejuvenate women's physical health as well as spiritual health"—this statement bears at best a tenuous relationship to moral, political, or social beliefs. Significantly, the Boy Scouts offered consistent instruction and engagement with a stable membership, in "activities like camping, archery, and fishing" designed to "inculcate [youth members] with the Boy Scouts' values." *Id.* at 649–50. In contrast, the Spa's commercial services are not similarly designed to

"transmit . . . a system of values." *Id.* at 650. Rather, they offer a service for which patrons pay. Consequently, unlike the Boy Scouts, in the absence of a cognizable association, the Spa cannot prevail on its First Amendment freedom of association claim.

## Conclusion

The HRC's enforcement action against Olympus Spa was a straightforward application of Washington's statutory scheme—WLAD—which prohibits discrimination on the basis of gender expression or identity in places of public accommodation. As applied, the statute does not abridge the Spa's rights to free speech, free exercise, or free association. We affirm the district court's dismissal of the complaint.

**AFFIRMED.**

FILED

*Olympus Spa, et al. v. Armstrong, et al.*, No. 23-4031
LEE, Circuit Judge, dissenting:

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

Korean spas are not like spas at the Four Seasons or Ritz Carlton with their soothing ambient music and lavender aroma in private lounges. Steeped in centuries-old tradition, Korean spas require their patrons to be fully naked, as they sit in communal saunas and undergo deep-tissue scrubbing of their entire bodies in an open area filled with other unclothed patrons. Given this intimate environment, Korean spas separate patrons as well as employees by their sex.

The State of Washington, however, threatened prosecution against Olympus Spa, a female-only Korean spa, because it denied entry to a pre-operative transgender female—*i.e.*, a biological male who identifies as female but has not undergone sex-reassignment surgery. Now, under edict from the state, women—and even girls as young as 13 years old—must be nude alongside patrons with exposed male genitalia as they receive treatment. And female spa employees must provide full-body massages to naked pre-operative transgender women with intact male sexual organs.

This is not what Washington state law requires. While the Washington Law Against Discrimination (WLAD) forbids discrimination based on (among other things) sex and sexual orientation, its text and structure make clear that it does not cover transgender status. Washington has perversely distorted a law that was enacted

1

to safeguard women's rights to strip women of protections. The women and girls of Washington state deserve better.

Olympus Spa—an immigrant-founded business run by a Korean family—also deserves better. The Spa's owners pleaded with the Washington Human Rights Commission that they wanted to provide privacy to women and girls, some of whom had complained years ago about seeing a naked person with male genitalia there. They also begged the government not to force them to violate their Christian belief in modesty between men and women. Those pleas fell on deaf ears. One would think that the Washington Human Rights Commission would be sympathetic to the Spa's owners—members of a racial minority group who want to share their cultural heritage and provide a safe space for women and girls. Instead, it threatened prosecution for defying the state's contorted reading of its anti-discrimination law.

I respectfully dissent.

## BACKGROUND

### A. Olympus Spa provides traditional Korean spa services rooted in hundreds of years of tradition.

Korean spas provide services incorporating hundreds of years of Korean cultural tradition going back to the Choson dynasty (1392–1910). Traditional Korean spa therapy focuses on rejuvenating the body and mind through treatments, massages, and full-body scrubs in communal bathhouses and steam rooms called *jjimjilbang*.

2

Korean spas are uniquely intimate environments: Patrons must be nude in the communal bathhouse and sauna areas, and unlike other spas, patrons are not given robes or towels for covering up.  Patrons must also remain fully nude to receive traditional Korean spa services like *seshin*, a traditional Korean body scrub of the entire body.  After soaking in a warm pool, customers are scrubbed head-to-toe to promote holistic health and to exfoliate the skin.  *Seshin* is performed by *ddemiri*, individuals who are trained in the Korean art of body scrub using traditional techniques.  *Ddemiri* intimately touch patrons for prolonged periods as they scrub them all over their bodies.  And all of this occurs in a large communal area, where all the patrons must be naked.  Given the intimate nature, Korean spas not surprisingly separate male and female customers.

Olympus Spa is one such Korean spa in the state of Washington.  For two decades, this family-owned business has provided Korean spa treatments to people from all walks of life: Non-Koreans have flocked to Olympus Spa to learn and experience this Korean cultural tradition—an ode to America's melting pot culture. The president of the Spa, Sun Lee, is a first-generation Korean American.  Lee's parents opened the Spa after fleeing Korea to the United States in the hopes of a better life and greater religious freedom as Christians.  The family hoped to preserve Korean tradition and culture—and to share their heritage with the larger community.

3

Today, Olympus Spa provides an intimate space for females to enjoy the benefits of Korean spa treatments. Women of all ages, including girls as young as 13 years old, visit the Spa for traditional services like *seshin* and to enjoy the steam rooms.

The Spa limits entry to biological women and post-operative transgender women (*i.e.*, people who were born biological males but underwent sex-reassignment operations). The Spa will treat biological women and post-operative transgender women of any sexual orientation, race, religion, or any other protected status. To put it plainly, Olympus Spa—a female-only spa—provides services to anyone without male genitalia.

As Sun Lee explained, the Spa's entry policy creates an intimate, safe, and private *jjimjilbang* for women to receive traditional Korean spa services. Because Korean tradition mandates sex-segregated facilities, the Spa considers this policy necessary to remain true to its cultural heritage. And given that the Spa provides services to girls as young as thirteen, Sun Lee believes the Spa has a responsibility to safeguard the privacy of those minors.

The entry policy also reflects the owners' religious beliefs. Describing themselves as "traditional theologically conservative Korean Christians," they consider modesty between males and females as a central tenet. They also believe

4

that it would violate their faith to compel their female employees to give full-body massages to individuals with exposed male genitalia.

The Spa has maintained its entry policy for over twenty years without complaint. But when one person complained about the policy in early 2020, the government pounced.

### B.    The state finds that Olympus Spa's entry policy violates WLAD.

In late 2020, Olympus Spa received a notice from the Washington State Human Rights Commission explaining that someone had filed a complaint against the Spa for violating Section 49.60 of WLAD. A pre-operative transgender woman claimed to have been denied entry into Olympus Spa in January 2020.

The Washington State Human Rights Commission warned Olympus Spa that it was investigating a discrimination claim and demanded a response in writing. Sun Lee wrote a letter, explaining that Korean *jjimjilbangs* require nudity and that, as a female-only spa, it aims to ensure the safety and privacy of its customers. Sun Lee also explained that the Spa allows post-operative transgender women to enjoy its services.

A Civil Rights Investigator from the Washington Human Rights Commission wrote back, accusing Olympus Spa of violating Washington's anti-discrimination law because "cisgender women are allowed to be fully nude in the spa while transgender women who have not had surgery are prohibited from even entering the

5

spa." The Civil Rights Investigator then pressured Olympus Spa to settle within ten days—or else she would prepare the case "for referral to the Attorney General's Office for prosecution."

Sun Lee responded, stating the Spa has no record of the complainant ever visiting the Spa. Sun Lee asked the Commission for more information so that the Spa may "ensur[e] that no person, especially [the complainant], feels discriminated against," and emphasized that the Spa has "had many guests who identify differently over the years and have never had an issue."

The Commission's Civil Rights Investigator refused to provide any further information, declaring that the "time to ensure that [the complainant] does not feel discriminated against has passed." She expressed little interest in discovering whether the complainant ever visited the Spa. She again threatened prosecution, warning that if the Spa did not acquiesce, then she would "proceed accordingly by preparing the case for referral to the Attorney General's Office for prosecution."

Given the state's unyielding position and threat of prosecution, Sun Lee said that the Spa would like to settle the matter, even though "we have told you that we have never had [the complainant] on the premises, nor denied entry." The Spa's owners agreed to change their entry policy and undergo training in exchange for not being prosecuted. The settlement agreement preserved the Spa's right to challenge the constitutionality of WLAD as applied here, and Olympus Spa ultimately sued.

6

The Spa fears that it will have to close its doors if it must permanently change its entry policy. Its employees and customers have made it clear that they will not return if naked individuals with male genitalia use the female-only spa.

### C. Olympus Spa challenges the state's enforcement of WLAD in court.

Olympus Spa sued the state. Among other claims, the Spa alleged that the state's enforcement of WLAD violates its rights under the First Amendment—the right to free exercise, free speech, and free association. The district court granted the state's motion to dismiss, determining that the state's enforcement of WLAD against Olympus Spa's entry policy did not violate the First Amendment. This appeal followed.

### DISCUSSION

### A. Washington's anti-discrimination statute does not cover transgender status.

Washington state contends that Olympus Spa's entry policy violates WLAD's prohibition against discrimination based on "gender expression or identity."

But that is not what WLAD says.[1] WLAD states that Washington's citizens have the "right to be free from discrimination because of race, creed, color, national

---

[1] The majority opinion states that the dissent is "conjur[ing a statutory interpretation] argument that is not, in fact, before the court." **Maj. Op. 9.** But the Supreme Court has held that courts can address a threshold statutory interpretation question because "to determine whether a statute is constitutional fairly includes the question of what that statute says." *Rumsfeld v. Forum for Acad. and Institutional Rts., Inc.*, 547 U.S.

origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability." WASH. REV. CODE § 49.60.030(1). Nowhere in that statutory provision does it mention "gender expression or identity" as a protected class.

The state plucks the term "gender expression or identity" out of context from the statutory definition of "sexual orientation" and claims that it is a standalone status protected under the law. *See* WASH. REV. CODE § 49.60.040(29). But as explained below, gender identity is protected only if it serves as a proxy for sexual orientation. Simply put, transgender status is different from sexual orientation—and WLAD protects only the latter, not the former.

The state's contorted reading of WLAD violates basic canons of statutory construction. "Context matters." *Wright v. Jeckle*, 144 P.3d 301, 304 (Wash. 2006) (citation omitted). It is a "fundamental canon of statutory construction" that courts must construe the words of a statute "in their context and with a view to their place

---

47, 56 (2006) (rejecting the government's argument that the statutory "question is not before the Court because it was neither included in the questions presented nor raised by FAIR."). Indeed, by addressing the statutory question, we can avoid thorny constitutional issues. *See Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.") (citation omitted). And because I believe that WLAD does not apply here, I would not consider the Spa's constitutional challenges to WLAD.

in the overall statutory scheme." *West Virginia v. Env't Prot. Agency,* 597 U.S. 697, 721 (2022) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). This well-known principle—known as the "whole-text canon"—"calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167 (2012). We must follow this mandate to read statutory provisions in context. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (reversing this court's interpretation of a statutory provision for failing to read it in the "context of the statute as a whole"); *see also Nissen v. Pierce Cnty.*, 357 P.3d 45, 52 (Wash. 2015) ("We cannot interpret statutory terms oblivious to the context in which they are used.").

We thus must read "gender expression or identity" in context as part of the definition of "sexual orientation." In 2006, the Washington legislature added "sexual orientation" to WLAD as a protected class. S.H.B. No. 2661, 59th Leg., Reg. Sess. (Wash. 2006). From then on, Washington forbade discrimination on the basis of "race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or . . . disability." WASH. REV. CODE § 49.60.030(1). The legislature, however, did not include "gender expression or identity" as an independently protected class. The legislature also chose not to include "gender expression or identity" within the definition of

9

"sex." "Sex" remained defined as "gender." *Id.* § 49.60.040(28). Rather, the legislature included "gender expression or identity" only in the definition of "sexual orientation." *Id.* § 49.60.040(29).

So why include "gender expression or identity" in the definition of "sexual orientation"? It guards against discrimination where gender identity serves as a proxy for sexual orientation. For instance, suppose a transgender woman (*i.e.*, a biological male who identifies as a female) is in a relationship with a biological male. An employer who harbors anti-gay views fires the transgender woman but claims that he did not discriminate based on sexual orientation because the transgender woman is in a relationship with a man. By including "gender expression and identity" in the definition of sexual orientation, the law tells businesses that such gamesmanship will not fly. It, however, does not create a separate and standalone protected class for gender identity or transgender status.

We simply cannot take words out of a definition to expand the statutory scope of anti-discrimination law. Consider the following example. Title VII of the Civil Rights Act prohibits employers from discriminating based on "national origin," 42 U.S.C. § 2000e-2(a)(1), and courts have interpreted discrimination based on "national origin" to include discrimination based on a person's accent. *See, e.g.*, *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1192–95 (9th Cir. 2003). For instance, an employer may have discriminated on the basis of national

10

origin if he refuses to hire someone because she has a Lebanese accent. *See id.* at 1195. In other words, an accent can serve as a proxy for national origin. But Title VII does not prohibit discrimination based on an accent independent of national origin. So it would likely not cover a national origin discrimination claim by an American-born Lebanese woman based on her Midwest twang because that accent has nothing to do with her national origin. Similarly here, WLAD does not protect individuals from discrimination based on gender identity when it does not implicate sexual orientation. And this case has nothing to do with sexual orientation.

The majority opinion ignores this statutory structure and context, and instead claims that the "plain meaning" of the statute bars discrimination based on "gender expression or identity" simply because those words appear somewhere in the text. **Maj. Op. at 8.** Instead of considering what "gender identity" means within the bounds of sexual orientation, the majority opinion does the opposite and concludes that the state adopted an "expansive" definition that treats gender identity as "one form of sexual orientation." **Maj. Op. 10.**

But such a reading defies common sense, statutory rules of construction, and the state's own reading of the statute. First, common sense: Someone's gender identity is different from his or her sexual orientation. A transgender woman has transgender status regardless of whether she is attracted to men or women. And the facts here further underscore that gender identity is not a form of sexual orientation:

11

The Spa admits lesbians and bisexuals, and only bars entry to people with male genitalia to protect the privacy of women and girls.

Our rules of statutory construction also undermine the majority opinion's reading. The Associated-Words Canon—*noscitur a sociis*—states that a series of words "associated in a context suggest[] that the words have something in common" and thus "bear on one another's meaning." Scalia & Garner, *supra* at 195. Here, sexual orientation is defined as "heterosexuality, homosexuality, bisexuality, and gender expression or identity." WASH. REV. CODE § 49.60.040(29). Thus, we should read "gender expression or identity" in context of the other three terms—*i.e.*, the statute bars discrimination based on gender identity when it is a proxy for sexual orientation, not as a standalone category divorced from sexual orientation.

Finally, the Washington Human Rights Commission itself treats "gender identity" as a standalone status, not as a form of sexual orientation. For example, one of its regulations states that "[h]arassment based on an individual's sexual orientation or gender expression or gender identity is prohibited." WASH. ADMIN. CODE § 162-32-040(1). If the Commission agreed with the majority's reading, there would be no need to reference gender identity separately because it would already be included in the definition of sexual orientation.[2]

---

[2] The Washington Human Rights Commission, of course, does not have authority to issue regulations that conflict with the authorizing statute. *See Washington Water*

In sum, "statutory provisions should not be read in isolation, and the meaning of a statutory provision must be consistent with the structure of the statute of which it is a part." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 731 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015). And in our case, that means "gender identity" cannot be exported out of its place in the statutory structure to establish a new standalone protected class.

### B. Olympus Spa does not discriminate on the basis of sexual orientation.

WLAD prevents businesses from discriminating based on, among other things, sexual orientation. But there is no whiff of discrimination based on sexual orientation by Olympus Spa. The Spa allows lesbians, heterosexuals, and bisexuals. And it allows post-operative transgender women to visit the Spa regardless of their sexual orientation. The Spa's entry policy focuses not on sexual orientation but on whether an individual has male genitalia.

Neither the state nor the complainant has alleged that the Spa's policy discriminates against patrons based on their sexual orientation. Rather, the state took issue only with Olympus Spa excluding pre-operative transgender women from a

---

*Power Co. v. Washington State Hum. Rights Comm'n*, 586 P.2d 1149, 1152 (Wash. 1978).

women's spa.  In short, Olympus Spa's entry policy does not discriminate based on sexual orientation and thus does not run afoul of WLAD.

### C. The Supreme Court's decision in *Bostock v. Clayton County* does not bear on this case.

Some may be thinking about the elephant in the room—what about the Supreme Court's decision in *Bostock v. Clayton County*?  590 U.S. 644, 683 (2020). Relying on a literalist textual reading of the statute, the Court held that discrimination on the basis of sexual orientation or transgender status must logically be discrimination based on "sex" under Title VII.  *See id.*

But *Bostock* has no relevance here.  Unlike WLAD, Title VII does not define "sex."  *Bostock*, 590 U.S. at 655.  Nor does it include "sexual orientation" or "gender expression or identity" anywhere in its text.  *Id.* at 670.  Because Congress did not include any definitions, the Court interpreted sex discrimination broadly to include transgender status based on a logical syllogism that the undefined term "sex" must implicate sexual orientation and gender identity.  *Id.* at 680.

Here, on the other hand, we are not left in the dark on how to interpret the term "sex" or to guess if the statute covers sexual orientation or gender identity.  The state legislature has already given us the answers.  WLAD explicitly prohibits discrimination based on "sexual orientation" and defines "sex" and "sexual orientation" differently.  WASH. REV. CODE §§ 49.60.030(1), 49.60.040(28)–(29). WLAD also expressly includes "gender expression or identity" under the definition

14

of "sexual orientation" (but not under "sex"), confirming that "gender identity" is distinct from "sex." *Bostock*'s reasoning thus has no application to WLAD's intricate statutory structure and express definitions. Not to mention that to read "sex" under WLAD to include sexual orientation or gender identity would render the 2006 amendment adding "sexual orientation" entirely superfluous. *See Whatcom Cnty. v. City of Bellingham*, 909 P.2d 1303, 1308 (Wash. 1996) ("Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.") (citation omitted).

It is no surprise that the Court in *Bostock* emphasized that its decision did not extend to any state anti-discrimination laws. 590 U.S. at 681 ("The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination . . . [b]ut none of these other laws are before us[,] . . . and we do not prejudge any such question today.").

* * * *

Washington is not just legally wrong in misconstruing its anti-discrimination law. It is also wrong in how it overzealously pursued its case against the interests of protected class members—the women and girls of the state, and the Korean owners of Olympus Spa, an immigrant-founded small business.

In 1973, the state amended WLAD to include "sex" as a forbidden basis for discriminatory treatment. H.B. No. 404, 43rd Leg., Reg. Sess. (Wash. 1973). Over

15

the years, the Washington Supreme Court construed the statute broadly to protect women and girls. *See, e.g.*, *MacLean v. First Northwest Indus.*, 635 P.2d 683, 684–86 (Wash. 1981) (holding that "ladies' night" with half-price tickets for women at an NBA game was a lawful way to increase attendance of female fans). Our court, too, has recognized that our laws provide privacy for females: For example, we noted that in shared "bathrooms and common areas, a girl may not want to walk around in her towel in front of a boy." *Fair Hous. Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216, 1221 (9th Cir. 2012).

But Washington has now rolled back the clock in protecting women and girls by bizarrely citing the very law that safeguarded their rights for decades. Now, women and girls as young as 13 years old must lay naked alongside individuals with exposed male genitalia as they receive treatment at Korean spas. And for the female employees at the Spa, they must provide full-body deep-tissue massage to naked persons with intact male sexual organs—or else lose their livelihood.

The state also unjustly hounded Olympus Spa's Korean owners. The Washington Human Rights Commission threatened them with prosecution on questionable legal grounds. As the owners explained, they wanted to share their ethnic heritage to the larger community, but they also felt obligated to ensure privacy for their female patrons and employees. That did not matter to the Commission.

16

Nor did the Commission care about the owners' fear of losing clients and ultimately their small business that they had worked so hard to build.

The Washington Human Rights Commission threatened prosecution against a protected class—racial minority members who want to share their cultural traditions—to favor a group that is not even a protected class under the statute. To be clear, transgender persons, like all people, deserve to be treated with respect and dignity. But showing respect does not mean the government can distort the law and impose its will on the people the law was intended to protect.

Ultimately, this case is not just about the fate of a family-owned business. It is about power—which groups have it and which do not. And Asian Americans in Washington have historically lacked political clout. Washington barred Chinese people from voting as soon as it became a territory in 1853.[3] Other restrictions (such as preventing them from testifying against whites) followed.[4] Even in the post-civil rights era, the University of Washington has faced repeated allegations of discrimination against Asian Americans.[5] And the Washington Human Rights

---

[3] *See* Matthew W. Klingle, Ctr. for the Study of the Pac. Nw., Univ. of Washington Dep't of Hist., *A History Bursting with Telling: Asian Americans in Washington State* 5, https://content.lib.washington.edu/curriculumpackets/A_History_Bursting_With_Telling.pdf (last visited May 7, 2025).

[4] *See id.*

[5] *See, e.g.*, Hannah Fry, *Rejected by 16 colleges, hired by Google. Now he's suing some of the schools for anti-Asian discrimination*, L.A. Times, Apr. 4, 2025

Commission's bullheaded investigation of Olympus Spa makes plain who has political power (and who does not) today.[6]

Make no mistake about it: the Washington Human Rights Commission has wielded its power to advance its own political agenda. The homepage of its website includes statements about national politics that have little to do with the Commission's duties under state law: It declares that "President Trump is misleading the American people on diversity, equity, and inclusion and accessibility initiatives."[7] The agency then links to a press release from a group of politicians

---

(detailing how Stanley Zhong—who "had a 4.42 grade-point average, a nearly perfect SAT score, had bested adults in competitive coding competitions and started his own electronic signing service all while still in high school"—was rejected by, among others, University of Washington); Heath Foster and Ruth Schubert, *Two UW law school applicants, two paths: one got in, one didn't*, Seattle Post-Intelligencer, Oct. 15, 1998 (noting disparity in LSAT scores).

[6] Not only did the state contort its reading of the statute, it flipped-flopped and took inconsistent positions in pursuing its case against the Spa's owners. While the state thought Olympus Spa's entry policy was serious enough to merit potential prosecution, it then argued to the district court that the Spa lacked standing because it faced no credible threat of state prosecution. In an about-face, the state argued that the Spa faces no credible threat of enforcement because it is unlikely that a pre-operative transgender woman will visit the Spa in the future. The state emphasized that there had been "only one instance of a transgender woman, who has not had gender-affirming surgery, who [ ] attempted to access the spa's services in over 20 years of the spa's existence." The state even oddly invoked Olympus Spa's contention that the complainant never visited the Spa to show that enforcement is unlikely. Intellectual consistency was no bar for the state in its campaign against the Spa.

[7] Washington State Human Rights Commission Home Page, https://www.hum. wa.gov/ (last visited on May 7, 2025).

attacking "President Trump's executive orders" as "unnecessary and disingenuous" and condemning him for "baseless and offensive claims."[8]  All this political palaver—from an agency tasked with impartially investigating and neutrally enforcing the state's anti-discrimination laws on behalf of all Washington citizens. It is no wonder then that the Washington Human Rights Commission exerted the full force of state power to bully members of a politically weak minority group.

      I respectfully dissent.

---

[8] *Joint statement from 13 state attorneys general: President Trump is misleading the American people on diversity, equity, and inclusion and accessibility initiatives*, Washington State Attorney General (Jan. 31, 2025), https://www.atg.wa.gov/news/news-releases/joint-statement-13-state-attorneys-general-president-trump-misleading-american (last visited on May 7, 2025).



FILED

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Olympus Spa, et al. v. Armstrong, et al.*, No. 23-4031

McKEOWN, Senior Circuit Judge, joined by MURGUIA, Chief Judge, HAWKINS, S.R. THOMAS, GRABER, FLETCHER, PAEZ, BERZON, CLIFTON, BYBEE, and HURWITZ, Senior Circuit Judges, WARDLAW, GOULD, RAWLINSON, M. SMITH, CHRISTEN, NGUYEN, FRIEDLAND, MILLER, KOH, SUNG, SANCHEZ, H.A. THOMAS, MENDOZA, DESAI, JOHNSTONE, and DE ALBA, Circuit Judges, respecting the denial of rehearing en banc:

The American legal system has long been regarded as a place to resolve disputes in a dignified and civil manner or, as Justice O'Connor put it, to "disagree without being disagreeable."[1] It is not a place for vulgar barroom talk. Nor is it a place to suggest that fellow judges have "collectively lost their minds," or that they are "woke judges[]" "complicit" in a scheme to harm ordinary Americans. That language makes us sound like juveniles, not judges, and it undermines public trust in the courts. The lead dissent's use of such coarse language and invective may make for publicity or entertainment value, but it has no place in a judicial opinion. The lead dissent ignores ordinary principles of dignity and civility and demeans this court. Neither the parties nor the panel dissent found it necessary to invoke such crude and vitriolic language. Decorum and collegiality demand more.

---

[1] Justice Sandra Day O'Connor, Speech to the American Bar Association (Dec. 12, 1993).



FILED

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Olympus Spa, et al. v. Armstrong, et al.*, No. 23-4031

McKEOWN, Senior Circuit Judge, joined by HAWKINS, FLETCHER, and PAEZ, Senior Circuit Judges, GOULD, M. SMITH, and DE ALBA, Circuit Judges, respecting the denial of rehearing en banc:

The lead dissent's crass language serves, at most, to distract from what this case is about. As the majority opinion explained, this is a case about the application of Washington's "entirely unexceptional" public accommodations law, the Washington Law Against Discrimination ("WLAD"). *303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 & n.2 (2023) (citing Wash. Rev. Code § 49.60.215). That law prohibits discrimination on the basis of "sexual orientation," which Washington law defines to include gender identity. Wash. Rev. Code § 49.60.040(29). The Washington legislature, not the panel, set out this controlling definition.[1] The majority simply held that the WLAD applied to Olympus Spa, a commercial establishment, when it purported to deny admission to certain transgender women, and that the WLAD survived the rational basis scrutiny applicable to such laws under the First Amendment.

Here's what this case is not about:

- COVID gathering restrictions. *See Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam).

---

[1] The dissents cannot simply wish away this definition and substitute their preferred judicial gloss on the unambiguous statute. Importantly, the Spa did not contest for purposes of this litigation that this definition applied.

1

- Exemptions that the Spa never claimed, related to private clubs and religious institutions. *See* Wash. Rev. Code § 49.60.040(2).

- An Establishment Clause theory that the Spa never presented. *See Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025).

It is certainly not a case involving "[w]oke regulators" and "complicit judges" out to harm "women and young girls," or in the words of the second dissent, a ruling that places the "public peace" at risk. Those assertions describe a case entirely different from the one presented to the panel.

When it comes to the thankfully more appropriate arguments about why the panel should have applied strict scrutiny to the WLAD under the Free Exercise clause, my colleagues are no closer to the mark.

Start with the basics. The WLAD prohibits various types of discrimination in places of public accommodation, including discrimination based on sexual orientation. Wash. Rev. Code § 49.60.030(1)(b). Like all such laws, the WLAD is limited to "place[s] of *public* resort, accommodation, assemblage, or amusement." *Id*. § 49.60.040(2) (emphasis added). The WLAD therefore exempts any "bona fide club, or place of accommodation, which is by its nature distinctly private." *Id*. The law also exempts certain facilities tied to "bona fide religious or sectarian institution[s]," like cemeteries. *Id*. These carve outs for private clubs and religious institutions are very common in public accommodations laws.

2

Under the Free Exercise Clause, the Spa must demonstrate that the challenged Washington law lacks general applicability for strict scrutiny to apply. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). There are "two ways" to do so, *Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022): The Spa can show that the law contains a "formal mechanism" for "discretionary" and "individualized exemptions" or that the law does not treat comparable religious and secular conduct alike. *Id.* at 1088 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)).

The Spa failed to carry its burden in this case. The WLAD does not permit individualized exemptions, formal or otherwise. And the exemptions the law does contain, like the one for "bona fide private clubs," are categorical and mandatory, meaning they do not invite the government to "pass[] judgment upon" an entity's "religious beliefs," *see Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018).

Nor does the law distinguish between secular and religious activity. Under the WLAD's general anti-discrimination mandate, a spa with a religious motivation for discrimination and a spa with a secular motivation for discrimination are treated exactly alike. Wash. Rev. Code § 49.60.030(1)(b). The private club exemption is likewise available across the board. And the Spa presented no evidence that those provisions—which are general on their face—create "religious

gerrymanders" in practice. *See Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring).

The dissenters nevertheless complain that this commercial Spa could be treated differently than a spa that claims the private club exemption. They argue that this case is analogous to *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam), where a California COVID restriction unlawfully treated at-home religious gatherings less favorably than "comparable secular" gatherings at "salons," "stores," and "restaurants." *Id*. at 63.

But they overlook precedent establishing that the government interests in regulating the two entities are distinct, meaning they are not comparable in the *Tandon* sense. The Supreme Court has long recognized that the antidiscrimination interest in regulating businesses like the Spa stems from the "unique evils" that can only accompany the "denials of equal access to *public* establishments" and the related "deprivation of personal dignity." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625, 628 (1984) (emphasis added) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964)); *accord 303 Creative LLC*, 600 U.S. at 590.[2]

---

[2] Washington asserted that precise interest in this case. In an effort to make the WLAD seem underinclusive, the dissenters cherrypick a portion of the statute to make the interest sound broader. *See* Wash. Rev. Code § 49.60.010. But the WLAD clarifies that the relevant "right" is a "right to the full enjoyment of . . . any place of *public* resort, accommodation, assemblage, or amusement." Wash. Rev. Code § 49.60.030(1)(b) (emphasis added).

That does not negate other types of antidiscrimination interests. Yet it must follow that Washington lacks a *comparable* interest in regulating clubs that were never public to begin with.

The government may even have a countervailing interest *in exempting* private clubs to the extent their membership decisions are central to expressive activity. *E.g.*, *Jaycees*, 468 U.S. at 623; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 581 (1995); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657 (2000) (noting the "potential for conflict" between "public accommodation" laws and "the First Amendment rights" of "membership organizations"). The private club exemption thus reflects the "necessary," "appropriate," and "practical" distinction "between genuinely public and private accommodations" that the First Amendment requires. *Heart of Atlanta Motel*, 379 U.S. at 293 (Douglas, J., concurring). That distinction was entirely absent in *Tandon*, and it is dispositive.

These omissions in the dissenters' analysis belie a much deeper tension with history and precedent. By definition, all public accommodations laws distinguish between *public* businesses and *private* organizations closed to the public. That is, they contain the same distinction the dissenters complain of. Yet the Supreme Court has twice stated that public accommodations statutes, including the WLAD, are "entirely 'unexceptional'" and do not "implicate the First Amendment" as a

5

general matter. *303 Creative*, 600 U.S. at 591–92 & n.2 (quoting *Masterpiece Cakeshop*, 584 U.S. at 632) (citing examples including the WLAD).[3] And the Court has situated those laws in a "venerable history" dating back at least 300 years. *Hurley*, 515 U.S. at 571 (citing *Lane v. Cotton,* 88 Eng. Rep. 1458, 1464–1465 (K.B. 1701) (Holt, C.J.)). It beggars belief that the Court would make such statements if every public accommodations law was facially flawed as the dissenters imply.

Indeed, if distinguishing between public and private accommodations deprives a law of general applicability, then not just every public accommodations law, but every *antidiscrimination* law from Title VII to the ADA would face strict scrutiny when a business justifies discrimination on religious grounds. 42 U.S.C. §§ 2000a(e), 12187 (Title VII and ADA exemptions for private clubs). The dissenters do not bother to defend that radical result, and their statements are glaringly devoid of authority to support it.

---

[3] Many of the statutes the Supreme Court cited alongside this statement contain special provisions for "private clubs." *See, e.g.*, Mich. Comp. Laws Ann. § 37.2302a; Me. Rev. Stat. Ann. tit. 5, §§ 4592(1)(B), (C) (exemption for certain "private entit[ies]"); Nev. Rev. Stat. Ann. § 651.060 (exemption for "any private club . . . or other establishment not in fact open to the public"); Va. Code Ann. § 2.2-3904 (exemption for "a private club" or "religious corporation" "not in fact open to the public"); Wis. Stat. Ann. § 106.52(e)(2) (exemption for "bona fide private, nonprofit organization or institution").

6

Separately, the dissents point to other provisions of the WLAD that exempt "bona fide religious or sectarian institution[s]" when operating certain facilities, and argue that they render the WLAD non-neutral. *See* Wash. Rev. Code § 49.60.040(2)). What they omit, however, is that no party mentioned those provisions at *any* stage of this case, and it would have violated party presentation principles for the panel to address them. *See Clark v. Sweeney*, 607 U.S. 7, 8 (2025). The lead dissent's resort to an orthogonal Establishment Clause precedent issued days *after* the majority opinion only underscores the Spa's failure to present any such theory here. *See Catholic Charities*, 605 U.S. at 241–42.

I do not address the religious-institution provision at length, as we lack both a record and briefing. But I observe that in a future case, Washington will have several compelling arguments at its disposal: This court has twice held that similar provisions reinforce a law's neutrality, *Tingley*, 47 F.4th at 1085; *Welch v. Brown*, 834 F.3d 1041, 1045 (9th Cir. 2016); those provisions may well be required to "protect the principle of church autonomy," *McMahon v. World Vision Inc.*, 147 F.4th 959, 970 (9th Cir. 2025); and, much like the private club exemption, exemptions for "entities controlled by religious organizations" are common features of antidiscrimination statutes that have existed for decades without courts batting an eye. *E.g.*, 42 U.S.C. § 12187.

7

\*     \*     \*

Our court's practice of entertaining spirited dissents from denials of rehearing en banc has its virtues. Such statements allow members of the court to present considered views on the legal issues before us. And they may deepen the understanding of those issues by the courts, the litigants, and the public.

But the statements here exhibit some of the downsides. They are not subject to the deliberative process that ordinarily ferrets out specious legal arguments. They are not held to the strictures of party presentation and may extend to arguments that were either forfeited or never discussed at all. And in the unfortunate case of the lead dissent, they may serve to air personal grievances entirely unbecoming of members of this court.

In view of Supreme Court and circuit precedent, the active judges of this court appropriately declined to reconsider this decision en banc.



FILED

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

OWENS, Circuit Judge, joined by FORREST, Circuit Judge, respecting the denial
of rehearing en banc:

Regarding the dissenting opinion of Judge VanDyke: We are better than this.

FILED

MAR 12 2026

*Olympus Spa, et al. v. Armstrong, et al.*, No. 23-4031

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

VANDYKE, Circuit Judge, dissenting from the denial of rehearing en banc:

This is a case about swinging dicks. The Christian owners of Olympus Spa— a traditional Korean, women-only, nude spa—understandably don't want them in their spa. Their female employees and female clients don't want them in their spa either. But Washington State insists on them. And now so does the Ninth Circuit.

You may think that swinging dicks shouldn't appear in a judicial opinion. You're not wrong. But as much as you might understandably be shocked and displeased to merely encounter that phrase in this opinion, I hope we all can agree that it is far more jarring for the unsuspecting and exposed women at Olympus Spa— some as young as thirteen—to be visually assaulted by the real thing.

Sometimes, it feels like the supposed adults in the room have collectively lost their minds. Woke regulators and complicit judges seem entirely willing, even eager, to ignore the consequences that their Frankenstein social experiments impose on real women and young girls. Yet if harmful and unfortunate consequences were all this case was about, we'd have to shrug and say: "That's what comes with living in a democracy." Unless the Constitution is implicated, we get what we voted for "good and hard."[1]

---

[1] H.L. MENCKEN, A LITTLE BOOK IN C MAJOR 19 (John Lane Co., 1916) ("Democracy is the theory that the common people know what they want, and deserve to get it good and hard.").

1

But some fundamental rights, like the right to the free exercise of religion, are constitutionally protected precisely to avoid majoritarian infringement. Unfortunately, in this case the panel majority has allowed Washington State bureaucrats to trample on such rights long secured by the Constitution. The Washington State legislature enacted the Washington Law Against Discrimination ("WLAD") to eliminate "discrimination against any of [the state's] inhabitants." Wash. Rev. Code § 49.60.010. To achieve this end, WLAD prohibits discrimination based on a long list of protected characteristics, including "sexual orientation." The statute defines "sexual orientation" to include a person's "gender expression or identity." *Id.* § 49.60.040(29).

In 2020, a man attempted to use WLAD's antidiscrimination mandate to gain access to Olympus Spa, the state's only traditional Korean, women-only, nude spa. Olympus Spa is owned and operated by a family of theologically conservative Christians who hold religious convictions that men and women should not be present together while unclothed unless married to one another. Based on these convictions, Olympus Spa denied the man entrance into its women-only, nude space. The man filed a complaint with state officials, who initiated enforcement proceedings and threatened Olympus Spa with prosecution. When Olympus Spa filed a complaint in federal court challenging WLAD on Free Exercise grounds, the district court ruled that the statute was neutral and generally applicable and dismissed the spa's suit. On

2

appeal, a split panel of our court affirmed the district court on the theory that WLAD did not mention religion or grant preferential treatment to comparable secular conduct, and held that the statute's application here survives rational basis review.

But the panel majority's decision mischaracterized WLAD's text and failed to apply controlling Free Exercise case law. WLAD is *not* a categorical ban on discrimination in Washington State. Instead, as relevant to this case, the text of WLAD carves out two groups for preferential treatment. First, WLAD grants an exemption to similarly situated private organizations. Second, WLAD grants an exemption to a narrow category of religious activities—an exemption only available to religions that practice their faith by teaching, worshiping, or performing last rites.

WLAD's exemption of private clubs grants preferable treatment to secular activities that pose a comparable threat to the government interest underlying the statute. As a result, WLAD is not generally applicable, and we should have subjected WLAD's application in this case to strict scrutiny, a standard it cannot survive. And as the intervening publication of *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), has made clear, WLAD is also not neutral because it facially distinguishes between religious activities based on religious practitioners' theological choices.

The panel majority inappropriately attempted to characterize this case as a straightforward application of *Employment Division, Department of Human*

*Resources of Oregon v. Smith*, 494 U.S. 872 (1990).  That result is an affront to the Olympus Spa owners' Free Exercise rights—one that is amplified by more general harms.  Indeed, Washington has applied WLAD's redefinition of sexual classifications in a perverse way that actually undermines legal protections granted to women.  Moreover, that redefinition generates an irreconcilable conflict with Washington's criminal laws against voyeurism and indecent exposure.

The Supreme Court's recent Free Exercise jurisprudence controls this case.  An optimist might expect that to have had some effect on the outcome of this dispute and our court's en banc vote.  But even where the Supreme Court has defined a clear rule protecting disfavored constitutional rights, never underestimate woke judges' willingness to sacrifice those rights on the altar of "social progress."

## I.

Olympus Spa is a traditional Korean, women-only, nude spa that is owned and operated by a family of theologically conservative Christians in Washington State.[2] Olympus Spa has operated in Washington for more than twenty years and is the only Korean spa in the state.  For centuries, traditional Korean spas have provided treatment to women in female-only spaces.  Full nudity is central to the tradition, and every woman is required to be completely nude when using Olympus Spa.

---

[2] Because this case was decided at the motion to dismiss stage, unless otherwise stated the quotations and facts recounted herein are taken from the plaintiffs' pleadings and the record in this case.

While nude, women collect in a common steam room, soak in a common pool, and are given body scrubs in the open by female employees. Girls as young as thirteen attend the spa with their mothers, participating together in this traditional cultural practice.

Consistent with this tradition and its owners' religious convictions, Olympus Spa "is designed specifically for women and [its] mission is to restore and rejuvenate women's physical health as well as spiritual health." The owners and employees of Olympus Spa hold conventional religious beliefs that men and women should not be present together while unclothed unless married to one another. Recognizing that "[w]omen are in a vulnerable position when they are unclothed," the owners of Olympus Spa consider themselves theologically compelled to maintain the spa as a female-only space where women "feel their privacy and rights are respected." Thus, the religious owners, their employees, and the patrons of Olympus Spa must maintain a female-only space to participate in the traditional practices of Korean spas in compliance with their sincerely held religious convictions.

In 2006, Washington's legislature amended WLAD to prohibit discrimination based on "sexual orientation." Wash. Rev. Code § 49.60.010. WLAD is a wide-

reaching statute aimed at eliminating "discrimination against any of [Washington's] inhabitants."[3]  *Id.*  WLAD defines "sexual orientation" to mean:

> heterosexuality, homosexuality, bisexuality, and gender expression or identity.  As used in this definition, "gender expression or identity" means having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth.

*Id.* § 49.60.040(29).  WLAD created a state agency, the Washington State Human Rights Commission ("HRC"), to enforce the statute's anti-discrimination mandate "in credit and insurance transactions, in places of public resort, accommodation, or amusement, and in real property transactions."  *Id.* §§ 49.60.010, 49.60.050.  The statute's definition of "place[s] of public resort, accommodation, assemblage, or amusement" encompasses almost every establishment in the state.  *Id.* § 49.60.040(2).  But notably, two categories of institutions are carved out from WLAD's scope.  First, "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private," is exempted from WLAD's requirements.  *Id.*  Second, "any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution" is also exempted.  *Id.*

---

[3] The panel majority agreed that WLAD's "stated purpose … is to prevent discrimination and enable individuals to seek recourse for discriminatory treatment." Amended Op. 18.

In the spring of 2020, Olympus Spa became the target of one man's campaign to compel the admission of men into the state's only traditional Korean, women-only, nude spa. *See* Brief of Women's Declaration International USA as Amicus Curiae in Support of Petitioners' Petitions for Rehearing and Rehearing En Banc at 8 n.6 ("I did it! I got the main naked lady spa in the area to change their policies and allow all self-identified women access regardless of surgery and genitals."). Haven Wilvich is a man who identifies as female, has twice been married to women, and remains sexually attracted to women.[4] On May 2, 2020, Wilvich filed a complaint with HRC alleging that he had visited Olympus Spa and that spa employees had denied him services based on his sexual orientation because he was a biological male "without surgery."[5]

In November 2020, HRC served a Notice of Complaint of Discrimination on Olympus Spa. Olympus Spa responded in March 2021, disputing the claim that its women-only rule violated WLAD's anti-discrimination provision. In an April 2021

---

[4] By his own account, Wilvich is sexually attracted to women. "I enjoy dating women and enbies in a way that I just don't get the same fulfillment with men." *Sex and Dating Updates*, Finding Haven (Feb. 20, 2022), https://findinghaven.blog/2022/02/20/sex-and-dating-updates/ [https://perma.cc/5JSQ-R8CP].

[5] Though the spa maintains a formal sign-in and screening process, Olympus Spa staff had no records or recollection of Wilvich ever having come into the spa. Wilvich later told local reporters that he never actually visited the spa but had, in reality, merely called ahead of a friend's visit.

reply, HRC stated that Olympus Spa's women-only rule was "clearly discriminatory and violate[d] the WLAD." HRC gave Olympus Spa ten days to indicate its interest in negotiating a pre-finding settlement agreement, after which the Commission would refer the case to the Attorney General's Office for prosecution. Olympus Spa agreed to negotiate a settlement, and, in October 2021, the parties executed a settlement agreement. At Olympus Spa's request, a clause was added to the settlement reserving the spa's right to bring a legal challenge as to the constitutionality of the agreement or the underlying statutes.

In the spring of 2022, Olympus Spa, several employees, and a patron filed suit against the Executive Director of the Commission in the United States District Court for the Western District of Washington. Olympus Spa brought three First Amendment claims, challenging the Commission's actions and WLAD's antidiscrimination provision on Free Exercise, speech, and associational grounds. The plaintiffs asserted that Olympus Spa was a "family-run business … owned by Christians who hold sincere, faith-based convictions" against allowing males into the nude, female-only spa. The district court, relying in part on the Tenth Circuit's subsequently reversed decision in *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1178 (10th Cir. 2021), *rev'd*, 600 U.S. 570 (2023), dismissed Olympus Spa's complaint without prejudice for failure to state a claim after concluding that WLAD was a neutral and generally applicable law that survived rational basis review.

8

Olympus Spa filed an amended complaint asserting the same Free Exercise, speech, and associational claims, alleging specifically that WLAD was "not neutral nor generally applicable." The district court dismissed Olympus Spa's amended complaint again, this time with prejudice. Olympus Spa appealed that dismissal to this court, arguing repeatedly in its opening brief that WLAD's "statutory carve outs" required that the court "review this case under strict scrutiny instead of rational basis."

A divided panel of this court affirmed dismissal of all of Olympus Spa's claims. Despite the statute's express exemption for certain religious activities, the panel majority incorrectly claimed that "[t]he statute does not 'refer[] to a religious practice'" and concluded that "WLAD is both neutral and generally applicable." Amended Op. 18–19 (alteration in original) (citation omitted). And no doubt writing from the fully clothed comfort of their judicial chambers, the panel majority also concluded that WLAD "only incidentally burdened" Olympus Spa's Free Exercise rights because the law "[did] not prohibit the Spa from expressing its religious beliefs." *Id.* at 17. Judge Lee dissented. *Id.* at 29–48 (Lee, J., dissenting).

## II.

WLAD does not categorically ban all discrimination based on gender identity. Instead, the statute expressly exempts *some* secular organizations and *some* religious practices from the statute's mandate. Because these exemptions grant preferential

9

treatment to comparable secular activity and favor some stereotypical religious practices over (apparently) disfavored ones, WLAD is neither neutral nor generally applicable and should have been subjected to strict scrutiny. The statute fails that demanding standard.

What is more, WLAD redefines "sex" in a manner that undermines the legal protections granted to women as a class and generates an irreconcilable conflict with criminal laws against voyeurism and indecent exposure. We should have reheard this case en banc and reversed this perversion.

A.    **WLAD is not generally applicable because it treats comparable secular activity more favorably than Olympus Spa's religiously motivated activity.**

"[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). Religious and secular activities need not be *identical* to be *comparable*. Instead, "[c]omparability is concerned with the risks various activities pose," and therefore "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62.

Courts do not compare the regulation of religious and secular activity in the aggregate or by artificially segmenting broad categories of activity. Even if "a State

10

treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue," a statute may still not be generally applicable. *Tandon*, 593 U.S. at 62. If "*any* comparable secular activity" is treated "more favorably than religious exercise," the law is not generally applicable. *Id.* Put another way, "[e]xceptions for one means strict scrutiny for all." *Fulton*, 593 U.S. at 624 (Gorsuch, J., concurring in the judgment).

WLAD is not generally applicable because it prohibits religiously motivated conduct like Olympus Spa's while permitting comparable secular conduct that identically undermines the government's asserted interest. WLAD's public accommodation provision expressly exempts "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations," from the statute's antidiscrimination mandate. Wash. Rev. Code § 49.60.040(2).

In practice, this means that a secular, traditional Korean, nude spa organized as a private institute, club, or accommodation would be permitted to enforce a women-only policy in Washington State. But next door, an otherwise identical, for-profit spa seeking to enforce the same policy based on the owners' sincere religious convictions would be prohibited from doing so. It's hard to think of a case in which a statute provides preferential treatment to a more identical secular analog.

11

For purposes of general applicability, Olympus Spa's for-profit status is not a relevant distinction for WLAD's private-organization exemption. "Comparability is concerned with the risks various activities pose" and therefore "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Here, Washington's interest asserted to justify WLAD is the elimination of "discrimination against any of its inhabitants." Wash. Rev. Code § 49.60.010. Though the panel majority now attempts to retroactively narrow that interest in response to the en banc call, the panel majority recognized in its opinion that WLAD's "stated purpose … is to prevent discrimination and enable individuals to seek recourse for discriminatory treatment." Amended Op. 18. This is a broad interest. Women-only policies pose an identical—certainly comparable—threat to the state's asserted interest whether they are enforced by for-profit or private-club spas. Both exclude the same category of people (males) from the same activity (traditional Korean, nude spa treatments). Nor could private clubs be said to affect a smaller share of the population. A private club's admissions policies do not impact *only* members of the club. When a private club maintains a women-only admissions policy, it excludes all men in the state. When a for-profit business maintains the same policy, it excludes precisely the same population. Because it expressly exempts private organizations' sex-based discrimination against all male inhabitants

of Washington state, WLAD is underinclusive for purposes of the interest it aims to advance.

Ample Supreme Court precedent makes clear that risks to the government's asserted interests can and should be compared across the for-profit divide. In *Church of Lukumi Babalu Aye v. City of Hialeah*, the Supreme Court considered a set of city ordinances that banned certain forms of animal slaughter within city limits to "protect[] the public health and prevent[] cruelty to animals." 508 U.S. 520, 527–28, 543–44 (1993). The Court held that the ordinances were not generally applicable and that they violated the Free Exercise Clause because they prohibited the animal sacrifices of the Santeria religion while exempting nonreligious conduct such as fishing, hunting, commercial butchering, extermination, humanitarian euthanasia, and medical research. *Id.* The Court did not allow the city to distinguish commercial conduct simply because it was *commercial*. Instead, the Court reasoned that any form of animal killing, whether executed by a private, non-profit, or commercial entity, posed a comparable risk to the government's asserted interests. *Id.* at 543–46. The ordinances were "underinclusive on [their] face" because they "pursue[d] the city's governmental interests only against conduct motivated by religious belief" and not with regard to nonreligious conduct. *Id.* at 544–45.

The same was true in *Tandon*, where the Supreme Court considered a California statute that restricted at-home religious gatherings and that California

13

attempted to justify by pointing to its interest in "reducing the spread of COVID." 593 U.S. at 63. The Court reasoned that "at-home religious exercise" posed the same threat to that interest as "comparable secular activities" such as *for-profit business* in "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." *Id.* Again, the Court did not allow California to distinguish activities presenting similar risks simply because one was private and the other was commercial. The Free Exercise Clause requires that comparable secular and religious activities be treated equally in either context.

So too here. Washington allows private institutes, clubs, places of accommodation, and fraternal organizations to freely exclude every biological male in the state, while penalizing Olympus Spa's identical "conduct motivated by religious belief." *Lukumi*, 508 U.S. at 545. A policy of excluding men poses a risk of "discrimination against [Washington's] inhabitants" whether the policy is enforced by private, non-profit, or commercial parties. Wash. Rev. Code § 49.60.010. Discrimination, like COVID, is transmitted through interpersonal interactions and "gather[ings.]" *See Tandon*, 593 U.S. at 62. If "at-home religious exercise" and for-profit public accommodations present a comparable risk of *interpersonal transmission* of COVID, then certainly female-only admissions policies in private clubs and in for-profit "public accommodations" present a comparable risk of *interpersonal discrimination*. Accordingly, WLAD is

14

"underinclusive on its face" and is not generally applicable. *Lukumi*, 508 U.S. at 545. And though the majority insists that private clubs can *never* be comparable to public accommodations, it is notable that they cannot cite a single case to support that extreme proposition. Because WLAD does not meet the Free Exercise Clause's general applicability standard, it must be subjected to strict scrutiny in this case.

It is also worth noting that many religious Americans are unable to confine their religious exercise to the contexts of private clubs or formal worship. Nor should they. Devout adherents to religious faiths that have a public mission and a moral code cannot live consistently with their convictions by locking themselves behind the closed doors of clubs and churches. The right to the free exercise of religion extends to cake makers, business owners, and employees while they participate in society. *E.g.*, *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018). "[W]hen constitutional religious liberty rights 'are extended to corporations, the purpose is to protect …. the religious liberty of the humans who own and control those companies.' … Corporate structure is not relevant in this analysis." *Oregon Right to Life v. Stolfi*, 158 F.4th 1013, 1019–20 (9th Cir. 2025) (second alteration in original) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014)). Thus, the free exercise of religion is not sufficiently protected simply because the government deigns to allow "non-secular aggregations" to

cloister in private places or attend traditional services. The Constitution's protection of free exercise is not so parsimonious.

### B. WLAD's application is not neutral because it facially differentiates among religions based on theological choices by granting an exemption to only a small set of favored religious activities.

WLAD's exemption of comparable secular activity is not the statute's only Free Exercise problem. Days after the panel majority published its opinion in this case holding that WLAD was neutral, the Supreme Court published *Catholic Charities*—holding that a religious exemption that "facially differentiat[ed] among religions based on theological choices" violated the First Amendment's guarantee of religious neutrality. *Cath. Charities*, 605 U.S. at 241–42, 251. After *Catholic Charities*, it is clear that WLAD suffers from the same defect: the statute guarantees preferential treatment to a small set of formal religious practices by granting them a statutory exemption, while disfavoring all other religious activity, including Olympus Spa's. WLAD is not neutral and, for this additional reason, should have been subjected to strict scrutiny.

"The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop*, 584 U.S. at 638 (citation modified) (quoting *Lukumi*, 508 U.S. at 534). "A law that differentiates between religions along theological lines is textbook denominational discrimination." *Cath. Charities*, 605 U.S. at 248. And a law may impermissibly differentiate between religions on

16

theological lines even if it does not identify and grant preferential treatment to some denomination by name. Accordingly, a law discriminates along theological lines if it bars "less ritualistic, more unorthodox, [and] less formal" religious conduct while permitting formal or orthodox religious practices. *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953). For example, "a law exempting only those religious organizations that perform baptisms or worship on Sundays" and a law containing "an exemption that requires proselytization or exclusive service of co-religionists" both impermissibly "establish[] a preference for certain religions based on the commands of their religious doctrine." *Cath. Charities*, 605 U.S. at 250.

WLAD discriminates between religions by exempting only a small set of favored religious practices from its antidiscrimination mandate. WLAD's public accommodation provision expressly exempts "any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution" from the statute's antidiscrimination requirements. Wash. Rev. Code § 49.60.040(2). Additionally, interpretive guidance published by WLAD's implementing agency, the Washington State Human Rights Commission, further clarifies that "a church or other religious entity in the activity of conducting worship services is not a place of public accommodation, and neither are religious educational institutions. However, other church-sponsored activities, such as a soup kitchen or public bake sale, might be considered a place of public

accommodation." Sexual Orientation & Gender Identity In Public Accommodations, *Guide to Sexual Orientation & Gender Identity & the Washington State Law Against Discrimination*, WASH. STATE HUM. RTS. COMM'N, [hereinafter *HRC Guide*] https://www.hum.wa.gov/public-accommodation-pa/sexual-orientation-gender-identity-pa [https://perma.cc/MRM2-RREZ].

In practice, this exemption means that only the religious convictions of the singing, praying, preaching, burying, and teaching types of religions are protected when their practices come into conflict with Washington law. In Washington, a church, school, or cemetery with thousands of members and with doors open to the public can freely exclude men from its services. But the religious owners of a Korean spa, compelled by the same religious convictions, are denied the same exemption and are not permitted to exclude men from entering their nude, female-only rituals intended "to restore and rejuvenate women's … spiritual health."

WLAD's express discrimination between religious practices is proscribed by the Supreme Court's unanimous decision in *Catholic Charities*. 605 U.S. 238. Catholic Charities, the organization at issue in that case, provided services to the general public regardless of the recipient's faith, did not require its employees to adhere to any religious faith, and did not proselytize during its work. *Id.* at 243–44. Indeed, as the Supreme Court observed, the services performed by Catholic Charities

18

were not uniquely religious, but rather "could [have been] provided by organizations of either religious or secular motivations." *Id.* at 247 (citation modified).

Like the State of Washington here, the State of Wisconsin had a statutory exemption for "certain religious organizations," but not one that fit Catholic Charities' religious practices. *Id.* at 241. As the State of Wisconsin explained, Catholic Charities did not qualify for Wisconsin's statutory exemption because Catholic Charities did not "engage in proselytization" and did not "serve only Catholics in their charitable work." *Id.* Wisconsin's state courts affirmed the denial of the exemption, reasoning that Catholic Charities' services were "neither inherently or primarily religious activities" and did not fall within the "[t]ypical activities of an organization operated for religious purposes." *Id.* at 245 (alteration in original) (citations omitted). Wisconsin's state courts held that Wisconsin's statutory exemption should be limited to only organizations that "participated in worship services, religious outreach, ceremony, or religious education." *Id.* (citation omitted).

The Supreme Court disagreed. It reversed the state courts, holding that the statute's religious organization exemption violated the Free Exercise Clause's requirement of "government neutrality between religions" by "facially differentiat[ing] among religions based on theological choices." *Id.* at 241–42, 251. The Court reasoned that "[d]ecisions about whether to 'express and inculcate

19

religious doctrine' through worship, proselytization, or religious education when performing charitable work are … fundamentally theological choices driven by the content of different religious doctrines." *Id.* at 252 (citation omitted). Thus, Wisconsin's exemption was not, "on its face, 'available on an equal basis' to all denominations." *Id.* at 251 (quoting *Larson v. Valente*, 456 U.S. 228, 247 n.23 (1982)).

WLAD's religious exemption suffers from the same facial defect that necessitated reversal in *Catholic Charities*. The panel majority claimed that WLAD "does not 'refer[] to a religious practice,'" but that's plainly incorrect. Amended Op. 19 (alteration in original) (quoting *Lukumi*, 593 U.S. at 533). By providing a religious exemption that is only available to religious "educational facilit[ies], columbarium[s], cremator[ies], mausoleum[s], or cemeter[ies]," Wash. Rev. Code § 49.60.040(2), Washington "facially differentiates among religions based on theological choices" just like Wisconsin did, *Cath. Charities*, 605 U.S. at 251.[6] Decisions about whether to practice and express one's religion by educating, worshiping, burying, or performing services that "could be provided by organizations of either religious or secular motivations" are "fundamentally

---

[6] Indeed, the Washington State Human Rights Commission's interpretive guidance confirms this, explaining that the same activities at issue in *Catholic Charities* would not qualify for WLAD's religious exemption. *HRC Guide¸ supra* (indicating that "other church-sponsored activities, such as a soup kitchen" may not qualify for the religious exemption).

20

theological choices driven by the content of different religious doctrines." *Cath. Charities*, 605 U.S. at 246, 252 (citation modified). So too is the decision to practice and express one's religion by offering spiritual healing through single-sex ritualistic massage treatments.

Because WLAD exempts only a small set of formal and orthodox religious practices while excluding "less ritualistic, more unorthodox, [and] less formal" religious practices, WLAD's religious exemption is not, "on its face, 'available on an equal basis' to all denominations," and therefore must be subjected to strict scrutiny. *Fowler*, 345 U.S. at 69; *Cath. Charities*, 605 U.S. at 251 (quoting *Larson*, 456 U.S. at 247 n.23). WLAD's preferential treatment of comparable secular activities independently requires application of the same standard. *Tandon*, 593 U.S. at 62.

A law survives strict scrutiny only if it is narrowly tailored to advance a compelling government interest. *Lukumi*, 508 U.S. at 531–32. While eliminating discrimination may very well be a compelling interest, WLAD's exemptions render the statute fatally "underinclusive in substantial respects." *Id.* at 546. WLAD's "proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree." *Id.* Similarly, "the line [WLAD] has drawn among religious organizations cannot be described as narrow tailoring." *Cath. Charities*,

605 U.S. at 254. The "absence of narrow tailoring suffices to establish the invalidity" of WLAD. *Lukumi*, 508 U.S. at 546.

### C. WLAD's woke redefinition of "sex" undermines the hard-fought legal protections granted to women as a class and undercuts established criminal laws against voyeurism and indecent exposure.

This case illustrates the alarming human costs imposed by a social cause that blindly drives forward without the self-awareness to realize that it has begun to incinerate its own hard-won, historic achievements. For millennia, women around the world have been denied the opportunity to participate as equals in society—they were barred from property ownership, excluded from educational institutions, refused political participation, denied economic opportunity, and victimized by sexually deviant men without effective legal recourse.

One of the great triumphs of our nation, delayed and imperfect as it may have been, was the recognition that women as a class were entitled to the equal protection of the law. For more than six decades, the federal legislature and federal judiciary have enacted and enforced protections for women as a sex-based class. Civil Rights Act of 1964, Title VII, codified at 42 U.S.C. § 2000e-2; *Reed v. Reed*, 404 U.S. 71 (1971).

But from its inception, the protection of women's rights has been predicated on the fact that men and women are different from one another, and immutably so. As Justice Ruth Bader Ginsburg recognized in her majority opinion in *United States*

*v. Virginia*, "[p]hysical differences between men and women … are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" 518 U.S. 515, 533 (1996) (all but the first alteration in the original) (quoting *Ballard v. United States,* 329 U.S. 187, 193, (1946)). And as a member of the legal team representing the female plaintiff in *Reed v. Reed*—the Supreme Court case to first extend the Equal Protection Clause to women—then-attorney Ruth Bader Ginsburg urged the Court to recognize that "[s]ex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth." Brief of Petitioner–Appellant at 20, *Reed*, 404 U.S. 71. The immutability of sex, the recognizability of sex, and the physical distinction between the sexes were bedrock justifications for the protection of women as a class.

This all makes a great deal of sense since—to recognize and protect women as a class—the law must rely upon a coherent conception of what a woman is.[7] "Classifying" women is synonymous with "distinguishing" them from non-women, namely "men." If "[s]ex classifications may be used to compensate women 'for particular economic disabilities [they have] suffered,' to 'promot[e] equal

---

[7] *But see* Transcript of Oral Argument at 98–99, *Hecox v. Little* (Jan. 13, 2026) (No. 24-38), where in response to Justice Alito's question, "For equal protection purposes, what does … it mean to be a boy or a girl or a man or a woman?," Respondent's counsel replied, "We do not have a definition for the Court."

employment opportunity,' [and] to advance full development of the talent and capacities of our Nation's people," the law and its practitioners must be able to distinguish members of the class, women, from non-members, men. *Virginia*, 518 U.S. at 533 (all but the first and fourth alterations in original). Biological sex provides—and has always been relied upon to provide—the litmus test for membership in the protected class of women. *See* Ryan T. Anderson, Neither Androgyny nor Stereotypes: Sex Differences and the Difference They Make, 24 Tex. Rev. L. & Pol. 211, 217 (2019) ("The conceptual distinction between male and female based on reproductive organization provides the only coherent way to classify the two sexes.").

But now an elite caste of high-profile activists, supported by some government leaders including some federal judges, seek to erase sex as a coherent legal category. In its place they impose an irrational and unscientific redefinition of sex to encompass an unlimited and unknowable variety of "sexual orientations," "gender expressions," and "gender identities." In so doing, they emasculate the law's protections for women as a class. What meaning remains of "compensating women for particular economic disabilities they have suffered" when the "compensation" will be directed to men who have never suffered the same disabilities? *Virginia*, 518 U.S. at 533 (citation modified). What account can the law take of the "enduring" "physical differences between men and women" when

24

the sexes are mischaracterized as fungible and mutable?  *Id.*  Without a stable legal definition of "women," it becomes impossible to protect women from discrimination, let alone preserve their access to single-sex spaces in accordance with Equal Protection jurisprudence.  By denying the immutability, recognizability, and physical distinctions of sex as historically recognized for millennia, today's activists threaten to destroy both the justification for and mechanism of protecting women as a class only recently established in our nation.

The fact that the religious owners of a traditional Korean, women-only, nude spa are *prohibited by law* from preventing a naked adult male, who remains sexually attracted to women, from exposing himself to thirteen-year-old girls tragically illustrates the sick and twisted consequences of erasing sex as a coherent legal category.  It is perversely ironic to see the categorical protections women spent decades fighting to obtain now weaponized to destroy their privacy and deny the enduring physical distinctions that define the sexes.  *See* Amended Op. 29–30 (Lee, J., dissenting) ("Washington has perversely distorted a law that was enacted to safeguard women's rights to strip women of protections.").  Such a result is not required by the law.  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) (holding that a school's sex-based bathroom policy did not violate the Equal Protection Clause or Title IX).  And such a result insults the moral principles of the overwhelming majority of Americans who recognize that

25

sex is biologically based and who sensibly prefer female-only interactions for women and girls in athletics, restrooms, and similar situations. Brief of Women's Declaration International USA as Amicus Curiae in Support of Petitioners' Petitions for Rehearing and Rehearing En Banc at 1 n.1 (citing SurveyUSA, *Strong Majorities Prefer Female-Only Interactions for Women, Girls, in Athletics, Restrooms, Other Situations* (Sep. 28, 2023)).

The prime directive of the activist class redefining sex in every corner of our law and lives seems to be: "When women stand in the way of men who want to be women, the women be damned." It is a tragedy that state governments like Washington's have decided to privilege recently discovered, woke "rights" over natural rights that have been recognized and protected since before our Nation's Founding. It is doubly so when a court like ours, entrusted to protect the time-honored rights enshrined in our Constitution, stands aside and pretends there is nothing to see here. The owners of Olympus Spa might fairly ask: "When the foundations are destroyed, what can the righteous do?"

Washington's enforcement of WLAD's antidiscrimination mandate neuters even more basic protections the law has historically guaranteed to women. WLAD's ban on sex-based exclusions renders Washington's criminal laws on indecent exposure and voyeurism practically unenforceable in traditionally female-only spaces.

26

Voyeurism and indecent exposure laws primarily protect women and girls from the predations of sexually deviant men. *See* Brief of Women's Declaration International USA as Amicus Curiae in Support of Neither Party at 14 n.10 (citing U.S. Sent'g Comm'n, "Quick Facts: Sexual Abuse Offenders" (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_Abuse_FY21.pdf [https://perma.cc/D2TB-ATEH] (indicating that, in 2021, 93.6% of federal sexual abuse offenders were men)). But as it has been interpreted and enforced by Washington in this case, WLAD now requires entities like Olympus Spa to permit these crimes to be committed on its premises against its patrons. And simultaneously, WLAD as applied by Washington's government provides an effective legal shelter for sexually deviant men to prey upon vulnerable women and girls without the threat of prosecution.

Under Wash. Rev. Code § 9A.44.115, a person commits voyeurism if, "for the purpose of arousing or gratifying the sexual desire of any person, he or she knowingly views … [a]nother person without that person's knowledge and consent while the person being viewed … is in a place where he or she would have a reasonable expectation of privacy." Likewise, under Wash. Rev. Code § 9A.88.010 a person commits indecent exposure "if he or she intentionally makes any open and obscene exposure of his or her person … knowing that such conduct is likely to

cause reasonable affront or alarm." The crime is elevated to a gross misdemeanor when minors under the age of fourteen are present. *Id.*

When an adult male enters a female-only nude spa and observes naked female patrons for sexual gratification, he is guilty of voyeurism. Until approximately yesterday, even liberal judges were willing to recognize that men and women felt that they could maintain sufficient privacy while disrobing in a single-sex space but could not maintain their privacy while disrobing in the presence of the other sex. And the record in this case makes clear that the female patrons of Olympus Spa felt that their "reasonable expectation of privacy," Wash. Rev. Code § 9A.44.115, was violated when men entered the facility—they repeatedly fled the scene and vowed never to return. But WLAD, as perversely applied by Washington, now virtually guarantees that male voyeurs can enter female-only spaces to satisfy their prurient interests with impunity simply by claiming that they identify as women.

Likewise, when an adult male enters a female-only spa and strips naked in front of its female patrons, he is guilty of indecent exposure. Again, the record here is clear that such indecent exposure is "likely to cause reasonable affront or alarm." Wash. Rev. Code § 9A.88.010. And in Olympus Spa, where girls as young as thirteen attend with their mothers, the offense would, in some circumstances, be elevated to a gross misdemeanor. But again, Washington's perverse application of WLAD here insulates such sexual predators from prosecution by mandating that

28

they be allowed to enter the spa as soon as they mouth the redoubtable phrase: "I am a woman."

It is a sad but certain fact that WLAD and similar "anti-discrimination" laws interpreted this way will be used by sexual deviants to prey on women in female-only spaces. Consider the case of Darren Merager, a 52-year-old man charged with nine counts of felony indecent exposure under California Penal Code § 314 after allegedly exposing his erect penis in the female spa area of the Korean Wi Spa in Los Angeles. Lois Beckett and Sam Levin, *Person charged with indecent exposure at LA Spa*, The Guardian (Sept. 2, 2021), https://www.theguardian.com/us-news/2021/sep/02/person-charged-with-indecent-exposure-at-la-spa-after-viral-instagram-video [https://perma.cc/XZ2H-4VSA]; Jeremy Lee Quinn, *Exclusive: WiSpa Suspect Not Guilty on All Nine Counts of Indecent Exposure*, Los Angeles Magazine (June 1, 2025), https://lamag.com/news/wispa-suspect-not-guilty-on-all-nine-counts-of-indecent-exposure/ [https://perma.cc/G7UY-MALN]. Merager, a registered sex offender with a long history of previous indecent exposure charges, gained access to the women's side of the spa by claiming that he identified as a woman. Like WLAD, California Civil Code § 51 prohibited Wi Spa from excluding males from female spaces. Merager's ultimate acquittal on all counts underscores how the incoherence of redefining "sex" in civil statutes shields male offenders from criminal accountability.

For women nationwide, this is not progress. This is regression. Confusion in civil discrimination codes now compels tolerance of the very same conduct that the criminal code simultaneously penalizes. The instances of male voyeurism and indecent exposure in female spaces will continue to grow in number. *See* Brief of Women's Declaration International USA as Amicus Brief in Support of Neither Party at 12–19. Sadly, the crowd of women and girls who have been victimized by men in formerly safe and private female spaces will grow as well.

## III.

Finally, I'll respond briefly to my colleagues' discomfort with how I've written this dissent. My distressed colleagues appear to have the fastidious sensibilities of a Victorian nun when it comes to mere unpleasant words in my opinion, yet exhibit the scruples of our dearly departed colleague Judge Reinhardt when it comes to the government trampling on religious liberties[8] and exposing women and girls to male genitalia.[9] That kind of selective outrage speaks for itself.

---

[8] *See, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166 (9th Cir. 2006), *cert. granted, judgment vacated sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

[9] *See, e.g.*, *Nunez v. Holder*, 594 F.3d 1124, 1132, 1137–38 (9th Cir. 2010) (opining that our court had "moved away from … austere moral values" before characterizing as "relatively harmless" (1) a man who, "in a fit of 'road rage,' exposed his penis and yelled" a vulgar remark at a female driver and (2) a boy who intentionally exposed himself to his "two female classmates").

The public deserves a court that is *actually* trustworthy. We should be earning that trust, not demanding it like petty tyrants.

Yes, the introduction to this dissent intentionally uses indecorous language. But that is quite literally what this case is about. Male genitalia is precisely (and only) what the Spa, for religious reasons, objects to admitting into its female-only space. The fact that so many on our court want to pretend that this case is about anything other than swinging dicks is the very reason the shocking language is necessary. The panel majority uses slick legal arguments and deflection to studiously avoid eye contact with the actual and horrific consequences of its erroneous opinion. The "ordinary Americans" affected by the majority's opinion don't have that luxury. Squirm as we might, I think it's only fair for our court to have a small taste of its own medicine.

Sometimes "dignified and civil" words are employed to mask a legal abomination. Or, to put it in vernacular perhaps more palatable to my colleagues' Victorian sensibilities: "In law, what plea so tainted and corrupt, / But, being seasoned with a gracious voice, / Obscures the show of evil?"[10]

Sometimes coarse and ugly words bear the truth.[11] I coarsely but respectfully dissent from our court's willingness to leave this travesty in place.

---

[10] William Shakespeare, Merchant of Venice act 3, sc. 2, ll. 75–77.

[11] *See, e.g.*, Matthew 3:7, 12:34.

31

FILED

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Olympus Spa, et al. v. Armstrong, et al.*, No. 23-4031

TUNG, Circuit Judge, joined by R. NELSON, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Let us be clear about what the law in Washington requires. Under its law, the State can disregard a small-business owner's Christian beliefs and force her family-run Korean spa to allow a nude man (who claims to be a woman) into an intimate space reserved for its female patrons. Yet under that same law, private clubs embracing secular values can refuse entry to that man. Schools and cemeteries can refuse service to that man, too, so long as they are run by institutions deemed "sectarian." Thus, while the law purports to protect any Washington resident from so-called gender-identity "discrimination," the State's prohibition exempts some secular organizations and certain religious ones—it just does not exempt the small business in its exercise of its religious beliefs here.

How is this at all a "neutral law of general applicability"? *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). It is not. The panel's conclusion to the contrary—immunizing the law from any serious First Amendment scrutiny—should have been vacated. I dissent.

\*　　\*　　\*

The Supreme Court has told us what to do in these kinds of cases. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any*

1

comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original).

Washington discriminates against religious exercise in just that way. The State prohibits "discrimination" against men who identify as women or against women who identify as men, declaring that "such discrimination . . . menaces the institutions and foundation of a free democratic state." Wash. Rev. Code §§ 49.60.010, 49.60.030, 49.60.040(29). To address that "state concern" (Wash. Rev. Code § 49.60.010), the law grants "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." Wash. Rev. Code § 49.60.030(1)(b).

But despite the State's asserted concern, the law *exempts* certain organizations from its prohibition on gender-identity "discrimination": "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private . . . [or] any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution." Wash. Rev. Code § 49.60.040(2).

The existence of those exemptions refutes the law's purported neutrality and general applicability. The exemptions permit secular private clubs to refuse service to a person who claims a sex different from his actual sex, while a business motivated

2

by religion (such as the business here) and engaged in the same activity is subject to a penalty by the State.   Accordingly, the law of Washington State treats a "comparable secular activity more favorably than religious exercise" and thus should have been subject to strict scrutiny. *Tandon*, 593 U.S. at 62.

The application of strict scrutiny is not defeated just because it is claimed that the "exemption for private clubs appl[ies] equally to secular and non-secular aggregations."  Amended Op. 20 (asserting that "this is not a situation where a 'comparable secular activity [is treated] more favorably than religious exercise").[1] Strict scrutiny is triggered "whenever [the law] treat[s] *any* comparable secular activity more favorably than religious exercise."  *Tandon*, 593 U.S. at 62 (emphasis in original).   Here, the State's exemption allows "any" one comparable secular activity (a private club refusing services on secular grounds) to be treated more favorably than religious exercise (a business refusing services on religious grounds). Indeed, "[i]t is no answer that a State treats some comparable secular businesses or

---

[1] The panel majority wrongly asserts that Appellants "waived" their argument about private clubs.  Amended Op. 19–20.  Appellants did not intentionally relinquish a known right and so did not "waive" the argument.  *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  Indeed, Appellants have preserved it: their complaint contended that the law was "not neutral nor generally applicable" (2-ER-130, 139, 144); the issue was briefed and argued before the district court (*see* 2-ER-19, 54; 3-ER-314–15, 3-ER-345–46, 361, 405–07); Appellant's opening brief discussed the private-clubs carveout (*see* Opening Br. 11, 32); the State argued in response that the carveout did not render the law unconstitutional (*see* Ans. Br. 41–45); and Appellants replied (*see* Reply Br. 9–12).  In any event, the panel majority addressed the argument on the merits resulting in an erroneous holding that warrants review.

other activities as poorly as or even less favorably than the religious exercise at issue." *Id.* Thus, the fact that some secular public accommodations are treated the same as the religious exercise here does not preclude strict scrutiny. Where, as here, a comparable secular activity is treated more favorably than religious exercise, strict scrutiny applies.

Any response that the two activities are not "comparable" would fail. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* Because the "asserted government interest" here is the elimination of "discrimination against *any* of its inhabitants because of" "gender identity" (Wash. Rev. Code §§ 49.60.010, 49.60.040(29) (emphasis added)), a secular private club's refusal to serve a man claiming to be a woman, and a religiously motivated refusal by a business to serve that same person, are "comparable" activities. *Tandon*, 593 U.S. at 62. Both activities result in "discrimination" because of "gender identity"— "a matter of state concern[.]" Wash. Rev. Code §§ 49.60.010, 49.60.040(29). But because the law treats the former (secular) activity more favorably than the latter (religious) activity, the law should be strictly scrutinized.

It might be suggested that the State's statutory carveout for private clubs reflects that the "asserted government interest" is, in fact, protection from discrimination in public, but not private, accommodations. If that suggestion were

4

correct, then secular private-club activity would not be "comparable" to the business's religiously motivated activity. But that suggestion is not correct. What the State "asserts" as its interest is one thing; how it in fact enforces that interest is another; and the mismatch between the two is what can cause a law to not be neutral or generally applicable. Here, the State has expressly "declare[d]" (or asserted) that "practices of discrimination against any of its inhabitants" on a gender-identity basis "are a matter of state concern" and that "such discrimination . . . menaces the institutions and foundation of a democratic free state." Wash. Rev. Code §§ 49.60.010, 49.60.040(29). That asserted interest is categorically expressed without qualification for where the discrimination occurs—all inhabitants should be protected against it. It is impossible to square the State's categorical declaration—that discrimination is a "matter of state concern" and "menaces" free institutions—with the suggestion that discrimination is a "concern" for the State and "menacing" *only in some places* but not in many others. Measured against its categorically asserted interest, the State's enforcement of that interest is pockmarked with exceptions that render its law not neutral or generally applicable.

The logic that statutory carveouts always reflect an "asserted government interest" proves too much. If that logic were accepted, then such carveouts (no matter how gerrymandered to target a particular religious exercise) could *never* be subject to strict scrutiny, since the State could always say that its statutory exceptions

are what delineate the "asserted government interest," so that any activity falling outside those exceptions would never be "comparable." That is not the law. In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Supreme Court held that the statutory exceptions there established that a law prohibiting religious animal sacrifice was not neutral or generally applicable. *Id.* at 542–46. If the asserted interest were always a perfect match with the statutory exceptions, the case would not have come out the way it did.

Plus, any claim that the "asserted government interest" is restricted to eradicating all discrimination in just public accommodations—and not private ones (as supposedly demonstrated by the statutory carveout for private clubs)—is belied by the fact that the State has exemptions even for certain *public* accommodations. *See, e.g.*, Wash. Rev. Code § 49.60.040(2) (schools, crematories, cemeteries operated by religious or sectarian institutions). Would the State's position then be that it has an "asserted government interest" against discrimination . . . *except* for these places too? Again, that logic—that the law's exceptions always mark the contours of the asserted government interest—would prove too much.

Last, one cannot save Washington's law from strict scrutiny by claiming that it exempts *some* religious exercises. That just reinforces the law's lack of neutrality and general applicability. The law exempts "any" school, crematory, mausoleum, or cemetery operated by a "religious or sectarian institution." Wash. Rev. Code

6

§ 49.60.040(2).  But, as Judge VanDyke explains (*see ante* **at 19–26**), such arbitrary line-drawing, which protects only certain religious exercises (of sectarian institutions operating certain businesses) but not other religious exercises (of family-run businesses), offends our Constitution's guarantee of religious liberty.  *Cf. Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953).  Consideration of First Amendment rights might have spurred the State into enacting these partial religious exemptions (and the statutory carveout for private clubs) in the first place.  But that does not excuse the law's lack of neutrality and general applicability.  Righting half the wrong does not right all of the wrong.  Rather than immunize State law from scrutiny, these preexisting exceptions reinforce the need for further scrutiny here.

*       *       *

We have strayed far from Founding-era principles (and decency) when the State can force a nude man (claiming to be a woman) into a room of women against the sincerely held religious beliefs of the host.  In our country's history, "the right to religious liberty" enjoyed "broad protection," but it did not extend to "conduct that would endanger 'the public peace' or 'safety.'"  *Fulton v. City of Philadelphia*, 593 U.S. 522, 571–78 (2021) (Alito, J., concurring in the judgment).  How ironic that this court would now risk endangerment to public peace or safety, not to protect religious liberty, but to advance a secular ideology *at the expense of* that liberty.

7

Rather than accept the distortions in our Free Exercise jurisprudence that have led us here, we should have corrected course.  I dissent.

FILED

MAR 12 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Olympus Spa et al. v. Armstrong et al.*, No. 23-4031

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

Based on somewhat different reasoning, I agree with Judge Lee's conclusion

that the relevant practices of Olympus Spa that are at issue in this case do not

violate the Washington Law Against Discrimination ("WLAD"), *see* REV. CODE

WASH. § 49.60.010 *et seq.*—thereby rendering it unnecessary to address any

"thorny constitutional issues" in this case. *See Olympus Spa v. Armstrong*, 138

F.4th 1204, 1225 n.1 (9th Cir. 2025) (Lee, J., dissenting); *see also* Amended Opin.

at 35 n.1 (Lee, J. dissenting). But the panel majority's opinion instead holds that

the statute "unambiguous[ly]" applies to Olympus Spa's conduct, and on that basis

it further declares categorically that Olympus Spa "cannot" obtain any relief "from

the First Amendment," either under its Free Exercise Clause or its Free Speech

Clause. *Olympus Spa*, Amended Opin. at 3, 9 (majority opinion). In my view, the

panel majority's opinion rests on a fundamentally flawed reading of the statute, and

that error vitiates the entirety of the panel majority's analysis of the important

constitutional issues it unnecessarily decides. We should have taken this case en

banc.

Because (as both the panel majority and dissent recognize) there is no

Washington Supreme Court case that addresses the relevant scope of WLAD here,

this court must construe the act in accordance with general principles of statutory

interpretation under Washington law. That means (again, as both the panel majority and dissent recognize) that one must begin with the plain meaning of the statute's language. *See Floeting v. Group Health Coop.*, 434 P.3d 39, 41 (Wash. 2019) (holding that, in construing WLAD, as with other statutes, "the court will give effect to the statute's plain language," and that, "[i]n determining if the statute is plain, [the court] will consider the ordinary meaning of words, basic rules of grammar, and statutory context"). Here, § 49.60.030 of WLAD guarantees the "right to be free from discrimination because of," *inter alia*, "sex" or "sexual orientation," with respect to the "full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." REV. CODE WASH. § 49.60.030(1)(b). The definitional section of WLAD states that "'[s]exual orientation' means heterosexuality, homosexuality, bisexuality, and gender expression or identity." *Id.* § 49.60.040(29). That section further defines the term "gender expression or identity" to "mean[] having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth." *Id.*

Plugging the phrase "gender expression or identity" into § 49.60.030's prohibition of discrimination "because of . . . sexual orientation," the panel

majority concludes that discrimination "because of . . . gender identity or expression" *simpliciter* is prohibited by WLAD. *Olympus Spa*, Amended Opin. at 8. Judge Lee disputes that conclusion, *see id*. at 30–35 (Lee, J., dissenting), but for present purposes, I will assume *arguendo* that the panel majority is correct on this point. In my view, however, it does not follow that Olympus Spa engaged in discrimination "because of . . . gender identity or expression" here.

Under the panel majority's view that "gender identity" is a "standalone protected class" under WLAD, *see Olympus Spa*, Amended Opin. at 41 (Lee, J., dissenting), there would be no doubt that WLAD prohibits a hotel from refusing to rent a room to a person because he is transgender or for a shoe shop to decline to sell shoes to a person for the same reason. And such a prohibition would be neutral and generally applicable and would readily survive rational basis scrutiny. If that were what is at issue here, this would be an easy case. But the discrimination claim presented in this case is a good deal more nuanced than the panel majority admits, because it does not fit that simple paradigm.

As the State concedes in its answering brief, Olympus Spa's entrance policy to its nude Spa "focuses on the genitals of patrons." Specifically, the Spa's policy is that no person with male genitalia is allowed into the Spa, precisely due to its all-nude environment. As Judge Lee explained:

> The Spa limits entry to biological women and post-
> operative transgender women (*i.e.*, people who were born

3

> biological males but underwent sex-reassignment operations).
> The Spa will treat biological women *and post-operative*
> *transgender women* of any sexual orientation, race, religion, or
> any other protected status. To put it plainly, Olympus Spa—a
> female-only spa—provides services to anyone without male
> genitalia.

*Olympus Spa*, Amended Opin. at 32 (Lee, J., dissenting) (emphasis added). The

panel majority agrees on this point as well. *Id*. at 23 (majority opinion) (noting

that the Spa will admit "any woman, except a transgender woman who has not yet

received gender confirmation surgery" and who therefore still possesses male

genitalia).

Given this crucial fact, I do not see how Olympus Spa's policy can be said to

discriminate "*because of*" gender identity or expression. REV. CODE WASH.

§ 49.60.030(1) (emphasis added). In contrast to the above examples involving a

refusal to provide a hotel room or to sell shoes to a transgender person, Olympus

Spa simply does not care whether a person seeking admittance is transgender; it

cares only whether the person has male genitalia. If the person lacks male

genitalia, the person will be admitted *regardless* of whether that person was born

without male genitalia or had them removed. A transgender person who was born

with female genitalia will be admitted, even though that person identifies as a

male, and a transgender person who was born with male genitalia will be admitted

if that person has had those genitalia removed. Because the *only* factor at play is

the possession of male genitalia, there is no sense in which a person's

4

"transgender" status can be said to be a "substantial factor" in Olympus Spa's admissions policy. *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1220 (Wash. 2019). For the same reason, Olympus Spa's exclusively genitalia-based line— which rests on the unique privacy, modesty, and even potentially safety concerns associated with having male genitalia in its all-nude space—cannot be said to be a pretext or proxy for transgender discrimination. *Id*. at 1220–22. Accordingly, the Spa's policy does not amount to "discrimination because of" "gender identity or expression," and it therefore does not violate WLAD.

In reaching its contrary conclusion that the Spa engages in discrimination because of gender identity, the panel majority's reasoning rests on the following one sentence: "The Spa's entrance policy denies entry to preoperative transgender women whose 'gender identity' or 'appearance,' as defined in WLAD, differ from *the physical traits* associated with postoperative or cisgender women." *Olympus Spa*, Amended Opin. at 8 (emphasis added). But this ignores the plain language of the statute, which says nothing about a person's current "physical traits." Rather, the statute defines "gender expression or identity" as denoting one's actual or perceived gender identity "whether or not" it "is different from that traditionally associated *with the sex assigned to that person at birth*." REV. CODE WASH. § 49.60.040(29) (emphasis added). For the reasons I have explained, it is undisputed and indisputable that Olympus Spa does not care whether a potential

patron has any particular real or perceived "gender identity," nor does it care whether a patron's gender identity does or does not match "the sex assigned to that person at birth." *Id*. The Spa cares only whether the person has male genitalia. That is not "discrimination because of" "gender identity."[1]

Indeed, under the panel majority's reading of WLAD, the Spa cannot ignore gender identity but instead *must take it into account*. That is, under the panel majority's construction of WLAD, the Spa must modify its no-male-genitalia rule, but *only* for those patrons with male genitalia *who identify as female*, and not for those who identify as male. It is a little Orwellian to assert that a "law against discrimination" based on a characteristic should be construed to *require* differential treatment based on that characteristic.

---

[1] The State does not contend (and could not contend) that the Spa's discrimination based on male genitalia constitutes unlawful discrimination based on "sex," such that it would violate WLAD on that alternative ground. In Washington, as elsewhere, it has long been accepted and understood that the maintenance of separate public restrooms, locker rooms, and shower facilities on the basis of sex does not constitute unlawful sex discrimination in light of the privacy, modesty, and safety issues arising from the "[p]hysical differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see also id.* at 550 n.19 (noting that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements"); *cf. Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (stating that separate restroom facilities do not violate equal protection principles, because that "gender classification *is justified* by acknowledged differences" between men and women and is confirmed by "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

I acknowledge that my plain-language reading of WLAD is directly contrary to the view that the Washington Human Rights Commission has adopted in its regulations implementing WLAD. *See* WASH. ADMIN. CODE § 162-32-060(1) ("All covered entities shall allow individuals the use of gender-segregated facilities, such as restrooms, locker rooms, dressing rooms, and homeless or emergency shelters, that are consistent with that individual's gender expression or gender identity."). But as the panel majority correctly notes, "[t]he unambiguous statute is the statute and it, not the regulations, controls." *Olympus Spa*, Amended Opin. at 11.

For the foregoing reasons, I agree with Judge Lee's bottom-line conclusion that "Olympus Spa's entry policy . . . does not run afoul of WLAD." *Olympus Spa*, Amended Opin. at 42 (Lee, J., dissenting). Because the panel majority incorrectly concluded otherwise, and thereby wrongly proceeded unnecessarily to resolve the "thorny constitutional issues" presented in this case, *id.* at 35 n.1, we should have taken this case en banc. I respectfully dissent from our failure to do so.

7